# UNITED STATES DISTRICT COURT
## FOR THE
## EASTERN DISTRICT OF CALIFORNIA

### OFFICE OF THE CLERK
**501 "I" Street**
**Sacramento, CA 95814**

US District Court, Northern District of California
450 Golden Gate Avenue, 16th floor #1111
San Francisco, CA 94102

FILED

JUN 9 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**RE:**       **ALEX MONETTE vs. NICK DAWSON**
**USDC No.:**   **2:07–CV–02119–WBS–KJM**

Dear Clerk,

Pursuant to the order transferring the above captioned case to your court, dated
October 22, 2007 , transmitted herewith are the following documents.

**Electronic Documents: 1 to 5.**

Documents maintained electronically by the district court are accessible through
PACER for the Eastern District of California at **https://ecf.caed.uscourts.gov**.

Please <u>acknowledge</u> receipt on the extra copy of this letter and return to the Clerk's Office.

Very truly yours,

**June 6, 2008**           /s/  **M. Plummer**

Deputy Clerk

RECEIVED BY:           Helen L. Almacen

Please Print Name

DATE RECEIVED:         JUN – 9 2008

NEW CASE
NUMBER:        CV 08        2880        PJH

E-filing



CLOSED, HABEAS

# U.S. District Court
## Eastern District of California - Live System (Sacramento)
## CIVIL DOCKET FOR CASE #: 2:07-cv-02119-WBS-KJM
### Internal Use Only

CV 08     2880

*E-filing*

(HC) Monette v. Dawson, et al

Assigned to: Judge William B. Shubb
Referred to: Magistrate Judge Kimberly J. Mueller
Cause: 28:2254 Petition for Writ of Habeas Corpus (State)

Date Filed: 10/09/2007
Date Terminated: 10/22/2007
Jury Demand: None
Nature of Suit: 530 Habeas Corpus (General)
Jurisdiction: Federal Question



**Petitioner**

**Alex Monette**

represented by **Steven Charles Sanders**
Sanders & Associates
3960 Industrial Boulevard
Suite 100
West Sacramento, CA 95691
916-376-8738
Email: keithechandler@yahoo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

I hereby certify that the annexed
instrument is a true and correct copy of
the original on file in my office.
ATTEST: **VICTORIA C. MINOR**

Clerk, U. S. District Court
Eastern District of California

By _____ Deputy Clerk

Dated _6-6-08_

V.

**Respondent**

**Nick Dawson**

**Respondent**

**Attorney General of the State of California**

| Date Filed | # | Docket Text |
|---|---|---|
| 10/09/2007 | 1 | PETITION for WRIT of HABEAS CORPUS by Alex Monette. Attorney Sanders, Steven Charles added. (Attachments: # 1 Points and Authorities # 2 Exhibit A-L # 3 Civil Cover Sheet) (Sanders, Steven) Modified on 10/9/2007 (Marciel, M). (Entered: 10/09/2007) |
| 10/09/2007 |  | (Court only) SUBMISSION of CREDIT CARD INFORMATION for Habeas Petition Filing Fee in the amount of $5.00;<br>Type of Credit Card: Visa<br>Name as it appears on Credit Card: Steven C. Sanders<br>Contact Telephone Number: 916-376-8738<br>Street: 3960 Indsutrial Blvd. |

| | | Suite: 100<br>Zip code: 95691<br>Credit Card Number: xxxx-xxxx-xxxx-xxxx<br>Expiration Date: xx/xx<br>Security Code: xxx<br>(Sanders, Steven) (Entered: 10/09/2007) |
|---|---|---|
| 10/09/2007 | ◑ 2 | (Court only) PROCESS CREDIT CARD (Marciel, M) (Entered: 10/09/2007) |
| 10/09/2007 | ◑ | RECEIPT number CAE200001714 of $5 for Habeas Corpus filing fee by attorney Alex Monette. (Marciel, M) (Entered: 10/09/2007) |
| 10/09/2007 | ◑ 3 | PRISONER NEW CASE DOCUMENTS ISSUED (Attachments: # 1 Consent Forms) (Marciel, M) (Entered: 10/09/2007) |
| 10/22/2007 | ◑ 5 | CASE TRANSFERRED to Northern District signed by Judge Kimberly J. Mueller on 10/19/07. Original file, certified copy of transfer order, and docket sheet sent. CASE CLOSED(Dillon, M) (Plummer, M). (Entered: 10/22/2007) |
| 10/22/2007 | ◑ 4 | TRANSMITTAL of DOCUMENTS on *10/22/2007* to * Northern District* *450 Golden Gate Avenue* *16th Floor, #1111* *San Francisco, CA 94102*.<br><br>*Electronic Documents: 1 to 3. *. (Dillon, M) (Entered: 10/22/2007) |
| 06/06/2008 | ◑ 6 | RESERVICE OF DOCUMENTS: re 5 Case Transferred Out to Another District addressed to all parties. (Plummer, M) (Entered: 06/06/2008) |
| 06/06/2008 | ◑ 7 | TRANSMITTAL of DOCUMENTS re 5 Case Transferred Out to Another District on *10/22/2007* to * US District Court, Northern District of California* *450 Golden Gate Avenue, 16th floor #1111* *San Francisco, CA 94102*. **<br>*Electronic Documents: 1 to 5. *. (Plummer, M) (Entered: 06/06/2008) |

1

2

3     I hereby certify that the annexed
      instrument is a true and correct copy of
      the original on file in my office.
4     ATTEST: **VICTORIA C. MINOR**

      Clerk, U. S. District Court
5     Eastern District of California

      By _____
6                          Deputy Clerk

      Dated  6-6-08
7

8                          IN THE UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10    ALEX MONETTE,

11              Petitioner,              No. CIV S-07-2119 WBS KJM P

12         vs.

13    NICK DAWSON, et al.,

14              Respondents.             ORDER

15    _____/

16              Petitioner, a state prisoner proceeding with counsel, has filed an application for a

17    writ of habeas corpus pursuant to 28 U.S.C. § 2254.

18              The application attacks a conviction issued by the Monterey County Superior

19    Court. While both this Court and the United States District Court in the district where petitioner

20    was convicted have jurisdiction, see Braden v. 30th Judicial Circuit Court, 410 U.S. 484 (1973),

21    any and all witnesses and evidence necessary for the resolution of petitioner's application are

22    more readily available in Monterey County. Id. at 499 n.15; 28 U.S.C. § 2241(d).

23    /////

24    /////

25    /////

26    /////

                                          1

1          Accordingly, in the furtherance of justice, IT IS HEREBY ORDERED that this

2     matter is transferred to the United States District Court for the Northern District of California.

3     DATED: October 19, 2007.

4                                              _____

                                               U.S. MAGISTRATE JUDGE

5

6     1/kc
      mone2119.108

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

2

Live 3.2.1 CM/ECF - U.S. District Court for Eastern California - Display Receipt.

Case 3:08-cv-02880-PJH     Document 1     Filed 06/09/2008     Page 6 of 6

```
MIME-Version:1.0
From:caed_cmecf_helpdesk@caed.uscourts.gov
To:caed_cmecf_nef@localhost.localdomain
Bcc:caed_cmecf_kjm@caed.uscourts.gov, caed_cmecf_wbs@caed.uscourts.gov,
keithechandler@yahoo.com
Message-Id:<1920955@caed.uscourts.gov>
Subject:Activity in Case 2:07-cv-02119-WBS-KJM (HC) Monette v. Dawson, et al Case
Transferred Out to Another District
```
Content-Type: text/html

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. District Court

### Eastern District of California - Live System

## Notice of Electronic Filing

The following transaction was entered on 10/22/2007 at 3:38 PM PDT and filed on 10/22/2007
**Case Name:**      (HC) Monette v. Dawson, et al
**Case Number:**    2:07-cv-2119
**Filer:**
**WARNING: CASE CLOSED on 10/22/2007**
**Document Number:** No document attached

**Docket Text:**
CASE TRANSFERRED to Northern District signed by Judge Kimberly J. Mueller on 10/19/07.
Original file, certified copy of transfer order, and docket sheet sent. CASE CLOSED(Dillon, M)

**2:07-cv-2119 Electronically filed documents will be served electronically to:**

Steven Charles Sanders    keithechandler@yahoo.com

**2:07-cv-2119 Electronically filed documents must be served conventionally by the filer to:**

AO 241    (Rev. 5/85)

PETITION UNDER 28 USC § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | District | Eastern District of California | |
|---|---|---|---|
| Name<br>Alex Monette | Prisoner No.<br>E-48953 | Case No. | |

| Place of Confinement |
|---|
| Avenal State Prison, Avenal, CA |

| Name of Petitioner (include name under which convicted) | | Name of Respondent (authorized person having custody of petitioner) |
|---|---|---|
| Alex Monette | V. | Nick Dawson |

| The Attorney General of the State of: |
|---|
| State of California |

**PETITION**

1. Name and location of court which entered the judgment of conviction under attack
   Monterrey County Superior Court, Monterrey, CA


2. Date of judgment of conviction    6/8/2005

3. Length of sentence    2 years

4. Nature of offense involved (all counts)
   Possession of drugs in prison (Penal Code 4573.6)




5. What was your plea?  (Check one)
   (a) Not guilty              ☐
   (b) Guilty                  ☐
   (c) Nolo contendere         ☑
   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:




6. If you pleaded not guilty, what kind of trial did you have?  (Check one)
   (a) Jury           ☑
   (b) Judge only     ☐

7. Did you testify at the trial?
   Yes   ☐   No   ☑

8. Did you appeal from the judgment of conviction?
   Yes   ☐   No   ☑

(2)

AO 241    (Rev. 5/85)

9.   If you did appeal, answer the following:

(a) Name of court   n/a

(b) Result

(c) Date of result and citation, if known

(d) Grounds raised

(e) If you sought further review of the decision on appeal by a higher state court, please answer the following:

(1) Name of court

(2) Result

(3) Date of result and citation, if known

(4) Grounds raised

(f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:

(1) Name of court

(2) Result

(3) Date of result and citation, if known

(4) Grounds raised

10.   Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?
Yes   ☑     No   ☐

11.   If your answer to 10 was "yes," give the following information:

(a) (1) Name of court   Monterey County Superior Court

(2) Nature of proceeding
       Habeas Corpus Petition

(3) Grounds raised
       Same as rasied herein

AO 241    (Rev. 5/85)

    (4)  Did you receive an evidentiary hearing on your petition, application or motion?

        Yes   ☐    No   ☑

    (5)  Result  denied

    (6)  Date of result  10/23/2006

  (b)  As to any second petition, application or motion give the same information:

    (1)  Name of court  Court of Appeal, 6th Appellate District

    (2)  Name of proceeding
        Habeas Corpus Petition

    (3)  Grounds raised
        Same as rased herein

    (4)  Did you receive an evidentiary hearing on your petition, application or motion?

        Yes   ☐    No   ☑

    (5)  Result  denied

    (6)  Date of result  1/4/2007

  (c)  Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?

    (1)  First petition, etc.       Yes   ☑    No   ☐

    (2)  Second petition, etc.    Yes   ☐    No   ☐

  (d)  If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

12.  State *concisely* every ground on which you claim that you are being held unlawfully.  Summarize *briefly* the *facts* supporting each ground.  If necessary, you may attach pages stating additional grounds and *facts* supporting same.
     CAUTION: In order to proceed in the federal court, you must ordinarily first exhaust your available state court remedies as to each ground on which you request action by the federal court.  If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.

AO 241    (Rev. 5/85)

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted your state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a)  Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.
(b)  Conviction obtained by use of coerced confession.
(c)  Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.
(d)  Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.
(e)  Conviction obtained by a violation of the privilege against self-incrimination.
(f)  Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.
(g)  Conviction obtained by a violation of the protection against double jeopardy.
(h)  Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.
(i)  Denial of effective assistance of counsel.
(j)  Denial of right of appeal.

A.  Ground one:
          See Attached Pages


     Supporting FACTS (state *briefly* without citing cases or law):
          See Attached Pages












B.  Ground two:



     Supporting FACTS (state *briefly* without citing cases or law):

AO 241    (Rev. 5/85)

   C.  Ground three:

      Supporting FACTS (state *briefly* without citing cases or law):

   D.  Ground four:

      Supporting FACTS (state *briefly* without citing cases or law):

13.   If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them:

14.   Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?
     Yes  ☐    No  ☑

15.   Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:
     (a)  At preliminary hearing
         James Dozier

     (b)  At arraignment and plea
         same as 15a

AO 241    (Rev. 5/85)

      (c)  At trial
             same as 15a

      (d)  At sentencing
             same as 15a

      (e)  On appeal
             n/a

      (f)  In any post-conviction proceeding
             Steven C. Sanders, current counsel

      (g)  On appeal from any adverse ruling in a post-conviction proceeding
             Steven C. Sanders, current counsel

16.  Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
Yes ☐  No ☑

17.  Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ☑  No ☐
    (a)  If so, give name and location of court which imposed sentence to be served in the future:
        15 years to life plus one year weapon use enhancment, Los Angeles County case # A893088

    (b)  Give date and length of the above sentence:
        indeterminate term, release date unknown

    (c)  Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes ☐  No ☑

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

10 8/07

_____
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct.  Executed on

_____9-21-07_____
Date

_____
Signature of Petitioner

(7)

1
2 **SANDERS & ASSOCIATES**
**STEVEN C. SANDERS, Esq.   SBN 171369**
3 3960 Industrial Blvd., Suite 100
West Sacramento, California 95691
4 Telephone No: (916) 376-8738
Facsimile No.: (916) 376-8717
5
6 Attorney for Alex Monette
7
8
9
10                    **UNITED STATES DISTRICT COURT**
11                    **EASTERN DISTRICT OF CALIFORNIA**
12
13 ALEX MONETTE,                        ) Case No. _____
                                        )
14       Petitioner,                    ) POINTS AND AUTHORITIES IN
                                        ) SUPPORT OF PETITION FOR WRIT
15                                       ) OF HABEAS  CORPUS
                                        )
16 vs                                    )
                                        )
17                                       )
NICK DAWSON, Warden, Avenal State       )
18 Prison,                               )
                                        )
19       Respondent.                     )
                                        )
20                                       )
                                        )
21                                       )
                                        )
22 _____      )
23
24
25
26
27
28

1

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 5

FACTS AND PROCEDURAL HISTORY OF CASE ............................................... 6

THE STATE COURT DECISIONS ......................................................................... 9

PETITIONER RECEIVED PREJUDICIALLY INEFFECTIVE ASSISTANCE OF COUNSEL AND WOULD NOT HAVE ENTERED INTO HIS PLEA AGREEMENT HAD HE RECEIVED COMPETENT ADVICE ..................................................................... 14
    A.   INTRODUCTION. ................................................................................. 14
    B.   THE CHARGES. ................................................................................... 15
    C.   THE EVIDENCE AGAINST PETITIONER ...................................... 15
    D.   THE POSSIBLE LEGAL DEFENSES ................................................ 15
    E.   AUTHORITIES RELATING TO THE GRANT OR DENIAL OF PAROLE UNDER CALIFORNIA LAW. .................................................................................. 16
    F.   PETITIONER'S OTHER CRIME AND THE MERIT OF HIS INDIVIDUAL BID FOR PAROLE. ........................................................................................................ 17
    G.   TRIAL COUNSEL DID NOT INVESTIGATE THE ONLY DEFENSE AND HAD NO IDEA OF HOW THE PAROLE BOARD OPERATED OR HOW THE NEW CHARGE WOULD IMPACT PETITIONER'S ULTIMATE RELEASE FROM PRISON; THIS IGNORANCE PREJUDICIALLY IMPACTED THE ADVICE TRIAL COUNSEL GAVE RELATING TO TAKING A PLEA ON THE DRUG CHARGE AND AS SUCH AMOUNTS TO PREJUDICIALLY INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL AS PETITIONER WOULD NOT HAVE PLED GUILTY ABSENT THE POOR ADVICE HE RECEIVED. .................................................................................................... 20
    H.   SUMMARY. .......................................................................................... 24

PETITIONER'S PLEA BARGAIN CONTRACT IS UNENFORCEABLE ............................. 25
    A.   INTRODUCTION ................................................................................. 25
    B.   PETITIONER RECEIVED NO BENEFIT FROM THE BARGAIN. ........................... 26
    C.   IMPOSSIBILITY. ................................................................................. 28
    D.   THE CONTRACT IS UNCONSCIONABLE AT THIS POINT IN TIME. .................... 28
    E.   MISTAKE OF FACT. ........................................................................... 29
    F.   MISTAKE OF LAW ............................................................................. 31
    G.   MISTAKEN UNDERSTANDING OF LEGAL CONSEQUENCES. ........................... 31
    H.   REMEDY. .............................................................................................. 32

CONCLUSION ........................................................................................................ 33

PRAYER FOR RELIEF ........................................................................................... 33

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **TABLE OF AUTHORITIES**

2

**Cases**

People v Shepard, 160 Cal.App.3d. 580, 586 (1985), ................................................20
Alvernaz v Ratelle, 831 F.Supp. 790 (S.D. Cal., 1993)............................................9
Balisteri v Nevada Livestock Production Credit Assn., 214 Cal.App.3d. 635 (1989) ...............24
Biggs v Terhune, 334 F.3d. 910, 913 (9th Cir., 2003)............................................12
Carboni v Arrospide, 2 Cal.App.4th 76, 81-82 (1991) .............................................23
City of Torrance v W.C.A.B., 32 Cal.3d. 371, 378 (1982).........................................20
Dairy Food Store v Alpert, 116 Cal.App. 670, 672 (1931). ....................................23, 24
Daniels v Williams, 474 U.S. 327, 331 (1986).....................................................11
Dent v West Virginia, 129 U.S. 114, 123 (1899) ..................................................11
F. P. Cutting Co. v Peterson, 164 Cal. 44 (1912) ................................................24
Hill v Lockhart, 474 U.S. 52 (1985) .............................................................10
Houge v Ford, 44 Cal.2d. 706, 713 (1955) ........................................................27
In re Alvernez, 2 Cal.4th 924 (1992) .............................................................9
In re Cordero, 46 Cal.3d. 161, 181 (1988). .......................................................9
In Re Crumpton, 9 Cal.3d. 463, 468  (1973) ..................................................23, 26
In re Dannenberg, 34 Cal.4th  1061 (2005)...............................................11, 12, 13
In re Powell, 45 Cal.3d. 894, 904 (1988).........................................................12
In re Rosenkrantz, 29 Cal.4th 616, 654 (2002)...........................................11, 12, 13
In Re Sutherland, 6 Cal.3d. 666, 672 (1972) .....................................................27
Lawrence v Shutt, 269 Cal.App.2d. 749 (1969) ....................................................25
Leo v Superior Court 179 Cal.App.3d. 274, 283 (1986) ............................................20
Lepper v Ratterree, 98 Cal.App. 245 (1929) ......................................................25
McQuillion v Duncan, 306 F.3d. 895, 902 (2002) ..............................................11, 12
Miller v Germann Seed & Plant Co., 193 Cal. 62, 67-70 (1924) ....................................21
Mitidiere v Saito, 246 Cal.App.2d. 535 (1969) ...................................................25
Moore v Copp, 119 Cal. 429 (1897) ...............................................................25
Mosher v Mayacamas Corp., 215 Cal.App.3d. 1, 5 (1989 ............................................25
Palace Hardware Co. v Smith, 134 Cal. 381 (1901).................................................25
Pechtel v Universal Underwriters Ins. Co., 15 Cal.App.3d. 194 (1971) ............................25
People v Alvarez, 127 Cal.App.3d. 629, 633 (1982)................................................20
People v Ames, 213 Cal.App.3d. 1214, 1217 (1989) ................................................20
People v Barnett, 113 Cal.App.3d. 563, 571-572 (1980) ...........................................20
People v Collins, 45 Cal.App.4th 849, 862-863 (1996). .......................................20, 21
People v Cox,  53 Cal.3d 618, 656 (1991)..........................................................9
People v Duncan 53 Cal.3d. 955, 966 (1991).......................................................9
People v Gallego, 90 Cal.App.3d.Supp. 21, 33 (1979).............................................23
People v Gallegos, 90 Cal.App.3d. Supp. 21 (1979) ...............................................26
People v Haney, 207 Cal.App.3d. 1034, 1037 (1989) ...............................................20
People v Huynh, 229 Cal.App.3d. 1067, 1083 (1991),........................................9, 16, 21
People v Ledesma, 43 Cal.3d. 171, 216 (1987) .....................................................9
People v Lewis, 50 Cal.3d 262, 288 (1990).........................................................9

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

People v Mancheno, 32 Cal.3d. 855, 860-861 (1982) ....................................................20, 26
People v Pope, 23 Cal.3d. 412, 424 (1979) ...................................................................... 17
People v Precaido, 78 Cal.App.3d. 144, 149 (1978) ................................................... 26
People v Spann, 187 Cal.App.3d. 400 (1986) .......................................................... 10
People v West ......................................................................................................... 7
Strickland v Washington, 466 U.S. 668, 688 (1984)............................................... 9
Superintendent v Hill, 472 U.S. 445, 456-457 (1985) ........................................... 12
Swenson v File, 3 Cal.3d. 389, 393 (1970)............................................................. 21
Taylor v Maddox, 366 F.3d. 992 (9ᵗʰ Cir., 2004) ……………………………………10, 11
Universal Sales Corp. v California Press Mfg. Co., 20 Cal.2d. 751 (1942)............. 20
Witkin's Summary of California Law, 9th Edition, Contracts, ...........................23, 24
Wolff v McDonnell, 418 U.S. 539, 558 (1974) ..................................................... 11

**Statutes**
California Civil Code 1441 ....................................................................................23
California Civil Code 1550.....................................................................................21
California Civil Code 1577.................................................................................24, 25
California Civil Code 1578.....................................................................................26
California Civil Code 1613.....................................................................................23
California Civil Code 1636.....................................................................................27
California Civil Code 1656.....................................................................................20
Penal Code 1170.12 ...............................................................................................10
Penal Code 12022(d) ...............................................................................................6
Penal Code 182 ...................................................................................................7, 10
Penal Code 187 .......................................................................................................6
Penal Code 3041 ....................................................................................................11
Penal Code 4573.6 ........................................................................................7, 8, 10, 18

**Regulations**
15 CCR 2402(a) .....................................................................................................11
15 CCR 3377.1(c) ....................................................................................................6

**Constitutional Provisions**
California Constitution, Article 1, §7 ....................................................................12
U.S. Constitution, Amendment 14........................................................................12

/// 
/// 
///

# I

## INTRODUCTION

Via this Petition, Alex Monette (petitioner) challenges his conviction for possession of drugs in a correctional institution.  Petitioner contends that he received ineffective assistance of counsel from his court appointed attorney.  Specifically that the attorney was not familiar with California Board of Parole Hearings (BPH) procedures and practices and failed to investigate his only defense; that these failures resulted in incompetent advice to plead guilty from the attorney and also resulted in petitioner receiving no discernible benefit from the plea agreement; and that petitioner would not have pled guilty had he received proper advice.  Petitioner also claims the plea bargain contract is unenforceable for violations of contract law principles as set forth herein.

Had trial counsel been even remotely familiar with BPH policies and practices he would have known that his client, who was proclaiming his innocence, would spend many additional years incarcerated on his existing 15 year to life sentence <u>because of the drug charge conviction</u>.  Had counsel grasped this, he would not have allowed his client, who was claming his innocence and did appear to have an arguable defense (which was never investigated), to plead guilty.  Simply put, there was no real benefit to pleading guilty under the unique circumstances of this case.

Petitioner prays the court, after considering the Petition and evidence submitted, will reverse the conviction on the drug charge.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II

## FACTS AND PROCEDURAL HISTORY OF CASE

Alex Monette (petitioner) is a state prison inmate who was serving a 15 year to life sentence for second degree murder (*Penal Code 187*) and a one year weapon use enhancement [*Penal Code 12022(d)*], via a conviction from the Los Angeles County Superior Court, case #A893088, on March 2, 1990.[1]

On September 23, 2003, petitioner was placed in administrative segregation at the Correctional Training Facility (CTF) at Soledad.  Other inmates were apparently involved in a marijuana trafficking scheme, where the drugs were allegedly brought in through the prison medical department, as revealed in an in-house prison investigation.

Petitioner was forced to share a cell with an inmate named Hemphill.[2]  Hemphill was one of the inmates targeted in the investigation relating to the drug smuggling operation. Search of their jointly occupied cell revealed the marijuana at issue.  See attached Exhibit "A," the investigative reports relating to petitioner's disciplinary proceedings.  Petitioner was tested for drugs as a result of finding drugs in the jointly occupied cell, and he tested positive for marijuana.

Petitioner claimed throughout the CDC-115 proceedings he was innocent and the

---

[1]    All factual assertions not proven by way of exhibit are proven via the attached declaration of petitioner or attorney Steven C. Sanders.

[2]    Prison inmates are forcibly double celled due to massive overcrowding.  The only exception are those inmates meeting the criteria for single cell placement.  See *15 CCR 3377.1(c)*.

marijuana was not his.**3** That he knew inmate Hemphill possessed marijuana because Hemphill would smoke it in the cell. See Exhibit "A," page 27 of 35. Inmate Hemphill admitted the marijuana was his and that petitioner had nothing to do with it. Hemphill explained petitioner would try and hide under a blanket when Hemphill would smoke marijuana in petitioner's presence. See Exhibit "A," pages 15 of 35 to 18 of 35.

Other inmates involved in the drug smuggling conspiracy also admit petitioner was not involved in any way. Inmate Fuller, an inmate found guilty in prison disciplinary proceedings of the drug smuggling conspiracy, claimed he did not even know petitioner (Monette). See Exhibit "F," 115 information, page 1 of 8. Petitioner was later absolved of any wrongdoing related to the smuggling of drugs into the prison by the prison disciplinary officer, as even under the low preponderance of the evidence standard used in those proceedings, the evidence was insufficient. See Exhibit "A."

Nonetheless, criminal charges were filed against petitioner for conspiracy and possession of drugs in a penal institution (*Penal Code 182*, *Penal Code 4573.6*), as well as for a prior prison term. Later the conspiracy charges were dropped <u>prior to entry of plea</u>. See Exhibit "B," the minute order from this proceeding.

Petitioner, <u>while still claiming his innocence</u>, was told by his appointed attorney that he would almost certainly be convicted and that he should plead guilty to avoid more serious punishment. Petitioner continued to assert his innocence and pressed his attorney to investigate second hand marijuana smoke effects. Ultimately, petitioner pled nolo contendere to the drug possession charge, pursuant to *People v West*. As explained to petitioner by trial counsel,

---

3    Prison Disciplinary offenses will be referred to by their prison designation, CDC-115 (or 115).

under *People v West*, you continue to maintain your innocence but enter a plea of no contest and the judge proceeds as if you are guilty in spite of your refusal to acknowledge guilt. Trial counsel also told petitioner that under a *People v West* plea he would have "no problems" with the parole board.

Petitioner was sentenced to two years in state prison, consecutive to his existing 15 year to life term. See Exhibit "C," the abstract of judgment and minute order of the entry of plea proceedings.

Petitioner then appeared before the California Board of Parole Hearings (BPH or board) on March 8, 2006, for his first parole hearing after his drug conviction. Predictably, the board spent a large amount of the hearing addressing the drug charge. In essence the board told petitioner that he was very close to parole but had destroyed that via the drug charge and that he needed years of distance between the new charge and a serious bid for parole. See numerous colloquies, some detailed infra, at Exhibit "D," the 2006 parole hearing transcript.

For the court's information, Hemphill was ultimately convicted in the Monterey County Superior Court of possession of drugs in a prison (*Penal Code 4573.6*) and in the prison 115 hearing of possession of drugs. See Exhibit "E," Hemphill's abstract of judgment, plea entry minute order and 115 proceedings.

Inmate Fuller was ultimately convicted in the Monterey County Superior Court of conspiracy relating to the drug smuggling and in the prison 115 hearing of the same charge. See Exhibit "F," Fuller's abstract of judgment, plea entry minute order, and 115 proceedings.

Petitioner filed a habeas corpus petition in the Monterey County Superior Court

1

2

challenging his drug conviction on the same exact grounds raised herein.  Said petition was

denied on October 23, 2006.  See Exhibit "J."

3

4

5

6

Petitioner filed a habeas corpus petition in the Sixth District Court of Appeal

challenging his drug conviction on the same exact grounds raised herein.  Said petition was

denied on January 4, 2007.  See Exhibit "K."

7

8

9

10

Petitioner filed a habeas corpus petition in the California Supreme Court challenging his

drug conviction on the same exact grounds raised herein.  Said petition was denied on June 27,

2007.  See Exhibit "L."

11

12

**III**

13

**THE STATE COURT DECISIONS**

14

15

16

17

18

19

20

The Superior Court response denying the Habeas Petition (Exhibit "J"), leaves much to

be desired.  The Superior Court claimed petitioner had failed to show errors by defense counsel

amounted to prejudicially ineffective assistance.  Exhibit "L," page 2:16-24.  The court goes on

to make factual findings via a list of the evidence against petitioner (quite inaccurately),[4] and

claimed petitioner benefited from the plea bargain.  Exhibit "J," page 3:1-12.

21

22

23

24

25

26

27

28

---

[4]    The "overwhelming evidence" the court cites was not as "overwhelming" as the court made it out to be.
The drugs were found in a place around the head area of petitioner's bunk as the court claimed.  Exhibit "J," page
1:14-16.  Yet the court selectively neglected to mention the fact that the bunk in question was a double bunk and
that anything hanging on the bunk would be hanging from the bunk of <u>both inmates in the cell</u>.  The court also
neglected to note the entire cell is a common area shared by two inmates complicating greatly the legal basis of
any claim of possession by petitioner; particularly when the other inmate admits the drugs were his and the prison
investigation (under a lesser standard of proof than a court) revealed petitioner had nothing to do with the drugs in
question save he possibly used some of them.   See Exhibit "A."  It is substantially unlikely a jury would have
found petitioner actually possessed the drugs in this factual scenario.  At best the "overwhelming" evidence
proved that petitioner had either smoked marijuana with his cell mate Hemphill or ingested marijuana via second
hand smoke.  The "investigative reports" the court mentions as "overwhelming evidence" lay all this out clearly.
Moreover, the evidence relating to the positive drug test of petitioner is inadmissible to prove petitioner possessed
the drugs, see *People v Spann, 187 Cal.App.3d. 400 (1986).*  Thus the evidence of possession was not as
"overwhelming" as the court claimed it was.  This erroneous legal conclusion by the court (brought about through
the plea and the subsequent lack of testing of the prosecution's case) clouded the court's view of the prejudice
petitioner suffered as a result of the plea.  A jury could have easily acquitted petitioner in this factual scenario.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

There are two problems with the Superior Court action in this case.  First off, petitioner submits that the Superior Court decision (Exhibit "J,") cannot be deferred to under the *AEDPA* based upon the reasoning of *Taylor v Maddox, 366 F.3d. 992 (9th Cir., 2004).*

It is clear no evidentiary hearing was held.  It is obvious, as any fair reading of Exhibit "J," will show, that the Superior Court decided many facts, contrary to petitioner's evidence and claims, <u>without benefit of any evidentiary hearing or other type of factual inquiry</u>.  In essence, the court took it upon itself to dispute petitioner's evidence and disregard his sworn statement.

These actions violated California's own habeas corpus procedure, set forth in *People v Duvall, 9 Cal.4th 464 (1995),* where the court held all allegations and evidence must be assumed as true as the court makes its <u>initial</u> habeas corpus determination.  It is clear that did not occur in this case.

Yet far more importantly at this point, the Superior Court actions destroyed any opportunuity for this court to defer to that order under the AEDPA.  As *Taylor v Maddox* stated:

> "If, for example, a state court makes evidentiary findings without holding a hearing, such findings clearly reuslt in an 'unreasonable determination of the facts." *Taylor v Maddox at 1001.*

> "Where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." *Id., at 1001.*

1

2

"And, as the Supreme Court noted in Miller-El, the state court fact finding process is undermined where the state court has before it, yet apparently ignores, evidence that supports petitioner's claim." *Id., at 1001.*

3

4

5

In summary, *Taylor v Maddox* stands squarely for the proposition that the Superior

6

Court Order (Exhibit "J,") cannot be deferred to in this case.

7

The second flaw in the Superior Court Order (Exhibit "J,") is that the court viewed

8

petitioner's claim too narrowly, with a belief that any benefit petitioner received under the plea

9

10

bargain undermines a claim of ineffective assistance of counsel.  The court cited <u>no authority</u>

11

for this proposition, which appears to be undermined *by Santabello v New York, 404 U.S. 257*

12

*(1971).*  It also defies common sense, as a prisoner could benefit from a plea bargain in some

13

14

way but still suffer severe prejudice from the same plea bargain in other areas.

15

Petitioner submitted a sworn declaration by a practicing attorney who has co-authored

16

the parole portion of CEB, California Criminal Law Procedure & Practice (Chapter 57, parole)

17

18

and is widely considered an expert in this area of law.  This declaration states the behavior of

19

trial counsel in recommending the plea bargain was prejudicially incompetent.  That, IN AND

20

OF ITSELF, was sufficient at the filing stage to warrant an Order To Show Cause.  When the

21

22

Superior Court refused to assume the facts alleged under penalty of perjury were true (that

23

petitioner suffered prejudicially ineffective assistance of counsel according to a member of the

24

state bar who has reviewed the case files) it failed to follow the dictates of *People v Duvall, 9*

25

*Cal.4th 464, 474-475 (1995).*   Phrased another way, petitioner's declaration from another

26

attorney <u>alone</u> established a prima facie case for relief on the ineffective assistance of counsel

27

28

claim.

Petitioner was NOT CHALLENGING the fact that a conviction would be considered by

the parole board as the Superior Court inaccurately claimed.  Exhibit "J," page 3:7-10.
Petitioner was challenging the fact that his trial attorney had a legal and ethical duty to protect
his client from unnecessary and needless prejudice.  Under the unique facts of this case, ANY
PLEA BARGAIN created undue prejudice because the case had a reasonable chance of
resulting in a not guilty verdict at trial, the client was proclaiming his total innocence, and
ANY FELONY CONVICTION would amount to a long term denial of parole for petitioner,
COMPLETELY NEGATING ANY BENEFIT FROM THE BARGAIN.

Because trial counsel was unaware of the board prejudice aspect, solely due to his
failure to consult experts on parole board law, or otherwise investigate, research, or educate
himself on the issue, he erroneously believed his client's best interests were being served by the
guilty plea when nothing could have been further from the truth.

The issue is not whether or not petitioner derived a benefit from the bargain by
narrowly focusing on just the charges at issue.  The issue is whether petitioner suffered
prejudicially ineffective assistance of counsel by the advice to plead guilty under the unique
factual scenario of this case.  The Superior Court ignored this distinction in its response and as
it did so it missed the entire issue petitioner was presenting to the court.

As to the court's claim that petitioner should have raised the issue of the enforceability
of the plea bargain on appeal the court is blatantly incorrect.  First of all, no issue is cognizable
on appeal that is unknown at the time of the appeal.  It was not until after the parole
proceedings in 2006 that petitioner became aware of the massive prejudice he was suffering
under the plea bargain contract and counsel's incompetent advice to plead guilty.  Immediately
after so learning of that prejudice petitioner retained counsel and moved timely through the

courts via habeas corpus.

Moreover, evidence outside the record could not have been considered on direct appeal and a habeas corpus action would have had to have been filed in any event.  Petitioner's habeas corpus petition relies on documents of his co-defendants and an expert witness declaration from another member of the state bar as to the ineffective assistance and prejudice petitioner received due to the decisions of trial counsel. One of the main exhibits is the parole hearing transcript (Exhibit "D,") which did not exist at the time of the appeal as the hearing had not been held yet.   Those documents could not have been considered in a direct appeal as this court is well aware.

Since the Superior Court erected a specious procedural hurdle the plea bargain issues have yet to be addressed.  This court should address the issue as it was properly before the court on habeas corpus contrary to the Superior Court Order.

In essence the Superior Court was unable to articulate anything to contradict the declaration of present counsel found at Exhibit "H."  Knowing it could not refute the factual claims of the declaration, the Superior Court side-stepped all issues touched upon by the declaration instead of confronting them.  Even prisoners deserve a full and fair hearing on their claims.  Petitioner did not receive that from the Superior Court.

The Appellate Court and Supreme Court responses (Exhibits "K" & "L") are no different.  Indeed, both Courts issued a summary denial meaning they did not take issue with anything the Superior Court did.  The Appellate and Supreme Court decisions suffer from the same flaws as just discussed relating to the Superior Court Decision.

As things currently stand the Superior Court decision is both contrary to, and an

1   unreasonable application of, decisional law of the U.S. Supreme Court *(Strickland v*

2   *Washington/Hill v Lockhart, infra).*

3                                    **IV**

4

5   **PETITIONER RECEIVED PREJUDICIALLY INEFFECTIVE ASSISTANCE OF**
    **COUNSEL AND WOULD NOT HAVE ENTERED INTO HIS PLEA AGREEMENT**
6   **HAD HE RECEIVED COMPETENT ADVICE**

7

8        A.    INTRODUCTION.

9        To sustain a claim of ineffective assistance of counsel, a court must determine that

10  counsel's performance fell "below an objective standard of reasonableness… under prevailing

11  professional norms" [*People v Ledesma, 43 Cal.3d. 171, 216 (1987)*, quoting *Strickland v*

12

13  *Washington, 466 U.S. 668, 688 (1984)*] and that "but for counsel's unprofessional errors, the

14  result of the proceeding would have been different."  *People v Ledesma, supra at 218;*

15

16  *Strickland v Washington, supra at 693.*

17        In *People v Lewis, 50 Cal.3d 262, 288 (1990),* the California Supreme Court stated that:

18
            To establish entitlement to relief for ineffective assistance of counsel the
19          burden is on the defendant to show (1) trial counsel failed to act in the manner
            to be expected of reasonably competent attorneys acting as diligent advocates
20          and (2) it is reasonably probable that a more favorable determination would
            have resulted in the absence of counsel's failings."  (See also *People v Cox,  53*
21          *Cal.3d 618, 656 (1991); People v Duncan 53 Cal.3d. 955, 966 (1991).*)

22        An attorney must investigate and explore all potential defenses.  *In re Cordero, 46*

23
    *Cal.3d. 161, 181 (1988).*  An attorney must also inform the defendant of the potential penalties
24
    for his conduct if a plea is offered to him.  See *In re Alvernez, 2 Cal.4th 924 (1992); Alvernaz v*
25
26  *Ratelle, 831 F.Supp. 790 (S.D. Cal., 1993).  In People v Huynh, 229 Cal.App.3d. 1067, 1083*

27  *(1991),* the court stated:

28
            "We cannot imagine a case where a defendant should not be informed by defense
            counsel not only about the probabilities of conviction of the charged offenses, but also
            the likely amount of incarceration, if any, following conviction."

                                        14

Inadequate assistance of counsel can occur in relation to a plea agreement. *Hill v Lockhart, 474 U.S. 52 (1985); In re Alvernaz, supra; Alvernaz v Ratelle, supra.*

B.     THE CHARGES.

Petitioner was charged with possession of drugs in a correctional institution (*Penal Code 4573.6*); conspiracy (relating to the smuggling of the drugs into the prison, *Penal Code 182*); and a prior felony conviction within the meaning of the three strikes law (*Penal Code 1170.12*). As the conspiracy charge was dismissed prior to entry of plea (see Exhibit "B") the evidence discussed focuses solely on the possession charge.

C.     THE EVIDENCE AGAINST PETITIONER

The evidence against petitioner consisted of the following: Marijuana was found in petitioner's cell; Petitioner tested positive for the presence of marijuana in his bloodstream.

D.     THE POSSIBLE LEGAL DEFENSES.

Case law indicates that a positive drug test is not, on its own, evidence of possession of a drug. *People v Spann, 187 Cal.App.3d. 400 (1986).*

A person can fail a drug test for marijuana if they are exposed to its second hand smoke. Poor air circulation, the small size of a room, the duration of exposure, the frequency of exposure and the potency of the drug all impact whether a dirty test will result from second hand smoke. See Exhibit "G," an internet overview of marijuana second hand smoke drug testing provided to students at Oregon State University.

Petitioner's cell mate (Inmate Hemphill) admitted the marijuana found in their jointly occupied cell did not belong to petitioner. Exhibit "A," page 15 of 35. Hemphill also admitted he smoked a marijuana cigarette, with petitioner present in the cell, only hours before the cell

1    was searched and the test was administered.  *Id.*

2        The person most centrally involved in the actual drug smuggling conspiracy according

3    to reports petitioner has been given (inmate Fuller), admitted he did not even know petitioner

4    (Monette), that he only knew inmate Hemphill (petitioner's cell mate).  See Exhibit "F,"

5    Fuller's 115 materials, page 1 of 8.

6        E.    AUTHORITIES RELATING TO THE GRANT OR DENIAL OF PAROLE

7    UNDER CALIFORNIA LAW.

8        California's parole statute (*Penal Code 3041*) is couched in mandatory language and

9    states that an inmate shall appear before the parole board at least one year prior to his minimum

10   eligible parole date and that the board "shall normally" grant parole unless public safety would

11   be endangered.   The parole board interprets this statute to mean that an inmate should be

12   denied parole if the board finds the inmate would pose "an unreasonable risk of danger to

13   society if released from prison."   *15 CCR 2402(a).*  The board has adopted a series of parole

14   suitability and unsuitability rules inmates are viewed under as they appear before the parole

15   board to carry out this statutory directive. See *15 CCR 2402 et.al.*

16       Based on the statutory language, inmates appearing before the BPH have a liberty

17   interest protected by the United States Constitution.   *In re Rosenkrantz, 29 Cal.4[th] 616, 654,*

18   *658 (2002); McQuillion v Duncan, 306 F.3d. 895, 902 (2002); In re Dannenberg, 34 Cal.4[th]*

19   *1061, 1084 (2005).*

20       The touchstone of due process is the protection of the individual against arbitrary

21   government action. *Dent v West Virginia, 129 U.S. 114, 123 (1899); Wolff v McDonnell, 418*

22   *U.S. 539, 558 (1974); Daniels v Williams, 474 U.S. 327, 331 (1986).*

16

BPH Decisions which lack evidence to support them are arbitrary, and thereby violative of the Due Process Clauses of both the California and Federal Constitutions. See *California Constitution, Article 1, §7; U.S. Constitution, Amendment 14*. Also see *In re Powell, 45 Cal.3d. 894, 904 (1988); In re Rosenkrantz, supra at 654-658; McQuillion v Duncan, supra at 903-906*.

The standard to be applied when reviewing BPH actions is the "some evidence" test set forth in *Superintendent v Hill, 472 U.S. 445, 456-457 (1985); In re Powell, supra at 902-904; In re Rosenkrantz, supra at 423; In re Dannenberg, supra at 1084*.

The commitment offense can be used as a basis to deny a prisoner parole if the board finds, and evidence supports the finding, that the crime was committed in a manner which exceeded the minimum elements required for conviction of the crime a prisoner was convicted of. *In re Dannenberg, supra; In re Rosenkrantz, supra*. However, repeated parole denial based on unchanging factors like the facts of the crime runs against the rehabilitative goals of California's parole system and can rise to a due process violation. See *Biggs v Terhune, 334 F.3d. 910, 913 (9th Cir., 2003); In re Rosenkrantz, supra (Moreno dissenting)*.

F.    PETITIONER'S OTHER CRIME AND THE MERIT OF HIS INDIVIDUAL BID FOR PAROLE.

The facts of petitioner's other crime (the life term) are detailed in his latest parole hearing transcript provided at Exhibit "D," pages 8-12. Basically a dispute started at a phone booth and petitioner stabbed the victim one time in the chest area killing him.

As to the life term crime, death via a single stab wound is without question the minimum necessary to cause a conviction for second degree murder via stabbing. As such,

1
2
under *In re Rosenkrantz* and *In re Dannenberg, supra*, the crime itself (after the minimum term has been served) is not a valid basis to deny petitioner parole.

3
4
5
6
7
8
Petitioner had no prior criminal record.  Exhibit "D," page 88.  Indeed, as the reading of the decision by the board makes clear, there was really no basis to deny parole but the crime (which does not appear legally valid) **and the new drug charge**.  See Exhibit "D," pages 86-92.

9
10
11
12
13
Careful review of the 92 page parole hearing transcript reveals that the drug case was mentioned much more often then the murder was during the latest parole hearing.  See Exhibit "D," pages 28, 29, 45, 46, 47, 48, 50, 51, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 81, 83, 87, 88, 89, 90, 91.

14
15
16
17
18
19
20
21
22
23
How prejudicial was the drug charge? Aside from consuming a large amount of time during the hearing, the board used the new drug charge to deny parole and as the **primary basis** to deny parole for four (4) years.  Exhibit "D," page 90.  Yet earlier in the parole hearing, the panel noted that petitioner had been treated well by the board previously, getting only a two year denial of parole at his first hearing (when the board usually denies for at least three years) and then petitioner received a one year denial at his next parole hearing (indicating a grant of parole was very close).[5]  Exhibit "D," pages 64-65.

24
25
26
The author of this petition, Steven C. Sanders, is an attorney who is a member of the parole board's panel that represents parole-eligible indigent inmates as well as in his own

27
28
[5]    Petitioner believes the record proves the new drug charge was the primary basis of the four year parole denial because the life term crime had never been viewed as a basis to deny parole for that length of time previously.  Petitioner submits that absent the new charge he would have been granted parole, or at the worst, denied parole for only one year.  Indeed, fair reading of the comments of the board make clear their frustration with petitioner's new drug charge; their desire to see him be released; and their inability to release him because of the drug charge.

18

private practice.  As the declaration of Mr. Sanders sets forth at Exhibit "H," he has represented

approximately 500 inmates before the parole board and is intimately familiar with parole board

rules, policies, practices and procedures, as well as state law covering parole.  Mr. Sanders has

set forth in declaration that he believes, <u>prior to the drug charge</u>, that petitioner was suitable for

parole due to his outstanding prison behavior; lack of prior record, supportive psychological

reports; waiting job offers; and large amounts of community support which would ease his

transition back to the free world.  Ultimately, Mr. Sanders concludes the only reason petitioner

was not granted parole in 2006 was because of the new criminal conviction.  Indeed,

petitioner's 2006 board attorney also believed petitioner was suitable for release absent the new

drug charge:

> "He's very pro-social in his orientation, in the way he conducts himself, and I just wish that he
> had not had these two 115's and that he – that  this blemish on his record with the consecutive
> prison term had not occurred.  Other than that, he is outstanding and should be paroled, and I
> hope the Board can see that."  Exhibit "D," page 83:21-27.

In summary, as a veteran of approximately 500 parole hearings as an attorney, Mr.

Sanders believes that petitioner has been denied parole because of the new drug charge, and

will likely be denied parole into the foreseeable future (at least one more parole denial is

likely), before petitioner is seriously considered again for parole by the board because of the

drug charge.

 <u>Prior to the drug charge, petitioner presented an overwhelming portrait of parole</u>

<u>suitability and would likely not be in prison at this time absent the new drug charge</u>.  The

prejudicial nature of the drug charge on petitioner's bid for parole on the murder charge is

clearly established.

1
2
3
4
5
6

    G.    TRIAL COUNSEL DID NOT INVESTIGATE THE ONLY DEFENSE AND HAD NO IDEA OF HOW THE PAROLE BOARD OPERATED OR HOW THE NEW CHARGE WOULD IMPACT PETITIONER'S ULTIMATE RELEASE FROM PRISON; THIS IGNORANCE PREJUDICIALLY IMPACTED THE ADVICE TRIAL COUNSEL GAVE RELATING TO TAKING A PLEA ON THE DRUG CHARGE AND AS SUCH AMOUNTS TO PREJUDICIALLY INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL AS PETITIONER WOULD NOT HAVE PLED GUILTY ABSENT THE POOR ADVICE HE RECEIVED.

7
8
9
10

    Trial counsel performed no investigation of second hand marijuana smoke causing positive drug tests for marijuana.    Yet he advised his client to plead guilty without even investigating this possibly meritorious defense.

11
12
13
14
15

    Examine the facts.  Hemphill was willing to testify (actually he already had) that the drugs were his.  Hemphill would also testify that petitioner didn't smoke pot and that Hemphill often smoked pot in the cell and did so right before the drug test in question.   See Exhibit "A," pages 15 of 35 to 18 of 35.

16
17
18
19
20
21
22

    Failure to investigate the second hand smoke defense under these facts is clearly derelict performance.   Given Hemphill's testimony, the ONLY evidence of petitioner's marijuana use was the positive drug test.  Thus any doubt that could be cast on the drug test result via second hand smoke was imperative to the defense and yet trial counsel never even bothered to investigate the issue.

23
24
25
26
27
28

    That is textbook prejudicially inadequate assistance, particularly given Exhibit "G."[6] The likelihood of being able to back the claim with an expert witness on what is frankly common knowledge:  Second hand cigarette smoke is so harmful public smoking has been strictly regulated to avoid harm to non-smokers; and marijuana smoke (as with all other kinds)

---

[6]    This document alone sets out a prima facie case for habeas corpus relief on the second hand smoke defense issue.  See *People v Duvall, 9 Cal.4th 464, 474-475 (1995).*

is inhaled by proximate non-smokers and they suffer its ill effects.  To be honest, junior high school kids know this.  Failure to investigate the defense was a blatantly prejudicial failure by trial counsel.[7]

As to the parole board, it is clear counsel had no idea how the parole board operated.  Yet that knowledge was crucial to his client's interests.  This was a prison case.  A prison drug case.  The client was a convicted murderer who had to appear before the parole board for parole.  Any action in the drug case would obviously impact petitioner's parole suitability on the murder charge.

It seems obvious that when an attorney represents a person already convicted of other crimes, those crime and their punishments are relevant to the tactical decisions to be made in the current case.  The other crimes impact whether the defendant will testify at a trial.  The other offenses also are relevant at sentencing, as they may be aggravating factors leading to a non-mitigated prison term or even consecutive sentences.

The other crimes are also **CRUCIAL** as a plea bargain is structured.   Any decision by petitioner to plead guilty in the drug case would be necessarily based, in large measure, on how much time petitioner would ultimately serve as a result of the plea.[8]  That meant an analysis of the interaction between the drug charges and other charges petitioner had already been convicted of was paramount to any competent advice later to be rendered as to entering a guilty plea on the drug charges.

---

[7]     Petitioner was entitled to make an informed decision as to whether to plead guilty.  Trial counsel's failure to investigate this angle of defense via contacts with experts allowed the decision to be made in a factual vacuum.

[8]     See *People v Huynh, supra at 1083,* where the court noted that a paramount concern of a defendant in seeking to resolve a case by way of plea is his total incarceration period as a result of the plea.

1    Given petitioner's legal situation, a plea agreement made in whole or part to reduce

2    petitioner's potential prison time on the drug charge was not possible.[9]  Yet trial counsel failed

3    to grasp that the time petitioner received for the drug case was, frankly, the least of petitioner's

4    problems.  In failing to grasp that point trial counsel failed in his first duty to his client; that of

5    being a diligent, conscientious advocate for his client's interests.  See *People v Pope, 23*

6    *Cal.3d. 412, 424 (1979).*

7

8    At its core, decisions to plead guilty are risk versus reward assessments.  What is the

9    risk of conviction on the charges and those possible consequences, versus the guarantee of a

10   punishment certain, an accurate assessment of the time the prisoner would actually serve, and

11   possible dismissal of some charges in the process.

12

13    That assessment of risk versus reward is <u>impossible to calculate</u> until the trained legal

14   professional making the assessment (in this case petitioner's trial attorney) understands and

15   appreciates the actual situation under which the client would enter into a plea, and the actual

16   repercussions the decision to plead guilty will have on the client.

17

18    It is clear to educated legal professionals in the area of parole law that an in-prison

19   criminal conviction **<u>dooms</u>** short term prospects for parole via the parole board.  See Exhibit

20   "H."   Trial counsel didn't grasp this.  That is not his failure.  <u>Trial counsel's failure was not</u>

21   <u>educating himself;</u> not doing the research necessary to properly and competently inform his

22   client of the real risks associated with pleading guilty so that the real rewards could be honestly

---

[9]     As petitioner's declaration sets forth, the only reason trial counsel wanted him to plead guilty was the fear that petitioner would receive more time from the court if convicted on the drug charge than the offer from the prosecutor to plead the case out.  Yet if parole would not be granted on the life term for many additional years because of the plea bargain in the drug case, then any benefit from a plea to the drug charges is illusory.

1    and accurately assessed by the client prior to the decision to enter into the plea agreement.

2          As it stands, trial counsel was ignorant of the actual impact any conviction would have

3    on petitioner before the parole board.  Indeed, trial counsel told petitioner that under his *People*

4    *v West* plea, the parole board would not be an issue.  Trial counsel also failed to investigate the

5    ingestion of second hand smoke as a defense to the charges.   Trial counsel then advised

6    petitioner to plead guilty based on the time he might receive if convicted on the drug charge

7    (which was irrelevant had trial counsel fully understood petitioner's true legal situation).

8    Petitioner ultimately entered a no contest plea on the drug possession charge for what are

9    frankly indiscernible reasons.**10**

10

11          Given the devastating nature of any conviction for petitioner on his underlying murder

12   charge, pleading guilty in this factual scenario is incomprehensible.   Petitioner gained no

13   discernible benefit from the bargain.  Whatever time petitioner was spared from by entering a

14   plea, that time **is more than offset** by the tremendous prejudice the conviction brings him

15   before the parole board as they continue to deny him parole because of the plea agreement.

16   This is what trial counsel failed to grasp.   That trial counsel also failed to investigate the

17   defense of second hand smoke ingestion prior to advising his client to plead guilty renders his

18   errors all the more prejudicial.

19          There was simply no reason for petitioner to plead guilty in this case.  No benefit was

20

---

10          The penalty for violation of *Penal Code 4573.6* is 2, 3, or 4 years.  Petitioner received a two year term via the plea.  Yet the court may have imposed the low or middle term after a trial.  As a two strike defendant, the court could have imposed a doubled sentence.  The court did strike the prison prior.  Yet the court may well have done that anyway after trial (not doubling the term) given that the drugs were clearly not petitioner's, and any "possession" of the drugs (for lack of a better term) was simply via petitioner's cell mate and the placement of the drugs by the cell mate into a shared common area.  Even assuming petitioner knew the drugs were present (which there is NO EVIDENCE of), the fact they were not petitioner's substantially mitigates petitioner's conduct, especially in light of the life threatening situation informing correctional officers on one's cell mate can create.

gained by pleading guilty.  Indeed, massive adverse effects were both predictable and ignored by a trial attorney who did not even bother to investigate the impact of the guilty plea on his client's other criminal convictions.  The error is exacerbated because a viable defense to the charges (given the witness testimony) clearly existed but was not investigated

Had petitioner been advised in a manner similar to the Declaration from Mr. Sanders (Exhibit "H,"); had trial counsel actually performed an investigation into second hand smoke causing positive drug tests; had the impact of the guilty plea been **fully** explained to him, petitioner contends in sworn statement he would not have entered a plea to the drug charge. See Exhibit "I," the declaration of petitioner.  There would have been no reason to do so. Petitioner understands he may have been convicted, but had he known (meaning had he been properly advised) how terribly the drug charge would impact his bid for parole on the murder, he would not have waived his right to fight the charges.  As ANY CONVICTION would seriously undermine realistic chances of parole in the next few years for petitioner, there would have been <u>no reason</u> not to exercise his right to a trial in exchange for the mere possibility of additional time in prison.  Defeating the new drug charge **in total** was the <u>only way</u> to eliminate the problems the new drug charge would cause to petitioner.  The problem was that his trial attorney never told him that because he failed to investigate.

H.    SUMMARY.

Petitioner received prejudicially inadequate assistance of counsel.  He would not have pled no contest to the drug charge had trial counsel conducted the investigation necessary on second hand smoke and fully and properly advised petitioner of his actual legal situation and

how drastic the impact of any conviction would be on his bid for parole.

Petitioner is respectfully entitled to reversal of his conviction.

**V**

**PETITIONER'S PLEA BARGAIN CONTRACT IS UNENFORCEABLE**

A.    INTRODUCTION

Petitioner contends a number of contract law principles invalidate his plea bargain contract. They are discussed infra after review of some preliminary authorities.

A plea bargain is in essence a contract between the defendant and the prosecutor to which the court agrees to be bound. *People v Shepard, 160 Cal.App.3d. 580, 586 (1985), People v Ames, 213 Cal.App.3d. 1214, 1217 (1989).* The bargaining process has been analogized to a unilateral contract. *People v Barnett, 113 Cal.App.3d. 563, 571-572 (1980).* Plea bargains are generally interpreted within the purview of contract principles. *People v Haney, 207 Cal.App.3d. 1034, 1037 (1989); People v Alvarez, 127 Cal.App.3d. 629, 633 (1982); Leo v Superior Court 179 Cal.App.3d. 274, 283 (1986).*

Although breaches of plea bargains are normally demonstrated by reliance on contract law, **the voiding of a plea is done under the due process clause because constitutional standards require more than contract law to remedy breaches**. *People v Barnett, supra at 571-572; People v Mancheno, 32 Cal.3d. 855, 860-861 (1982); Leo v Superior Court, supra at 283; People v Haney, supra at 1037, fn. 2.*

Every contract, express or implied, carries with it an implied covenant of good faith and fair dealing. *Universal Sales Corp. v California Press Mfg. Co., 20 Cal.2d. 751 (1942).*

The idea of "reciprocal benefits" or "mutuality of advantage" is the basis of the plea

1    bargaining process. This has been recognized by both the California and U.S. Supreme Courts.

2    *People v Collins, 45 Cal.App.4th 849, 862-863 (1996).*

3

4         It is a fundamental rule of contract law that all statutes in existence when a contract is

5    made become a part of it. *California Civil Code 1656; City of Torrance v W.C.A.B., 32 Cal.3d.*

6    *371, 378 (1982); Haney, supra at 1038.* Or, as another Court put it:

7

8              "As a general rule, all applicable laws in existence when an agreement is made, which
              laws the parties are presumed to know and to have had in mind, necessarily enter into the
9              contract and form a part of it, without any stipulation to that effect, as if they were
              expressly referred to and incorporated." *Swenson v File, 3 Cal.3d. 389, 393 (1970).*

10        Customs exhibited by parties to a contract can be considered as an implied part of that

11

12   contract. See *Miller v Germann Seed & Plant Co., 193 Cal. 62, 67-70 (1924).*

13        The parties had a right to consider the length of incarceration as part of the decision to

14

15   enter into a plea. Indeed, this is normally the pre-eminent concern of a criminal defendant. As

16   the Court in *People v Huynh, supra at 1083,* stated:

17

18             "We cannot imagine a case where a defendant should not be informed by defense
             counsel not only about the probabilities of conviction of the charged offenses, but also
             the likely amount of incarceration, if any, following conviction."

19        B.    PETITIONER RECEIVED NO BENEFIT FROM THE BARGAIN.

20

21        Some sort of consideration, or "reciprocal benefit," is required in every contract.

22   *California Civil Code 1550.* This is especially true in plea bargain situations. *People v*

23   *Collins, supra at 862-863.* Yet in petitioner's case he pled nolo contendere, and waived his

24

25   constitutional rights, for nothing.

26        Petitioner's consideration was illusory. Receiving the low term on the drug charge was

27   an illusory benefit at best (as was not doubling that term). First of all, the court is obviously

28   forbidden from penalizing a person for exercising their constitutional right to trial by jury. It is

     highly unlikely any court would do so. Thus petitioner could have went to trial and received

                                                26

the same two year sentence on the drug charge after conviction as he received in the bargain (there were mitigating factors). Even assuming the lower term was not chosen by the court, and the sentence was doubled, the benefits to petitioner were an illusion.

Petitioner cannot be released from prison until paroled by the BPH. As the BPH just denied parole for four years (when the worst previous denial was two years prior to the new charge—and the most recent denial of parole before the new charge was one year), any "benefit" from the bargain is already offset by the increased parole denial period from the parole board on the underlying murder charge caused by the new drug charge.

Trial counsel's failures caused petitioner to not be warned about how negatively the BPH would view <u>any conviction</u>. Had trial counsel sought out the help of an attorney well versed in board policy, or just did some basic research, he would have known any reduction in time pursuant to a plea in the Monterey County drug case would be more than offset by the penalties the parole board would impose on the underlying murder count via lengthy denials of parole.<u>**11**</u>

Thus trial counsel presented the plea bargain offer to his client as if it had a benefit, but neglected to tell petitioner the benefit was illusory, and that he had minimal risk by going to trial given the completely predictable way the parole board would view the matter if <u>any conviction</u> was ever entered onto his record.

---

[11] It is for this reason dismissal of the prior prison term (and possibly doubling of the sentence) are illusory benefits. Even if the maximum term was imposed on the possession charge and the sentence doubled, end punishment would have been 8 years. Petitioner will almost certainly suffer <u>at least that amount of prejudice to his application to parole from the parole board</u>. There was just no reason not to fight the drug case. Particularly when a witness was admitting the drugs were his; that petitioner never used drugs in his presence; and that he smoked marijuana in the very small cell with petitioner present often (including a few hours before petitioner was tested for drugs).

1  As there was no consideration, or at best an illusory consideration, the contract is not
2  enforceable.  Relief lies.

3  C.    IMPOSSIBILITY.

4  Petitioner was advised to plead guilty to avoid the punishment that could have been
5
6  imposed had he not pled guilty.  Yet the punishment to be avoided in fact wasn't avoided **due**
7
8  **to trial counsel not understanding the situation completely and not explaining it to**
9  **petitioner completely.**

10  *California Civil Code 1441* allows for the voiding of a contract that has a condition that
11
12  is impossible to fulfill.  A contract which provides for a method of consideration which
13  becomes impossible to execute can be voided.  *California Civil Code 1613*.  If a thing essential
14
15  to a contract exists at the time of the agreement, but then ceases to exist, there is a contract, but
16  its performance is excused by impossibility.  *Dairy Food Store v Alpert, 116 Cal.App. 670, 672*
17  *(1931)*.  Also See *Witkin's Summary of California Law, 9th Edition, Contracts, §366*.  The
18
19  principle of impossibility has been extended to plea agreement situations.  See among others
20  *People v Gallego, 90 Cal.App.3d.Supp. 21, 33 (1979)*.

21  The consideration petitioner sought in the contract never came to fruition, and thereby
22
23  the contract is impossible to fulfill.  Relief lies.

24  D.    THE CONTRACT IS UNCONSCIONABLE AT THIS POINT IN TIME.

25  A contract can be voided if it is, or becomes, unconscionable.  *California Civil Code*
26
27  *1670.5*.  As stated by one court, "at some point the price of money lent becomes so extreme
28  that it is unconscionable."  *Carboni v Arrospide, 2 Cal.App.4th 76, 81-82 (1991)*.  The

unconscionability premise has been extended to plea agreements. *In Re Crumpton, 9 Cal.3d. 463, 468 (1973).*

Petitioner would respectfully submit that the point of unconscionability in his plea agreement contract has been reached. He will almost certainly be denied parole at his next hearing on the murder charge based on the plea agreement in the drug case that was supposed to provide him some benefit. The sentence to a low term and the striking of the prior felony conviction allegation appear on their face to be benefits, but they are illusory as any benefit is offset as the parole board deals with the new criminal charge harshly and repeatedly denies petitioner parole into the foreseeable future.

That fact, unknown to trial counsel simply due to his lack of research, means the actual benefit bargained for was a complete illusion.

It is, with all due respect, unconscionable that petitioner remains incarcerated under the terms of this plea agreement. He received only illusory benefit from the bargain. Illusory benefits are no benefits at all. Relief is required.

E.      MISTAKE OF FACT.

Petitioner contends that the parties entered into the contract under a mistake of fact: That there would actually be some consideration for petitioner if he pled guilty.

*California Civil Code 1577* allows a contract to be voided or modified if a party displays an unconscious ignorance of a thing material to a contract, or if belief in the existence of a thing, material to the contract, does not exist.

At times mistake of fact prevents the formulation of a contract altogether, because there is no meeting of the minds. *Balisteri v Nevada Livestock Production Credit Assn., 214*

1   *Cal.App.3d. 635 (1989).*  If a thing essential to a contract exists at the time of the agreement,

2   but then ceases to exist, there is a contract, but its performance is excused by impossibility.

3   *Dairy Food Store v Alpert, 116 Cal.App. 670, 672 (1931).*  Also See *Witkin's Summary of*

4   *California Law, 9th Edition, Contracts, §366; Gallegos, supra at 33.*

5   

6          Relief from the consequences of a mutual mistake is allowed where both parties expect

7   a future event to occur, and make it clear if the event does not occur as expected it would defeat

8   the real intention of the contract.  *F. P. Cutting Co. v Peterson, 164 Cal. 44 (1912).*  In this

9   regard, it was clearly not the intent of the parties to cause petitioner to plead no contest in

10  exchange for nothing.  Indeed, that would be a fraudulent intent by the prosecutor which is

11  unlikely.  Yet nothing is what the net result is to petitioner and that was never explained to him

12  prior to entry of the plea.

13  

14         *California Civil Code 1577* normally applies to mistakes of fact existing at the time of

15  the contract.  Yet if there is evidence of a "future contingency" that is an assumption of the

16  contract, mistake of fact will allow for relief.  *Mosher v Mayacamas Corp., 215 Cal.App.3d. 1,*

17  *5 (1989).*

18  

19         The plea agreement contract in petitioner's case was based on the understanding of the

20  parties that if petitioner pled guilty he would derive some benefit from the bargain.  It is clear

21  no benefit was received and that this was predictable upon basic legal research by trial counsel.

22  

23         It has been held that the court, under its equitable powers, has the authority to rescind a

24  contract for the purely unilateral mistake of one contracting party, even though such mistake

25  was not induced or contributed to by the other party.  *Moore v Copp, 119 Cal. 429 (1897);*

26  *Palace Hardware Co. v Smith, 134 Cal. 381 (1901); Lepper v Ratterree, 98 Cal.App. 245*

27  

28

*(1929); Mitidiere v Saito, 246 Cal.App.2d. 535 (1969); Lawrence v Shutt, 269 Cal.App.2d. 749 (1969); Pechtel v Universal Underwriters Ins. Co., 15 Cal.App.3d. 194 (1971).*

Under any interpretation possible, neither petitioner nor his trial attorney ever envisioned the current scenario. Petitioner forfeited his constitutional rights (in a case he had always proclaimed his innocence in) only to learn that there was no true benefit bestowed upon him as a result of his entry into the plea bargain contract.

The result is that petitioner's unilateral mistake of fact destroys the validity of the contract even if the court were to find there was not a "mutual" mistake. Also see *People v Precaido, 78 Cal.App.3d. 144, 149 (1978).*

It is submitted that both parties, and certainly petitioner, were operating under a mistake of fact when they entered into the plea agreement, and that this error prevented a contract from ever being formed, or at the very least, allow for it to be modified or voided at this time.

F.    MISTAKE OF LAW.

*California Civil Code 1578* allows a contact to be modified or voided for mistake of law.

Petitioner submits that neither party to this contract fully grasped petitioner's legal position and thereby failed to understand the benefit the government bestowed, and petitioner bargained for, was a complete illusion.

Relief lies.

G.    MISTAKEN UNDERSTANDING OF LEGAL CONSEQUENCES.

Mistaken understanding of legal consequences has been held to be a ground to void a plea agreement. See *In Re Crumpton, 9 Cal.3d. 463 (1973); People v Gallegos, 90 Cal.App.3d.*

31

*Supp. 21 (1979).*

It is obvious, through trial counsel's dereliction of his duties, that petitioner had no idea of the true legal consequences of bargain he was entering into.

Relief lies.

H.     REMEDY.

In normal plea bargain situations, errors are rectified through either a withdrawal of the plea, or the specific enforcement of its conditions.  *People v Mancheno, 32 Cal.3d. 855, 860-861 (1982).*   In this case specific enforcement is impossible, because the consideration petitioner bargained for originally cannot be received, and the true intent of the parties cannot be realized.**12**

Withdrawal of the plea would return the parties to the state of affairs immediately before the plea was entered.**13**  The physical evidence in this case is a lab result that is on paper and the testimony of witnesses, most if not all of which are government employees or incarcerated inmates.  All known witnesses have had statements taken by correctional officer investigators and those statements appear in official reports.  It is respectfully submitted that neither the people nor petitioner would be prejudiced if this case were to return to the Superior Court for further proceedings.

I.     SUMMARY.

Petitioner had no idea what he was agreeing to when he entered into the plea bargain contract.  For any number of reasons this contract is not enforceable.  Petitioner prays the court

---

12      The intent of the parties at the time of the agreement is the fundamental question in contract disputes. *Houge v Ford, 44 Cal.2d. 706, 713 (1955); California Civil Code 1636.*

13      *In Re Sutherland, 6 Cal.3d. 666, 672 (1972).*

will void the plea agreement based on the arguments made herein.

## VI

## CONCLUSION

For the foregoing reasons, petitioner prays the relief requested herein will be granted.

## VII

## PRAYER FOR RELIEF

Petitioner respectfully requests the following relief:

1.      That the Court issue an Order To Show Cause.

2.      That the Court issue a briefing schedule.

4.      That after briefing is complete, the Court grant an evidentiary hearing on any unresolved factual issues.

5.      That the Court find petitioner's trial attorney rendered prejudicially ineffective assistance as to his advice relating to the plea, and that petitioner's conviction on the drug charge be reversed as a result.

6.      That the court find the plea bargain contract fails to abide by contract law principles and that petitioner's conviction for the drug charge be reversed as a result.

7.      That the Court issue any other Orders it deems necessary to resolve the issues in dispute.

1

2          Respectfully submitted this 8th day of October,  2007, by

3

4

5

6    /s/ Steven C. Sanders

7

8    Attorney for Petitioner Alex Monette

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2  **SANDERS & ASSOCIATES**
   **STEVEN C. SANDERS, Esq.   SBN 171369**
3  3960 Industrial Blvd., Suite 100
   West Sacramento, California 95691
4  Telephone No: (916) 376-8738
   Facsimile No.: (916) 376-8717
5
   Attorney for Alex Monette
6
7
8
9
10              **UNITED STATES DISTRICT COURT**

11              **EASTERN DISTRICT OF CALIFORNIA**

12

13  ALEX MONETTE,                      )  Case No. _____
                                       )
14     Petitioner,                     )  EXHIBITS
                                       )  PETITION FOR WRIT
15                                     )  OF HABEAS CORPUS
                                       )
16  vs                                 )
                                       )
17                                     )
    NICK DAWSON, Warden, Avenal State  )
18  Prison,                            )
                                       )
19     Respondent.                     )
                                       )
20                                     )
                                       )
21                                     )
                                       )
22  _____ )

23
24
25
26
27
28

1

**EXHIBIT LIST**

Exhibit A     Petitioner's CDC-115 And Disposition

Exhibit B     Minute Order Dated May 20, 2005, Dismissing Conspiracy Charge.

Exhibit C     Abstract Of Judgment Of Petitioner Dated July 15, 2005 And Minute Order Dated   June 8, 2005,  Re Entry Of Plea And Sentencing

Exhibit D     Transcript Of Parole Hearing Held March 8, 2006

Exhibit E     Inmate Hemphill's Abstract Of Judgment Dated July 15, 2005; Minute Order  Dated May 20, 2005, Re Entry Of Plea And Sentencing; And CDC-115 And Disposition

Exhibit F     Inmate Fuller's Abstract Of Judgment Dated July 15, 2005; Minute Order Dated  March 2, 2005, Re Entry Of Plea And Sentencing; And CDC-115 And Disposition.

Exhibit G     Oregon State University Answer Spot Re Second Hand Marijuana Smoke

Exhibit H     Declaration Of Steven C. Sanders

Exhibit I     Declaration Of Alex Monette

Exhibit J     Superior Court Order October 23, 2006, Denying Habeas Corpus Relief

Exhibit K     Appellate Court Order of January 4, 2007, Denying Habeas Corpus Relief

Exhibit L     Supreme Court Order of June 27, 2007, Denying Habeas Corpus Relief

# Exhibit "A"

A COPY TO RECORDS ON: _____ BY: _____ [ ]CCCMS [ ]EOP [ ] MHP

CALIFORNIA                                                    DEPARTMENT OF CORRECTIONS

## ...ES VIOLATION REPORT                                       0-234L

| NUMBER | INMATE'S NAME | RELEASE/BOARD DATE | INST. | HOUSING NO | LOG NO |
|---|---|---|---|---|---|
| E48953 | Monette, Alex | Lifer | CTF-C | GW-237U | I-05-04-H0 |

| VIOLATED RULE NO(S) | SPECIFIC ACTS | LOCATION | DATE | TIME |
|---|---|---|---|---|
| 3016 (c) | ~~Consp. To Intro/Dist~~ Possession of Controlled Substances | Central Facility | 5/26/04 | 12:00 |

CIRCUMSTANCES

On May 26, 2004, at approximately 1200 hours, the Investigative Services Unit (ISU) concluded an investigation into a conspiracy to introduce and distribution of controlled substances into the institution by Inmate Fuller, H-45171, ZW-230U, Monette, E-48953, GW-237U, Inmate Hemphill, C-63328, GW-237L, a CTF-Soledad Medical Department staff member and several civilians, when it was notified that an investigation had been completed by the California Department of Corrections, Office of Internal Affairs.

Previously in the investigation, the Investigative Services Unit received a report from the California Department of Justice, Forensic Services Laboratory in Watsonville, California, indicating a combined positive test for 437.44 grams of marijuana. It should be noted that the Laboratory did not analyze or weigh two bindles that had a combined presumptive weight of 203 grams.

On May 22, 2002, at approximately 0845 hours, Materials and Stores Supervisor I (M&SS I) R. Angeles observed a partially opened white box addressed to CTF-Soledad Medical Department personnel. M&SS I Angeles

| REPORTING EMPLOYEE | DATE | ASSIGNMENT | RDO'S |
|---|---|---|---|
| D. J. Doglietto, Correctional Officer | 5/26/04 | Post # 1505 | S/S/H |

| REVIEWING SUPERVISOR'S SIGNATURE | DATE | [X]INMATE SEGREGATED PENDING HEARING | LOC |
|---|---|---|---|
| D. Mansfield, Correctional Sergeant | 5/26/04 | | |

| CLASSIFIED | OFFENSE DIVISION | | CLASSIFIED BY: (Typed Name and Signature) | HEARING REFERRED TO |
|---|---|---|---|---|
| [ ] SERIOUS [X] | B6 A-2 | 6-1-04 | Lt. D. King, Jr. | [ ] SHO [ ] SC [ ] FC |

COPIES GIVEN INMATE BEFORE HEARING

| [X] CDC 115 | BY: (STAFF'S SIGNATURE) C/O R. Shaw | DATE 4/9/04 | TIME 1000 | TITLE OF SUPPLEMENT 13 sets - phone records |
|---|---|---|---|---|
| | | | | pages 20,21 - missing from evident pkg |

| [ ] INCIDENT REPORT LOG NUMBER 03 | BY: (STAFF'S SIGNATURE) C/O R. Shaw | DATE 4/9/04 | TIME 1100 | BY (STAFF'S SIGNATURE) C/O J.G. REYES | DATE 8/13/04 | TIME 1035 |
|---|---|---|---|---|---|---|

HEARING

FC 09-05-0080  C/O R. Shaw III PAYES   6/15/04 0930 Hrs.

I/m Monette waived the 24 hour period for review of the letters submitted into evidence (signature) E48953

On 08/17/04, at approximately 1230 hours, Inmate MONETTE, appeared before this Senior Hearing Officer

**(HEARING CONTINUED ON ATTACHED CDC 115-C)**

**FINDINGS:** Inmate MONETTE was found 'Guilty' of a lesser charge, specifically: "Possession of Controlled Substances", CCR, Title 15, §3016(a), a Division B-6 level offense.

**(FINDINGS CONTINUED ON ATTACHED CDC 115-C)**

**DISPOSITION:** The SHO elected to reduce this RVR, from Division "A-2", CCR, Title 15, §3016(a), with specific act of "Conspiracy to Intr./Dist. Controlled Substances" to a Division "B-6", with specific act of: "Possession Of Controlled Substances"; and Inmate MONETTE was found "Guilty" (of lesser included offense) - in violation of CCR, Title 15, §3016(a).

**DISPOSITION CONTINUED ON ATTACHED CDC 115-C)**

REFERRED TO [ ] CLASSIFICATION [ ] BPT/NAEA

| ACTION BY: (TYPED NAME) L.B. TUCKER, Correctional Lieutenant | SIGNATURE LT | DATE 9/04 | TIME 1122 |
|---|---|---|---|

| REVIEWED BY: (SIGNATURE) R.A. POPE, Facility Captain | DATE 9-31-04 | CHIEF DISCIPLINARY OFFICER'S SIGNATURE W. Hill, Associate Warden | DATE 9-22-04 |
|---|---|---|---|

| [X] COPY OF CDC 115 GIVEN TO INMATE AFTER HEARING | BY: (STAFF'S SIGNATURE) | L.M. ELLIOTT | DATE 9-1-04 | TIME 1200 |
|---|---|---|---|---|

CDC 115 (7/88)

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE _2_ OF _35_

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 8/17/04 |

☐ SUPPLEMENTAL ☒ CONTINUATION OF: ☐ 115 CIRCUMSTANCES ☒ HEARING ☐ IE REPORT ☐ OTHER _____

HEARING - continued:
(Correctional Lieutenant C.B. Tucker), for the adjudication of CDC-115, Rules Violation Report, Log #: I-05-04-40, charging him with violation of CCR, Title 15, §3016(c), for the specific act of: "Conspiracy To Introduce/Distribut Controlled Substances", classified as a "Serious", CCR, §3323(c); a Division "A-2(8)" level offense. It is to be noted that after thorough considerations of all pertinent facts relevant to this case, the SHO subsequently elected to reduce this RVR to a lesser charge, dated 06/01/04, (from a Division A-2 to Division B-6 level offense, specifically: "Possession of Controlled Substances", CCR, Title 15, §3016(a), as indicated on the RVR.)

This SHO introduced herself and explained the purpose for this hearing, to include all applicable rules and procedures for the hearing, to Inmate MONETTE. Inmate MONETTE stated that he understood the process, and that his health was good. Also, he stated that he was ready, and felt prepared to proceed with this hearing. As indicated on the RVR, Inmate MONETTE is not a patient/participant in the Mental Health Services Delivery System (MHSDS) at any level of care. The circumstances portion of the RVR did not include evidence of bizarre or uncharacteristic behavior and a Departmental Mental Health Assessment (CDC-115X) was not necessary; neither was one required at the hearing.

STAFF ASSISTANT/INVESTIGATIVE EMPLOYEE ASSIGNMENT: This SHO reviewed the Inmate's TABE / GPL score and determined that Inmate MONETTE'S TABE score is above 4.0, and the assignment of a Staff Assistant was not necessary, as per CCR, Title 15, §3315(d). Inmate MONETTE waived (indicated in the CDC-115A, dated 06/09/04) the assignment of an Investigative Employee (I.E.), and as per CCR, Title 15, §3315(d)(1). Inmate MONETTE did request for the presence of Reporting Employee at the hearing.

DUE PROCESS: In the hearing, Inmate MONETTE initially verified/acknowledged receiving copies of all pertinent documents regarding this rule violations report, (and all pertinent documents, as described within the RVR) more than twenty-fours (24) prior to the hearing . As noted, the preliminary copy of the disciplinary report was served to Inmate within the mandated time-frame (15 days) of discovery. The hearing was held/started within thirty (30) days of service. Inmate MONETTE was advised by this SHO that this violation will be referred for felony prosecution. Inmate MONETTE was advised of the credit restoration procedures, per CCR, Title 15, §3327 (Restoration of Forfeited Credits), and §3328 Disciplinary-Free Periods). However, in this instant, being that the offense level is included within CCR, Title 15, §3327(a)(1), credit restoration is not available.

INMATE'S PLEA / STATEMENT: This Senior Hearing Officer read and explained the charge, as written to Inmate MONETTE , and he pled: "Not Guilty", stating "I am not guilty of this charge..

DISPOSITION - CONTINUED:
Being found "Guilty" as charged, Inmate MONETTE was assessed 90 days no visiting,(commencing: 09/08/04 through 12/07/04; followed by 90 days non-contact visiting (commencing: 12/07/04 - 03/07/05); and twelve (12) months random Mandatory Drug Testing, and is to provide a minimum of one (1) random drug test per month for one (1) year, beginning 09/08/04. Per CCR, Title 15, §3315(f)(5)(I)(1) – MONETTE has been ordered to enroll in and attend meetings of the Narcotics Anonymous. Assessed 150 days credit forfeiture, consistent with a Division "B-6", CCR, Title 15, §3323(d)(6), level offense.
**HEARING CONTINUED ON ATTACHED CDC 115-C)**

| SIGNATURE OF WRITER | DATE SIGNED |
|---|---|
| C. B. TUCKER, Correctional Lieutenant | 9-19-04 |

| | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
|---|---|---|---|
| ☐ COPY OF CDC 115-C GIVEN TO INMATE | | 8/23 | 1100 |

DC 115-C (5/95)

STATE OF CALIFORNIA                                                                   DEPARTMENT OF CORRECTIONS
RULES VIOLATION REPORT - PART C                                                       PAGE _3_ OF _35_

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|------------|---------------|------------|-------------|--------------|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 8/17/04 |

☐ SUPPLEMENTAL   ☒ CONTINUATION OF:   ☐ 115 CIRCUMSTANCES   ☒ HEARING   ☐ IE REPORT   ☐ OTHER _____

HEARING - continued:

FINDING - CONTINUED - Evidence included : (SHO's Finding continued from Page 1 of the hearing):

The SHO's finding was based upon a preponderance of the evidence submitted at the hearing, which substantiate the SHO's final conclusion. Supportive evidence included:

(1) Information provided in the RVR, dated May 26, 2004, (to include all subsequent nine pages, continuation of circumstances/supplementals relevant to this RVR) by the Reporting Employee, Correctional Officer D. J. Doglietto, wherein occurrences of events were described/summarized and miticulously composed.

(2) CDC Form 837s, (Incident Reports), Log Numbers: CTF-CEN-03-10-0263; CTF-CEN-02-05-0080; and phone records.

(3) Statements provided by MONETTE during the hearing.

(4) Also, submitted and taken into considerations were the testimonies provided by the requested inmate witnesses (Inmate FULLER, H-45171, and Inmate HEMPHILL, C63328) throughout the hearing process.

WITNESS (or WITNESSES) REQUESTED:  As indicated in CDC-115A, Inmate MONETTE requested for Inmate HEMPHILL, C63328, and Inmate FULLER, H45171, to be present at the hearing (granted by this SHO), dated 08/22/04, for questioning.

Also entered as witnesses (staff):

Dr. Joseph E. Graas, Director of San Diego Reference Lab – 08/27/04
C/O Mendez, Third Watch, Second Floor Infirmary Officer – 08/27/04
C/O D. J. Doglietto – 09/08/04, 1130 hours.
Agent West – 09/08/04
Dr. G. Howlen – 08/27/04.

(HEARING CONTINUED ON ATTACHED  CDC 115-C)

| | SIGNATURE OF WRITER | DATE SIGNED |
|--|--|--|
| | C. B. TUCKER, Correctional Lieutenant | 9/9/04 |
| COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
| | | 9/23/09 | 1100 |

CDC 115-C (5/95)

3

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE _4_ OF _35_

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 8/17/04 |

☐ SUPPLEMENTAL   ☒ CONTINUATION OF:   ☐ 115 CIRCUMSTANCES   ☒ HEARING   ☐ IE REPORT   ☐ OTHER _____

HEARING - continued:

After meticulous review of the evidence, Inmate MONETTE is being found GUILTY of a lesser included offense, the specific act of "Possession of Controlled Substance," in violation of CCR, Title 15, CCR § 3016(a), a Division "B" offense.

Actual Possession defined: Having it on your person, preferably in your hands.

Constructive Possession: If something is in an area under your domain and control, anything in this area belongs to you. It only means that you have it under your control.

Controlled Substance defined: A specific term defined by both Federal and State statutes (H&S 11054-11058) In general, any substance that falls under one of these categories is a controlled substance: Opiates, Opium derivatives, hallucinogenic substances, depressants, cocaine and its derivatives, stimulants, codeine, and other narcotics - marijuana is a controlled substance.

This SHO struggled when addressing the specific act of "conspiracy to introduce/distribute controlled substance into the institution," through the mail. Through the evidence provided in the RVR #I-05-04-41, Incident Report CTF-CEN-02-05-0080 and the recorded phone records, there must be documentation establishing a direct and unequivocal connection between Inmates MONETTE, HEMPHILL and FULLER in this conspiracy. To identify this evidence, it is essential that one is familiar with the definition of a conspiracy, which reads as follows:

Conspiracy requires more than one person. There must be evidence of an agreement to commit a criminal offense. When an inmate is aware of and agrees to the plans, and actively promotes or assists these plans, the inmate is a member of the conspiracy. In order to establish an inmate's guilt in a conspiracy, the inmate or any other member of the conspiracy must make some type of an "overt act" in furtherance of the conspiracy. Agreement can be shown by circumstantial evidence. It can also be shown by the relationship of the conspirators or their common interests. Simple association is not enough.

Conspiracy requires evidence of an "overt act". An "overt act" occurs when the conspiracy moves from the planning stage to acting. If roles are assigned to each member of the conspiracy and they carry out these roles, this is an "overt act". They are no longer talking and have put the plan into action.

Penal Code, Section 184, defines "overt act" as follows:
No agreement amounts to a conspiracy unless some act, besides such agreement, be done within this state to effect the object hereof, by one or more of the parties to such agreement and the trial of cases of conspiracy may be had in any county in which any such act can be done."

A conspiracy to distribute controlled substances within the Institution usually consists of two or more individuals who form a criminal conspiracy to acquire and sell controlled substances to other inmates. This is where the goal of the conspirators includes acquiring a controlled substance for sale to other inmates (even if personal use is also intended). Additionally, if the quantity is greater than a reasonable amount for personal use, or the controlled substance is packaged for re-sale, it is reasonable to assume that this was a conspiracy to acquire and sale to others.

HEARING CONTINUED ON ATTACHED CDC 115-C)

| | SIGNATURE OF WRITER | DATE SIGNED |
|---|---|---|
| | C. B. TUCKER, Correctional Lieutenant | 9/9/04 |
| ✓ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED 9/15/09  TIME SIGNED 1100 |

DC 115-C (5/95)

4

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE 3 OF 35

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | 1 -05-04-40 | CTF-C | 8 12 04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER |
|---|---|---|---|---|---|

HEARING - continued:

Although there is clear and convincing evidence which proves Inmate FULLER's guilt of the specific act of "conspiracy to Introduce and Distribute a Controlled Substance into the Institution," through the mail, in violation of Title 15, CCR § 3016(c), a Division "A-2" offense, the evidence establishing FULLER's guilt does not show a nexus to Inmate MONETTE.

The issue in question is whether there is circumstantial and/or direct evidence which proves Inmate MONETTE's involvement in the planning, purchase and introduction of two (2) parcels of marijuana received by the Institution's warehouse and mailroom via the mail on 5-22-02. After review of numerous recorded phone records, which consisted of calls placed by Inmate HEMPHILL (MONETTE'S cellie) from the Institution initially on it's face seemed to reveal the possibility of Inmate MONETTE's involvement in this conspiracy. However, upon further and a more detailed review, specifically during the RVR hearing, it became apparent through questioning witnesses, and thorough review of the evidence provided, that the nexus initially established when reading the documents in evidence, such as the RVR, phone records, and Incident Report became questionable incomplete, incomplete, flawed, and less reliable in establishing Inmate MONETTE'S direct involvement in this conspiracy.

Through the recorded phone records submitted by Correctional Officer D. Doglietto regarding conversations by Inmate HEMPHILL to his family members, there is much discussion regarding somewhat suspicious conversation which implicates Inmate MONETTE. Additionally, the nickname Inmate HEMPHILL calls his brother .. "Moe" (nickname - not AKA), which is similar to an individual in Inmate FULLER's conversation by the same name. "Moe" (AKA).  When questioning Inmate FULLER regarding "Moe," during the RVR hearing of Inmate MONETTE, he explained that his friend "Moe", was a close childhood friend. Then he revealed a tattoo on the back of his right bicep which read "Moe." This led me to believe that this could not be the same individual as the "Moe" Inmate HEMPHILL refers to (his brother's nickname), being that they were not raised in the same area, nor were they familiar with each other's families.  It is important to understand that the association of Inmate MONETTE to Inmate HEMPHILL by being cellmates alone, does not establish, nor confirm criminal activity involvement by this relation alone.  To do so would be inappropriate and taint the hearing process by ignoring rules of evidence.  It is also essential to understand as an SHO that although the standard of proof is a preponderance of evidence, the conclusion of guilt must still be based on clear evidence.
This standard, although a lesser burden does not mean that incomplete or unclear information submitted as evidence hold more reliability because the standard of proof is lower.  To do so is unacceptable and negligent in addressing a finding of guilt.

This RVR contained numerous pages submitted into evidence for review by this SHO. The seriousness of the charge in addition to the involvement of individual other than inmates inside and outside of the institution, as well as a plethora of circumstantial evidence regarding the conspiracy to introduce/distribute controlled substance. It was necessary to be extremely meticulous with this RVR and the evidence because there are liberty issues which the outcome will effect.  To rush through such a complex case would be irresponsible.
There must be evidence to establish such activity.
HEARING CONTINUED ON ATTACHED CDC 115-C)

SIGNATURE OF WRITER
C. B. TUCKER, Correctional Lieutenant

GIVEN BY: (Staff's Signature)

☐ COPY OF CDC 115-C GIVEN TO INMATE

DATE SIGNED 9/9/04

DATE SIGNED 9/25/04    TIME SIGNED 1100

CDc

OC 115-C (5/95)

5

STATE OF CALIFORNIA
**RULES VIOLATION REPORT - PART C**

DEPARTMENT OF CORRECTIONS
PAGE 6 OF 35

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 9/18/04 |

☐ SUPPLEMENTAL  ☒ CONTINUATION OF:  ☐ 115 CIRCUMSTANCES  ☒ HEARING  ☐ IE REPORT  ☐ OTHER _____

HEARING - continued:

Phone conversation on 03/02/02 (08:37:45, by Inmate HEMPHILL, per Criminal Complaint); it states that MONETTE'S girl will get at him Tuesday. When asked on clarification by Inmate MONETTE, he stated, "He's not talking about me!" When I looked at the actual phone transcript, it reads; "Yeah, he's going to call his girl ...his girl ... going to call you." Additionally, after review of the majority of Inmate HEMPHILL'S phone conversations, it was evident that he switches conversation throughout his recorded phone calls, and regardless of the topic. In the end of his conversation, as covered earlier, Inmate HEMPHILL'S hesitance for not discussing, "that on the horn right now", was testified to as a marijuana cigarette in his pocket, which I do find credible by the response of the recipient in the phone conversation as surprised; by stating, "For reals!".

In the body of the criminal complaint, there are interviews with unidentified inmates regarding I/M WATERS and I/M MONETTE. On page 21, an Inmate offers the statement that WATERS and MONETTE are now working with an unidentified inmate as well. However, there was no supporting evidence offered to substantiate or validate this statement as credible, other than the statement itself. On 12/02/03, Special Agent Gary West conducted an interview with another unidentified inmate, who made the statement, "that he was surprised to hear that GHOST (WATERS) and "AL" (MONETTE) had been rolled up for drugs. The inmate offers his "opinion" by stating that they were working for someone else. This opinion offered into evidence by this inmate is unsubstantiated. In accessing the evidence, it was necessary to review witnesses statements when interviewed on their direct observations of Inmate MONETTE and his interactions with staff while at work in the infirmary, second floor. The information provided showed that there was accountability for the time period one spent away from his work site, when on duty. On March 23, 2004 (03/23/04), C/O Doglietto interviewed an officer who was assigned to the second floor Infirmary, on 2nd Watch, from 01-24-2000 to 01-28-02. After closer observations of the dates, when the officer was assigned, I realized that inmate MONETTE was not yet assigned to the infirmary at that time, during the period this officer was assigned to second floor infirmary. So who was the employee referring to (inmate) and why was it inclusive in reference to Inmate MONETTE?

The interview of another medical staff member on 04-07-04, recalled her observations of conversations between an employee and inmates MONETTE and WATERS for hours at a time. However; in the note portion of this interview on Page 33, the employee was not able to distinguish between the photographs of inmates MONETTE and WATERS. The one photo she was certain of was MONETTE. This employee currently is assigned from 0600-1400 hours. This employee does introduce information in regards to "WAM Designs," and the employee in question, and how the employee tells her that she went to Fontana down by LA., "to see her uncle and met her uncle's new girlfriend. This information was disclosed a couple days before the 911 products were brought in for the employee to sell. The employee also was observed by this staff member carrying her cell phone wherever she went.

HEARING CONTINUED ON ATTACHED CDC-115C)

| SIGNATURE OF WRITER | DATE SIGNED |
|---|---|
| C. B. TUCKER, Correctional Lieutenant | 9/19/04 |

| COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
|---|---|---|---|
| | | 9/25/04 | 1150 |

DC 115-C (5/95)

STATE OF CALIFORNIA                                                      DEPARTMENT OF CORRECTIONS
RULES VIOLATION REPORT - PART C                                         7  PAGE _7_ OF _35_

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 9/18/04 |

| ☐ SUPPLEMENTAL | ☐ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☐ HEARING | ☐ IE REPORT | ☐ OTHER _____ |
|---|---|---|---|---|---|

HEARING - conitnued:

This information relayed by the staff member regarding "WAM Design" and the cell phone is consistent with information known to be true, such as Inmate MONETTE'S mother and her "WAM Design" business located in Fontana.  Also, the employee's disobedience of Institutional Policy, for no cell phones allowed inside the institution except by certain employees. This created the opportunity for the misconduct and over-familiarity by the employee in relinquishing the cell phone to I/M MONETTE for use in his cell, which also created the opportunity by other inmates to use the cell phone (Nokia/Nextel).  As a result of this over-familiarity the employee inappropriately conducted business with the family of an inmate; therefore, becoming over-familiar with the inmate and providing him illegal access and usage of two personal cell phones. Inmate MONETTE is responsible as well for his voluntary acceptance of the cell phone, which he knew was unauthorized.  The over-familiarity has been established clearly between the employee and Inmate MONETTE and WATERS.  However, what I cannot establish is their participation in the conspiracy of distribution/introduction of controlled substance.  Yes, there are phone records from the cell phone numbers, but what was also established is the fact that Inmates HEMPHILL, WATERS and FRAZIER,  had access to the cell phones, and did on occasion use them.

It is confirmed by the Medical Department that Javier Martinez picks up U.P.S. from the procurement warehouse, one has to inquire, if these parcels were not discovered at the warehouse as to their contents, and enter inside the institution by a staff member, where would this box eventually end up? Yes, it is established that Javier only picks up UPS shipments, but if another medical employee picks up these parcels by chance, would they eventually  arrive downstairs to the basement?  Is this feasible? It is not feasible for the boxes to be taken to medical records, because by appearance alone  staff's desks are placed so closely to each other, you could not conceal the contents or the boxes themselves.  This would draw suspicion.    Therefore, such a big piece of mail would be suspicious, especially being addressed to someone in the basement in the Medical Department.  If the box was taken to the CMO's office, where the individual would be notified for pick  up.  The box would make it down to the Medical Depatrmtnet.  This parcel could have easily been picked up by Javier and taken to the basement to store away without his knowlege of its contents.  An inmate who has access to this area and assists Javier with unpacking these boxes could easily continue to conceal the marijuana  shipment by careful removal  of the flyers from the box.  Again, after Javier would have opened the box, discovering the contents, he could have unsuspectingly had the  inmate unpack its contents without suspicion. The fact that the parcel did not arrive as U.P.S.; I believe should not be the focal point and not the real issue.  The introduction inside the institution and by which means it was to arrive to medical for distribution to the mainline, given the set of circumstances presented is similar to what has  been set forth by C/O Dogletto, as a theory, and nothing more when presented at the administrative hearing process.

This investigation is much more broad than what has been discovered thus far.  It is important that  the focus into this investigation not be deminished by the implication and prosecution of the current alleged conspirator.  When attempting to discover the players, the planning and the sources within and outside the institution, I feel it is clear that other inmates are involved and  still conducting business as usual.

HEARING CONTINUED ON ATTACHED CDC 115-C)

| | SIGNATURE OF WRITER | DATE SIGNED |
|---|---|---|
| | C. B. TUCKER, Correctional Lieutenant | 9/19/04 |
| ☐ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED  9/28/04 | TIME SIGNED 1105 |

CDC 115-C (5/95)

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE 8 OF 35

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 8/17/04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER |
|---|---|---|---|---|---|

HEARING - continued:

During the course of the RVR, Inmate FULLER adamantly denied Inmates MONETTE and HEMPHILL's involvement in this conspiracy. This was validated by the conspirators and confirmed in the phone conversation between Inmate FULLER and Trina, dated 05/14/02, in which Trina validates the fact that Inmate HEMPHILL's people did not contact Trina, even though she made two efforts to do so.

In the adjudication of this RVR, it is essential that the SHO address the evidence as it relates to Inmate HEMPHILL, as well as Inmate MONETTE, due to the evidence of criminal involvement in this conspiracy  in addressing the evidence introduced  both inmates are jointly implicated..

Phone recorded records, dated 5-14-02, Trina is told by Inmate FULLER to give $100.00 to his "Moe."  Where as in another conversation between Inmate HEMPHILL and  his people, he tells them the figure $100.00 (for his birthday purchase). Again, if his is  the same "Moe," why would HEMPHILL want him (his brother "Moe") to pay $100.00 and FULLER would pay him right back?  This does not make sense, nor is it reasonable.
These conversations led me to believe that the individual "Moe" is not  the same person as the "Moe" alluded to in conversations.

Additionally, the phone records dated 4-30-02, a conversation between Inmate FULLER and Trina when FULLER references "two fifty." The conversation sounds more like the purchase of an item other than narcotics (canning machine). The conversation between Inmate HEMPHILL and Billy Ray on 3-2-02 at 0837 hours, HEMPHILL comments on  Page 17, Line 10, "I got one," this is referencing possession of a marijuana cigarette in his pocket at the time of the call, which was disclosed by Inmate HEMPHILL at the RVR hearing.

The recorded phone conversations by Inmate HEMPHILL to Corshia, Billy Ray and his nephew, as suspect as some of the content in discussion and conversations, it is not clear in this  evidence, nor does it establish that Inmate HEMPHILL'S  and MONETTE'S direct  connection, or affiliation  with Inmate FULLER'S conspiracy.  To do so, I would have to speculate  or make  suppositions regarding these conversation.  Inmate FULLER's recorded  phone conversations validate the fact that Trina made negative contact with Inmate HEMPHILL's people. There is no clear assignment to conspirator roles isolating and recognizing direct involvement by Inmate MONETTE. The planning and preparation which is obviously communicated by Inmate FULLER to Trina during their recorded conversation is not present in Inmate  HEMPHILL's conversations, to directly tie him and Inmate MONETTE  to Inmate FULLER'S conspiracy.

The monitored phone records of Inmate FULLER regarding conversations he had with the non-CDC employee Trina, revealed the planning and delegating of the roles and duties of the conspirators implementing the conspiracy into action. It is also evident  the interview of Trina, contained in the Incident Report, where she is interviewed by Special Agent West on 10/16/03 regarding this conspiracy. There is clear implication of an ex-inmate, A.K.A. "Hoss." As well as the need to consider the inmate only identified by ISU, who provided the monetary support for this specific act of "Conspiracy to Introduce/Distribute Controlled Substance in the Institution," through the mail.

HEARING CONTINUED ON ATTACHED CDC 115-C)

| | SIGNATURE OF WRITER | DATE SIGNED |
|---|---|---|
| | C. B. TUCKER, Correctional Lieutenant | 9/9/04 |
| ☐ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED    TIME SIGNED |
| | | 9/29/05    1100 |

C 115-C (5/95)

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE _9_ OF _35_

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 8 17 04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER |

HEARING - continued:

This evidence has definitely established the planning, headed by Inmate FULLER and with the assistance of the co-conspirators, as well as the execution of the act itself. The evidence identified Trina, the non-CDC employee as purchasing and making the copies of the medical literature which was contained in both parcels in order to conceal the marijuana. The printed mailing labels and the information contained on both labels were done in order to present legitimacy to the parcels as being sent from ETR Associates. The planning was so meticulous in the preparation of these parcels, it went as far as filling both parcels with known literature normally purchased and received through this particular vendor, for dissemination to the general inmate population at CTF.

The non-CDC employee Trina also identified an ex-inmate, who was later validated as having been incarcerated at CTF, A.K.A. "Hoss," as preparing the boxes for the packing of the marijuana, and the labels contained on both parcels. Trina also admitted to paying for and mailing out both parcels from Lynnwood, California, which was the postmark on both parcels.

We must not ignore the involvement of the unidentified inmate (known to ISU) who provided $3,500.00 to the non-CDC employee, Trina, which could only be utilized for the purchase of narcotics. This SHO truly believes that his role is just as guilty, if not more than the others involved in this conspiracy. The provision of monetary funds alone, withdrawn using a fabricated debt, then forwarded to an individual on the streets who is actively involved in a conspiracy for distribution and introduction of narcotics into an institution, is extremely suspect.

The phone records revealed numerous conversations between Inmate FULLER and his mother. Inmate FULLER's mother was also inclusive in this investigation. Inmate FULLER's mother did on several occasions pass information/messages to Trina for Inmate FULLER. However, it is not clear or likely that she was aware of her son's criminal activity in its entirety. These phone records proved to be valuable in the conversations between Inmate FULLER and Trina. Their numerous recorded contacts revealed the conversations regarding the cost of the photo copies, the somewhat coded conversations about the expected mailing of the parcels, the paperwork sent out by Inmate FULLER (medical literature), the inquiring about the marijuana and the amount of parcels being sent. The totality of evidence reveals planning, preparation and roles of the individuals directly involved in this conspiracy. There is substantial evidence of an overt act committed by Inmate FULLER, non-CDC employee Trina, ex-inmate A.K.A. "Hoss," and in this SHO's opinion the inmate providing the monetary funds known to ISU, totaling $3,500.00.

The RVR speaks to the involvement of Inmate HEMPHILL, C-63328, and Inmate MONETTE, E-48953. It is evident that this conspiracy has other players who have not been appropriately identified yet, however, I have great difficulty in directly establishing a nexus between Inmate FULLER with Inmate HEMPHILL and Inmate MONETTE. However, I do believe that HEMPHILL, MONETTE and WATERS, though not conspiring with inmate FULLER, possibly are involved in separate activities which is adverse in nature combined with their present incarceration status, therefore, illegal and possibly criminal. I can only speculate to this. This theory is supposition, which cannot be deemed credible or reliable based on the lack of evidence required to validate it as truth, beyond Inmate MONETTE'S possession of marijuana in the cell, his positive urinalysis for THC and the cell phone charger in his cell.

**HEARING CONTINUED ON ATTACHED CDC 115-C)**

| SIGNATURE OF WRITER | DATE SIGNED |
|---|---|
| C. B. TUCKER, Correctional Lieutenant | 9/9/04 |

| ☑ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
|---|---|---|---|
| | | 9/13/04 | 1100 |

OC 115-C (5/95)

9

STATE OF CALIFORNIA

RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE 10 OF 35

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 8/17/04 |

☐ SUPPLEMENTAL  ☒ CONTINUATION OF:  ☐ 115 CIRCUMSTANCES  ☒ HEARING  ☐ IE REPORT  ☐ OTHER _____

'Even though Page 13 of 111 states that Inmate MONETTE and WATERS made additional calls to inmates asking relatives to send money ($100.00 to $150.00) to Inmate MONETTE'S grandmother, where is the evidence of such conversations taking place? C/O D. Doglietto, when questioned on this point in the course of the RVR hearing on 09/08/04, stated that I/M CRANDLE made a call, but the phone records were not available, nor offered into evidence to support this statement, of other inmates', and CRANDLE'S conversation. Inmate MONETTE'S explanation at the RVR hearing regarding the $100.00 to $150.00 phone conversations that his mother's business "WAM" required an initial investment of these amounts in order to get started. Inmate MONETTE explained that this was how "WAM" worked. The donation to 9-11 would be subtracted from the initial investment fee and forwarded to that charity. All merchandise would then be sold at a profit for the individual who purchased into the business. Besides this statement alone, there is no supporting evidence of this, when requested, C/O Doglietto was unable to bring the items to the RVR hearing because he felt this document did not exist in what was confiscated from MONETTE'S cell. Even so, there is still no connection to Inmate FULLER.

The nexus between Inmates FULLER, MONETTE and Inmate HEMPHILL, when reviewing phone records seems apparent. That is until clarification could be provided during questioning of witnesses during the RVR hearing. I could not establish a clear and concrete nexus involving Inmate MONETTE and Inmate FULLER in this particular conspiracy (Inmate MONETTE is guilty of specific act not directly related to this case, which consists of a cell phone possession and possession of marijuana and MONETTE'S over-familiarity with staff.) Inmate HEMPHILL's habitual drug usage immediately makes him suspect, through family, giving money to Trina, that never happened nor was there a real effort made by HEMPHILL's people to do so, by not connecting with Trina, even though Trina made an effort to do so. (According to Inmate FULLER, Inmates HEMPHILL and MONETTE, and the medical record, staff member have no involvement with this conspiracy, which he openly and voluntarily verbalized numerous times during the RVR hearing.)

The calls were outgoing, and the majority were to Inmate MONETTE'S family. Taking this evidence into consideration and applying it to this current conspiracy, what does this mean? There is the assumption that these calls were made for the purpose of drug trafficking. To assume this would be inappropriate; beyond these calls being made to his mother and family, there is no evidence provided of the content of discussion, or if in fact the individual MONETTE was speaking to was a drug dealer, unless you categorize his mother, as such, there is no evidence of this.

On Page 12 of 111 (original package issued)...the last paragraph contains a sentence that reads: "Additional calls were made to inmates WATERS, H-11664, FRAZIER, P-33880 and HEMPHILL, C-63328." This paragraph begins by stating that in May and July 2002, over three-hundred (300) calls had been placed from this number to the parents and wife of Inmate MONTTE, E-8953. These calls were made by cell phone. During the hearing, C/O Doglietto confirmed that this was a typo, and should have read "calls placed by" instead. Again, the information regarding the cell phone disclosed numerous calls to MONETTE'S family. Additionally, others did use the cell phone which was testified to at the RVR hearing by both inmates MONETTE and HEMPHILL.

On Page 14 of 111, Paragraph #2 reveals again that numerous calls were made to the parents and relatives of Inmate MONETTE and Inmate WATERS. At the RVR hearing I/M MONETTE admitted to having a cell phone a couple days a week and on the weekends sometimes. Inmate MONETTE also admitted to the cell phone being given to him by an employee (either Nokia or a Motorola), but refused to disclose or identify this employee. Inmate MONETTE admitted during the RVR hearing that he made numerous phone calls to his family and wife. Inmate MONETTE adamantly denied receiving calls to the cell phone, except from his mother.

HEARING CONTINUED ON ATTACHED CDC 115-C

| | SIGNATURE OF WRITER | DATE SIGNED |
|---|---|---|
| | C. B. TUCKER, Correctional Lieutenant | 9/8/04 |
| | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
| ☐ COPY OF CDC 115-C GIVEN TO INMATE | | 9/28/04 | 1100 |

IC 115-C (5/95)

10

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE 11 OF 35

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 8/17/04 |

☐ SUPPLEMENTAL  ☒ CONTINUATION OF:  ☐ 115 CIRCUMSTANCES  ☒ HEARING  ☐ IE REPORT  ☐ OTHER

HEARING - continued:

In closing, it is truly disturbing to realize that there is an additional staff involvement beyond what is realized as of this date. Currently, one staff member has been named for their alleged involvement with adverse ramifications, when it is all too clear that there is possibly another medical staff member involved in this conspiracy, whom at this point are not recognized or identified. One has to wonder how the knowledge was obtained and acquired to utilize the HIV medical literature, with the current distributor of these flyers, the correct return address and the mailing address, and to a specific employee who picks up parcels at the warehouse and their exact extension number.

It is disturbingly apparent that there was a lot of thought, planning and preparation put into the disguise of the marijuana shipment. The idea of its packaging and concealment by the HIV medical literature leads me to believe the involvement of staff's knowledge and familiarization regarding these types of bulk packaging and medical shipments sent to the institution, and by what vendor, as not to draw suspicion to the parcels. The reason for discovery was only due to the diligence of Warehouse staff in observing the contents as being suspect when the contents was revealed by the tear in the box. If not for the damage on the box, this discovery would not have been made. During the RVR hearing, Inmate FULLER denied the involvement of the employee who was adversely removed from their job site. . Inmate FULLER states he does not know who she is. Inmate FULLER expressed sympathy for the employee removed their position. for being identified as a party to his conspiracy, when he adamantly states that she is not. During the course of the RVR hearing, Inmate FULLER was asked several times to reveal the identity of the staff involved, but he declined to do so. Inmate FULLER also stated that both inmates MONETTE and HEMPHILL had nothing to do with what he had going on, and that he did not even know the staff member named in his criminal complaint.

Although there is clear and convincing evidence which proves Inmate FULLER's guilt of the specific act of "Conspiracy to Introduce and Distribute a Controlled Substance into the Institution," through the mail, in violation of Title 15, CCR § 3016(c), a Division "A-2" offense, the evidence establishing FULLER's guilt does not show a nexus to Inmate MONETTE.

Inmate MONETTE'S finding of guilt of a lesser included offense, the specific act of: "Possession of a Controlled Substance," is based on the following evidence:

- Incident Package CTF-Central 03-10-0263. In a report authored by ISU Officer J.C. Ramirez he states that on 9-23-03, at approximately 0930 hours, while assigned as ISU Officer, he was instructed, along with ISU Officer E. Oglesby, to conduct a search of cell GW-237, occupied by Inmate HEMPHILL, C-63328, and Inmate MONETTE, E-48953. During the search of the bed and locker area of Inmate MONETTE, GW-237L, I discovered three (3) bindles of green leafy material wrapped in plastic. These bindles were located in a skull cap hanging on a side rail near the bead area, of Inmate MONETTE'S bunk in open view.

- Inmate HEMPHILL's admission during the RVR hearing as to the marijuana in the skull cap belonging to him, not Inmate MONETTE. However, it was later revealed that this initial admission by HEMPHILL was not cooperative.   This response of ownership was confirmed by agreement to pay HEMPHILL the sum of $250.00.

HEARING CONTINUED ON ATTACHED CDC 115-C)

| | SIGNATURE OF WRITER | DATE SIGNED |
|---|---|---|
| | C. B. TUCKER. Correctional Lieutenant | 9/19/04 |
| ☐ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED   TIME SIGNED |
| | | 9/21/04    1101 |

IC 115-C (5/95)

11

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE 12 OF 35

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 8 17 04 |

☐ SUPPLEMENTAL  ☒ CONTINUATION OF:  ☐ 115 CIRCUMSTANCES  ☒ HEARING  ☐ IE REPORT  ☐ OTHER _____

HEARING - continued:

3-A Motorola brand cellular phone charger was discovered by ISU Officer, I. N. Oglesby in the locker of Inmate MONETTE.

4- The presumptive test resulted positive for marijuana, and weighed the approximate weight of 15 grams with plastic wrap. The large bindle 14 grams, the two little bindles 0.5 grams.

5- On 9-23-03, at approximately 1800 hours, Inmate MONETTE was ordered by Officer E. Umi to submit to a urine sample, which was witnessed by Officer Chamberlin.

6- A report from the San Diego Reference Lab, Department of Corrections, Controlled Substances Urinalysis testing, received on 10-01-03 by ISU, revealed a positive urinalysis for Inmate MONETTE, E-48953, for THC (marijuana.)

7- A Department of Justice, Bureau of Forensic Services, report for controlled substances dated 10-2-03, and received by ISU on 10-6-03 validates item JR1- One large bindle containing green leafy matter as marijuana: 10.96 grams net. Items JR2 and JR3 were both analyzed. The subject of this report is listed as MONETTE, E-48953, owner of the marijuana in this report.

8- On 9-11-02, a staff member submitted a memorandum to Warden Jim Hamlet at CTF requesting permission to sell items from a company called "WAM Designs".

9- November 14, 2004, Agent West received a photo-copy of a check, dated September 19, 2002, signed by Jill Brown. The check was made out to "WAM Designs" with a memo "notaover", "T-Shirt and two (2) coffee mugs". On the reverse side, the check was endorsed by the mother of Inmate MONETTE.

10- On 9-23-03, envelope bearing handwritten address of employee, discovered during the cell search of Inmate MONETTE'S cell, G-237.

**HEARING CONTINUED ON ATTACHED CDC 115-C)**

SIGNATURE OF WRITER   C. B. TUCKER, Correctional Lieutenant   DATE SIGNED 9/19/04

☐ COPY OF CDC 115-C GIVEN TO INMATE

GIVEN BY (Staff's Signature)   DATE SIGNED 9-23-04   TIME SIGNED 1100

C 115-C (5/95)

12

STATE OF CALIFORNIA
**RULES VIOLATION REPORT - PART C**

DEPARTMENT OF CORRECTIONS
PAGE 13 OF 35

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 8/17/04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER |
|---|---|---|---|---|---|

HEARING - continued    (08/18/04, 1254 - 1346 hours)
The SHO asked  Inmate MONETTE the following questions:

| Q-1 | SHO | Do you know who Inmate Fuller? |
|---|---|---|
| A-1 | MONETTE | No, we did not know each other, we met 12/02. |

| Q-2 | SHO | During the search of your cell G-237, on 09/23/03, staff confiscated an approximate amount of 15 grams of marijuana from your cell, in a skull cap.  Did this marijuana belong to you? (1-bindle large, 2 small bindles, one rolled cigarette). |
|---|---|---|
| A-2 | MONETTE | No. |

| Q-3 | SHO | On October 6, 2003, at approximately 1100 hours, results of your urine sample were received from San Diego Reference Laboratory.  The urine test indicated a positive test for the presence of marijuana.  Did you use marijuana frequently? |
|---|---|---|
| A-3 | MONETTE | Never. |

| Q-4 | SHO | The day of the cell search a phone charger was also confiscated from Cell G-237, occupied by you and I/M HEMPHILL.  Who did the phone charger belong to? |
|---|---|---|
| A-4 | MONETTE | Me. |

| Q-5 | SHO | Who gave it to you?  The source. |
|---|---|---|
| A-5 | MONETTE | Employee |

| Q-6 | SHO | Were you at anytime in possession of a cellular phone? |
|---|---|---|
| A-6 | MONETTE | Yes. |

| Q-7 | SHO | How often? |
|---|---|---|
| A-7 | MONETTE | Once a week. |

| Q-8 | SHO | For what purpose would you need a cell phone for ? |
|---|---|---|
| A-8 | MONETTE | Talk to family. |

| Q-9 | SHO | Do you realize that it is illegal for you to possess a cellular phone? |
|---|---|---|
| A-9 | MONETTE | Yes. |

| Q-10 | SHO | Did you ever allow Inmate HEMPHILL, your cellmate, use this cell – phone? |
|---|---|---|
| A-10 | MONETTE | Yes. |

| Q-11 | SHO | How many occasions – approximately? |
|---|---|---|
| A-11 | MONETTE | Several occasions. |

**HEARING CONTINUED ON ATTACHED CDC 115-C)**

| | SIGNATURE OF WRITER | DATE SIGNED |
|---|---|---|
| | C. B. TUCKER, Correctional Lieutenant | 9/19/04 |
| ☐ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
| | | 9/23/04 | 1100 |

Martin, CDO

C 115-C (5/95)

13

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE 14 OF 35

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 8/17/04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER _____ |
|---|---|---|---|---|---|

HEARING - continued  (08/18/04, 1254 -1346 hours):
SHO's questions to Inmate MONETTE
/

Q-12    SHO    What type of business does your mother have?
A-12    MONETTE    I don't have a business, it's illegal for us to have while incarcerated.  I did not have a business relationship with any state employee.

Q-13    SHO    This business your mother has also involves Inmate WATERS, is that correct?  *mother CT*
A-13    MONETTE    Yes.

Q-14    SHO    How did Inmate WATERS come to possess the large sum of money on his person?
A-14    MONETTE    Don't know.

Q-15    SHO    The fact that you received a cell phone from a staff member, in combination with phone records, identifies the staff member as being the female on the criminal complaint.  For what purpose and why such a thing?
A-15    MONETTE    Have no idea.

Q-16    SHO    At any point during your contact with the staff member, did you get the impression that the rapore  was becoming an infatuation on the part of the employee?
A-16    MONETTE    Yes, by the way she looked at me, and also her approval of allowing me access to a cell phone, knowing that I would only use it to contact my family, and advising my Mother on ideas and thoughts on her business.

Q-17    SHO    Were you surprised by being offered the usage of a cell phone?
A-17    MONETTE    Yes, but I was concerned about not wanting jeopardize her job, or my possible release from prison.

Q-18    SHO    Did you make that clear to the employee?
A-18    MONETTE    Yes.


SHO's questions to Inmate HEMPILL  (08/22/04, 0902/1207 hours)

Q-1    SHO    Are you and Monette part of the conspiracy with Inmate FULLER to introduce/distribute controlled substances into the Institution?
A-1    HEMPHILL    No.

**HEARING CONTINUED ON ATTACHED CDC 115-C)**

| | SIGNATURE OF WRITER C. B. TUCKER, Correctional Lieutenant | | DATE SIGNED 9/19/04 | |
|---|---|---|---|---|
| ☑ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |

OC 115-C (5/95)

14

STATE OF CALIFORNIA
**RULES VIOLATION REPORT - PART C**

DEPARTMENT OF CORRECTIONS
PAGE __15__ OF __35__

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 8/17/04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER _____ |

HEARING - continued:
SHO's questions to Inmate HEMPILL  (08/22/04, 0902/1207 hours)

Q-2  SHO On 09/23/03, C/O John Ramirez discovered three (3) bindles of green leaf substance
     wrapped in plastic, located in a skull cap hanging on a side rail near the head area
     of Inmate MONETTE'S bunk in open view. The substance later tested positive
     for marijuana. Who did the marijuana belong to?
A-2  HEMPHILL Mine.

Q-3  SHO On 09/23/03, C/O I. N. Oglesby searched the top bunk of G-237U, and found one (1)
     rolled cigarette with green leafy material inside. A presumptive drug screen test,
     tested positive for marijuana, weighing approximately 0.3 grams including the
     cigarette paper. Who did this marijuana cigarette belong to?
A-3  HEMPHILL Mine.

Q-4  SHO How often during the day on a daily basis did you smoke marijuana?
A-4  HEMPHILL Four days a week about.

Q-5  SHO Did Inmate MONETTE also smoke marijuana.
A-5  HEMPHILL Not to my knowledge.

Q-6  SHO On the day of the cell search where the marijuana was discovered in your cell, did
     you smoke marijuana?
A-6  HEMPHILL Yeah -- 4:30-5.00 A.M. -- whole cigarette.

Q-7  SHO The cell phone charger which was found in your cell G-237, in Inmate MONETTE'S
     locker, who did it belong to?
A-7  HEMPHILL It wasn't mine, I imagine ...

Q-8  SHO Was Inmate MONETTE in possession of a cell phone in G-237? And how often did
     you use the cell phone.
A-8  HEMPHILL Yes, several times.

Q-9  SHO How frequent was the cell phone in cell G-237?
A-9  HEMPHILL Twice and three (3) times a week.

Q-10  SHO Who did you call on the cell phone?
A-10  HEMPHILL Nephew and once (1) Trina.

**HEARING CONTINUED ON ATTACHED CDC 115-C)**

| | SIGNATURE OF WRITER | DATE SIGNED |
|---|---|---|
| | C. B. TUCKER, Correctional Lieutenant | 9/9/04 |
| | GIVEN BY (Staff's Signature) | DATE SIGNED | TIME SIGNED |
| ☐ COPY OF CDC 115-C GIVEN TO INMATE | | | |

DC 115-C (5/95)

15

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE 16 OF 35

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 8/17/04 |

☐ SUPPLEMENTAL  ☒ CONTINUATION OF:  ☐ 115 CIRCUMSTANCES  ☒ HEARING  ☐ IE REPORT  ☐ OTHER _____

HEARING - continued:
SHO's questions to Inmate HEMPILL  (08/22/04, 0902/1207 hours)

Q-11   SHO   On 10/06/03, the lab results of a urine sample collected from you and MONETTE was
?             received from San Diego Reference lab indicating a positive test for the presence of
.             marijuana; therefore, you and MONETTE were both charged with Possession of a Controlled
              Substance.  Do you find these results reliable?  Was MONETTE in the cell?
A-11  HEMPHILL  Yes - he had his head under the cover.

Q-12   SHO   You were asked in your RVR hearing  (03/02/02 at 08:37:45)about your statement
              to your brother regarding I/M MONETTE'S girl contacting him on Tuesday.
              What did you mean by this statement?
A-12  HEMPHILL  I don't recall.
              (MONETTE  interjects  that he was trying to hook HEMPHILL up  with a girl at one time.)

Q-13   SHO   In the phone transcripts, specifically 05/12/02 at 07:49:26, you discussed  the amount
              of  $100.00 and give your nephew's wife the phone number and name – TEE, why?
A-13  HEMPHILL  Birthday present.

Q-14   SHO   Phone records 5-5-02 at 08:34:40 hours, you called your brother's house and conversed
              with Corshia regarding your birthday coming up, and the discussion of  "home-girl to call"
              (your brother).  Was this conversation regarding marijuana was a Birthday present?
A-14  HEMPHILL  Yes.

Q-15   SHO   On the same conversation on 5-5-02, you made a statement, "But i can't be discussing
              It on the horn right now".  What were you referencing?  Drug trafficking?
A-15  HEMPHILL  No, I had a marijuana cigarette in my pocket.

       Questions from Inmate MONETTE  to Inmate HEMPHILL (through the SHO):

Q-1    Did you and Inmate MONETTE ever conspire to introduce any controlled substances?
A-1    No.
Q-2    Does Inmate MONETTE  or his family know anyone of your family members?
A-2    No.
Q-3    Did Inmate MONETTE have any knowledge of the controlled substances found in the cell?
A-3    No.
Q-4    Was the skull cap yours that was found hanging on the side-rail of the bunk?
A-4    Yes.
Q-5    Did the marijuana that was found in the skull cap belong to you?
A-5    Yes.

HEARING CONTINUED ON ATTACHED CDC 115-C)

| SIGNATURE OF WRITER | DATE SIGNED |
|---|---|
| C. B. TUCKER, Correctional Lieutenant | 9/19/04 |

| ☒ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
|---|---|---|---|
| | | 9/23/04 | 1100 |

C 115-C (5/95)

16

STATE OF CALIFORNIA
**RULES VIOLATION REPORT - PART C**

DEPARTMENT OF CORRECTIONS
PAGE 17 OF 35

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 8/17/04 |

☐ SUPPLEMENTAL ☒ CONTINUATION OF: ☐ 115 CIRCUMSTANCES ☒ HEARING ☐ IE REPORT ☐ OTHER _____

HEARING - continued:
(Questions from Inmate MONETTE to Inmate HEMPHILL - through the SHO - continued)

Q-6    Did Inmate MONETTE have any knowledge of the contents enclosed in the skull cap?
A-6    No.

Q-7    How often did you smoke the controlled substance in your cell?
A-7    Twice, three times a week, morning.

Q-8    Did Inmate MONETTE ever participate with you?
A-8    No.

Q-9    At what particular times would you smoke while inside the cell?
A-9    Morning.

Q-10    Did Inmate MONETTE agree with your smoking in the cell?
A-10    No, but I informed him I was gonna do it.


Questions from Inmate MONETTE to Inmate FULLER (through the SHO):

Q-1    What wing were you housed in on or before May 22, 2002?
A-1    Z-Wing.

Q-2    Had you ever met Inmate MONETTE on or before May 22, 2002?
A-2    No.

Q-3    When did you meet Inmate MONETTE?
A-3    2002 around late December, early January.

Q-4    Were you conspiring with Inmate MONETTE to introduce a controlled substance?
A-4    Absolutely not.

Q-5    Was Inmate MONETTE'S involvement with any staff member directly involved in your conspiracy
       to introduce?
A-5    No.

**HEARING CONTINUED ON ATTACHED CDC 115-C)**

| | SIGNATURE OF WRITER    LT | DATE SIGNED |
|---|---|---|
| | C. B. TUCKER, Correctional Lieutenant | 9/19/04 |
| ☒  COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED: 9-23-04 | TIME SIGNED: 1100 |

JC 115-C (5/95)

17

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE 18 OF 35

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|------------|--------------|------------|-------------|--------------|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 8/17/04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER _____ |

HEARING - continued:
(Questions asked to Inmate FULLER from SHO - 08/22/04)

Q-1     SHO  Was Inmate MONETTE and Inmate HEMPHHILL involved in the conspiracy to
             Introduce/Distribute Controlled Substance into the Institution through the mail with you?
A-1     FULLER   No.

Q-2     SHO  How well do you know Inmate MONETTE?
A-2     FULLER   Not well.

Q-3     SHO  The CTF employee assigned to medical records who is named in the criminal complaint,
             what is her involvement with you?
A-3     FULLER   I don't even know her, None.

Q-4     SHO  If Inmate MONETTE and Inmate HEMPHILL are not part of the conspiracy to
             Introduce/Distribute Controlled Substance into the Institution, then why are they named
             in the criminal complaint?
A-4     FULLER   I have no idea, ask D.J. Doglietto – he has the answers.

Q-5     SHO  It seems that C/O Doglietto established an individual named "Moe", which link you,
             HEMPHILL and MONETTE as being involved. Who is this "Moe"?
A-5     FULLER   My childhood friend. Has tattoo on back RT forearm...lifted sleeve.

Q-6     SHO  Is he related to I/M HEMPHILL?
A-6     FULLER   No.

Q-7     SHO  Did you ever have access to, or use a cell-phone while in your cell?
A-7     FULLER   No.

Q-8     SHO  Were you assigned to medical at the same time as MONETTE?
A-8     FULLER   No.

Q-9     SHO  Is it your statement, that I/M MONETTE, E-48953, and I/M HEMPHILL, C-63328, have
             Nothing to do with your conspiracy?
A-9     FULLER   Correct.

**HEARING CONTINUED ON ATTACHED CDC 115-C)**

| | SIGNATURE OF WRITER | | DATE SIGNED |
|---|---|---|---|
| | C. B. TUCKER, Correctional Lieutenant | | 9/19/04 |
| ☒ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) Martinez | DATE SIGNED 9/23/04 | TIME SIGNED 1100 |

CDC 115-C (5/95)

18

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE 19 OF 35

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 8/17/04 |

☐ SUPPLEMENTAL  ☒ CONTINUATION OF:  ☐ 115 CIRCUMSTANCES  ☒ HEARING  ☐ IE REPORT  ☐ OTHER _____

HEARING – continued:    08/27/04, at about 1500 hours.

Witness requested by Inmate MONETTE  (C/O Mendez, 2nd Floor Infirmary, Inmate MONETTE's Supervisor for 13 & ½ years) :  Questions were asked by the SHO.

Q-1    SHO    What are your hours for the 2nd Floor Infirmary?
A-1    Mendez    1400-2200...

Q-2    SHO    Are your security checks of the 2nd Floor regular and consistent?
A-2    Mendez    Yes.

Q-3    SHO    Were you interviewed and questioned by I.S.U. or C.I.A. concerning I/M MONETTE?
A-3    Mendez    No.

Q-4    SHO    When your shift began, was it normal to see inmates waiting in the waiting room to see the doctors?
A-4    Mendez    Normal procedures.

Q-5    SHO    From the inmates that were ducated to the 2nd Floor, how would their ducats get on the doctor's doors in order to be called?
A-5    Mendez    Front gate; inmate worker puts on windows – MONETTE did all workers.

Q-6    SHO    Do you recall approximately the time that the "food cart" would have to be picked up from the Central kitchen?
A-6    Mendez    Past 1500 hours – daily.

Q-7    SHO    How would you describe Inmate MONETTE'S work performance?
A-7    Mendez    Normal – average.

Q-8    SHO    How would you describe your rapport with Inmate MONETTE?
A-8    Mendez    Good – understanding.

Q-9    SHO    In your opinion, was Inmate MONETTE'S rapport with you the same with other staff members?
A-9    Mendez    Sure, he had no problems – spoke to everyone.

HEARING CONTINUED ON ATTACHED CDC 115-C)

SIGNATURE OF WRITER
C. B. PUCKER, Correctional Lieutenant
DATE SIGNED 9/19/04

☒ COPY OF CDC 115-C GIVEN TO INMATE
GIVEN BY: (Staff's Signature)
DATE SIGNED 9/23/04    TIME SIGNED 1100

IC 115-C (5/95)

19

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE 20 OF 35

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 8/17/04 |

☐ SUPPLEMENTAL ☒ CONTINUATION OF: ☐ 115 CIRCUMSTANCES ☒ HEARING ☐ IE REPORT ☐ OTHER

HEARING - continued:   08/27/04, at about 1500 hours
Witness requested by Inmate MONETTE  (C/O Mendez, 2nd Floor Infirmary, Inmate MONETTE's Supervisor for 13 & ½ years) : Questions were asked by the SHO.

   Comments by the SHO: The direct constant supervision of all workers daily – only one hallway. Is it safe to say that while MONETTE was assigned, you were in direct and constant supervision of him?

Q-10   SHO   If you would have noticed something inappropriate between inmates and staff, what would you have done?
A-10   Mendez   Intervened and counsel inmate; tell staff.

Q-11   SHO   Have you ever witnessed any inappropriate behavior or conversation between Inmate MONETTE and staff?
A-11   Mendez   No.

Q-12   SHO   Have you ever witnessed I/M MONETTE talking to any staff member for "hours at a time"?
A-12   Mendez   No.

Q-13   SHO   Is it fair to assume that your supervision of Inmate MONETTE between 2 P.M-4 P.M. was often and frequent?
A-13   Mendez   Yeah. I see my workers always working. They are in my constant view.

Q-14   SHO   Was the inmate break-room often used as an office for doctors and records release when all other rooms were occupied?
A-14   Mendez   Yes – doctors had one to use it – cause they needed an office for interviewing.

Q-15   SHO   Do you feel that Inmate MONETTE'S attitude and behavior were within Departmental Guidelines?
A-15   Mendez   Yes, never had a problem with him.

Q-16   SHO   Were you surprised?
A-16   Mendez   Yes.

Q-17   SHO   Did you see what happened?
A-17   Mendez   I had no idea what happened.

       ****** This concluded the questions for C/O Mendez *******.
HEARING CONTINUED ON ATTACHED CDC 115-C)

| | SIGNATURE OF WRITER | DATE SIGNED |
|---|---|---|
| | C. B. TUCKER, Correctional Lieutenant | 9/14/0 |
| ☒ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) Martinez | DATE SIGNED 9/23/04 | TIME SIGNED 1100 |

DC 115-C (5/95)

20

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE 21 OF 35

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 8/17/04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER |
|---|---|---|---|---|---|

HEARING - continued:

Witness requested by Inmate MONETTE  (C/O Mendez, 2nd Floor Infirmary, Inmate MONETTE's Supervisor for 13 & ½ years) :  Questions were asked by the SHO.

On 08/27/04, at  1517 hours, furnished phone interview Dr. Joseph E. Graas, San Diego Lab Director.  Leona  (Lab Tech..) answered the phone.

 - Screening Level of 50

| Q-1 | SHO | How are these levels arrived at? |
|---|---|---|
| A-1 | Dr. Graas | The testing of the thin layer chromatographer if 2nd hand smoker it would be at 15, the cut-off. This is a side stream/not actually smoking. |

| Q-2 | SHO | The size of the living areas, or frequency of the smoking - does this matter? |
|---|---|---|
| A-2 | Dr. Graas | It could be taken into consideration.  This test is not dipstick in urine, the narcotic must be in your system in your blood first. |

| Q-3 | SHO | What can you tell  me about the screening level of 50? |
|---|---|---|
| A-3 | Dr. Graas | Screening level of 50, 2nd/hand is the cut off 15;  50 is way above for 2nd/hand smoke. |

| Q-4 | SHO | Can a positive level be recorded due to  marijuana residue on a razor blade,  transferred to food items, when chopping/slicing them? |
|---|---|---|
| A-4 | Dr. Graas | The source is too small, minute. |

**** End of questions *********

**HEARING CONTINUED ON ATTACHED CDC 115-C)**

| SIGNATURE OF WRITER | DATE SIGNED |
|---|---|
| C. B. TUCKER, Correctional Lieutenant | 9/19/04 |

| GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
|---|---|---|
| Martinez | 9/23/04 | 1100 |

☒ COPY OF CDC 115-C GIVEN TO INMATE

C 115-C (5/95)

21

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE 22 OF 35

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 8/17/04 |

☐ SUPPLEMENTAL  ☒ CONTINUATION OF:  ☐ 115 CIRCUMSTANCES  ☒ HEARING  ☐ IE REPORT  ☐ OTHER _____

HEARING - continued:
Questions to Dr. Howlin, 08/27/04, 1530 hours:

Q-1    SHO    What were your scheduled work hours between 2002 and 2003?
A-1  Dr.. Howlin    0630 – 4:00

Q-2    SHO    Was it normal for you to have inmates ducated to your office between the hours of 1 P.M. - 3 P.M.
A-2  Dr. Howlin    Sure.

Q-3    SHO    Were you questioned by investigators concerning  Inmate MONETTE'S departure?
A-3  Dr. Howlin    No.

Q-4    SHO    How would you describe your rapport with Inmate MONETTE?
A-4  Dr. Howlin    Fine.

Q-5    SHO    How would you describe Inmate MONETTE'S demeanor and attitude during work hours and individual sessions?
A-5  Dr. Howlin    Appropriate.

Q-6    SHO    Would you say that you saw Inmate MONETTE regularly during the work hours?
A-6  Dr. Howlin    Sure.

Q-7    SHO    Were you aware of Inmate MONETTE'S pursuit towards a college education?
A-7  Dr. Howlin    Yes.

Q-8    SHO  Have you ever witnessed any inappropriate conduct by staff and Inmate MONETTE that would be in violation of Departmental Policy's?
A-8  Dr. Howlin    No.

Q-9    SHO  In your opinion, would the 2nd Floor Officer be able to notice any inappropriate behavior between inmates and staff?
A-9  Dr. Howlin    Yes.

Q-10    SHO  Have you ever noticed Inmate MONETTE conversing with staff for "hours at a time"?
A-10 Dr. Howlin  No.

Q-11    SHO  During your individual psychotherapy sessions with Inmate MONETTE, did he demonstrate any behavior that would raise your suspicion that he used drugs?
A-11 Dr. Howlin  No.

**HEARING CONTINUED ON ATTACHED CDC 115-C)**

SIGNATURE OF WRITER
C. B. TUCKER, Correctional Lieutenant

DATE SIGNED
9/19/04

☒ COPY OF CDC 115-C GIVEN TO INMATE

GIVEN BY: (Staff's Signature)

DATE SIGNED
7/23/04

TIME SIGNED
1100

)C 115-C (5/95)

22

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE 23 OF 35

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 9/17/04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER _____ |
|---|---|---|---|---|---|

HEARING - continued:
Questions to Dr. Howlin, 08/27/04, 1530 hours: (continued)

Q-12      SHO   In your opinion, would you describe Inmate MONETTE as a drug user?
A-12 Dr. Howlin   No.

Q-13      SHO   If you are at liberty to discuss, did Inmate MONETTE ever discuss with you a business
              called "WAM Designs" that commemorated products of September 11th and owned
              by his mother?
A-13 Dr. Howlin   It's been so long ago, I vaguely remember the conversation, probably.

** 09/04-04   (0930 hours to 1300 hours) **   Questions to I/M MONETTE

Q-1      SHO   Did you use the same cell phone all the time?
A-1   MONETTE   Sometimes two (2) different one: Nextel or Motorola.

Q-2      SHO   May 2002, June & July 2002 – over 300 calls placed from cell phone -- to who?
A-2   MONETTE   To my parents and wife. I let HEMPHILL use the phone, WATERS and FRAZIER. I
              called during the last week of April, May, June, July and August 2002. Also relatives
              regarding Networking for my mother's business, "WAM Designs".

Q-3      SHO   Were there ever any incoming call while you had the cell phones?
A-3   MONETTE   Only from my mom.

Q-4      SHO   Did you let anyone besides HEMPHILL use the cell phone?
A-4   MONETTE   Yes, I/M WATERS, I agreed to let him use it to discuss "WAM" Designs, ideas & suggestions
              with his mother.

Q-5      SHO   Page 14 of 111 states that calls to MONETTE and WATERS' parents and relatives were made;
              as well as ten (10) telephone numbers (#s) that matched calls placed by inmates at CTF and
              recorded on I/mars, whose number is the statement offering to.
A-5   MONETTE   Could have been HEMPHILL – when WATERS had the phone he probably let FRAZIER
              his cellie use it.

Q-6      SHO   No, this question is regarding the yard phones.
A-6   MONETTE   Oh, where are the phone transcripts of these calls?
         SHO   They were not included in the packet. Doglietto will be contacted regarding this evidence.

**HEARING CONTINUED ON ATTACHED CDC 115-C)**

| | SIGNATURE OF WRITER | DATE SIGNED |
|---|---|---|
| | C. B. TUCKER, Correctional Lieutenant | 9/19/04 |
| | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
| ☐ COPY OF CDC 115-C GIVEN TO INMATE | | 9/23/04 | 1100 |

DC 115-C (5/95)

25

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE 24 OF 35

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 9/17/04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER _____ |

HEARING - continued:

** 09/04-04  (0930 hours to 1300 hours) **  Questions to I/M MONETTE n - continued:

Q-7     SHO    What are the "WAM" items confiscated from the cell search by I.S.U.?
A-7    MONETTE   Approximately 50 pages website – hard copy, flyers, rough draft letters to fundraising events
                in New York City 9/11 Anniversary, copies of website book info to research for my mother,
                giving her suggestions; and a copy of the bulk order form for the business.

Q-8     SHO    Your interview with Agent West on 09/23/03 -- 300, 240 M/C.
A-8    MONETTE   Pay off my school course.

Q-9     SHO    So the phone to your mother's residence, who usually answered, and had access to that phone?
A-9    MONETTE   My grand-mother and mother.

Q-10     SHO    How close are you with Inmate WATERS?
A-10   MONETTE   Casual friends, we saw each other occasionally on the basketball court and at work. He
                was close custody and had to be back at the wing by 1900 for count. I don't socialize with him
                other than work, and the business ideas for "WAM Design". He's a Crip I don't normally
                affiliate with gang members.

Q-11     SHO    On 10/23/03 – interview of unidentified I/M – why would he implicate you and WATERS
                as working with drug dealer?.
A-11  MONETTE   The statements offered by unidentified inmates were fueled by rumors throughout the inmate
                population only. There is no real fact or evidence to these statement, they are opinion
                and hearsay (assumptions). Possibly to take heat off of himself. When this all started
                everyone (inmates) gossips about what went on, this is human nature here.

**HEARING CONTINUED ON ATTACHED CDC 115-C)**

| SIGNATURE OF WRITER | DATE SIGNED |
|---|---|
| C. B. TUCKER, Correctional Lieutenant | 9/19/04 |

| | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
|---|---|---|---|
| ☒ COPY OF CDC 115-C GIVEN TO INMATE | Hatine-C | 9-23-04 | 1100 |

C 115-C (5/95)

24

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE 25 OF 35

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 9/17/04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER |

HEARING - continued:
Pages 3 through 6

Questions to I/M MONETTE – continued:

Q-12    SHO    Through the Incident Report CTF-CEN-02-050-0080, it is established that you and
Inmate WATERS participated in over-familiar conduct which was reciprocated by the
the employee. The progression of the illegal relationship you had with staff was initiated for
what purpose?
A-12    MONETTE    I dispute every statement made by staff.

Q-13    SHO    Were you or Inmate WATERS romantically involved with this employee?
A-13    MONETTE    No.

Q-14    SHO    Who's idea was to smuggle in the cell phone?
A-14    MONETTE    I asked because expensive on this yard.

Q-15    SHO    Who recruited her to your business – to "WAM" if you know?
A-15    MONETTE    She found out on her own. The flyers were being passed.

Q-16    SHO    What did she have to gain by this involvement?
A-16    MONETTE    Business on the side.

Q-17    SHO    Were you aware of drug trafficking through the medical Dept., by other inmates?
A-17    MONETTE    No, I was assigned there, and it was quiet, so I could do my school work, because I
was enrolled Coastline Community College.

Q-18    SHO    Have you ever heard of a RN named Alice?
A-18    MONETTE    No.

Q-19    SHO    According to Page 12 of CTF-CEN-02-0080, the bottom of the page under "Note", in which
the CTF employee is identified by address and telephone number. It is also documented in
May and July 2002 – over 300 telephone calls had been placed from the cell phone number
to your parents and wife.
A-19    MONETTE    I talked to my family.

Q-20    SHO    This Page 12, ends with the statement that additional calls were made to inmates WATERS
H-11664, FRAZIER, P-33880, and HEMPHILL, C-03328. Were people placing call
To the cell phone?
A-20    MONETTE    No, never.

**HEARING CONTINUED ON ATTACHED CDC 115-C)**

| | SIGNATURE OF WRITER | DATE SIGNED |
|---|---|---|
| | C. B. TUCKER, Correctional Lieutenant | 9/19/04 |
| ☒ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) Martinez | DATE SIGNED 9-23-04 | TIME SIGNED 1100 |

CDC 115-C (5/95)

25

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE 26 OF 35

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 8/17/04 |

☐ SUPPLEMENTAL  ☒ CONTINUATION OF:  ☐ 115 CIRCUMSTANCES  ☒ HEARING  ☐ IE REPORT  ☐ OTHER ____

HEARING - continued
Questions to I/M MONETTE - continued.

Q-21    SHO   Were there two (2) different cell phones that you would use?
A-21   MONETTE   Yes.

Q-22    SHO   Who exactly runs "WAM Designs"?
A-22   MONETTE   My mother, it is her business, not mine.

Q-23    SHO   What exactly is your involvement?
A-23   MONETTE   I just provide ideas for Networking and Marketing. I am not part of the business.

Q-24    SHO   Who recruited the CTF employee to the business (WAM)?
A-24   MONETTE   She saw what I was working on at work one day and I told her about my mother's business.

Q-25    SHO   How many inmate used the cell phone? Was this a scam? (money-making venture).
A-25   MONETTE   Only HEMPHILL.

Q-26    SHO   How would you categorize your relationship with I/M WATERS?
A-26   MONETTE   I met WATERS a couple years ago, were friends, I don't hang around him, we just talk while working out about ideas for our mother's business.

Q-27    SHO   How would you describe your friendship with I/M HEMPHILL?
A-27   MONETTE   I met him February 2002, he moved in my cell, came off close custody from D-wing to G-Wing 237.

Q-28    SHO   In your own words, exactly what was the extent of your relationship with the medical Staff member?
A-28   MONETTE   Good repore, but I also had a good repore with all the doctors and staff in medical.

Q-29    SHO   How did this repore evolve, past the point of professional to over-familiar?  MAJOR
A-29   MONETTE   It was common knowledge that I am a double business and psychology, and I expressed to her that I had so many business ideas that I would like to relay to my mother who had a business called "WAM". However, it was expensive and inconvenient to communicate this information through the yard phones. So I communicated, not asking, that it would be nice to have my own phone.

**HEARING CONTINUED ON ATTACHED CDC 115-C)**

SIGNATURE OF WRITER
C. B. TUCKER, Correctional Lieutenant    DATE SIGNED 9/9/04

GIVEN BY: (Staff's Signature)    Matinez   DATE SIGNED 9-23-04   TIME SIGNED 1300

☒ COPY OF CDC 115-C GIVEN TO INMATE

C 115-C (5/95)

26

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE 27 OF 35

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 9/17/04 |

☐ SUPPLEMENTAL  ☒ CONTINUATION OF:  ☐ 115 CIRCUMSTANCES  ☒ HEARING  ☐ IE REPORT  ☐ OTHER _____

HEARING - continued:

Questions to I/M MONETTE - continued:

Q-30    SHO    Other than the cell phone and charger, what else did you ask the employee to give to you?
A-30    MONETTE

Q-31    SHO    Explain why would certain staff members communicated on how you, the employee,
                And I/M WATERS spent so much time together.
A-31    MONETTE    Coeherced, We spent the same amount of time with all other employees than with the specific
                Employee.

Q-32    SHO    If you do not use marijuana, how can you explain the positive urinalysis?
A-32    MONETTE    Through the second hand smoke from marijuana by I/M HEMPHILL on a consistent basis.

Q-33    SHO    Have you ever been U.A.'d before?
A-33    MONETTE    Never.

Inmate MONETTE'S questions to Doglietto, 09/08/04   (1130 hours):

Q-1 (A)    In I/M FULLER'S letter to Trina, he admits to ½ the shipment being gaffled
            eight (8) days later, in your opinion is he clearly referring to the parcel that
            was initially discovered and partially opened?  (Page 21 of 113).

A-1    Only ½ the shipment, the box was burst at the seams.

Q-2 (B)    From the first parcel that was discovered & found partially opened, could marijuana have been taken out of
            that box?
A-2    No, it was wrapped in plastic you would have had  to open the box.

Q-3 (C)    On Page 15 of 111 of the Crime Report, Agent West learned that the Spanish
            HIV Literature used to conceal the drugs actually came from a handout given
            to inmates who attended HIV classes,....where were these classes conducted?
A-3    Education Department.

Q-4 (D)    During your investigation, did I ever attend any of these classes?
A-4    No, WATERS did.

Note:  questions (E), (F), (G) were lined-through.

HEARING CONTINUED ON ATTACHED CDC 115-C)

| SIGNATURE OF WRITER  C. B. TUCKER, Correctional Lieutenant | | DATE SIGNED 9/19/04 |
|---|---|---|
| ☒ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED 9-23-04 | TIME SIGNED 1100 |

C 115-C (5/95)

27

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE 28 OF 35

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 9/17/04 |

☐ SUPPLEMENTAL  ☒ CONTINUATION OF:  ☐ 115 CIRCUMSTANCES  ☒ HEARING  ☐ IE REPORT  ☐ OTHER _____

HEARING - continued:

The SHO asked questions to Inmate MONETTE (09/08/04) - regarding the kite and letter he sent out of O-Wing:

Q-1  SHO  Why did you write something that was not true about the disposition as possession of a cell phone charge in the letter authored by another inmate?

The information from the letter written to Ms. Wells (MONETTE'S mother) by another another inmate, was based on a kite sent out from O-Wing, (authored by Inmate MONETTE).

A-1  MONETTE  I told HEMPHILL that information, I did not write it in my kite. I knew that he would talk about my business, and this only showed that, by the letter to my mother saying that. It's no one's business how my case is going.

Q-2  SHO  Why would he care about you?
A-2  MONETTE  He seemed concerned.

Q-3  SHO  What did you mean in the last statement in your kite about the elimination of specific paperwork?
A-3  MONETTE  I wanted Skinny Minnie (Marybell Sedano) - a woman who visited me and who I wrote letters, to destroy them. I was getting back with my wife and I knew she would try to interfere, once I told her she couldn't visit me anymore.

Q-4  SHO  Who is this Skinny Minnie?
A-4  MONETTE  Her name is Marybell Sedano, she was given that nickname by Inmate MILLER, who met her in the visiting room.

Q-5  SHO  Why did you write informatioin that was not true in your kite and letter regarding staff trying to to get you back to the mainline, and the cell phone charger offense?
A-5  MONETTE  I didn't write the cell phone charger offense in my kite. I told that to HEMPHILL.

Q-6  SHO  Why did you agree to pay Inmate HEMPHILL $250.00. Did you bribe him to take the responsponsibility for the marijuana in the skull cap?
A-6  MONETTE  It was not my dope, and I convinced him to take responsibility for his drugs. Initially he did not want to. It was his dope, that's what I meant.

Q-7  SHO  So was he black mailing you?
A-7  MONETTE  No, he just had to be convinced to take responsibility for his habit.

Q-8  SHO  So you do not consider this a bribe, and did this 'out-of-the-goodness' of your heart and threw in $250.00?
A-8  MONETTE  HEMPHILL has nothing, he has no money and I wanted to help him out.

HEARING CONTINUED ON ATTACHED CDC 115-C)

| SIGNATURE OF WRITER | DATE SIGNED |
|---|---|
| C. B. TUCKER, Correctional Lieutenant | 9/19/04 |

| ☒ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) Martinez | DATE SIGNED 9-23-04 | TIME SIGNED 1100 |

28

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE _29_ OF _35_

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 8/17/04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER _____ |

HEARING - continued:

C/O Doglietto (09/08/04) - Questions from Inmate MONETTE.

Q-1      On Page 13 of 111 of the Crime Report, you noted that you made in Internet inquiry of "WAM Designs", can you describe what you found?

A-1   (#1)     Dog. / Still under construction recovered the person who owned Website. What available reduced items address where to send stuff order.

Q-2      Did you browse through the entire Website?

A-2   (#2)     WAM only to demonstrate.

Q-3      Did you call the 1-800-# provided on the fliers, and if so, what did you hear?

Q3   (#6)     Assoc. established, envelop in cell employees address further indicates 3 bindles marijuana, skull cap in his bunk joint found in cell.

Q-4      Was Inmate MONETTE provided with the proper documentation towards the "Unidentified" inmate sources reliability? (Title 15, Page 10°)

A-4   (#11)     Part criminal proceeding against employee not mentioned in RVR.

Q-5      Were these "confidential sources" reliability established per the criteria of CCR, §3321?

A-5   (#12)     Dito.

**HEARING CONTINUED ON ATTACHED CDC 115-C)**

| | SIGNATURE OF WRITER | DATE SIGNED |
|---|---|---|
| | C. B. TUCKER, Correctional Lieutenant | 9/9/04 |

| | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
|---|---|---|---|
| ☒ COPY OF CDC 115-C GIVEN TO INMATE | Martinez | 9-23-04 | 1100 |

C 115-C (5/95)

29

STATE OF CALIFORNIA                                                      DEPARTMENT OF CORRECTIONS
RULES VIOLATION REPORT - PART C                                          PAGE 30 OF 35

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 8/17/04 |

[ ] SUPPLEMENTAL  [X] CONTINUATION OF:  [ ] 115 CIRCUMSTANCES  [X] HEARING  [ ] IE REPORT  [ ] OTHER _____

HEARING - continued:

Present  Lt. C.B. Tucker,  C/O D. Doglietto (ISU Officer); Special Agent West
Monette 9-8-04, RVR, Time 1130 hours

Q-1      SHO   At this time has there been a discussion on disposition assessed to you by the
                SHO, regarding this disciplinary hearing?
A-1 MONETTE   ~~Correct~~. No

Q-2       SHO  Has the SHO ever informed you at anytime that the change would be reduced  to
                 possession of a cell phone chargers?
A-2 MONETTE   No.


Q-1      SHO   Where did you get the idea and why did  you think that you were getting off
                 with just contraband?
A-1  MONETTE  I didn't, RVR wasn't complete; I told that to HEMPHILL because I wanted to
                 see if he would blab this to the mainline, and he did.

The SHO, introduced witnesses present at the RVR hearing, ISU, D. Doglietto, and Special Agent West. Doglietto was
requested at the hearing by I/M MONETTE.  Special Agent West's  presence at the RVR hearing was requested by the SHO.

At the conclusion of the questioning of the witness, SHO introduced three (3) letters.  One letter written by I/M MONETTE, and
two other letters written by an unidentified inmate on behalf of  Inmate MONETTE, with one letter addressed to I/M
MONETTE'S mother, the other letter to I/M MONETTE'S wife.

I/M MONETTE waived the 24 hours period for review of the  evidence, and opted to proceed with the RVR hearing.  The SHO
reviewed the evidence (letters) with I/M MONETTE prior to proceeding with the RVR hearing.

After review of the letters, I/M  MONETTE was questioned by the SHO regarding their content.

This SHO proceeded to ask the following questions:

-1       SHO   Where did you get the idea and why did  you think that you were getting off
                 with just contraband?
-1   MONETTE   I didn't, RVR wasn't complete; I told that to HEMPHILL because I wanted to
                 see if he would blab this to the mainline, and he did.

HEARING CONTINUED ON ATTACHED CDC 115-C)

| | SIGNATURE OF WRITER | DATE SIGNED |
|---|---|---|
| | C. B. TUCKER, Correctional Lieutenant | 9/19/04 |
| | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
| [X] COPY OF CDC 115-C GIVEN TO INMATE | | 9-23-04 | 1100 |

C 115-C (5/95)

30

STATE OF CALIFORNIA

RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS

PAGE 31 OF 35

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 8/17/04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER _____ |

HEARING - continued:

This SHO proceeded to ask the following questions: continued

Q-2    SHO    Based on the evidence, you have presented at your RVR hearing, looking at
              your letters, it is clear that you were not credible and honest when answering questions as to your
              involvement in possession of marijuana in your cell. Do you agree with this statement?
A-2  MONETTE    No, I was honest (later in the RVR hearing, MONETTE elaborated by stating
              that HEMPHILL was not initially going to take blame for his dope. Because
              it might give him three-strikes. He made statement about what he was going
              to blame it on me if I didn't.)

Q-3    SHO    Who is Skinnie Minnie?
A-3  MONETTE    A female I write to on the streets.

Q-4    SHO    What evidence did you desparately want Skinnie Minnie to destroy?
A-4  MONETTE    Letters to another female, so they won't get back to my wife.

Q-5    SHO    Why would a female send letters .
A-5  MONETTE    No longer visits me.

Q-6    SHO    Was the item you wanted destroyed copies of the mailing label, or HIV pamphlets?
A-6  MONETTE    "No!", I was visiting with female who came up here, so she won't try to use
              them against me. When I tell her not to visit anymore.

Q-7    SHO    Who smuggled or how did you smuggle the note out of O-Wing?
A-7  MONETTE    I gave it to HEMPHILL, told read it so. See he can get to $250.00 on his books.

Q-8    SHO    Who is the inmate that wrote the letters for you?
A-8  MONETTE    I/M MILLER, Y-Wing. HEMPHILL gave him the note and told him about
              the phone charger – finding. Based on my note, MILLER write his own version,
              which was not how I worded my note. When he refers to the .....

Q-9    SHO    Have you ever gone by the name of Keith?
A-9  MONETTE    No.

Doglietto check – White Miller in Z-Wing, D07910....
**HEARING CONTINUED ON ATTACHED CDC 115-C)**

| | | SIGNATURE OF WRITER | | DATE SIGNED |
|---|---|---|---|---|
| | | C. B. TUCKER, Correctional Liéutenant | | 9/19/04 |
| | | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
| ☒ COPY OF CDC 115-C GIVEN TO INMATE | | Martinez | 9-23-04 | 1,00' |

IC 115-C (5/95)

31

STATE OF CALIFORNIA                                                    DEPARTMENT OF CORRECTIONS
RULES VIOLATION REPORT - PART C                                       PAGE 32 OF 35

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 8/17/04 |

☐ SUPPLEMENTAL  ☒ CONTINUATION OF:  ☐ 115 CIRCUMSTANCES  ☒ HEARING  ☐ IE REPORT  ☐ OTHER _____

HEARING - continued:

Doglietto -  08/31/04  (Questions to Doglietto)

Q-1    SHO        Did you verify how many inmates that MONETTE talked  to actually sent
                   money to his grand mother?
A-1    Doglietto   The transcript is forthcoming.


          Questions to Agent West:

Q-1    SHO        Page 22 of 111, November 12th,  Interview of an inmate's wife it is revealed
                   that a money order for $150.00 was received by her.  Was this money order
         *Agent West*  in any way linked to I/M MONETTE?
A-1    Agent West   The statement regarding I/M's sending $150.00 to MONETTE'S  grand mother,
         *A-Wells:*   implied you to come to what conclusion in your investigation? Page 13 of !!!
         *SHO*

A-1    Doglietto:   Amount indicative of drug trafficking.

Q-2    SHO        Did you interview the third/watch supervisor of I/M MONETTE regarding over-
                   familiarity?
A-2    Doglietto   No.

Q-3    SHO        When shown  a photo of I/M MONETTE the report states that Ms. Jorgenson
                   could not identify I/M MONETTE, do you recall this?
A-3    Doglietto   Yes.

          Comment by Agent West:  Evidence – Page 36 of 111. #2 MONETTE, 4, 5, (#18?)


Question to MONETTE by the SHO:          *MY RESPONSE.*

                                         *AGENT WEST' RESPONSE.*
Q-1    SHO     What is your young brother's name?
A-1    MONETTE   [Anthony Jon Wells,] Imars and wife A-wells, 1764 Hobart Street reside at
                 address. A-wells' brother. LA)

Q-2    SHO     Page 14 of 111 – calls to relatives to ten numbers match I/M at CTF on
                 Imars – which inmates?
A-2    Doglietto   Phone records verify cell phone and I/M's Crandle. Records are forthcoming.

Q-3    SHO     During questioning of Trina, did she implicate MONETTE? (Pg 19 of 111.
A-3    Doglietto   No, not directly.

HEARING CONTINUED ON ATTACHED CDC 115-C)

| | SIGNATURE OF WRITER | DATE SIGNED |
|---|---|---|
| | C. B. TUCKER, Correctional Lieutenant | 9/19/04 |
| ☑ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature)  Martinez | DATE SIGNED  9/23/04 | TIME SIGNED  1100 |

CDC 115-C (5/95)

32

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE 33 OF 35

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 8/17/04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER _____ |

HEARING - continued:

09/08/04 -  1200 HOURS   ( Correctional Officer Doglietto):

Q-1    Where is there proof that "WAM Designs" was used for something other than it
       was created for?
A-1    No intimation never used for and it demonstrates the association with the employee.

Q-2    Where is there proof that "WAM Design" was a front for money laundering?
A-2    Never any.

Q-3    If "WAM Design" was a front, why would I openly discuss its existence, have
       my family involved, or sell the items to staff?
A-3    No intimation.

Q-4    Where is there proof that the 300 calls made were to someone other than my mother, wife, and relatives?
A-4    Telephone records lengthy calls were placed to family members of MONETTE and WATERS, a whole
       list of phone numbers (#'s).

Q-5    Where is there proof that the calls I made to my mother, wife, or relatives, were
       for something other than "WAM Design" discussions".
A-5    obviously we can't monitor cell phones – no indication or intimations.

Q-6    Where are the recordings or interviews conducted by you (C/O Doglietto)  regarding calls requesting
       money on Page 12 of the Crime Report?
A-6    There are forthcoming – numerous calls – instructing relatives to send money to
       Lacy. - There is a typo should  "from I/M asking  family  to send in amounts of  $100.00 to $150.00  (dollars)
       to MONETTE'S  Grand-mother.

Q-7    What parties in particular were asked to send money and who asked them to do so?
A-7    Majority of inmate's first name or by alias overall.  Might be gone or transferred..

Q-8    Did any of these people state that the funds being requested were for drugs?
A-8    No, they know calls monitored, topic not disclosed amount consistent w/purchase Controlled Substance (C&S).

**HEARING CONTINUED ON ATTACHED CDC 115-C)**

| | SIGNATURE OF WRITER | DATE SIGNED |
|---|---|---|
| | C. B. TUCKER, Correctional Lieutenant | 9/19/04 |
| ☒ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
| | | 9/23/04 | 1100 |

CDC 115-C (5/95)

33

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS

RULES VIOLATION REPORT - PART C

PAGE 34 OF 35

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 8/17/04 |

☐ SUPPLEMENTAL  ☒ CONTINUATION OF:  ☐ 115 CIRCUMSTANCES  ☒ HEARING  ☐ IE REPORT  ☐ OTHER _____

HEARING - continued:

09/08/04 - 1200 HOURS  ( Correctional Officer Doglietto):

Q-9    When, if ever, was drug sales or transactions made mention of by any of your
       interviews as a result of having pulled phone records?
A-9    Lower and higher, package for debts – instructs relatives and friends to
       send & (money)  from outside the Institution. -- to collect  monies.

       9a  No purchase orders or order forms on people affiliate with "WAM Designs"  shows purchase orders.
           Available CTP.
       9b  No mail, I/M Crandle's was  inspected daily, no "WAM" invoice  or order form/special purchase, none.

Q-10    It's your contention that I/M MONETTE  was involved with I/M FULLER in
        this conspiracy, what evidence do you have to verify/validate this?
A-10    It is our contention that MONETTE  position was means  by which
        items in question were delivered, mentioned by HEMPHILL, or relatives discussed
        acquisition of controlled substance, girl of  MONETTE. The response all
        she has to do is plan it up,  get to you HEMPHILL asked was it  stress?
        HEMPHILL  said  yes,.  They made a plan to contact again.  In investigations my
        Experience as an expert witness, reference to stress is street slang for marijuana.
        MONETTE had relationships  with a staff member,  staff responds to  retrieve parcels for mail by postal
        service to Medical Department Parcels, not UPS postal service,  arrive at the mailroom and await pick up.
        There were discovered by worker In the warehouse. Additional  money collected from I/M's on the
        yard and sent  to money drop address,  cell phone records connection to the employee and parties in the
        conspiracy.

Q-11    Did you check to see if I/m MONETTE had access to pick up packages from
        the area where the parcel was discovered?
A-11    Inmate MONETTE did not have access to the  mailroom, MONETTE'S associate the employee did.

Q-12    Who besides JAVIER  in medical has access to pick up property/packages from the basement?
A-12    Parcels do not arrive to the basement, JAVIER picks up UPS only,  Medical records staff picks up mail.

Q-13    Being that the package was addressed to JAVIER , how could I possibly obtain it?
A-13    Even JAVIER did not obtain the parcel.  It was not sent UPS, by  US mail.

HEARING CONTINUED ON ATTACHED CDC 115-C)

| SIGNATURE OF WRITER | DATE SIGNED |
|---|---|
| C. B. TUCKER, Correctional Lieutenant | 9/19/04 |

| ☐ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
|---|---|---|---|
| | | 9-23-04 | 11 00 |

C 115-C (5/95)

34

STATE OF CALIFORNIA                                           DEPARTMENT OF CORRECTIONS
RULES VIOLATION REPORT - PART C                                         PAGE 35 OF 35

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|------------|---------------|------------|-------------|--------------|
| E48953 | MONETTE, A. | I -05-04-40 | CTF-C | 8/17/04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER |

HEARING - continued:
C/O Doglietto's answers  09/08/04 – continued:

Q-14      Would anyone else be able to obtain this package when it was clearly addressed to JAVIER?
A-14      Medical records staff. Could.

Q-14a    Therefore, isn't it true that any packages picked up would be delivered to and
         opened up by the party it was addressed to?
A-14a    No, because had it arrived in parcel JAVIER would pick it up.  It arrived as US mail,
         so he would not pick it up. This  allowed the warehouseman by chance to discover the marijuana..
         If JAVIER was involved,  he would have  had it sent UPS. JAVIER  is  not involved.

Q-15      Being that it's your contention that I was involved in drug activity with the aid of  staff,
         why would I need to introduce drugs via a package?
         (instead of obtaining it via staff directly?)
A-15      Our contention is that MONETTE  is actually involved, and  used many different methods.
         Indicative  of  I/M HEMPHILL'S phone calls to his brother.

Q-16      On Page 11 of the Crime Report, how did you determine that calls were made
         to inmates WATERS, FRAZIER, and HEMPHILL, when they are obviously incarcerated?
A-16      Typo,  made to relatives  is what it should read.

Q-17      Is I/M Crandell – known to be involved in narcotic?

A-17      J.S  - A user of controlled substance.

Q-18      In your experience in narcotics, what can you  offer into testimony regarding purchase of narcotic.
A-18      Based on my training  and experience the dollar amount is  consistent with  the purchase of controlled substance.


Reviewed by: _____ Date: 9-21-04
                   R. A. POPE, Facility Captain


Chief Disciplinary Officer: _____ Date: 9.22.04
                       W. HILL, Associate Warden

| | | SIGNATURE OF WRITER | DATE SIGNED |
|---|---|---|---|
| | | C. B. TUCKER, Correctional Lieutenant | 9/19/04 |
| ☒ | COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED: 9-23-04 | TIME SIGNED: 1100 |

C 115-C (5/95)

35

# Exhibit "B"

Exhibit "B"

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF MONTEREY | | |
|---|---|---|
| **The People of the State of California,** <br><br> Plaintiff <br><br> vs. <br><br> **Monette, Alex,** <br><br> Defendant | Hon.  **Robert F. Moody** <br> Clerk:          **Jamie Adcock** <br> CSR:           **Yvette Gallardo-Garmon** <br> Recording No. | |
| Minutes:     **Preliminary Examination** <br><br> **May 20, 2005** | **Case No.**     **SS050647C** <br>               **Courtroom 4** | |
| Charges: <br> **2:   PC1170.12(c)(1) [Prior felony conviction]    ALLSP** <br><br> **1:   PC182(a)(1) [Conspiracy: Commit Crime]   FEL** <br><br> **2:   PC4573.6 [Possession Of Drugs Where Prisoners Are Kept]    FEL** | | |

Deputy District Attorney Rick Storms appeared.

Defendant appears and is in custody on this case.

Defendant appeared with Counsel Jim Dozier.

The above named Defendant, being charged in a complaint on file in this court and having waived preliminary examination as to count 2; the court and District Attorney consenting thereto, it is ordered that he be held to answer the same.

Count 1 dismissed on motion of the District Attorney. Reason for dismissal or discharge: Furtherance of Justice.(PC 1385.)

Parties stipulate matter is certified to Superior Court on existing complaint.

Defendant entered a plea of not guilty to count 2.

**Time not waived.**

Matter is set for pre-trial and jury trial setting on Wednesday, June 08, 2005 at 10:00am in Salinas courtroom 4.

Defendant is to remain in the custody of the Dept. of Corrections.//

# Exhibit "C"

Exhibit "C"

ABSTR... OF JUDGMENT – PRISON COMMITME... – DETERMINATE
SINGLE, CONCURRENT, OR FULL-TERM CONSECUTIVE COUNT FORM
*[Not to be used for multiple count convictions or for 1/3 consecutive sentences.]*
CR-290

☒ SUPERIOR COURT OF CALIFORNIA, COUNTY OF: Monterey
☐ MUNICIPAL BRANCH OR JUDICIAL DISTRICT

PEOPLE OF THE STATE OF CALIFORNIA vs.
DEFENDANT: Alex Monette   DOB: 02-01-70
AKA:
CII#: A09141924
BOOKING #:   ☐ NOT PRESENT

CASE NUMBER
SS050647C

**FILED**
JUL 1 5 2005
LISA M. GALDOS
CLERK OF THE SUPERIOR COURT
DEPUTY
J. NICHOLSON

COMMITMENT TO STATE PRISON
ABSTRACT OF JUDGMENT   ☐ AMENDED ABSTRACT

DATE OF HEARING 06-08-05 | DEPT. NO. 4 | JUDGE Robert F. Moody
CLERK Jamie Adcock | REPORTER Yvette Garmon 12889 | PROBATION NO. or PROBATION OFFICER: Immediate Sentence
COUNSEL FOR PEOPLE Rick Storms | COUNSEL FOR DEFENDANT James Dozier ☒ APPT'D.

1. Defendant was convicted of the commission of the following felony:

| CNT. | CODE | SECTION NUMBER | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION (MO./DATE/YEAR) | JURY | COURT | PLEA | TERM (if st, li, u) | YRS. | MOS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | PC | 4573.6 | Possession Of Drugs In Prison | 2002 | 06-08-05 | | | X | L | 2 | 0 |

2. ENHANCEMENTS charged and found to be true TIED TO SPECIFIC COUNTS (mainly in the PC 12022 series). List each count enhancement horizontally. Enter time imposed for each or "S" for stayed. DO NOT LIST enhancements stricken under PC 1385.

| CNT. | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

3. ENHANCEMENTS charged and found to be true FOR PRIOR CONVICTION OR PRISON TERMS (mainly in the PC 667 series). List all enhancements horizontally. Enter time imposed for each or "S" for stayed. DO NOT LIST enhancements stricken under PC 1385.

| ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | TOTAL |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

4. ☐ Defendant was sentenced pursuant to PC 667 (b)-(i) or PC 1170.12 (two-strikes).
5. FINANCIAL OBLIGATIONS (including any applicable penalty assessments):
   a. RESTITUTION FINE of: $400 per PC 1202.4(b) forthwith per PC 2085.5.
   b. RESTITUTION FINE of: $400 per PC 1202.45 suspended unless parole is revoked.
   c. RESTITUTION of: $_____ per PC 1202.4(f) to ☐ victim(s)* ☐ Restitution Fund
      (*List victim name(s) if known and amount breakdown in item 7, below.)
      (1) ☐ Amount to be determined.   (2) ☐ Interest rate of: __% (not to exceed 10% per PC 1202.4(f)(3)(F)).
   d. ☐ LAB FEE of: $_____ for counts: _____ per H&SC 11372.5(a).
   e. ☐ DRUG PROGRAM FEE of $150 per H&SC 11372.7(a).   f. ☐ FINE of $___ per PC 1202.5.
   TESTING: ☐ AIDS ☐ DNA pursuant to ☐ PC 1202.1 ☐ PC 290.2 ☐ other (specify):
   Other orders (specify):

8. | TOTAL TIME IMPOSED: | 2 | 0 |
9. ☐ This sentence is to run concurrent with (specify):
10. Execution of sentence imposed
    a. ☒ at initial sentencing hearing.          d. ☐ at resentencing per recall of commitment. (PC 1170(d).)
    b. ☐ at resentencing per decision on appeal.  e. ☐ other (specify):
    c. ☐ after revocation of probation.

11. | DATE SENTENCE PRONOUNCED 06-08-05 | CREDIT FOR TIME SPENT IN CUSTODY: 0 | TOTAL DAYS INCLUDING: | ACTUAL LOCAL TIME 0 | LOCAL CONDUCT CREDITS 0 | ☒ 4019 ☐ 2933.1 | SERVED TIME IN STATE INSTITUTION ☐ DMH ☐ CDC ☐ CRC |

12. The defendant is remanded to the custody of the sheriff ☒ forthwith ☐ after 48 hours excluding Saturdays, Sundays, and holidays
    To be delivered to ☐ the reception center designated by the director of the California Department of Corrections.
    ☒ other (specify): CTF-SOLEDAD

CLERK OF THE COURT: I hereby certify the foregoing to be a correct abstract of the judgment made in this action.
DEPUTY'S SIGNATURE Jamie Adcock | DATE 07-11-05
This form is prescribed under PC 1213.5 to satisfy the requirements of PC 1213 for determinate sentences. Attachments may be used but must be referred to in this document.

Form Adopted by the Judicial Council of California CR-290.1 (Rev. January 1, 1999)

ABSTRACT OF JUDGMENT – PRISON COMMITMENT – DETERMINATE
SINGLE, CONCURRENT, OR FULL-TERM CONSECUTIVE COUNT FORM

Penal Code §§ 1170, 1213, 1213.5

36

37

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF MONTEREY | |
|---|---|
| **The People of the State of California,**<br><br>Plaintiff<br><br>vs.<br><br>**Monette, Alex,**<br><br>Defendant | Hon. **Robert F. Moody**<br>Clerk:           **Jamie Adcock**<br>CSR:            **Yvette Gallardo-Garmon**<br>Recording No. |
| Minutes:     **Pre-Trial & Setting of Jury Trial**<br><br>**June 8, 2005** | Case No.     **SS050647C**<br>               **Courtroom 4** |
| Charges:<br>**2:    PC1170.12(c)(1) [Prior felony conviction]    ALLSP**<br>**1:    PC182(a)(1) [Conspiracy: Commit Crime]    FEL**<br>**2:    PC4573.6 [Possession Of Drugs Where Prisoners Are Kept]    FEL** | |

Deputy District Attorney Rick Storms appeared.

Defendant appears and is in custody on this case.

Defendant appeared with Counsel James Dozier.

Defendant moves to withdraw plea of not guilty to enter conditional plea.

Motion to Withdraw Plea is granted.

Defendant enters a plea of nolo contendere to count 2.

Allegation number 01 pursuant to PC 1170.12c(1) as alleged in count 2 is admitted.

Plea entered on condition: Lower term 2 years.

Plea entered pursuant to People vs. West.

Plea is accepted by District Attorney and approved by the court after explaining provisions of section PC 1192.5 to Defendant.

Upon stipulation of Counsel, court finds a factual basis for the plea.

*38*

Last saved on: September 6, 2005 at 3:26 PM

Defendant advised that on entering a plea of guilty or Nolo Contendere that he would be giving up the following rights: His privilege against self-incrimination, the right to jury trial to confrontation and cross-examination of the witnesses against him. After questioning the Defendant the court finds that he understood the nature of the charge and the possible range of penalties and other consequences of his plea, including the effect of the admission of any prior convictions. The court finds that the Defendant understood and knowingly, voluntarily and intelligently waived each of the above rights, and that there was a factual basis for the plea.

Defendant orally states that he has read and understands the acknowledgement of waiver or rights form, and the maximum, and minimum penalties form, which he has signed and is incorporated herein.

Defendant waives time for sentencing..

Defendant waives probation referral and requests immediate sentence.

Defendant states there is no legal cause why judgment should not be pronounced.

Court removes strike from sentencing

Probation is denied.

As to count 2: imposed the lower term of 2 year(s), 0 month(s), 0 day(s).

This case to be served: Consecutive to any other sentence.

Defendant committed to department of corrections for the total fixed term of 2 year(s), 0 month(s), 0 day(s).

Pay restitution fine of $400.00 to state restitution fund  (PC 1202.4)

Pay an additional restitution fine in the amount of $400.00 under PC 1202.4(b). This fine shall be suspended unless parole is revoked (PC 120245)

Defendant to provide two specimens of blood, a saliva sample, right thumbprint, and full palm impressions of each hand for law enforcement identification analysis pursuant to Section 296(a)(1) of the Penal Code.

Count 1 dismissed on motion of the District Attorney. Reason for dismissal or discharge: Furtherance of Justice.(PC 1385.)

Defendant is advised of Appeal rights.

SS050647C, June 8, 2005

39

Defendant to remain In-Custody

Sheriff to deliver Defendant into custody of the Director of California Institution for Men at CTF-SOLEDAD.

All sentence elements for this proceeding entered.

DATE:_____

_____

JUDGE OF THE SUPERIOR COURT

**SS050647C, June 8, 2005**

# Exhibit "D"

**Exhibit "D"**

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life )
Term Parole Consideration )
Hearing of:              )          CDC Number E-48953
                         )
ALEX MONETTE             )
                         )
                         )
_____)

INMATE COPY

AVENAL STATE PRISON

AVENAL, CALIFORNIA

MARCH 8, 2006

2:05 P.M.


PANEL PRESENT:

Ms. Tracey St. Julien, Presiding Commissioner
Ms. Diane Lushbough, Deputy Commissioner



OTHERS PRESENT:

Mr. Alex Monette, Inmate
Ms. Candace Christensen, Attorney for Inmate
Ms. Nancy Naftel, Deputy District Attorney
Correctional Officers Unidentified




CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No      See Review of Hearing
_____    Yes     Transcript Memorandum



**Stacy Wegner, Peters Shorthand Reporting**

41Q

ii

INDEX

                                                         PAGE

Proceedings........................................ 1

Case Factors....................................... 8

Pre-Commitment Factors............................ 18

Post-Commitment Factors........................... 45

Parole Plans...................................... 29

Closing Statements................................ 80

Recess............................................ 85

Decision.......................................... 86

Adjournment....................................... 92

Transcriber Certification......................... 93

--oOo--

42

1

1        **P R O C E E D I N G S**

2        **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.

3    We're on record.

4        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

5    The time is five after 2:00 p.m. and this is a

6    subsequent parole hearing for Alex Monette, CDC

7    number E-48953.  Today is March 8, 2006.  We're

8    at Avenal State Prison.  Mr. Monette was

9    received on March 22, 1990, life term starting

10   December 6, 1990.  Count one, murder second with

11   the use of a weapon, and it's a violation of

12   Penal Code Sections 187 and 12022(d), and the

13   term received is 16 years to life.  Minimum

14   eligible parole date is April 30, 2001.  This is

15   from the county of Los Angeles, case number

16   A893088.  And is that correct, sir?

17       **INMATE MONETTE:**  Yes, ma'am.

18       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

19   We're going to go to -- we're tape recording the

20   hearing, so we'll go around the room and

21   introduce ourselves for the transcriber.  We'll

22   say our name, spell our name, and then if you've

23   also state your CDC number.

24       **INMATE MONETTE:**  Okay.

25       **PRESIDING COMMISSIONER ST. JULIEN:**  And my

26   name is Tracey St. Julien, T-R-A-C-E-Y, S-T

27   capital J-U-L-I-E-N, Commissioner.

43

2

1        **DEPUTY COMMISSIONER LUSHBOUGH:**  Diane

2    Lushbough, D-I-A-N-E, L-U-S-H-B-O-U-G-H.  I'm

3    the Deputy Commissioner.

4        **ATTORNEY CHRISTENSEN:**  Candace Christensen,

5    C-H-R-I-S-T-E-N-S-E-N, attorney for Mr. Monette.

6        **INMATE MONETTE:**  Alex Monette, M-O-N-E-T-T-

7    E, my number is E-48953.

8        **DEPUTY DISTRICT ATTORNEY NAFTEL:**  Nancy

9    Naftel, N-A-F-T-E-L, Deputy District Attorney,

10   Los Angeles County.

11       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

12   And we also have one correctional officer in the

13   room who is here for security purposes.  So it

14   is Monette like the jewelry, not Monette like

15   the champagne?

16       **INMATE MONETTE:**  Monette, yes.

17       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

18       **ATTORNEY CHRISTENSEN:**  Monette like the

19   painter.

20       **INMATE MONETTE:**  Like the painter.

21       **PRESIDING COMMISSIONER ST. JULIEN:**  Oh, see

22   where my head is, jewelry.  Okay.  Mr. Monette,

23   your attorney just went over with you the ADA

24   issues?

25       **INMATE MONETTE:**  Yes.

26       **PRESIDING COMMISSIONER ST. JULIEN:**

27   American's with Disabilities Act rights, as well

44

3

1  as the hearing procedure?

2     **INMATE MONETTE:**  Yes, ma'am.

3     **PRESIDING COMMISSIONER ST. JULIEN:**  And

4  apparently you -- did you have a problem -- is

5  your knee problem recent?

6     **INMATE MONETTE:**  No, it's been since before

7  I was incarcerated.

8     **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

9  Because I was looking on your BPT Form 1073,

10  that's the form that you and your counselor

11  would of gone over to, you know, that talks

12  about if you have any disability, and nothing

13  was checked, but anyway that form was signed on

14  May 11, 2005.

15     **ATTORNEY CHRISTENSEN:**  Here's the form that

16  you should of checked right here.

17     **INMATE MONETTE:**  Okay.

18     **PRESIDING COMMISSIONER ST. JULIEN:**  So next

19  time --

20     **ATTORNEY CHRISTENSEN:**  If that should

21  continue to be a problem.

22     **INMATE MONETTE:**  I didn't consider myself -

23  -

24     **PRESIDING COMMISSIONER ST. JULIEN:**

25  Disabled?

26     **INMATE MONETTE:**  Yes.

27     **PRESIDING COMMISSIONER ST. JULIEN:**  Did you

45

4

1    need a wheelchair to come in the room today?

2         INMATE MONETTE:  No.

3         PRESIDING COMMISSIONER ST. JULIEN:  Okay.

4    Basically, if somebody has a problem, you know,

5    a lot of the older inmates or whatever they have

6    problems getting in the room or up and down

7    stairs or something like that, then we'll

8    provide them a wheelchair or some kind of way --

9         INMATE MONETTE:  Support.

10        PRESIDING COMMISSIONER ST. JULIEN:  For

11   them to get in, so that's basically what that

12   question is designed for, if you needed any

13   help.  Now, did you need any help today?  Are

14   you able to walk on your own?

15        INMATE MONETTE:  Oh, yes, I can walk.

16        PRESIDING COMMISSIONER ST. JULIEN:  Okay.

17        INMATE MONETTE:  It's an old sports injury.

18        PRESIDING COMMISSIONER ST. JULIEN:  Okay.

19   But you have it causes you constant pain?

20        INMATE MONETTE:  Yes.

21        PRESIDING COMMISSIONER ST. JULIEN:  Do you

22   take my ibuprofen or any kind of --

23        INMATE MONETTE:  I have been given Motrin

24   600s for many, many times, and it doesn't help

25   at all, so I've been requesting over and over to

26   see the doctor to have another MRI done because

27   I felt through my own research that I had a

46

5

1  medial mediscus tear, and the last MRI was done,

2  I believe in '98.  They didn't find any tearing

3  in the ligaments or the bone, but I've had the

4  same problem with the right knee.  It was taken

5  care at Chuckawalla Valley State Prison, so now

6  I know the symptoms, so I know exactly what's

7  going on with the left knee, but it's just

8  taking so long to see somebody.

9       **PRESIDING COMMISSIONER ST. JULIEN:**  Well,

10 as I'm sure you've read, the prison system --

11 health care system --

12      **INMATE MONETTE:**  Yes.

13      **PRESIDING COMMISSIONER ST. JULIEN:**  Is

14 about to be revamped.

15      **INMATE MONETTE:**  Yes.

16      **PRESIDING COMMISSIONER ST. JULIEN:**  So

17 hopefully you will be able to get some relief

18 sooner rather than later.  Okay.  But you're

19 okay to walk?

20      **INMATE MONETTE:**  Sure.

21      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

22      **INMATE MONETTE:**  Yes.

23      **PRESIDING COMMISSIONER ST. JULIEN:**  And Ms.

24 Christensen, are you satisfied that your

25 client's ADA rights have been met?

26      **ATTORNEY CHRISTENSEN:**  Yes, I am.

27      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

47

6

1    And we do have some additional documents that

2    were submitted earlier for Mr. Monette.  Do you

3    have anything else you'd like to present us

4    with?  I think we have a resume here somewhere.

5        **ATTORNEY CHRISTENSEN:**  No, he's fine.

6        **PRESIDING COMMISSIONER ST. JULIEN:**  And do

7    you have any preliminary objections?

8        **ATTORNEY CHRISTENSEN:**  No, I don't.

9        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

10   And the hearing checklist, I note that I

11   received that back, and was that list in order?

12       **ATTORNEY CHRISTENSEN:**  Yes it was.  Thank

13   you.

14       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

15   Thank you.  And Ms. Naftel, I'm looking at

16   hearing checklist dated February 3, 2006,

17   prepared by last name Gilfoy, G-I-L-F-O-Y.  Is

18   that the same list you have?

19       **DEPUTY DISTRICT ATTORNEY NAFTEL:**  Yes, I

20   do.

21       **PRESIDING COMMISSIONER ST. JULIEN:**  And is

22   that list in order?

23       **DEPUTY DISTRICT ATTORNEY NAFTEL:**  Yes, it

24   is.

25       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

26   Thank you.  And Commissioner Lushbough, is there

27   any confidential?

48

7

1      **DEPUTY COMMISSIONER LUSHBOUGH:** There is,

2   and I have not been able to locate -- I'm just

3   now locating it in the file.

4      **PRESIDING COMMISSIONER ST. JULIEN:** Okay.

5   Mr. Monette, you have the right to be heard by a

6   fair and impartial Panel. Now that you've seen

7   the Panel here today, do you have any

8   objections?

9      **INMATE MONETTE:** No, none at this time, no.

10      **PRESIDING COMMISSIONER ST. JULIEN:** Okay.

11   Are you going to object after we give you the

12   decision?

13      **INMATE MONETTE:** No.

14      **PRESIDING COMMISSIONER ST. JULIEN:** Okay.

15   And Ms. Christensen?

16      **ATTORNEY CHRISTENSEN:** Absolutely none.

17      **PRESIDING COMMISSIONER ST. JULIEN:** Okay.

18   I was looking at your appellate court decision

19   to read the facts in there, but they don't

20   actually list the facts. Now -- and do you have

21   any questions about the hearing procedure today?

22      **INMATE MONETTE:** No.

23      **PRESIDING COMMISSIONER ST. JULIEN:** In

24   terms of what we're going to talk about?

25      **INMATE MONETTE:** No.

26      **PRESIDING COMMISSIONER ST. JULIEN:** Okay.

27   And feel free if at any point in time you need

49

8

```
 1   to clarify any comments we make, then please
 2   feel free to do so.
 3        INMATE MONETTE:  Okay.
 4        PRESIDING COMMISSIONER ST. JULIEN:  Okay.
 5   So the summary of the crime, and I'm looking at
 6   the March 2004 board report that was from March
 7   2004 calendar, and it states that the following
 8   information was taken from the LA County
 9   Probation Officer's Report.  "On April 26th 1989
10   at approximately 2200 hours the victim and his
11   girlfriend pulled into a service station in the
12   vicinity of Brea, B-R-E-A, Canyon Road in
13   Colima, Walnut, California, and the victim in
14   this case was Adrian Lazandro.
15        INMATE MONETTE:  Villalba.
16        PRESIDING COMMISSIONER ST. JULIEN:  Okay.
17   I was going to spell Lazandro first.
18        INMATE MONETTE:  Okay.
19        PRESIDING COMMISSIONER ST. JULIEN:  L-I-Z-
20   A-N-D-R-O, last name, is it Villalba?
21        INMATE MONETTE:  Uh-huh, yes.
22        PRESIDING COMMISSIONER ST. JULIEN:  Okay.
23   V-I-L-L-A-L-B-A.  "The victim walked up to a
24   bank of telephone booths, and apparently a
25   confrontation developed between the victim and
26   the inmate.  The victim walked away from the
27   phone booth towards his vehicle.  The victim was
```

50

9

1   attacked by the inmate, who stabbed the victim

2   in the chest.  The victim was transported to

3   Brea Community Hospital where he was pronounced

4   dead at 2329 hours on" -- so he died a couple

5   days later on April 30th, 1989.  He died a day

6   or so later?

7       INMATE MONETTE:  I think it was the same

8   evening.

9       PRESIDING COMMISSIONER ST. JULIEN:  Yeah,

10  this doesn't make sense.

11      ATTORNEY CHRISTENSEN:  If this occurred on

12  the 26th, and he was pronounced on the 30th,

13  that's a couple days later.

14      PRESIDING COMMISSIONER ST. JULIEN:  That

15  doesn't -- was he brain dead?

16      INMATE MONETTE:  No, I -- according to the

17  Probation Officer's Report of what you just read

18  -- every time I come to this hearing there's

19  always some discrepancies.

20      PRESIDING COMMISSIONER ST. JULIEN:  I

21  notice that.

22      INMATE MONETTE:  Yes.  And the fact of the

23  matter he was stabbed here right above the --

24  right in the chest -- I mean, the shoulder,

25  shoulder area.

26      PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

27      INMATE MONETTE:  And he was not walking

10

1    away.  We were face to face, and as far as I can

2    remember, he ended up bleeding to death.

3          PRESIDING COMMISSIONER ST. JULIEN:  Well,

4    on the Probation Officer's Report it does give

5    us two different dates.  Well, in any case,

6    unfortunately the victim did succumb to that

7    stab wound.

8          INMATE MONETTE:  Yes.

9          PRESIDING COMMISSIONER ST. JULIEN:  Okay.

10    Now, I had also read your version of the crime,

11    and it was a little different --

12          INMATE MONETTE:  Yes, ma'am.

13          PRESIDING COMMISSIONER ST. JULIEN:  -- as I

14    recall.  So why don't you tell us what happened.

15          INMATE MONETTE:  Well, I was at the phone

16    booth myself first, and when I was approached by

17    the victim.  And he asked me for a light.

18          PRESIDING COMMISSIONER ST. JULIEN:  For the

19    cigarette?

20          INMATE MONETTE:  No, a light.  He didn't

21    say a cigarette.  I assumed it was a cigarette.

22          PRESIDING COMMISSIONER ST. JULIEN:  Okay.

23          INMATE MONETTE:  Those were just his words.

24    Spanish speaking, so his English wasn't as

25    clear, but I assumed it was for a light for a

26    cigarette.  And I said I don't smoke, I don't

27    have any, so as I turned back around to the pay

52

11

1    phone.  He pulled me -- put his hands on my
2    shoulder and pulled me back around and said, you
3    know, I need some help, I need some money.  I
4    said I don't have anything for you.  And I was
5    at the time putting in my calling card.  I was
6    calling my father at the pay phone, and when he
7    got close to me, I ended up pushing him back.
8    He pushed back.  Then that's when the
9    altercation took place.
10       PRESIDING COMMISSIONER ST. JULIEN:  And
11   then did he end up getting stabbed?
12       INMATE MONETTE:  When he hit me in the
13   stomach when I went down.  I remember I had the
14   knife in my pocket, and I pulled it out, and
15   that's when I reached forward for him and one
16   hand hit here and the other hit here.  This is
17   where the stab wound was, and he started
18   backwards.  As he walked back all I heard was
19   let's go, let's go, because I had two friends
20   who were there that night with me.  We had went
21   out that evening.  And when I heard let's go, I
22   just took off.  I knew what area I was in.  I
23   knew it was too late to be there in the first
24   place.
25       ATTORNEY CHRISTENSEN:  What time of night?
26       INMATE MONETTE:  About 11:00, about 11:30
27   in the evening.

12

1      **ATTORNEY CHRISTENSEN:**  Okay.

2      **INMATE MONETTE:**  And I drove away, went to

3   a girlfriend's house and had her call the

4   (indiscernible) police station to find out if

5   anybody had been hurt.  And they said yes,

6   somebody had been hurt and they wanted some

7   answers, so I went down to the police station,

8   explained what happened.

9      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

10   Then at what point in time did you find out that

11   he had died?

12      **INMATE MONETTE:**  At the police station.

13      **PRESIDING COMMISSIONER ST. JULIEN:**  And

14   that was the same --

15      **INMATE MONETTE:**  That was --

16      **PRESIDING COMMISSIONER ST. JULIEN:**  -- same

17   day, same night?

18      **INMATE MONETTE:**  Yes.

19      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

20   So how -- do you know how tall the victim was?

21   I mean, were you bigger than him because you're

22   not a small guy?

23      **INMATE MONETTE:**  Close to the same height.

24      **PRESIDING COMMISSIONER ST. JULIEN:**  How

25   tall are you?

26      **INMATE MONETTE:**  I'm 6'2 and a half.

27      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

54

13

1  So he was tall?

2      **INMATE MONETTE:**  By that time I was only

3  19.  I was about maybe six foot.

4      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

5      **INMATE MONETTE:**  Well, yeah, about six foot

6  at that time.

7      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

8  But he was still fairly tall?

9      **INMATE MONETTE:**  Yeah, we were right about

10  the same.

11      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

12  So did you think he was drunk?  I mean, why did

13  you think -- because generally people don't put

14  their hands on strangers.

15      **INMATE MONETTE:**  Exactly.

16      **PRESIDING COMMISSIONER ST. JULIEN:**  So --

17      **INMATE MONETTE:**  I was scared of the way he

18  put his hands on me.

19      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

20      **INMATE MONETTE:**  That's what triggered,

21  like what's going on here.

22      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

23  So you have two friends -- are they waiting in

24  the car?

25      **INMATE MONETTE:**  No, one had gotten out and

26  was using the pay phone in the first pay phone

27  booth.  And the other one, I guess, was right

14

1   behind him.  I got out of the car first and was
2   on my way over there to use the phone.  That was
3   the whole reason to get off the freeway to use
4   the phone for me.  And as I was on the phone,
5   this whole altercation took place in a matter of
6   seconds right there at the phone booth.
7       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.
8   Now, do you think he saw your friends?  This is
9   very strange that he would basically confront
10  you if, you know, confront a couple of guys.
11  Don't you think that's strange?
12      **INMATE MONETTE:**  Yes.
13      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.
14  And did your friends -- you had a jury trial,
15  right?
16      **INMATE MONETTE:**  Yes.
17      **PRESIDING COMMISSIONER ST. JULIEN:**  Did
18  your friends, the friends you were with testify?
19      **INMATE MONETTE:**  Yes.
20      **PRESIDING COMMISSIONER ST. JULIEN:**  And
21  what did they say happened that night?
22      **INMATE MONETTE:**  That when they -- when
23  they were on the phone -- in phone booths, one
24  individual who was in the phone booths, and he
25  felt the phones shake.  He turned around and saw
26  me leap at the individual in front of me.
27  That's what he saw.  That's what he testified

JO

15

1   to.

2        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

3        **INMATE MONETTE:**  When the shoving went on

4   between him and I, my back was hit up against

5   the telephone booth.

6        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

7   So in this -- the Probation Officer's Report I'm

8   looking at it says the victim was attacked by

9   the defendant.  So was there any evidence

10  presented that you attacked Mr. Villalba?

11       **INMATE MONETTE:**  No.  They were saying that

12  his girlfriend, who was in the car --

13       **PRESIDING COMMISSIONER ST. JULIEN:**  Oh, she

14  was there?

15       **INMATE MONETTE:**  She was around the corner

16  because the car had broken down.

17       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

18       **INMATE MONETTE:**  She says that she saw some

19  individuals in the gas station area but couldn't

20  determine whether they attacked him or that he

21  just fell on the spot.  She couldn't tell that.

22  I didn't see him fall firstly myself because as

23  I pushed him away I took off.

24       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

25  So did you say self defense in your trial?

26       **INMATE MONETTE:**  Yes.

27       **PRESIDING COMMISSIONER ST. JULIEN:**  So why

57

16

1  do you think that didn't work?

2      INMATE MONETTE:  Because I had the knife

3  and I attacked him, and just by him putting his

4  hands on me I should of at least walked away or

5  ran away at that point.

6      PRESIDING COMMISSIONER ST. JULIEN:  And he

7  didn't have any weapon?

8      INMATE MONETTE:  Not that I know of.

9      PRESIDING COMMISSIONER ST. JULIEN:  Okay.

10  So all these years later, how do you feel about

11  all this?

12      INMATE MONETTE:  I still feel terrible.  My

13  intentions were never to hurt anybody.  I'm

14  going to have to live with this for the rest of

15  my life.

16      PRESIDING COMMISSIONER ST. JULIEN:  Were

17  you offered a plea?

18      INMATE MONETTE:  No, ma'am.

19      PRESIDING COMMISSIONER ST. JULIEN:  No.

20  Okay.

21      INMATE MONETTE:  I really don't like

22  talking about it.  At first I decided not

23  talking about the case initially.

24      PRESIDING COMMISSIONER ST. JULIEN:  Well, I

25  think that --

26      INMATE MONETTE:  Then I decided to because

27  I have to deal with this every day after I

58

17

1  leave.  I just don't talk about it anymore.

2      PRESIDING COMMISSIONER ST. JULIEN:  Well,

3  I'll be an armchair lawyer and tell you that

4  it's always better for the inmate to talk.

5      INMATE MONETTE:  Yes, she --

6      PRESIDING COMMISSIONER ST. JULIEN:  Okay.

7      INMATE MONETTE:  Yes, she did.

8      PRESIDING COMMISSIONER ST. JULIEN:  Okay.

9      ATTORNEY CHRISTENSEN:  It's okay if you get

10  a little teary.

11      PRESIDING COMMISSIONER ST. JULIEN:  Okay.

12  You can --

13      ATTORNEY CHRISTENSEN:  We have Kleenex

14  here.

15      INMATE MONETTE:  Yeah.

16      PRESIDING COMMISSIONER ST. JULIEN:  It's

17  your right not to talk about it, but it deprives

18  us of an opportunity, I think, to make a full

19  evaluation.

20      ATTORNEY CHRISTENSEN:  I explained all that

21  to him.

22      PRESIDING COMMISSIONER ST. JULIEN:  Yeah,

23  it's always in your best interest for us to be

24  able to do that.

25      INMATE MONETTE:  I understand.

26      PRESIDING COMMISSIONER ST. JULIEN:  Okay.

27  Anyway, okay.  So -- and face it, I mean, this

18

1  is the reason why you're here.

2      **INMATE MONETTE:**  Yes.

3      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

4      **INMATE MONETTE:**  Yes.

5      **PRESIDING COMMISSIONER ST. JULIEN:**  So you

6  have to be able to talk about it.  Now, you

7  don't have a juvenile record, and you don't have

8  an adult record.  So you were in school, you

9  were going to college -- you just graduated?

10      **INMATE MONETTE:**  No, I was going -- I just

11  started going to Cal State Fullerton University.

12      **PRESIDING COMMISSIONER ST. JULIEN:**  Oh,

13  because this says you were preregistered.

14      **INMATE MONETTE:**  Preregistered at Cal State

15  Fullerton.

16      **PRESIDING COMMISSIONER ST. JULIEN:**  But

17  were you actually attending?

18      **INMATE MONETTE:**  No, I hadn't started yet.

19      **PRESIDING COMMISSIONER ST. JULIEN:**  So you

20  graduated from high school?

21      **INMATE MONETTE:**  I graduated from high

22  school in 1987.

23      **PRESIDING COMMISSIONER ST. JULIEN:**  And

24  then you were going to Cal State Fullerton?

25      **INMATE MONETTE:**  Yes, I was working at the

26  time.

27      **PRESIDING COMMISSIONER ST. JULIEN:**  And

19

1    what was your major going to be?

2        **INMATE MONETTE:**  Psychology and business.

3        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

4    And you were working?

5        **INMATE MONETTE:**  Yes, ma'am.

6        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

7    You were working in a store?

8        **INMATE MONETTE:**  Uh-huh.

9        **PRESIDING COMMISSIONER ST. JULIEN:**  Was it

10   full time or part time?

11       **INMATE MONETTE:**  It was full time.

12       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

13   And you -- what was your plan for you life?

14   What plans did you have?

15       **INMATE MONETTE:**  I had planned to become a

16   police officer.  I was in the process of doing

17   some training with my uncle Mark Hallon, he's a

18   lieutenant at Santa Monica Police Department,

19   and I was on that path.  I figured I would do a

20   couple years of college.  I was still looking to

21   find my way into professional sports.  The road

22   I was going was basketball and football, and I

23   was going to try that first.  And if it didn't

24   work, I had planned to be a police officer in

25   Santa Monica.

26       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

27   Now, about your growing up, you -- I'm trying to

61

20

1    find your family history.  Sometimes it's easy
2    to find and sometimes it isn't.  No wonder I
3    don't have anything highlighted.  I don't have
4    any family history in here.
5        INMATE MONETTE:  What kind of family
6    history are you talking about?
7        PRESIDING COMMISSIONER ST. JULIEN:  You
8    know, parents, siblings.
9        INMATE MONETTE:  Well, my mother's name is
10   Denise Wells.
11       PRESIDING COMMISSIONER ST. JULIEN:  Where
12   did you grow up?
13       INMATE MONETTE:  Los Angeles.
14       PRESIDING COMMISSIONER ST. JULIEN:  Okay.
15       INMATE MONETTE:  I went to school, Catholic
16   school, St. Christensen in LA.  I was an alter
17   boy.  From that point I went to Jr. high school,
18   Elder White Jr. High School.  I played sports
19   ever since I was a little boy, baseball,
20   basketball, football and tennis.  I went to west
21   Chester High School in Los Angeles.  From there
22   I transferred to Ganesha High School in Pomona,
23   California.
24       PRESIDING COMMISSIONER ST. JULIEN:  Yeah,
25   so now how -- because that's quite a ways?
26       INMATE MONETTE:  Yeah, my mother and father
27   moved out of -- my mother and stepfather moved

62

21

1  out of Los Angeles.

2  **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

3  **INMATE MONETTE:**  And moved to Fontana.

4  **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

5  **INMATE MONETTE:**  And so I moved with them.

6  **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

7  **INMATE MONETTE:**  And transferred to

8  Ganesha, and did my senior year playing sports

9  at Ganesha High School.

10  **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

11  **INMATE MONETTE:**  That's when I graduated in

12  1987.

13  **PRESIDING COMMISSIONER ST. JULIEN:**  And how

14  old are you now?

15  **INMATE MONETTE:**  36.

16  **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

17  And what about siblings?

18  **INMATE MONETTE:**  Sister, Angela, love her

19  to death.  She's 29 years old now.  Just had

20  another baby, two nephews, two boys and a girl

21  she just had.  Younger brother Anthony Wells,

22  he's 21.  He's working hard.  I just saw him

23  this past weekend.  I'm real close with my

24  family.  They're here pretty much every month.

25  I stay in constant contact with everybody.  I

26  have a lot of uncles, aunts, nephews, cousins.

27  **PRESIDING COMMISSIONER ST. JULIEN:**  And how

*63*

22

1   did the family react --

2       **INMATE MONETTE:**  Devastated.

3       **PRESIDING COMMISSIONER ST. JULIEN:**  -- when

4   this case happened?

5       **INMATE MONETTE:**  Devastated, the whole

6   family.  The community, friends, everybody was.

7   As you can see, everybody wrote wonderful

8   letters.  I was in tears last night.  I just

9   received them last night.

10      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

11      **INMATE MONETTE:**  I heard about this Board

12  hearing in such short notice, but they were able

13  to get in what they could.

14      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

15      **INMATE MONETTE:**  It just hurts me more than

16  anything to see what they're going through

17  waiting for me every day, every week.  It's

18  hard.  I'm sorry.  I miss my family

19  tremendously, but more importantly, I would like

20  to show the victim's family once I'm released

21  what a difference I can make, and this is not

22  the person -- I'm not an individual just going

23  around hurting people or to kill anybody.

24  That's not who I am.

25      **PRESIDING COMMISSIONER ST. JULIEN:**  Were

26  you violent before?

27      **INMATE MONETTE:**  No, never.

6 4

23

1        **PRESIDING COMMISSIONER ST. JULIEN:**  Did you

2   get in fights?

3        **INMATE MONETTE:**  Never.  Maybe as a child I

4   might of got in a ruffle as a young boy, but I

5   don't have a violent temper.  I don't have a

6   streak in me, anything like that, very calm,

7   very open, very easy to talk to, very helpful.

8   I kind of give my last dollar to whoever may

9   need it, and I'm sure I'll be all right because

10  that's just the way it is with me.  You know,

11  there is a part of this hearing that I do feel

12  could be unfair, and I know at the beginning you

13  said fair and unbiased, basically about this

14  hearing, but --

15       **PRESIDING COMMISSIONER ST. JULIEN:**

16  Impartial.

17       **INMATE MONETTE:**  Impartial, excuse me.  I

18  was told not to talk about this, but I feel it's

19  unfair that the Panel doesn't get to know who I

20  am in time.  They -- you guys have to read

21  information on paper and not get to see the

22  individual on a daily basis, and that's the part

23  I feel -- I know your job is difficult.  I know

24  that's hard to make a determination on whether a

25  person is -- can go into public and be safe and

26  not harm anybody.  I think that's a very

27  difficult job to do, but it's also unfair to me

65

24

 1  that you guys don't actually get to know me
 2  every day, or every month, or we get to see each
 3  other on a more consistent basis to understand
 4  that this is a person who doesn't belong on this
 5  block, and that's what I feel every day.  I
 6  don't belong here, and it's difficult.
 7      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.
 8  So who do you think should be able to assess
 9  your parole suitability?
10      **INMATE MONETTE:**  Well, I think you should.
11      **PRESIDING COMMISSIONER ST. JULIEN:**  No, I
12  mean, you said you don't think it's fair because
13  we don't -- and that's true, I mean, we're with
14  you a very short period of time.
15      **INMATE MONETTE:**  Right.
16      **PRESIDING COMMISSIONER ST. JULIEN:**  And
17  we're able to ask you question and have some
18  kind of a dialogue, but we do have to come to
19  some type of rapid assessment, so who -- I mean,
20  if you -- have you thought about, who do you
21  think?
22      **INMATE MONETTE:**  Just something off the top
23  of my head.  I would like to see the Panel maybe
24  once a month after you get to a certain point in
25  your time where you've done 15, 16 years, and I
26  feel like I've served my time for what I've done
27  wrong, then maybe a month interviews with an

66

25

1    individual who is probably ready to go home
2    would be appropriate to get to know that person,
3    and not just by chronos or by board reports,
4    just conversation and understanding, what their
5    goals are, and what they plan to do in the
6    future.
7        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.
8        **INMATE MONETTE:**  I come from a background
9    of entrepreneurial individuals, family members,
10   and that's my goal to do business and get
11   involved in their business once I get out.  And
12   I have a big -- I have a lot ahead of me, you
13   know, not enough time in the day for the things
14   I plan to do, but --
15       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.
16   Well, I think you had some legitimate concerns;
17   however, this is the system that's been in place
18   for many years.
19       **INMATE MONETTE:**  Right.
20       **PRESIDING COMMISSIONER ST. JULIEN:**  It's
21   definitely could use improvement, and I don't
22   argue with you there, but unfortunately the
23   population of lifers is exponential.  And just
24   going by the numbers, I don't think it's
25   possibly for the kind of system you suggest, but
26   you know what, I would encourage you to put your
27   thoughts on paper, you know, write them to your

67

26

1    assemblyman or your senator because that's --
2    they would have to make statutory changes.
3        **INMATE MONETTE:**  Sure.
4        **PRESIDING COMMISSIONER ST. JULIEN:**  But I
5    would encourage you to do that.
6        **INMATE MONETTE:**  I just wanted to express.
7        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.
8        **INMATE MONETTE:**  Thank you.
9        **PRESIDING COMMISSIONER ST. JULIEN:**  And
10   that's fine.  We do take -- people who do see
11   you very frequently do have the opportunity to
12   write a chrono, to do your board report, your
13   psych eval and things like that, so we try to
14   get as much information as we can, you know, on
15   each candidate.
16       **INMATE MONETTE:**  True.
17       **PRESIDING COMMISSIONER ST. JULIEN:**  And we
18   try to use the time we do have with you, you
19   know, to maximize that time, but unfortunately
20   for you, you were given a life sentence.
21       **INMATE MONETTE:**  Yes.
22       **PRESIDING COMMISSIONER ST. JULIEN:**  So even
23   though you feel your debt has been paid and that
24   type of thing, and I know, you know, lifers have
25   a very tough road.  You have to prove to the
26   Board that you can make it out there, and it's a
27   very, very high standard that we hold people



27

1   accountable to maintain.  Okay.  So now are you

2   still married to Suzanne?

3        **INMATE MONETTE:**  Yes, ma'am.

4        **PRESIDING COMMISSIONER ST. JULIEN:**  And

5   that's been since 1991?

6        **INMATE MONETTE:**  Yes.

7        **PRESIDING COMMISSIONER ST. JULIEN:**  And how

8   did you meet?

9        **INMATE MONETTE:**  We met at the club right

10  before I was incarcerated.

11       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

12       **INMATE MONETTE:**  While I was out on bail

13  for this case as a matter of fact.

14       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

15  And then you still decided to go through with

16  the marriage?

17       **INMATE MONETTE:**  Yes.

18       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

19       **INMATE MONETTE:**  Immediate attraction,

20  wonderful friendship.

21       **PRESIDING COMMISSIONER ST. JULIEN:**  And how

22  -- I'm sure this has been hard on her?

23       **INMATE MONETTE:**  Yes, very hard on her.

24       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

25       **INMATE MONETTE:**  She's very strong and

26  loyal individual.  I give her that, and she's a

27  mother of three.

69

28

1      PRESIDING COMMISSIONER ST. JULIEN:   And how

2   old are the kids?

3      INMATE MONETTE:   One is 17, one is 12, and

4   one is 11.

5      PRESIDING COMMISSIONER ST. JULIEN:   Wow,

6   okay.  Now, Commissioner Lushbough's area is --

7   covers the behavior and programming since the

8   commitment, so I'm going to let -- leave the

9   meat of this to her, but I'm going to make a

10  comment that I want you to think about.  I'm

11  sure you have thought about it but, you know,

12  you're looking pretty good.

13     INMATE MONETTE:   Thank you.

14     PRESIDING COMMISSIONER ST. JULIEN:   Your

15  programming and all that kind of stuff, and then

16  what happens -- I think you were at Soledad?

17     INMATE MONETTE:   Yes, ma'am.

18     PRESIDING COMMISSIONER ST. JULIEN:   What's

19  going on?

20     INMATE MONETTE:   I was around the wrong

21  individuals.

22     PRESIDING COMMISSIONER ST. JULIEN:   Okay.

23     INMATE MONETTE:   And I'm totally

24  responsible for that, I'm sorry.

25     PRESIDING COMMISSIONER ST. JULIEN:   You're

26  what?

27     INMATE MONETTE:   I'm totally responsible

29

1  for my actions.

2       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

3       **INMATE MONETTE:**  And I'm sorry.

4       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

5  And we're going to talk about that a little more

6  in depth, but I hope you realize, I'm sure you

7  realize --

8       **INMATE MONETTE:**  Yes, I do.

9       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

10  The severity of those actions.  Okay.  Now, we

11  do have a tremendous, a huge amount of letters.

12  I went to count them.  I haven't had the chance

13  to do that, but you have a about a one-inch

14  packet of letters from family and friends, as

15  well as job offers, and you have nicely put them

16  together.  They're indexed and categorized, and

17  the relationship is made.  Someone even did

18  count them.

19       **INMATE MONETTE:**  32 letters.

20       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

21       **INMATE MONETTE:**  Seven job offers.

22       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

23  From the family.  Your family at first was very

24  devastated.

25       **INMATE MONETTE:**  Yes, ma'am.

26       **PRESIDING COMMISSIONER ST. JULIEN:**  So how

27  do you think they have come around to want to

30

1  support you?

2  **INMATE MONETTE:**  Well, they know the

3  individual I am.  They know the individual they

4  raised as a child, and they know this is an

5  incident that will never reoccur.  It will never

6  occur again.  We've talked about it in depth.

7  We really don't talk about it too much anymore.

8  All we do is speak on what I can do when I get

9  out to make it better, particularly for the

10  victim's family.  I was really drawing up some

11  plans on doing a nonprofit organization and

12  trying to speak to at-youth risk school, Jr.

13  high school, colleges about what happened to me

14  and how my life changed in an instant, what I've

15  done wrong, and how individuals cannot do the

16  same thing.  Listen to my story and take heed

17  that your life can change overnight just by

18  making the wrong decision at the wrong time, so

19  I'm working on that right now.  And I plan to

20  put that in effect just to show the family that

21  I care and I'm sorry.  I will always hurting as

22  much -- not as much as them, but I will always

23  hurt for what I've done, and I look forward to

24  diving into that.

25  **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

26  Now, your father unfortunately has died since

27  you've been here?

72

31

1      INMATE MONETTE:  Yes.

2      PRESIDING COMMISSIONER ST. JULIEN:  Okay.

3      INMATE MONETTE:  June 21st.

4      PRESIDING COMMISSIONER ST. JULIEN:  And he

5  writes a very powerful letter.  He says at first

6  -- I guess for the first six years he was pretty

7  mad at you?

8      INMATE MONETTE:  Pretty upset?

9      PRESIDING COMMISSIONER ST. JULIEN:  Oh,

10  after your incarceration?

11      INMATE MONETTE:  Yes, he was pretty upset

12  at the whole situation.

13      PRESIDING COMMISSIONER ST. JULIEN:  Okay.

14  So apparently he says that you've always got

15  along with others.  You loved going to school.

16  You went fishing, and you had little league

17  games and that type of a young life.

18      INMATE MONETTE:  Uh-huh.

19      PRESIDING COMMISSIONER ST. JULIEN:  And so

20  after he was able, I guess, to deal with your

21  prison sentence then -- did he feel some guilt?

22  He says I feel his incarceration had a great

23  deal to do with me and the choices I made as a

24  father, husband, and friend.

25      INMATE MONETTE:  Well, my parents divorced

26  when I was seven.

27      PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

73

32

```
 1      INMATE MONETTE:  My father was an
 2  alcoholic.  I learned through his experience
 3  what he went through with my mother and me as a
 4  child having to look over my little sister.
 5  When the separation went down, my mother was a
 6  single mother working for the state of
 7  California Unemployment Development Department,
 8  so I was more like a father figure to my sister
 9  and cousins, children I took care of.  And he
10  felt, as we talked through my incarceration, he
11  felt that it was a lot of his fault that I had
12  to go through that growing up.  And he also felt
13  that that night of the crime itself if I hadn't
14  got off the freeway to call him then I wouldn't
15  of got off the freeway, but, you know, I figured
16  that as him and I talked extensively, I figured
17  you wanted me to call to see if you wanted me to
18  work in the morning.  That's the reason I got
19  off the freeway.  I didn't want to drive all the
20  way to Chino and drop my friends off and my girl
21  and then turn around and have to come back.  So
22  I figured if I get off the freeway now and ask
23  him do you want me to come in in the morning, if
24  he says yes, then I can drop everybody off
25  before I get to where I need to get to and just
26  go back.  I never got a chance to get through to
27  him.  He felt like a lot of that was his fault.
```

74

33

1   I tried to explain to him that it's not your

2   fault.  It's not your fault at all.

3        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

4        **INMATE MONETTE:**  I made the bad decision,

5   and I'm paying for it.

6        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

7   And then we have a letter from your mother

8   Denise.

9        **INMATE MONETTE:**  Yes.

10       **PRESIDING COMMISSIONER ST. JULIEN:**  Well,

11  and she's now retired, as you said, from EDD?

12       **INMATE MONETTE:**  Yeah.

13       **PRESIDING COMMISSIONER ST. JULIEN:**  And she

14  says that -- it's a residence offer with she and

15  -- I guess she's remarried?

16       **INMATE MONETTE:**  Yes.

17       **PRESIDING COMMISSIONER ST. JULIEN:**  So she

18  offers you residence and transportation, and she

19  says that you have a great deal of enthusiasm,

20  so she's sure you'll be able to get a job.  She

21  says -- she hopes that we recognize that served

22  for society and have repented, and that you'd be

23  a law-abiding citizen.  And then your stepfather

24  --

25       **INMATE MONETTE:**  Yes.

26       **PRESIDING COMMISSIONER ST. JULIEN:**  And

27  he's John Wells?

34

1      **INMATE MONETTE:**  Yes.

2      **PRESIDING COMMISSIONER ST. JULIEN:**  And

3  he's a Vietnam vet, and he's worked for 35 years

4  for the state as well, LAPD, California Highway

5  Patrol.  He's a master mechanic.  And I guess

6  you were trained to do mechanics?

7      **INMATE MONETTE:**  Yes, ma'am.

8      **PRESIDING COMMISSIONER ST. JULIEN:**  Is that

9  correct?  Okay.  And he says, "Alex was

10  defending himself and his defense was supposed

11  to have gone as self defense, but for some

12  uncertain reason it didn't.  This is a truly

13  unfortunate event."  Okay.  So what do you think

14  went wrong in your trial?

15      **INMATE MONETTE:**  You know, ma'am, I don't

16  know.  I don't know the law.  I didn't know it

17  then.  I had never been in trouble.

18      **PRESIDING COMMISSIONER ST. JULIEN:**  Was it

19  proven that you attacked?  I mean, did you --

20  that you attacked Mr. Villalba?

21      **INMATE MONETTE:**  They said -- there was

22  law, not a law, but a Penal Code Section 22.2 or

23  something where it says that once the assailant

24  -- the assailant can become the victim if after

25  a point you know when to stop.

26      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

27  So you should of stopped?

*76*

35

1      **INMATE MONETTE:**  Right.  When I was the
2  victim, I should of stopped, but when I kept
3  going, I turned into the assailant and he
4  becomes the victim.
5      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.
6  And that is where the self defense law was ruled
7  out at that point.
8      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.
9  So apparently growing up you weren't in a gang.
10  You had good parents.  You hated cigarette
11  smoking and you didn't drink, there wasn't
12  really alcohol.  You went to church, and so
13  apparently there was no indication that this
14  crime would be in your future.  And then your
15  stepfather says that "Alex has a full supportive
16  family for him to assist him in adjusting in
17  society.  As it is today we have a room in our
18  home and can provide with all his needs until
19  he's established and on his own."  Okay.  And
20  then again here's, I think, is your grandmother.
21      **INMATE MONETTE:**  Lacine Howen.
22      **PRESIDING COMMISSIONER ST. JULIEN:**  Yeah.
23  And she says that again, talks about your
24  childhood.  You had a good childhood, and that
25  you've been living in a different world here in
26  prison, and that you've have participated in
27  academic classes, trade programs and sports.

36

1   And she says that unfortunately she can't travel
2   as much as she used to to come see you; however,
3   you do talk on the phone as much as possible.
4   Okay.  And then we have another -- grandmother
5   EC Howen?

6       **INMATE MONETTE:**  Yes, ma'am.

7       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

8       **INMATE MONETTE:**  My grandfather.

9       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.
10  And he's retired now from the Metropolitan Water
11  District, and he says, "upon the event Alex is
12  granted parole, he will have the family support.
13  He will definitely have a place to live, access
14  to transportation, find useful employment for
15  himself, money for his use, and inspiration he
16  would gain and maintain a useful life in our
17  society."  Okay.  Well, that's -- you have --
18  you only have lost one grandfather?

19      **INMATE MONETTE:**  Yes, ma'am.  He passed
20  before I was born.

21      **PRESIDING COMMISSIONER ST. JULIEN:**  Well,
22  that's -- you're lucky to still have --

23      **INMATE MONETTE:**  I'm lucky to have both my
24  grandmothers.

25      **PRESIDING COMMISSIONER ST. JULIEN:**  -- all
26  the grandparents.

27      **INMATE MONETTE:**  And one grandfather.

78

37

1     **PRESIDING COMMISSIONER ST. JULIEN:** Okay.

2 So your grandmother outlived your father, it

3 looks like?

4     **INMATE MONETTE:** Yes.

5     **PRESIDING COMMISSIONER ST. JULIEN:** She

6 says that her son Alex Sr. died in 2001, and --

7 oh, apparently your father was visiting in

8 Louisiana?

9     **INMATE MONETTE:** Yes, ma'am.

10     **PRESIDING COMMISSIONER ST. JULIEN:** And he

11 died there?

12     **INMATE MONETTE:** Yes.

13     **PRESIDING COMMISSIONER ST. JULIEN:** Okay.

14 And it was tragic that you weren't allowed to go

15 to the funeral, and she recounts how you worked

16 together refurbishing houses and fishing trips

17 and that type of thing. And your grandmother

18 says, "I pray every night in hopes that he will

19 be safe and healthy while in prison. When he is

20 released he will always have a place to stay

21 with me." Okay. Then it continues on, we have

22 -- everybody I think in your family has written,

23 and the next one I'll give is a job offer. Mike

24 Smith's Furniture Service?

25     **INMATE MONETTE:** Yes, ma'am.

26     **PRESIDING COMMISSIONER ST. JULIEN:** And

27 that is refinishing touch-up and repair business

29

38

1   in Lancaster.  Is he your brother, yeah, Michael
2   is your brother-in-law?
3       **INMATE MONETTE:**  He's my brother-in-law.
4       **PRESIDING COMMISSIONER ST. JULIEN:**  And
5   he's married to your sister Angela.  And he says
6   that you two have a lot in common, wood work and
7   carpentry, and that he says, "I've expressed to
8   him that my door is open for him to come and
9   work with me in my refinishing business.  My
10  profession is in high demand in my community,
11  and there is not enough skilled people to handle
12  the work.  I have a good long-standing
13  reputation, and I'd love to have an extra pair
14  of hands, especially family.  Are the -- let's
15  see here, are the job offers interspersed?
16      **INMATE MONETTE:**  Interspersed?
17      **PRESIDING COMMISSIONER ST. JULIEN:**  You
18  know, are they --
19      **ATTORNEY CHRISTENSEN:**  The job offers are
20  at the back.
21      **INMATE MONETTE:**  Yes, they're at --
22      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.
23      **ATTORNEY CHRISTENSEN:**  I think there's some
24  repetition.
25      **INMATE MONETTE:**  Yes, there's a sheet that
26  says employment opportunities.
27      **PRESIDING COMMISSIONER ST. JULIEN:**  I see.



39

1    **INMATE MONETTE:**  The first is Maxtel
2  Incorporated.
3    **PRESIDING COMMISSIONER ST. JULIEN:**  And
4  Maxtel, and that's M-A-X-T-E-L, and that's in
5  Los Angeles.  And the letter is signed by Dennis
6  Brown, and apparently he has written before?
7    **INMATE MONETTE:**  Yes.
8    **PRESIDING COMMISSIONER ST. JULIEN:**  He
9  says, "we would like to -- it's with great
10  confidence that we at Maxtel consider Alex for a
11  position with our company upon his return to
12  society.  He would be an asset to the growth of
13  the business.  He's consistently maintained an
14  high level of interest in modern technology and
15  construction," and they give monthly salary that
16  you would be receiving there.  And they say that
17  you're ready to resume your place in society.
18  And then Junior Drake, and that is D-R-A-K-E,
19  Incorporated in Los Angeles.  Now, what kind of
20  business is that?
21    **INMATE MONETTE:**  His business is of
22  handbags.
23    **PRESIDING COMMISSIONER ST. JULIEN:**  Oh.
24    **INMATE MONETTE:**  They're made and sold
25  right here it -- from here to China.  They have
26  a base company in China, as well from Maxtel
27  Incorporated through Junior Drake.

81

40

1    **PRESIDING COMMISSIONER ST. JULIEN:**  And
2  that's a person?
3    **INMATE MONETTE:**  That's a person?
4    **PRESIDING COMMISSIONER ST. JULIEN:**  Is
5  Junior Drake a person?
6    **INMATE MONETTE:**  No.
7    **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.
8  Okay.  The letter is signed, is it Tgia?
9    **INMATE MONETTE:**  Yes, Tgia Jones.
10    **PRESIDING COMMISSIONER ST. JULIEN:**  Oh,
11  just Tgia?
12    **INMATE MONETTE:**  Tgia Jones.
13    **PRESIDING COMMISSIONER ST. JULIEN:**  It
14  looks like there's a T there?
15    **INMATE MONETTE:**  That is a T.  That's how
16  she spells her name.
17    **PRESIDING COMMISSIONER ST. JULIEN:**  But
18  it's just pronounced Tgia?
19    **INMATE MONETTE:**  T-G-I-A.
20    **PRESIDING COMMISSIONER ST. JULIEN:**  Tgia
21  Jones, who is the president of the company, and
22  she says that she has -- do you draw?
23    **INMATE MONETTE:**  Yes, ma'am.
24    **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.
25  So she's seen your drawing sketches and concept
26  drawings?
27    **INMATE MONETTE:**  Yes.

82

41

1       **PRESIDING COMMISSIONER ST. JULIEN:**  And you

2   -- or they're interested in your designs for

3   their handbags, and she says that "they would

4   offer you a position as a concept artist and

5   office manager, and that you would be a valuable

6   asset to them in shipping and receiving, keeping

7   records and consulting with the design team."

8   And she lists the initial salary per month with

9   opportunities for promotion.  Okay.  And then,

10  oh, is this Mike Smith?

11      **INMATE MONETTE:**  Yes.

12      **PRESIDING COMMISSIONER ST. JULIEN:**

13  Furniture Services that we mentioned earlier,

14  and this is a formal letter saying that you

15  possess the necessary skills to hold a position

16  in the company.  And again they offer you a

17  specific salary and talk about the specific

18  position that you would do, so your letters are

19  very detailed, which is very helpful.

20      **INMATE MONETTE:**  Thank you.

21      **PRESIDING COMMISSIONER ST. JULIEN:**  And

22  then we have a letter from Earnest and Shirley

23  Waters in Gardena, and they own Waterman

24  Construction Company.  And they say that you

25  have a job waiting for you, hourly wage starting

26  out as a construction leader, and that you will

27  be very instrumental to the business.  And they

83

42

```
 1    are begging us in all fairness to grant mercy
 2    and to provide you the opportunity to be a
 3    fruitful member of society.  And apparently
 4    they've known you and your family for many
 5    years?
 6         INMATE MONETTE:  Yes, ma'am.
 7         PRESIDING COMMISSIONER ST. JULIEN:  Okay.
 8    And then I think -- is that Walter and Royce
 9    Crowder?
10         INMATE MONETTE:  Yes, up at the top it says
11    Crowder Properties.
12         PRESIDING COMMISSIONER ST. JULIEN:  Sorry,
13    yeah, and that's in Los Angeles, and they know
14    you and your family.
15         INMATE MONETTE:  Yes.
16         PRESIDING COMMISSIONER ST. JULIEN:  And
17    they say that they were government employees,
18    city, county -- city and state for nearly 40
19    years.  And you were friends with their
20    children, and they say that even though you are
21    in prison, they've always been impressed with
22    your dedication to the family as well as all the
23    accomplishments you've made in prison.  And they
24    also are extending a job, collection of rents,
25    overseeing day-to-day maintenance of the
26    apartment complex, coordinating, monitoring,
27    plumbing, painting, electrical jobs.  Do they do
```

84

43

1  property management?

2      INMATE MONETTE:  Yes, ma'am.  They also own

3  apartment complexes.

4      PRESIDING COMMISSIONER ST. JULIEN:  Units?

5      INMATE MONETTE:  Units.

6      PRESIDING COMMISSIONER ST. JULIEN:  Okay.

7  And then first initial R.  It's R. Mitchel.

8      INMATE MONETTE:  Yes, ma'am.

9      PRESIDING COMMISSIONER ST. JULIEN:  M-I-T-

10 C-H-E-L, also in Los Angeles, and a letter is

11 signed by Paulo Brown.  And it says that they

12 think that you've prepared yourself by your

13 intelligence and maturity to reenter society,

14 and that they would offer you a sales position

15 with commission.  And they say this job will

16 consist of contacting our clients by telephone

17 and Internet.  We feel that Alex's friendly

18 nature will lend himself to this new career.

19 And what kind of business is that?

20     INMATE MONETTE:  This is in the business of

21 creating computer chip trays.

22     PRESIDING COMMISSIONER ST. JULIEN:

23 Computer what?

24     INMATE MONETTE:  Computer chip trays.

25     PRESIDING COMMISSIONER ST. JULIEN:  Oh.

26     INMATE MONETTE:  Where computer chips are

27 laid on trays for safety for transportation

85

44

1  between here and all over the world.

2      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

3      **INMATE MONETTE:**  This company is connected

4  with Maxtel incorporated, and they've already

5  set up a home base computer system at my

6  mother's house where I can actually work from

7  home once paroled, so I wouldn't have to leave

8  and I can do all my work from the computer over

9  the phone and fax, et cetera.

10      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

11  And then a letter from Larry Springs, and he's

12  saying that he's a 25-year licensed real estate

13  professional.  He's known you since you were

14  born, and he's talked to you a lot about the

15  real estate business, and he's impressed with

16  your knowledge about real estate business, and

17  he says that he's willing to be a mentor and to

18  help you reestablish yourself into society.

19  Okay.  So they mentioned you have a strong

20  showing of community support, and you also have

21  presented us with a resume, a listing of your

22  accomplishments and your activities, and that's

23  very good.  I always ask people to do this, so

24  that was good that you thought ahead to do that.

25      **INMATE MONETTE:**  Thank you.

26      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

27  Commissioner Lushbough, would you like to

86

45

1   proceed?

2       **DEPUTY COMMISSIONER LUSHBOUGH:**  Thank you.

3   Mr. Monette, hello.

4       **INMATE MONETTE:**  Hello.

5       **DEPUTY COMMISSIONER LUSHBOUGH:**  You were

6   received March 22nd, 1990.  Your last full

7   hearing was March 20th, 2003.  At that time you

8   were denied parole for a year, and that was at

9   CTF.  Subsequent to that on May the 25th, 2004,

10  you asked for a postponement, and that was

11  granted because you had some concerns about the

12  outcome of a possible Ad. Seg. placement?

13      **INMATE MONETTE:**  Yes, ma'am.

14      **DEPUTY COMMISSIONER LUSHBOUGH:**  So when I'm

15  reviewing your file, and I've gone through

16  everything, I'll be really focusing on the

17  period of review from March 20th, 2003, to the

18  present time.

19      **INMATE MONETTE:**  Okay.

20      **DEPUTY COMMISSIONER LUSHBOUGH:**  And not to

21  say that I haven't looked at your -- I thought

22  your resume was very inclusive, and know there's

23  more that you've done, but we're basically

24  focusing on that.

25      **INMATE MONETTE:**  Okay.

26      **DEPUTY COMMISSIONER LUSHBOUGH:**  You're

27  clearly not in Ad. Seg. now?

47

46

1        INMATE MONETTE:  No.

2        DEPUTY COMMISSIONER LUSHBOUGH:  When did

3   you get out?

4        INMATE MONETTE:  16 months ago.

5        DEPUTY COMMISSIONER LUSHBOUGH:  Okay.  When

6   you came in you had a score, a classification

7   score of 53 points.  You've been at zero since

8   2001, and I know you carry the mandatory

9   placement score that all lifers have, the 19

10  points.

11       INMATE MONETTE:  Yes, ma'am.

12       DEPUTY COMMISSIONER LUSHBOUGH:  And up

13  until 2004 you really were doing extremely well.

14  However, now you have four 115s, and two of them

15  are in this review period, so we need to talk

16  about those, and you've been free of them now

17  for approximately two years.  The earlier one

18  May 26th, 2004, was the possession of controlled

19  substance, fairly substantial amount of

20  marijuana.  I know that was referred to the

21  Monterey DA, and you got two years consecutive

22  to the life term?

23       INMATE MONETTE:  Yes.

24       DEPUTY COMMISSIONER LUSHBOUGH:  Is there

25  anything you want to tell us about that?  I

26  mean, I've read the reports, they're quite

27  lengthy.

47

1      **INMATE MONETTE:**  Yes.  Through the 115

2    process you're allowed to have a hearing where

3    you can have witnesses or with not.  The

4    witnesses in my case was my cell mate and

5    several other individuals who came to the

6    hearing and said that Mr. Monette had nothing to

7    do with this whatsoever.  This was something

8    that they had done, and it was my roommate that

9    had done it, and I was involved because we were

10   cell mates, involved in that whole situation.  I

11   was at fault for having the inmate in my cell to

12   begin with, and I fault myself for that

13   completely.

14      **DEPUTY COMMISSIONER LUSHBOUGH:**  Well, you

15   were found guilty?

16      **INMATE MONETTE:**  Yes.

17      **DEPUTY COMMISSIONER LUSHBOUGH:**  At the

18   institutional hearing?

19      **INMATE MONETTE:**  Yes.

20      **DEPUTY COMMISSIONER LUSHBOUGH:**  And we're

21   aware of how this 115 thing works.

22      **INMATE MONETTE:**  Okay.

23      **DEPUTY COMMISSIONER LUSHBOUGH:**  But perhaps

24   what's more significant is that the court found

25   you guilty.

26      **INMATE MONETTE:**  Yes.

27      **DEPUTY COMMISSIONER LUSHBOUGH:**  And gave

89

48

1  you some more time, so --

2      INMATE MONETTE:  I pleaded no contendere to

3  that.

4      DEPUTY COMMISSIONER LUSHBOUGH:  I'm sorry?

5      INMATE MONETTE:  I pleaded no contendere.

6      DEPUTY COMMISSIONER LUSHBOUGH:  Yeah.

7      INMATE MONETTE:  When I went to court.

8      DEPUTY COMMISSIONER LUSHBOUGH:  Okay.

9      INMATE MONETTE:  Based on what I was told

10  by the attorney.

11      DEPUTY COMMISSIONER LUSHBOUGH:  Okay.  So

12  you didn't have a trial, basically I did it, and

13  I don't want to fight about it or argue about

14  it?

15      INMATE MONETTE:  No, I told him I didn't do

16  it, and they gave me People V. West.  The

17  attorney said if you apply People V. West that

18  means if you plead no contendere you are not

19  being found guilty, you're not saying you're

20  guilty of what you did, but you're taking the

21  best route out.

22      DEPUTY COMMISSIONER LUSHBOUGH:  Okay.

23      INMATE MONETTE:  That's what was explained

24  to me.

25      DEPUTY COMMISSIONER LUSHBOUGH:  Okay.  Then

26  the next 115 was September 7th, 2004, and that

27  was falsified chronos?

90

49

1      INMATE MONETTE:  Yes, ma'am.

2      DEPUTY COMMISSIONER LUSHBOUGH:  How did

3  that come about?  Because I went back through

4  your file, frankly, after I read the 115, and I

5  did find some chronos that Dr. Dayalan, D-A-Y-A-

6  L-A-N, wrote in 2000 that are in your file.

7  There's things like soft shoes and you can have

8  a beard and have a lower bunk.

9      INMATE MONETTE:  Yes.

10     DEPUTY COMMISSIONER LUSHBOUGH:  Those kinds

11 of things.

12     INMATE MONETTE:  Yes.

13     DEPUTY COMMISSIONER LUSHBOUGH:  So how did

14 it happen in 2004 that you had chronos that were

15 appeared to be signed by him but apparently

16 weren't?

17     INMATE MONETTE:  They were in my file for

18 two years prior to them being found.  They were

19 put in there because I wasn't supposed to be on

20 the bottom bunk in my cell, and I went ahead and

21 told the guy to go ahead and do it, to put the

22 chronos in there because I was going to get a

23 115 for being on the bottom bunk during count

24 time, and I had a problem.

25     DEPUTY COMMISSIONER LUSHBOUGH:  Okay.

26     INMATE MONETTE:  My knee was wrapped by the

27 doctor, and my cell mate asked the officer would

*91*

50

1    you like Mr. Monette to go on the bottom bunk
2    because he can't get up on the top bunk due to
3    his problem, and the officer said no.  So this
4    went on for a couple weeks with me in pain.
5    Eventually I said, you know what, do whatever
6    chronos need to be done, and they did them, and
7    it kind of took everybody off of me from having
8    a problem with me being on the bottom bunk and
9    calling me up and down due to my injury because
10   I was trying to see the medical department for
11   my problem.
12        **DEPUTY COMMISSIONER LUSHBOUGH:**  Well, in
13   both of these 115s, do you feel you have any
14   responsibility?
15        **INMATE MONETTE:**  Yes, ma'am.
16        **DEPUTY COMMISSIONER LUSHBOUGH:**  Because
17   you're kind of pointing at the cell mates?
18        **INMATE MONETTE:**  Yes, it's my complete
19   fault.
20        **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.
21        **INMATE MONETTE:**  Definitely.
22        **DEPUTY COMMISSIONER LUSHBOUGH:**  All right.
23        **INMATE MONETTE:**  I made a bad decision.
24        **DEPUTY COMMISSIONER LUSHBOUGH:**  All right.
25   There was another possible charges.  From what I
26   can tell here, you weren't written up on a 115.
27   It was part of the possession of the controlled

*92*

51

1  substance.  It had to do with over familiarity,

2  and if I understand it correctly, it was -- it

3  had to do with a cell phone?

4      **INMATE MONETTE:**  Yes.

5      **DEPUTY COMMISSIONER LUSHBOUGH:**  That was

6  dropped?  I don't see it in here.

7      **INMATE MONETTE:**  Yes.

8      **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.  And

9  I did read the investigation.  It didn't look

10  like there is anymore investigation --

11      **INMATE MONETTE:**  No.

12      **DEPUTY COMMISSIONER LUSHBOUGH:**  -- being

13  conducted right now?

14      **INMATE MONETTE:**  No.

15      **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.

16  Well, you've had five counseling chronos, the

17  most recent was June 25th, 2005, which was a

18  failure to attend?

19      **INMATE MONETTE:**  On orientation?

20      **DEPUTY COMMISSIONER LUSHBOUGH:**  Well, wait

21  a minute now, I've said that now, but I'm not

22  seeing it here.  I saw it on the list of

23  documents, but I don't see it here.  It said

24  failure to attend orientation, but it's not in

25  the file, so --

26      **INMATE MONETTE:**  I know nothing about that.

27      **DEPUTY COMMISSIONER LUSHBOUGH:**  Well, and

93

52

1  neither do I, except for the list.

2      INMATE MONETTE:  Yeah.

3      DEPUTY COMMISSIONER LUSHBOUGH:  All right.

4  If it isn't documented, there's no way for us to

5  know.

6      INMATE MONETTE:  All right.

7      DEPUTY COMMISSIONER LUSHBOUGH:  But the

8  last one -- oh, here it is.  It was just flipped

9  up, I think.  Yeah, okay.  It was by RW Hurl, H-

10  U-R-L, a correctional Sergeant.  You were

11  ducketed to attend facility four orientation

12  presented by staff to familiarize with the rules

13  and regs, and you were advised that since you

14  didn't appear you had the appear at the next

15  orientation, which was July the 3rd, 2005.

16      INMATE MONETTE:  No.  I would like a copy

17  of that, I don't --

18      DEPUTY COMMISSIONER LUSHBOUGH:  Well, see

19  your counselor, and ask your counselor to give

20  you a copy.  I can't copy -- I can't take

21  anything --

22      INMATE MONETTE:  Okay.

23      DEPUTY COMMISSIONER LUSHBOUGH:  -- out or

24  put anything in.

25      INMATE MONETTE:  Okay.

26      DEPUTY COMMISSIONER LUSHBOUGH:  I have to

27  leave it just the way it is.

53

1        INMATE MONETTE:  Okay.

2        DEPUTY COMMISSIONER LUSHBOUGH:  But

3    certainly that's available to you.  And it is

4    Monette, E-48953, yeah, talk to your counselor

5    about that.

6        INMATE MONETTE:  Okay.  Thank you.

7        DEPUTY COMMISSIONER LUSHBOUGH:  Verify that

8    I saw also that you had completed high school.

9    Your total TABE score was 11.1, and also

10   vocationally you've been pretty busy.  In '95

11   had vocational welding, vocational carpentry.

12   You were in roofing at one point.  Did you

13   complete roofing?

14       INMATE MONETTE:  Yes, ma'am.

15       DEPUTY COMMISSIONER LUSHBOUGH:  Okay.  And

16   I saw some vocational clerical, and that you

17   were currently on a waiting list for vocational

18   office services?

19       INMATE MONETTE:  Yes.

20       DEPUTY COMMISSIONER LUSHBOUGH:  Is that

21   still the case?

22       INMATE MONETTE:  Yes, right here.

23       DEPUTY COMMISSIONER LUSHBOUGH:  All right.

24   Your work history was interrupted by the Ad.

25   Seg. as you know?

26       INMATE MONETTE:  Yes.

27       DEPUTY COMMISSIONER LUSHBOUGH:  But I did

95

54

1   see food cart attendant and dental assistant

2   during this period.  Do you have formal training

3   to be a dental assistant, or were you just an

4   aid?

5        INMATE MONETTE:  I was in training at the

6   time.

7        DEPUTY COMMISSIONER LUSHBOUGH:  Okay.

8        INMATE MONETTE:  And then from there that's

9   when I went to the hospital for the food cart --

10  where I was in hospice taking care of ill

11  inmates.

12       DEPUTY COMMISSIONER LUSHBOUGH:  Okay.

13  Basically seeing that meals got to them?

14       INMATE MONETTE:  Yes.

15       DEPUTY COMMISSIONER LUSHBOUGH:  Okay.  From

16  a standpoint of self-help, there's laudatory

17  chronos in the file.  There were -- let's see,

18  one, two, three, four, five of them for your

19  participation in Narcotics Anonymous during this

20  review period.

21       INMATE MONETTE:  Yes, ma'am.

22       DEPUTY COMMISSIONER LUSHBOUGH:  On February

23  27th, 2003, which is actually just a little bit

24  before your last hearing there was a chrono

25  indicating that you had attended psychotherapy

26  sessions and on July 8th, 2003, that you had

27  completed the requirements for self-help

96

55

1   regarding positive change.  August 2003,

2   correspondence courses with Ashworth College.

3   That permission slip that I saw in here expired

4   in 2004.  Were you able to renew it?

5       INMATE MONETTE:  What permission -- I'm not

6   sure what permission you're regarding.

7       DEPUTY COMMISSIONER LUSHBOUGH:  Well, the

8   institution writes up that you're going to

9   receive certain books.

10      INMATE MONETTE:  Oh, yes, yes.

11      DEPUTY COMMISSIONER LUSHBOUGH:  But it says

12  it expired 2004.  Did you get the book and

13  everything started okay?

14      INMATE MONETTE:  Oh, yes.

15      DEPUTY COMMISSIONER LUSHBOUGH:  Good.

16      INMATE MONETTE:  It's still continuing.

17  I'm waiting for my test now.

18      DEPUTY COMMISSIONER LUSHBOUGH:  Okay.

19  Because I saw -- the books I saw were English,

20  Human Resources, two psychology books, and

21  Future of Business.

22      INMATE MONETTE:  Right.

23      DEPUTY COMMISSIONER LUSHBOUGH:  So you're

24  working on that now?

25      INMATE MONETTE:  Yes.

26      DEPUTY COMMISSIONER LUSHBOUGH:  Good.

27      INMATE MONETTE:  Those courses were given

97

56

1   to you for your major, based on your major.

2       **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.  As

3   you get chronos, and I'm sure you know this, but

4   bear with me, I will tell you anyway.  Chronos

5   or certificates from Ashworth College, naturally

6   if they go directly to the counselor, the

7   counselor should put them in the C file.  I'm

8   assuming you'll get a copy, but if they come

9   directly to you, be sure you keep a copy of

10  everything, and if you don't get a date today,

11  you want to bring those in here.

12      **INMATE MONETTE:**  Yes.

13      **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.  Then

14  there was another independent study Coastline

15  College.  What was that?

16      **INMATE MONETTE:**  Coastline College is

17  actually where I started.

18      **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.

19      **INMATE MONETTE:**  At CTF when I was at

20  Soledad.

21      **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.

22      **INMATE MONETTE:**  And I took a few courses

23  there in Spanish and my computer technology.

24      **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.

25      **INMATE MONETTE:**  I left Coastline College

26  and transferred to Ashworth University in

27  Georgia, based on their -- my major and what

*G8*

57

1  they offered me.  It seemed to be better

2  classes, better courses, and that's where I've

3  been attending since.  I don't know if the paper

4  is in there, but it should look like this,

5  Ashworth College and all the courses, and it's

6  signed by the Dean.

7      DEPUTY COMMISSIONER LUSHBOUGH:  I didn't

8  locate that.

9      INMATE MONETTE:  Okay.

10      DEPUTY COMMISSIONER LUSHBOUGH:  But I will

11  look before this hearing is over.  I will do

12  another search.

13      INMATE MONETTE:  Okay.

14      DEPUTY COMMISSIONER LUSHBOUGH:  And make

15  sure, see if I can find it.  Also, I did note

16  that although this is going back beyond the

17  review period, that you were in AA from '95 to

18  at least 2001.  Are you in NA or AA now?

19      INMATE MONETTE:  No.

20      DEPUTY COMMISSIONER LUSHBOUGH:  Neither

21  one?

22      INMATE MONETTE:  Because I just left from

23  four yard transferred to six yard so I had to

24  put myself back on the list.

25      DEPUTY COMMISSIONER LUSHBOUGH:  Okay.

26      INMATE MONETTE:  But I was attending on

27  four yard.

*99*

58

1        **DEPUTY COMMISSIONER LUSHBOUGH:**  Were you

2   studying the steps?

3        **INMATE MONETTE:**  Somewhat.

4        **DEPUTY COMMISSIONER LUSHBOUGH:**  Somewhat?

5        **INMATE MONETTE:**  I'm mostly trying to read

6   and understand what the group is all about, how

7   it can be helpful to me.

8        **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.

9        **INMATE MONETTE:**  I was just getting

10  started.

11       **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.  All

12  right.  Have I left anything out that you've

13  accomplished since March 20th of 2003 because if

14  so, this is the time to bring it to your

15  attention so you get credit for it.

16       **INMATE MONETTE:**  No.  We pretty much

17  covered everything, the college, the one-on-one

18  psychotherapy sessions had stopped, but I've

19  applied for them again here to see a psych

20  asking them for one-on-one psychotherapy

21  sessions, and I haven't been responded to yet,

22  but I'm still waiting.

23       **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.

24       **INMATE MONETTE:**  Other than that,

25  everything else you pretty much covered

26  everything.

27       **DEPUTY COMMISSIONER LUSHBOUGH:**  The one-on-

100

59

1  one was that once a week, once a month?

2      **INMATE MONETTE:**  Once a week.

3      **DEPUTY COMMISSIONER LUSHBOUGH:**  Once a

4  week?

5      **INMATE MONETTE:**  Yes.

6      **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.

7  About for an hour or --

8      **INMATE MONETTE:**  About two hours.

9      **DEPUTY COMMISSIONER LUSHBOUGH:**  Two hours,

10  okay.  You found those helpful, I gather?

11      **INMATE MONETTE:**  Oh, definitely.

12      **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.  All

13  right.  Well, Counselor, unless there's

14  something else in post-conviction, I'm going to

15  move on to the psych evaluation.

16      **ATTORNEY CHRISTENSEN:**  No.  Is there any

17  programming?

18      **INMATE MONETTE:**  Any programming, no.  As

19  of right now, I'm waiting to be put in office

20  services is what I'm waiting for.  While I'm

21  doing that I'm still going to college, doing my

22  college work, my courses.  I'm in my second

23  semester.  Other than that, that's all.

24      **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.

25  Well, I hope you do get into office service.

26  That no doubt would be of some help to you in

27  terms of the other things you're trying to get

101

60

1  done with the college courses.

2      **INMATE MONETTE:**  Yes.

3      **DEPUTY COMMISSIONER LUSHBOUGH:**  All right.

4      **INMATE MONETTE:**  Well, it just happens that

5  office services is a great connection to Maxtel

6  Incorporated which is the company I plan to work

7  for when I get out.  What they're offering,

8  their curriculum, coincides with what I plan to

9  be doing at Maxtel, so that's why I want to take

10  it.

11      **DEPUTY COMMISSIONER LUSHBOUGH:**  That's

12  good.  Sometimes I talk to people about

13  vocations, and I'll tell them to try to get

14  things that they think they can utilize in their

15  future or and that they're really interested in

16  because just going around collecting the

17  certificates is kind of meaningless, unless it's

18  something you're going to really use and enjoy

19  and like to do, and that sounds like that's the

20  path you're on?

21      **INMATE MONETTE:**  True.  I believe that

22  wholehearted.

23      **DEPUTY COMMISSIONER LUSHBOUGH:**  Yeah.

24      **INMATE MONETTE:**  And I try to indulge

25  myself in things that benefit me, that make me

26  happy, and I like to do.  Because you don't do

27  anything -- you're doing something you don't

102

61

1  like to do then --

2      **DEPUTY COMMISSIONER LUSHBOUGH:**  You won't

3  do it well.

4      **INMATE MONETTE:**  Right, exactly.

5      **DEPUTY COMMISSIONER LUSHBOUGH:**  Yeah.

6      **INMATE MONETTE:**  I like to do the best I

7  can.

8      **DEPUTY COMMISSIONER LUSHBOUGH:**  Yeah.

9  Okay.  The most recent psych evaluation I have

10  is dated February 22nd, 2001, and it was

11  prepared by Joe Reed, R-E-E-D, the psychologist.

12  And he comments that, and I'll use his words,

13  his prognosis for community living appears to be

14  good.  Under the current diagnostic impressions

15  there were none on access one, access two, or

16  access three.  He noted that there was no

17  evidence of a mood or thought disorder, and

18  estimated level of intellectual functioning was

19  within the average range.  He also notes some of

20  your earlier programming, which I don't mean to

21  neglect or ignore.  I certainly saw it there,

22  but I have to work with this program.  However,

23  that you have been involved in Men's Advisory

24  Council from '94 to '98, and the literacy

25  program '95 to '96, and a seminar, historic

26  black educators.  You also attended Amnesty

27  International in 1988, and Christopher's

103

62

1    leadership score in '99.

2        INMATE MONETTE:  That should be '90, I'm

3    sorry.

4        DEPUTY COMMISSIONER LUSHBOUGH:  Is it '90?

5    Okay.

6        INMATE MONETTE:  Amnesty International in

7    1990.  I think it was just a typo.

8        DEPUTY COMMISSIONER LUSHBOUGH:  Okay.

9    Thank you.  And that you participated in the

10   youth offender program.  Where was that?  At

11   what institution?

12       INMATE MONETTE:  That was at Chuckawalla.

13       DEPUTY COMMISSIONER LUSHBOUGH:  Okay.  The

14   current level of insight and judgment in general

15   supports a positive prediction of successful

16   adaptation to community living.  Under the

17   assessment of dangerousness, and of course, this

18   evaluation is old enough that it doesn't include

19   the two 115s, so -- in 2004 his violence

20   potential in a controlled setting is considered

21   to be significantly below average relative to

22   this level two inmate population.  And he talks

23   about factors, such as only having received two

24   115s, the last one in 1995, and four 128(a)s,

25   which actually now it's five.  On the other

26   hand, however, he has no juvenile criminal

27   history, no adult history, no apparent gang

184

63

1  affiliations, and he's received no

2  disciplinaries for overtly violent behavior

3  during his nine years of incarceration.

4  Therefore, in light of these facts, his violence

5  potential is considered to be significantly

6  below average to this level two inmate

7  population.  If released to the community, his

8  violence potential is considered to be no more

9  than the average citizen in the community.

10  There are no significant risk factors which may

11  be precursors to violence for this individual.

12  And with that, I'll conclude the summary of the

13  psych evaluation.  Counsel, would you or your

14  client care to make any comments at this time on

15  the evaluation, or would you prefer to wait

16  until closing?

17      **ATTORNEY CHRISTENSEN:**  Well, I would just

18  like to say that if Mr. Monette is not granted

19  parole this time, we would request that a new

20  psych evaluation be performed for him to deal

21  with the new issues, specifically the 115s.

22      **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.

23  Thank you.  I will take that into consideration.

24  Anything else?

25      **ATTORNEY CHRISTENSEN:**  No.

26      **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.

27  Well, Mr. Monette, thank you for your attention.

105

64

1    I will return it to the Chair at this time.

2         **INMATE MONETTE:**  Thank you, very much.

3         **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.

4         **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

5    So I was reading your past hearing transcript,

6    and I guess you've had two other hearings?

7         **INMATE MONETTE:**  Yes.

8         **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

9    And boy in each of them they sure say don't come

10   back here with any disciplinaries, no 115, no

11   128s, and we do give that caution and you've

12   gotten breaks.

13        **INMATE MONETTE:**  I've gotten breaks?

14        **PRESIDING COMMISSIONER ST. JULIEN:**  Yes,

15   because generally people in here for murder on

16   their initial hearing -- you're down to a year,

17   year denials.  Your first hearing you got two

18   years?

19        **INMATE MONETTE:**  Yes.

20        **PRESIDING COMMISSIONER ST. JULIEN:**  That's

21   very rare.  Generally people get four, five,

22   maybe three, but you got -- so you got the

23   benefit of the doubt.  Your initial, and then

24   the last hearing in 2003 you got a year with

25   many, many cautions about being disciplinary

26   free.  So now we see you, and not only do you

27   have disciplinaries, but you have an additional

106

65

1  prison term, so how are we supposed to consider

2  that?  You've gotten breaks, previous boards

3  have given you breaks, and I mean, it's almost

4  like -- it's like, what are you doing to

5  yourself because your -- you know, look at your

6  record and what Commissioner Lushbough just went

7  through, you know.  You're doing great

8  programming wise, but you're really stabbing

9  yourself in the back when you get the

10  disciplinaries.

11      **INMATE MONETTE:**  Yes.

12      **PRESIDING COMMISSIONER ST. JULIEN:**  So what

13  --

14      **INMATE MONETTE:**  I made some bad decisions.

15      **PRESIDING COMMISSIONER ST. JULIEN:**  And in

16  here you can't.

17      **INMATE MONETTE:**  You're right.  I know it

18  doesn't matter, but this is a very difficult

19  place to survive, and of course, I make my own

20  decisions, and I had the last say in what I do

21  and what I agree to, but it's difficult.

22      **PRESIDING COMMISSIONER ST. JULIEN:**  I can't

23  even imagine how difficult it is.

24      **INMATE MONETTE:**  It is --

25      **PRESIDING COMMISSIONER ST. JULIEN:**  I can't

26  even imagine, but you're a smart guy.  You're

27  working with a lot of tools that a lot of other

*107*

66

1    inmates don't have, and usually we see people

2    with a lot of disciplinaries depending on the

3    institution.  This week we've seen so many

4    people that have nothing, I mean spot -- blemish

5    free, whatever the phrase is, records.  Okay.

6    And they're still sitting here after 20

7    something odd years.  Okay.  Because there are

8    many different factors, you know --

9        **INMATE MONETTE:**  Yes.

10       **PRESIDING COMMISSIONER ST. JULIEN:**  -- that

11   we consider.  But I look at you, and I look at

12   somebody who is young, who is intelligent, you

13   know.  The scales are way in your favor, and we

14   look at the factors of unsuitability that we use

15   as a guide, and we look at the factors of

16   unsuitability, you know.  You're doing really

17   good, which is why I think you got the benefit

18   of the doubt in your two prior hearings, but

19   then you come in here today and, you know, I

20   don't know --

21       **INMATE MONETTE:**  Well, I'm not trying to do

22   wrong.

23       **PRESIDING COMMISSIONER ST. JULIEN:**  Well,

24   of course not.

25       **INMATE MONETTE:**  Believe me, I'm not trying

26   to do anything to harm my chance of going home -

27   -

108

67

1      **PRESIDING COMMISSIONER ST. JULIEN:**  But you

2  did.

3      **INMATE MONETTE:**  You're right.

4      **PRESIDING COMMISSIONER ST. JULIEN:**  But you

5  did.

6      **INMATE MONETTE:**  You're right, and I'm

7  sorry.  I mean --

8      **PRESIDING COMMISSIONER ST. JULIEN:**  No, but

9  I know, no -- but I'm trying to explain to you,

10  I think, where we're coming from.

11      **INMATE MONETTE:**  Okay.  I --

12      **PRESIDING COMMISSIONER ST. JULIEN:**  And it

13  doesn't have to do with how much time we stand

14  with you.

15      **INMATE MONETTE:**  Right.

16      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

17  Because surprisingly enough, and it surprised

18  me, but surprisingly enough, it's amazing how

19  much you can get from someone with the amount of

20  time we spend with you and, frankly, you know,

21  when we read the cases, you know, very few

22  people look good on paper.

23      **INMATE MONETTE:**  Right.

24      **PRESIDING COMMISSIONER ST. JULIEN:**  Very

25  few people look good, and they come in here and

26  80 percent of the time I have a completely

27  different impression.  My mind is changed, and

109

68

1   whenever complete a denial or, you know, the

2   Governor's office, let's say reversing a grant,

3   I always say, and generally on record, that it's

4   very unfortunate that people are going to be

5   evaluating you just by your record and not with

6   the benefit of seeing the person, so I

7   understand how you feel in that case.  And

8   that's why we really do try to do our best.

9        INMATE MONETTE:  I understand.

10        PRESIDING COMMISSIONER ST. JULIEN:  To have

11   a conversation and to make an assessment that is

12   very fair to you.  Okay.  And the law says we

13   have to be fair to you.  Okay.

14        INMATE MONETTE:  Right.

15        PRESIDING COMMISSIONER ST. JULIEN:  And I

16   think we take that very seriously, you know, but

17   again, it's extremely frustrating.

18        INMATE MONETTE:  Right.

19        PRESIDING COMMISSIONER ST. JULIEN:  It's

20   frustrating, I think, on this side of the table.

21   I know it's agonizing probably for you?

22        INMATE MONETTE:  Yes.

23        PRESIDING COMMISSIONER ST. JULIEN:  But

24   believe it or not, at least this Panel, we want

25   to see you do well.

26        INMATE MONETTE:  Thank you.

27        PRESIDING COMMISSIONER ST. JULIEN:  Okay.

110

69

1   I would rather -- I wish I could give out grants

2   all the time.  Believe me, it's very depressing

3   for me to say no every day, all day, it's very

4   depressing.

5        INMATE MONETTE:  Right.

6        PRESIDING COMMISSIONER ST. JULIEN:  So when

7   I see somebody that's a candidate, you're glad.

8   And I see you, and I don't know what I read

9   about -- or I read your disciplinaries the first

10  thing.  They're on cover page.  Okay.  Sometimes

11  I'll start at different -- you know.

12       INMATE MONETTE:  -- cover page.

13       PRESIDING COMMISSIONER ST. JULIEN:  I start

14  at a different area all the time.

15       INMATE MONETTE:  Okay.

16       PRESIDING COMMISSIONER ST. JULIEN:  But

17  unfortunately I saw yours first, so I'm thinking

18  okay, what's this guy do, and then you read

19  further on, and then it's like, what is he doing

20  to himself?

21       INMATE MONETTE:  If I may, I see the

22  disciplinaries, and it hurts me.  It hurts me

23  that it even happened, and once again, I'm

24  sorry.  I look at it --

25       PRESIDING COMMISSIONER ST. JULIEN:  Excuse

26  me.  I don't even think you would meet the

27  matrix.

70

1      **INMATE MONETTE:**  What is that?

2      **PRESIDING COMMISSIONER ST. JULIEN:**  Do you

3  know what the matrix is and how we calculate

4  people's dates?

5      **INMATE MONETTE:**  I think mine was 21 years

6  at the time, at the most, I believe what I read.

7      **PRESIDING COMMISSIONER ST. JULIEN:**  Do you

8  know what the 115s do to your time?

9      **INMATE MONETTE:**  No, ma'am.

10     **PRESIDING COMMISSIONER ST. JULIEN:**  You

11  don't get -- you get good time credit for each

12  year that you don't get a 115, and each year you

13  do get a 115 we take it away, so I haven't done

14  any calculations on you, but just by looking at

15  the amount of time you've been in and that type

16  of thing, you might have more time to serve.

17  Even if we gave you a date today, I'm not saying

18  we're not going to do, but, you know, you would

19  probably have more time to serve.  These 115s

20  kill you.  I'm trying to find your list here,

21  the years you got them in.  That's why the Board

22  is always telling people don't get a 115 because

23  it hurts in, I think, in more way that you

24  realize.  And unless the whole process has been

25  explained to you, and I don't think it has

26  because most inmates don't know, it's hard to

27  get a real grasp on how it impacts you because,

112

71

1    you know, this is the first step?

2        **INMATE MONETTE:** Yes.

3        **PRESIDING COMMISSIONER ST. JULIEN:** Okay.

4    And it goes through a couple of different

5    channels. And even if it went to the Board's

6    decision review unit, they see these two recent

7    115s, and it's like what?

8        **INMATE MONETTE:** I understand.

9        **PRESIDING COMMISSIONER ST. JULIEN:** But in

10   any case, you have 115s in four, actually three

11   years of your incarceration.

12       **INMATE MONETTE:** Three years of my

13   incarceration? I've been incarcerated 16 years.

14       **PRESIDING COMMISSIONER ST. JULIEN:** Yeah,

15   but in three of those years --

16       **INMATE MONETTE:** Okay, yes.

17       **PRESIDING COMMISSIONER ST. JULIEN:** In

18   three of the 16 you got --

19       **INMATE MONETTE:** I have --

20       **PRESIDING COMMISSIONER ST. JULIEN:** So you

21   wouldn't get credit for those three years.

22       **INMATE MONETTE:** Okay.

23       **PRESIDING COMMISSIONER ST. JULIEN:** Luckily

24   you got two in the same year.

25       **INMATE MONETTE:** So that would mean 16

26   years I've been incarcerated --

27       **PRESIDING COMMISSIONER ST. JULIEN:** Well

113

72

1    I'll do the calculation, but not right now.

2        INMATE MONETTE:  I'm sorry.

3        PRESIDING COMMISSIONER ST. JULIEN:  But

4    anyway -- but so what I'm saying is these things

5    hurt you, and they follow you forever.

6        INMATE MONETTE:  Yes, I understand.  I

7    really do.  It's hurt me tremendously that this

8    happened.  And presently I'm under appeal on

9    this situation there with the conviction.

10       PRESIDING COMMISSIONER ST. JULIEN:  How can

11   you appeal if you pleaded no contest?

12       INMATE MONETTE:  Because the law firms

13   inform me that I shouldn't of taken the advice

14   of the attorney because I was not guilty of the

15   charges based on what they read.  And People V.

16   West didn't help me, it hurt me, so my mother

17   contacted law firms Sanders and Associates, and

18   they contacted us back saying you know what, he

19   shouldn't have a conviction for this, so they're

20   in the process right now of dealing with that.

21       PRESIDING COMMISSIONER ST. JULIEN:  Well,

22   I'd be -- have you spent some time in the prison

23   law library here?

24       INMATE MONETTE:  No, ma'am.  Prison is not

25   one of my things.

26       PRESIDING COMMISSIONER ST. JULIEN:  No,

27   prison law library.

119

73

1      **INMATE MONETTE:**  I haven't been in it.

2      **PRESIDING COMMISSIONER ST. JULIEN:**  You

3   need to go in there.

4      **INMATE MONETTE:**  Okay.

5      **PRESIDING COMMISSIONER ST. JULIEN:**  You

6   need to -- you need to read the law.

7      **INMATE MONETTE:**  Okay.

8      **PRESIDING COMMISSIONER ST. JULIEN:**  You

9   need to take some more ownership of your

10   offenses.  Okay.  And I'm just saying that --

11   just a word of caution because it's always good.

12   It's like when people send their taxes out, why

13   are you sending your taxes out because you have

14   to give the person information anyway.  If you

15   get called in on an audit you're the one that

16   has to go in and defend it, so you need to take

17   ownership of your life in here.  You need to

18   read that case and see if it applies to you or

19   if it doesn't.  Your parents are going to spend

20   a bloody fortune on a lawyer, and it may not be

21   to anyone's best investments.  Okay.

22      **INMATE MONETTE:**  I'll do that.

23      **PRESIDING COMMISSIONER ST. JULIEN:**  So you

24   need to read up on your parole situation and all

25   that other kind of stuff.  Okay?

26      **INMATE MONETTE:**  Okay.

27      **PRESIDING COMMISSIONER ST. JULIEN:**  I said

115

74

1   you're a smart guy, okay, so you're planning for

2   your future, but you need to take first things

3   first.

4       **INMATE MONETTE:**  Okay.

5       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

6   Commissioner Lushbough, do you have any

7   questions or comments?

8       **DEPUTY COMMISSIONER LUSHBOUGH:**  No, no,

9   just other than to just say to you I've been

10  doing this a long time, and I've heard

11  Commissioners in years past say that 115s are

12  like coffin nails, or they're like nails you

13  drive into a door and you can't leave, and

14  they're not kidding.  And I think you can figure

15  it out, and I don't think you're going to put

16  yourself in that position again.  It's not worth

17  it to you.

18      **INMATE MONETTE:**  Correct.

19      **DEPUTY COMMISSIONER LUSHBOUGH:**  But I just

20  want to be sure that you really take care

21  because I think you have promise, and I think

22  you've got a lot going for you, but these things

23  will keep you in here.  Okay.  That's all I

24  have.

25      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

26  And I think even, and correct if I'm wrong, it

27  would -- but he got these reversed, or if the

116

75

1  court reversed the conviction on appeal or
2  anything, would the 115 still be in the file?
3      **DEPUTY COMMISSIONER LUSHBOUGH:**  Yes,
4  because the standard, the burden of proof of
5  standard is much lower than it is in court, so
6  they don't have to have as much evidence here in
7  an administrative hearing like the lieutenants
8  have, as the Board has.
9      **INMATE MONETTE:**  It was explained to me
10 that once the -- if the conviction gets turned
11 over because the whole conviction was for
12 conspiracy -- and I was not found guilty of
13 conspiracy.  Those charges were dropped, and the
14 115 was based on that as well.  And that if the
15 conviction was overturned, the 115 would have to
16 be removed as well because there was a
17 connection --
18     **DEPUTY COMMISSIONER LUSHBOUGH:**  Well,
19 actually --
20     **INMATE MONETTE:**  -- to the whole
21 investigation.
22     **DEPUTY COMMISSIONER LUSHBOUGH:**  Actually,
23 no.
24     **ATTORNEY CHRISTENSEN:**  That's not true, as
25 I explained to you.
26     **INMATE MONETTE:**  Okay.
27     **ATTORNEY CHRISTENSEN:**  They can then give

117

76

1  you a 115 for something else having to do --

2      **DEPUTY COMMISSIONER LUSHBOUGH:**  They didn't

3  charge him with conspiracy anyway, it was

4  possession.

5      **ATTORNEY CHRISTENSEN:**  Possession.

6      **DEPUTY COMMISSIONER LUSHBOUGH:**  And that's

7  kind of a tricky term because if it's under your

8  dominion and control, or if it's in the area

9  that you live in or the car that you own or the

10  car that you're driving, you know, possession is

11  not too hard to prove.

12      **INMATE MONETTE:**  True.

13      **DEPUTY COMMISSIONER LUSHBOUGH:**  So I wish

14  you good luck with your appeal.  I'm not saying

15  that you shouldn't do that, but just be aware

16  that for the future you have to be really

17  careful.

18      **INMATE MONETTE:**  I will, thank you.

19      **PRESIDING COMMISSIONER ST. JULIEN:**  And

20  look into all this stuff yourself.

21      **INMATE MONETTE:**  I plan to.

22      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

23  Because people -- you have very experienced

24  lawyers here.  Okay.  They know what they're

25  talking about and, you know, buyer beware.

26      **INMATE MONETTE:**  Buyer beware?

27      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

118

77

1      **INMATE MONETTE:**  Okay.

2      **PRESIDING COMMISSIONER ST. JULIEN:**  And I

3   mean that in terms of your parents paying for

4   the lawyer.

5      **INMATE MONETTE:**  Yes.

6      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

7   Ms. Naftel, do you have any questions for Mr.

8   Monette?

9      **DEPUTY DISTRICT ATTORNEY NAFTEL:**  Yes.  I

10  would like the inmate to explain why he took a

11  knife out of the car when they went to the

12  service station when he was going to make a

13  phone call?

14     **INMATE MONETTE:**  The knife was already in

15  my pocket, and according to the transcripts, one

16  of my friends said that they thought they saw I

17  took the knife out of my pocket.  What they were

18  referring to was the knife case, which sits in

19  between the seat and the tool belt, so the knife

20  was already in my pocket at the time.  It was in

21  my pocket pretty much the whole evening from

22  work.

23     **DEPUTY DISTRICT ATTORNEY NAFTEL:**  I have a

24  question then as to why the appellate decision

25  reflected that, I believe Mr. Williams testified

26  that the inmate took the knife out of the case

27  and took it with him as he exited the car?

119

78

1    **INMATE MONETTE:**  That's what he said.  I

2 don't recall that happening.  I remember having

3 it in my pocket the whole night.

4    **DEPUTY DISTRICT ATTORNEY NAFTEL:**  One other

5 question regarding the crime.  Did the victim

6 ask for money?

7    **INMATE MONETTE:**  He asked for help.  As I

8 recall he asked for help.

9    **DEPUTY DISTRICT ATTORNEY NAFTEL:**  Okay.  I

10 have no further questions.  Thank you.

11    **INMATE MONETTE:**  All right, thank you.

12    **PRESIDING COMMISSIONER ST. JULIEN:**  Thank

13 you.  Ms. Christensen?

14    **ATTORNEY CHRISTENSEN:**  Did the victim punch

15 you in the stomach?

16    **INMATE MONETTE:**  Yes, ma'am.

17    **ATTORNEY CHRISTENSEN:**  What did you do

18 after that?

19    **INMATE MONETTE:**  That's when I came up out

20 of my pocket with the knife.

21    **ATTORNEY CHRISTENSEN:**  Okay.  Did he say

22 anything more to you at that point?

23    **INMATE MONETTE:**  Not that I recall.

24    **ATTORNEY CHRISTENSEN:**  Was it hard to

25 understand him?  Was there any language barrier?

26    **INMATE MONETTE:**  Yes, he was a Spanish

27 speaking individual, so the English was not as

120

79

1   clear as it would be for someone whose first

2   language was English.

3       **ATTORNEY CHRISTENSEN:**  Okay.  Then I have a

4   question, and this is news to me, are you able

5   to have one-on-one therapy here without being in

6   CCCMS?

7       **INMATE MONETTE:**  I don't know, at Soledad

8   you could.

9       **ATTORNEY CHRISTENSEN:**  I haven't heard of

10  that happening.

11      **INMATE MONETTE:**  Yeah, I don't know here

12  yet because I haven't been responded to my

13  request, but at Soledad you could, and that's

14  why I took those steps to take it at Soledad,

15  but here I'm trying to do the same thing, and I

16  haven't been responded to, so I couldn't answer

17  that at this point.

18      **ATTORNEY CHRISTENSEN:**  Okay.  And then I'm

19  just curious, what does Amnesty International do

20  when they come to the prison?

21      **INMATE MONETTE:**  They talk to the people --

22      **ATTORNEY CHRISTENSEN:**  Is it some type of

23  program?

24      **INMATE MONETTE:**  Well, they come --

25      **ATTORNEY CHRISTENSEN:**  What is that?

26      **INMATE MONETTE:**  They come to interview you

27  about how you can help society.  This in

121

80

 1  particular -- this particular amnesty group

 2  wanted me to help communities that you chose,

 3  and I chose the community where my family was

 4  living at the time to try to help out there.

 5     **ATTORNEY CHRISTENSEN:**  And how would you be

 6  able to help them?

 7     **INMATE MONETTE:**  Writing individuals, being

 8  a mentor, talking to youth, talking to

 9  individuals and youth about what I did.

10     **ATTORNEY CHRISTENSEN:**  Okay.  I see.

11  That's good.  I don't have any other questions.

12     **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

13  And Ms. Naftel, do you have a closing statement,

14  please?

15     **DEPUTY DISTRICT ATTORNEY NAFTEL:**  Thank

16  you.  We do oppose parole at this time.  One of

17  our concerns is the nature of the crime, and in

18  reading the appellate decision, it seems as if

19  the jury made the decision based on testimony

20  that was not exactly the same as the inmate's

21  position as to how the crime occurred.  A friend

22  did testify according to the decision that he

23  saw the inmate take the knife out of a case and

24  take it out of the car with him and that it

25  wasn't in his pocket.  That's just one thing,

26  but it appears that the inmate is still blaming

27  the victim for becoming the victim, that the

*122*

81

1  victim punched him, the victim hit him or

2  touched him on the shoulder, things like that.

3  So I think there needs to be a little more

4  introspection on the inmate's part as to what

5  really happened and how he is really responsible

6  for this.  The other thing that really concerns

7  us is the 115s now and the conviction for having

8  drugs in the prison, and I think until these

9  things are cleared up and the inmate can go back

10  to his, as the Panel mentioned, his rather good

11  programming before the events of recently.  I

12  think the inmate does need to realize that this

13  is very serious for him, and that he cannot make

14  any more bad decisions.  Thank you.

15      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

16  Thank you.

17      **ATTORNEY CHRISTENSEN:**  Okay.  First of all,

18  I want to say that the Mr. Monette does not

19  blame the victim at all.  He takes full

20  responsibility for his actions and has great

21  remorse for what has occurred, but considering

22  being at a place at night and all of a sudden

23  someone comes up to you and asks you for money,

24  and then they touch you on the shoulder, he --

25  it certainly was not something that he intended

26  to hurt this man in any way, shape, or form.

27  He's deeply remorseful for that.  Mr. Monette

123

82

1    does not come from the type of background that
2    encourages violence.  He is not a violent
3    person.  He is very peaceful.  This is a person
4    who comes from an excellent family, a very good
5    family situation.  He had no prior record
6    whatsoever.  He was a college student.  He was
7    working.  He was on track to become a police
8    officer.  He was interested in sports.
9    Everything about him at that time pointed to
10   someone who was very responsible, not someone
11   who was a cold, callous individual to just
12   attack someone.  He functioned very well before
13   this happened in society, and he can function
14   equally as well, if not better, if he -- if he
15   is to be paroled because of all the skills he
16   has acquired since he has been in prison.  He's
17   utilized his time very wisely.  He immediately
18   got down to business when he came into the
19   prison, not like some inmates, many inmates,
20   that I see who take years before they finally
21   get with the program and realize what they're
22   supposed to be doing.  He did not waste time.
23   He jumped in with both feet, and he participated
24   in this, participated in that, and he got a lot
25   out of every activity that he involved himself
26   in.  He has a long list of accomplishments, and
27   all of these vocational skills as well.  Excuse

124

83

1   me a second.  As we've seen here, obviously this

2   is a highly intelligent, articulate person, very

3   well spoken, also talented and ambitious.  He

4   wants to go into society and be part of the

5   solution, certainly not part of the problem.

6   And before this happened he wanted to pursue

7   areas in business and psychology, and he has

8   picked up with exactly that thinking in here.

9   That's what he is doing, so he is fulfilling

10  those goals that he has set for himself.  He's

11  very goal oriented.  Just a very, very

12  impressive inmate.  His family support speaks

13  for itself.  He has enough support out there for

14  any 10 inmates, and he knows that he has been

15  blessed with a very wonderful family and friends

16  who have stood by him for years, and he's got

17  seven job offers.  This is remarkable.  There's

18  no doubt that he can be highly successful on

19  parole.  He's not a gang member.  He doesn't

20  smoke.  He doesn't drink.  He doesn't use drugs.

21  He's very pro-social in his orientation, in the

22  way he conducts himself, and I just wish that he

23  had not had these two 115s and that he -- that

24  this blemish on his record with the consecutive

25  prison term had not occurred.  Other than that,

26  he is outstanding and should be paroled, and I

27  hope that the Board can see that.

84

1      **PRESIDING COMMISSIONER ST. JULIEN:**   Okay.
2    Thank you, very much.  And Mr. Monette?
3      **INMATE MONETTE:**   Yes, ma'am.
4      **PRESIDING COMMISSIONER ST. JULIEN:**   Do you
5    have a statement?
6      **INMATE MONETTE:**   Yes.  I would just hope
7    that the Panel -- well, first of all, I
8    appreciate the Panel today.  And I felt that
9    everything so far has been fair, and I
10   appreciate your candor and your honesty.  All I
11   can say is hopefully I can put these two
12   obstacles behind me and move forward, is what I
13   plan to do, and show you in the next year or
14   two, or whatever it may be, that I'm worthy of
15   society.  I believe that this environment is not
16   for me.  I believe pretty much every day that
17   I've accepted it -- to accept my responsibility
18   for what I did and accept the punishment.  I
19   feel that the punishment has been served not
20   only physically, but spiritually, mentally.
21   I'll always deal with this for the rest of my
22   life because I've hurt someone, taken someone
23   from someone's family, and that's never my
24   intentions at all.  I'm hoping to show this
25   Panel next time I come or, if I get a date, or
26   whenever I see you again that you're even more
27   impressed with what I've done since then.  That,

126

85

1    as far as I'm concerned, would be no more
2    disciplinaries, and I'll do everything I can to
3    make sure that happens.  It's very difficult in
4    here.  There's really nowhere for me to turn on
5    a -- this place is filled with negatively every
6    corner you turn, and I'm trying to do the best I
7    can to stay away from the negative clouds that
8    hover this place and individuals on a daily
9    basis.  I'm trying to do the best I can, and I
10   hope to get out in society real soon so that I
11   can prove myself, regain the trust of everybody
12   that believes in me, and thank you for today.
13       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.
14   Thank you, very much, sir.  We'll recess now for
15   deliberations.
16                     **R E C E S S**
17                      --oOo--
18
19
20
21
22
23
24
25
26
27

127

86

1          **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                   **D E C I S I O N**

3          **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.

4     We're on record.

5          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

6     Mr. Monette, we are going to deny parole today,

7     and we're going to give you a multi-year denial.

8     I'm going to go head and read the decision.  The

9     Panel has reviewed all the information received

10    from the public and relied on the following

11    circumstances in concluding that the inmate is

12    not yet suitable for parole and would pose an

13    unreasonable risk of danger to society if

14    released from prison.  Specifically, the

15    commitment offense.  The offense was carried out

16    in a cruel manner, and this was the stabbing

17    manner of Adrian Lazandro Villalba, and this

18    occurred on March -- I'm sorry, April 26th,

19    1989, apparently at the location in Walnut,

20    California.  The inmate and two of his friends

21    had stopped at a telephone booth to make

22    telephone calls home.  The victim also stopped

23    at this area.  His girlfriend was in the car.

24    The victim, apparently his car -- they were

25    having car trouble.  They approached the inmate

26    at the telephone booth, and apparently a

27    **ALEX MONETTE E-48953 DECISION PAGE 1 3/8/06**

128

87

1 confrontation developed and there's statement

2 and testimony that the victim asked the inmate

3 for a light or for money, I'm not sure which or

4 both or either.  And apparently according to

5 some eyewitness testimony, the victim walked

6 away from the phone booth and towards his

7 vehicle.  And Mr. Monette says the victim

8 approached him and put his hands on him, and he

9 felt threatened by this and withdrew his knife,

10 and the victim was stabbed in the chest.

11 However, there's also statements saying that the

12 victim was attacked by the inmate.  In any

13 event, Mr. Villalba did die from the stab wound.

14 And however this happened, the motive was very

15 trivial in relation to the offense, and this

16 crime is still murky in terms of what happened,

17 and all that stuff.  We and any other Panel has

18 to take the appellate court decision, you know,

19 the findings of the Court as the truth, but it's

20 -- you have a conflicting story, and we do want

21 to hear that as well, but it is very murky, and

22 I would suggest if things happened the way the

23 appellate court decision reads, I would suggest

24 that you come to grips with that and come

25 forward and admit that.  You've already been

26 convicted.  You're in prison, but when we have

27 **ALEX MONETTE E-48953 DECISION PAGE 2 3/8/06**

129

88

1  conflicting stories, it just makes it hard for a

2  Panel to say this guy knows what he did.  He

3  knows where he went wrong, and therefore he's

4  much less apt to make the same mistake again.

5  Okay.  It's just food for thought.  You do not

6  have any prior criminal history, no arrests, no

7  convictions, so indeed this is, I think, is a

8  very sad situation for you to find yourself in.

9  And in terms of programming while in prison, you

10  have programmed extremely well.  However, we do

11  note that there are two serious 115 -- CDC 115s

12  that you received in 2004, possession of a

13  controlled substance and falsification of

14  chronos.  The psychological report dated

15  February 22, 2001, authored by Dr. Reed is

16  favorable.  And we will be requesting a new

17  psychological evaluation to be done before your

18  next hearing.

19      **INMATE MONETTE:**  Thank you.

20      **PRESIDING COMMISSIONER ST. JULIEN:**  And in

21  terms of parole plan, you have outstanding

22  parole plans.  You have an abundance of

23  residential offers.  You have numerous job

24  offers.  You have a marketable skill.  Your

25  parole plans are very good.  And the hearing

26  Panel notes that in response to 3042 notices,

27  **ALEX MONETTE E-48953 DECISION PAGE 3 3/8/06**

130

89

1  the District Attorney of Los Angeles County has

2  expressed opposition to a finding of parole

3  suitability.  And we make the following

4  findings:  That you continue to need self-help

5  in order to face, discuss, and understand, and

6  cope with conflict and stress in a

7  nondestructive manner.  And as you know your

8  negative behavior, which we perceive your 115s

9  to be, you have recent 115s, and there's no

10  indication to us from that information that you

11  would behave differently if paroled.  In a

12  separate decision we find that you've been

13  convicted of murder, and it is not reasonable to

14  expect that parole would be granted at a hearing

15  during the next four years.  Again,

16  specifically, the commitment offense.  The

17  offense was committed in a cruel manner, and

18  this was the stabbing death of Adrian Lazandro

19  Villalba on Villalba 26, 1989.  The victim and

20  the inmate encountered each other at a location

21  near some telephone booths.  Apparently a

22  confrontation developed and the inmate stabbed

23  the victim with a knife that he had on his

24  person.  The victim was hit in the chest,

25  stabbed in the chest, and did die from those

26  wounds.  And again, the motive very trivial to

27  **ALEX MONETTE E-48953 DECISION PAGE 4 3/8/06**

131

90

1   the offense.  And the inmate has recently
2   committed two serious disciplinary violations,
3   controlled substances in the prison institution
4   and fabricating chronos.  Therefore, a longer
5   period of observation and evaluation is required
6   before the Board should find the inmate suitable
7   for parole.  And I think you will find that one
8   thing the Board does not show any mercy on, and
9   that is 115s.  Okay.  You got really good
10  breaks, like I said before, two years on an
11  initial and then a year.  You're on your way out
12  of here, but unfortunately you've got to put a
13  great deal of distance between you and the 115s,
14  so we recommend that you become disciplinary
15  free, remain disciplinary free.  If available,
16  participate -- continue to participate in self-
17  help.  There's nothing I can say about your
18  programming.  It's excellent.  We would like to
19  commend you for your participation in Narcotics
20  Anonymous.  You've also attended psychotherapy
21  sessions back in 2003, and you've done the
22  positive change program for self-help.  You've
23  also taken correspondence courses through
24  Ashworth College, psychology, English, human
25  relations, psychology, and business classes, and
26  you've also taken independent classes at
27  **ALEX MONETTE E-48953 DECISION PAGE 5 3/8/06**

132

91

 1    Coastline, classes in Spanish and computer
 2    technology, and also Alcoholics Anonymous.  And
 3    I would encourage you to spend some time in the
 4    prison law library.  Research some cases.
 5    You're going to find a wealth of information,
 6    and I think it might be very useful to you.
 7         **INMATE MONETTE:**  Okay.  Thank you.
 8         **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.
 9    I don't know.  I think I've probably said
10    everything I have to say.  Commissioner
11    Lushbough?
12         **DEPUTY COMMISSIONER LUSHBOUGH:**  You know, I
13    do want to wish you luck, but I also just want
14    to be awfully sure you understand how serious
15    115s are.
16         **INMATE MONETTE:**  Yes.
17         **DEPUTY COMMISSIONER LUSHBOUGH:**  And I'm
18    sorry they happened because I thought you were
19    on a good road, and I thought you were going
20    somewhere, and I think you still will.  It's
21    going to take a little more time now.  I do wish
22    you good luck.
23         **INMATE MONETTE:**  Thank you.
24         **DEPUTY COMMISSIONER LUSHBOUGH:**  I think you
25    have possibilities.
26         **INMATE MONETTE:**  I appreciate that.
27    **ALEX MONETTE E-48953 DECISION PAGE 6 3/8/06**

133

92

1      **PRESIDING COMMISSIONER ST. JULIEN:** Yeah, I

2  do as well, sir.

3      **INMATE MONETTE:** Thank you, very much.

4      **PRESIDING COMMISSIONER ST. JULIEN:** Thank

5  you.  We'll adjourn this hearing.  It's 4:00

6  p.m.

7                  --oOo--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23  **PAROLE DENIED FOUR YEARS**              JUL   6 2006

24  **THIS DECISION WILL BE FINAL ON:_____**

25  **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26  **DATE, THE DECISION IS MODIFIED.**

27  **ALEX MONETTE E-48953 DECISION PAGE 7 3/8/06**

*134*

93

CERTIFICATE AND
DECLARATION OF TRANSCRIBER

I, STACY WEGNER, a duly designated transcriber,

PETERS SHORTHAND REPORTING, do hereby declare and

certify under penalty of perjury that I have

transcribed tape(s) which total one in number and

cover a total of pages numbered 1 - 92, and which

recording was duly recorded at AVENAL STATE PRISON,

AVENAL, CALIFORNIA, in the matter of the SUBSEQUENT

PAROLE CONSIDERATION HEARING OF ALEX MONETTE, CDC NO.

E-48953, ON MARCH 8, 2006, and that the foregoing

pages constitute a true, complete, and accurate

transcription of the aforementioned tape to the best

of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated March 28, 2006 at Sacramento, California.

STACY WEGNER
TRANSCRIBER
**PETERS SHORTHAND REPORTING**



# Exhibit "E"

ABSTRACT OF JUDGMENT – PRISON COMMITME    – DETERMINATE
SINGLE, CONCURRENT, OR FULL-TERM CONSECUTIVE COUNT FORM
*[Not to be used for multiple count convictions or for 1/3 consecutive sentences.]*

CR-290.

| ☒ SUPERIOR | COURT OF CALIFORNIA, COUNTY OF Monterey |
|---|---|
| ☐ MUNICIPAL | BRANCH OR JUDICIAL DISTRICT |

**FILED**

**JUL 1 5 2005**

LISA M. GALDOS
CLERK OF THE SUPERIOR COURT
*[signature]* DEPUTY
J. NICHOLSON.

| PEOPLE OF THE STATE OF CALIFORNIA vs. DEFENDANT: Anthony Hemphill | DOB: 05-26-61 | CASE NUMBER SS050647B |
|---|---|---|

| AKA: |
|---|
| CII#: A05534016 |

| BOOKING #: | ☐ NOT PRESENT |
|---|---|

| COMMITMENT TO STATE PRISON ABSTRACT OF JUDGMENT | ☐ AMENDED ABSTRACT |
|---|---|

| DATE OF HEARING 05-20-05 | DEPT. NO. 4 | JUDGE Robert F. Moody |
|---|---|---|

| CLERK Jamie Adcock | REPORTER Yvette Garmon 12889 | PROBATION NO. OR PROBATION OFFICER Immediate Sentencing |
|---|---|---|

| COUNSEL FOR PEOPLE Rick Storms | COUNSEL FOR DEFENDANT Frank Dice | ☐ APPT'D. |
|---|---|---|

1. Defendant was convicted of the commission of the following felony:

| CNT. | CODE | SECTION NUMBER | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION (MO./DATE/YEAR) | CONVICTED BY JURY | COURT | PLEA | TERM (L, M, U) | TIME IMPOSED YRS. | MOS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | PC | 4573.6 | Possess Controlled Substance in Prison | 2002 | 05-20-05 | | | X | L | 4 | 0 |

ENHANCEMENTS charged and found to be true TIED TO SPECIFIC COUNTS (mainly in the PC 12022 series). List each count enhancement horizontally. Enter time imposed for each or "S" for stayed. DO NOT LIST enhancements stricken under PC 1385.

| CNT. | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

3. ENHANCEMENTS charged and found to be true FOR PRIOR CONVICTION OR PRISON TERMS (mainly in the PC 667 series). List all enhancements horizontally. Enter time imposed for each or "S" for stayed. DO NOT LIST enhancements stricken under PC 1385.

| ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | TOTAL |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

4. ☒ Defendant was sentenced pursuant to PC 667 (b)-(i) or PC 1170.12 (two-strikes).
5. FINANCIAL OBLIGATIONS (including any applicable penalty assessments):
   a. RESTITUTION FINE of: $800 per PC 1202.4(b) forthwith per PC 2085.5.
   b. RESTITUTION FINE of: $800 per PC 1202.45 suspended unless parole is revoked.
   c. RESTITUTION of: $____ per PC 1202.4(f) to ☐ victim(s)* ☐ Restitution Fund
   (*List victim name(s) if known and amount breakdown in item 7, below.)
   (1) ☐ Amount to be determined.    (2) ☐ Interest rate of: __% (not to exceed 10% per PC 1202.4(f)(3)(F)).
   d. ☐ LAB FEE of: $____ for counts: ____ per H&SC 11372.5(a).
   e. ☐ DRUG PROGRAM FEE of $150 per H&SC 11372.7(a).    f. ☐ FINE of $____ per PC 1202.5.
   TESTING: ☐ AIDS ☐ DNA    pursuant to ☐ PC 1202.1 ☐ PC 290.2 ☒ other *(specify):* PC 296(a)(1)
   Other orders *(specify):*

| 8. | TOTAL TIME IMPOSED: | 4 | 0 |
|---|---|---|---|

9. ☐ This sentence is to run concurrent with *(specify):*
10. Execution of sentence imposed
    a. ☒ at initial sentencing hearing.          d. ☐ at resentencing per recall of commitment. (PC 1170(d).)
    b. ☐ at resentencing per decision on appeal.  e. ☐ other *(specify):*
    c. ☐ after revocation of probation.

| 11. | DATE SENTENCE PROUNOUNCED 05-20-05 | CREDIT FOR TIME SPENT IN CUSTODY 0 | TOTAL DAYS INCLUDING: | ACTUAL LOCAL TIME 0 | LOCAL CONDUCT CREDITS 0 | ☒ 4019 ☐ 2933.1 | SERVED TIME IN STATE INSTITUTION ☐ DMH ☐ CDC ☐ CRC |
|---|---|---|---|---|---|---|---|

12. The defendant is remanded to the custody of the sheriff ☒ forthwith ☐ after 48 hours excluding Saturdays, Sundays, and holidays
    To be delivered to ☐ the reception center designated by the director of the California Department of Corrections.
    ☒ other *(specify):* CTF-SOLEDAD

**CLERK OF THE COURT:** I hereby certify the foregoing to be a correct abstract of the judgment made in this action.

| DEPUTY'S SIGNATURE Jamie Adcock *[signature]* | DATE 07-11-05 |
|---|---|

This form is prescribed under PC 1213.5 to satisfy the requirements of PC 1213 for determinate sentences. Attachments may be used but must be referred to in this document.

Form Adopted by the
Judicial Council of California
CR–290.1 (Rev. January 1, 1999)

ABSTRACT OF JUDGMENT – PRISON COMMITMENT – DETERMINATE
SINGLE, CONCURRENT, OR FULL-TERM CONSECUTIVE COUNT FORM

Penal Code
§§ 1170,
1213, 1213.5

136



i37

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF MONTEREY

| The People of the State of California,<br><br>Plaintiff<br><br>vs.<br><br>Hemphill, Anthony,<br><br>Defendant | Hon. **Robert F. Moody**<br>Clerk:     **Jamie Adcock**<br>CSR:     **Yvette Gallardo-Garmon**<br>Recording No. |
|---|---|
| Minutes:    **Preliminary Hearing Confirmation**<br><br>**May 20, 2005** | Case No.    **SS050647B**<br>**Courtroom 4** |

Charges:
2:    PC1170.12(c)(1) [Prior felony conviction]    **ALLSP**
1:    PC182(a)(1) [Conspiracy: Commit Crime]    **FEL**

Deputy District Attorney Rick Storms appeared.

Defendant appears and is in custody on this case.

Defendant appeared with Counsel Frank Dice.

Attorney Frank Dice appeared for Attorney of record, Rick West.

Complaint amended to add count 2:  Felony, violation of PC 4573.6, on Motion of the District Attorney.

Defendant enters a plea of guilty to count 2..

Allegation number 01 pursuant to PC 1170.12c(1) as alleged in count 2 is admitted.

Plea entered on condition: 4 years.

Plea is accepted by District Attorney and approved by the court after explaining provisions of section PC 1192.5 to Defendant.

Upon stipulation of Counsel, court finds a factual basis for the plea.

Defendant advised that on entering a plea of guilty or Nolo Contendere that he would be giving up the following rights: His privilege against self-incrimination, the right to jury trial to confrontation and cross-examination of the witnesses against him.  After questioning the Defendant the court finds that he understood the nature of the charge

and the possible range of penalties and other consequences of his plea, including the effect of the admission of any prior convictions. The court finds that the Defendant understood and knowingly, voluntarily and intelligently waived each of the above rights, and that there was a factual basis for the plea.

Defendant orally states that he has read and understands the acknowledgement of waiver or rights form, and the maximum, and minimum penalties form, which he has signed and is incorporated herein.

Defendant waives time for sentencing..

Waives probation referral and request immediate sentence

Count 1 dismissed on motion of the District Attorney. Reason for dismissal or discharge: Furtherance of Justice.(PC 1385.)

Probation is denied.

As to count 2: imposed the lower term of 2 year(s), 0 month(s), 0 day(s).

Sentence as to count 2 doubled pursuant to PC 1170.12c(1).

This case to be served: Consecutive to any other sentence.

Defendant committed to department of corrections for the total fixed term of 4 year(s), 0 month(s), 0 day(s).

Pay restitution fine of $800.00 to state restitution fund (PC 1202.4)

Pay an additional restituion fine in the amount of $800.00 under PC 1202.4(b). This fine shall be suspended unless parole is revoked (PC 1202.45)

Defendant to provide two specimens of blood, a saliva sample, right thumbprint, and full palm impressions of each hand for law enforcement identification analysis pursuant to Section 296(a)(1) of the Penal Code.

Defendant is advised of Appeal rights.

Defendant to remain In-Custody

Sheriff to deliver Defendant into custody of the Director of California Institution for Men at CTF-SOLEDAD.

All sentence elements for this proceeding entered.

Page 2 of 3

SS050647B, May 20, 2005

DATE: _____7-12-05_____

JUDGE OF THE SUPERIOR COURT

SS050647B, May 20, 2005

14ᵗ


STATE OF CALIFORNIA
**RULES VIOLATION REPORT - PART C**

DEPARTMENT OF CORRECTIONS
PAGE 2 OF 16

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| C63328 | HEMPHILL, A. | I -05-04-41 | CTF-C | 7/28/04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER |

HEARING - continued:

classified as a "Serious", CCR, §3323(c); a Division "A-2(8)" level offense. It is to be noted that after thorough considerations of all pertinent facts relevant to this case, the SHO subsequently elected to reduce this RVR to a lesser charge, dated 06/01/04, (from a Division A-2 to Division B-6 level offense, specifically: "Possession of Controlled Substances", CCR, Title 15, §3016(a), as indicated on the RVR.)

This SHO introduced herself and explained the purpose for this hearing, to include all applicable rules and procedures for the hearing, to Inmate HEMPHILL. Inmate HEMPHILL stated that he understood the process, and that his health was good. Also, he stated that he was ready, and felt prepared to proceed with this hearing. As indicated on the RVR, Inmate HEMPHILL is not a patient/participant in the Mental Health Services Delivery System (MHSDS) at any level of care. The circumstances portion of the RVR did not include evidence of bizarre or uncharacteristic behavior and a Departmental Mental Health Assessment (CDC-115X) was not necessary; neither was one required at the hearing.

STAFF ASSISTANT/INVESTIGATIVE EMPLOYEE ASSIGNMENT: This SHO reviewed the Inmate's TABE / GPL score and determined that HEMPHILL'S TABE score is above 4.0 , and the assignment of a Staff Assistant was not necessary, as per CCR, Title 15, §3315(d). Inmate HEMPHILL waived (indicated in the CDC-115A, dated 06/09/04) the assignment of an Investigative Employee (I.E.), and as per CCR, Title 15, §3315(d)(1). Inmate HEMPHILL did not request for the presence of Reporting Employee at the hearing.

DUE PROCESS: In the hearing, Inmate HEMPHILL initially verified/acknowledged receiving copies of all pertinent documents regarding this rule violations report, (and all pertinent documents, as described within the RVR) more than twenty-fours (24) prior to the hearing . As noted, the preliminary copy of the disciplinary report was served to Inmate HEMPHILL within the mandated time-frame (15 days) of discovery. The hearing was held/started within thirty (30) days of service. Thus, time constraints were not met due to the late issuance of evidence by I.S.U. Inmate HEMPHILL was advised by this SHO that this violation will be referred for felony prosecution. Inmate HEMPHILL was advised of the credit restoration procedures, per CCR, Title 15, §3327 (Restoration of Forfeited Credits), and §3328 (Disciplinary-Free Periods). However, in this instant, being that the offense level is included within CCR, Title 15, §3327(a)(1), credit restoration is not available.

INMATE'S PLEA / STATEMENT: This Senior Hearing Officer read and explained the charge, as written to Inmate HEMPHILL, and he pled: "Not Guilty", stating "I have nothing to do with this, Doglietto always targets me."

DISPOSITION - CONTINUED:

'Possession Of Controlled Substances"; and Inmate HEMPHILL was found "Guilty" (of lesser included offense) - of violating CCR, Title 15, §3016(a). Inmate was also assessed 90 days no visits commencing: 06/29/04 through 9/27/04; and assessed 90 days noncontact visits commencing: 09/27/04 through 12/26/04; twelve (12) months random Mandatory Drug Testing and is to provide a minimum of one (1) random drug test per month for one (1) year, beginning Co/29/04. Per CCR, Title 15, §3315(f)(5)(I)(1) - HEMPHILL has been ordered to enroll in and attend meetings of the Narcotics Anonymous. Assessed zero 0) days credit forfeiture due to the RVR's hearing not conducted/held within the time-constraints

**HEARING CONTINUED ON ATTACHED CDC 115-C)**

| | SIGNATURE OF WRITER | DATE SIGNED |
|---|---|---|
| | C.B. TUCKER., Correctional Lieutenant | |
| ☐ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
| | CDK Shaw | 8/19/04 | 1345 |

DC 115-C (5/95)

142



STATE OF CALIFORNIA

RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE 3 OF 16

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| C63328 | HEMPHILL, A. | I -05-04-41 | CTF-C | 7/28/04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER _____ |
|---|---|---|---|---|---|

HEARING - (Inmate's plea/statement) continued:

During the course of the RVR hearing, Inmate HEMPHILL inquired about two (2) pages which appeared to be missing from Incident Package, CTF-CEN-02-07-0080, in addition to phone records, which are also mentioned in the RVR, Log#I-05-04-41. Upon review of the Incident Package, the SHO discovered that there were possibly two (2) pages missing, and no phone records were issued to either the SHO or Inmate HEMPHILL. Due to the majority of the documentation being issued, Inmate HEMPHILL was eager to proceed with the RVR hearing. Inmate HEMPHILL requested not to postpone the RVR hearing even though he was not in receipt of the two (2) missing pages from CTF-CEN-02-07-0080, and the phone records by I.S.U. Upon Inmate HEMPHILL'S insistance on beginning the RVR hearing, I informed him that I.S.U. would be informed of the missing documents in order to provide them to Inmate HEMPHILL and the SHO. This is necessary as not to violate Inmate HEMPHILL'S due process and for Inmate HEMPHILL'S preparation for an adequate defense. Inmate HEMPHILL was instructed by the SHO that this initial meeting to adjudicate his RVR report would encompass review of the RVR, and all pertinent evidence, in its entirety, as well as questioning witnesses that he requested at his RVR hearing. Therefore, Inmate HEMPHILL will only be questioned regarding the documentation he had received up to this point - (CTF-CEN-02-07-0080, CTF-CEN-03-10-0263, RVR Log #I-05-04-41). It should be noted that the SHO was not aware that I.S.U. had phone records they needed to issue, or that these two (2) pages of CTF-CEN-02-05-0080, were missing. Therefore, inquiry to I.S.U. regarding the existence of the documents would be made by the SHO. The phone records were issued 7-9-04, and the two (2) missing pages were received from I.S.U., and issued on 7-11-04; therefore, barring any credit loss due to the thirty (30) day time limitation being surpassed.

FINDING - CONTINUED - Evidence included (SHO's Finding continued from Page 1 of the hearing):
The SHO's finding was based upon a preponderance of the evidence submitted at the hearing, which substantiate the SHO's final conclusion. Supportive evidence included:

(1) Information provided in the RVR (to include all subsequent nine pages, continuation of circumstances/supplementals relevant to this RVR) by the Reporting Employee, Correctional Officer D. J. Doglietto, wherein occurrences of events were described/summarized and miticulously composed.

(2) CDC Form 837s, (Incident Reports), Log Numbers: CTF-CEN-03-10-0263; CTF-CEN-02-05-0080; and phone records.

(3) Statements provided by HEMPHILL during the hearing. Also, submitted and taken into considerations were the testimonies provided by the requested inmate witnesses (Inmate FULLER, H-45171, and Inmate MONETTE, E-48953) throughout the hearing process.

WITNESS (or WITNESSES) REQUESTED: As indicated in CDC-115A, Inmate HEMPHILL requested for Inmate FULLER, H-45171, and Inmate MONETTE, E-48953, to be present at the hearing (granted by this SHO), dated 06/29/04 and 7-6-04, for more extensive questioning.

**HEARING CONTINUED ON ATTACHED CDC 115-C)**

| | SIGNATURE OF WRITER | DATE SIGNED |
|---|---|---|
| | C.B. TUCKER., Correctional Lieutenant | |
| ☒ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
| | | 8/19/04 | 1345 |

DC 115-C (5/95)

143

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE 4 OF 16

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| C63328 | HEMPHILL, A. | I-05-04-41 | CTF-C | 7/28/04 |

☐ SUPPLEMENTAL  ☒ CONTINUATION OF:  ☐ 115 CIRCUMSTANCES  ☒ HEARING  ☐ IE REPORT  ☐ OTHER _____

HEARING - continued:

After meticulous review of the evidence, Inmate HEMPHILL is being found GUILTY of a lesser included offense, the specific act of "Possession of Controlled Substance," in violation of CCR, Title 15, CCR § 3016(a), a Division "B" offense.

Actual Possession defined: Having it on your person, preferably in your hands.

Constructive Possession: If something is in an area under your domain and control, anything in this area belongs to you. It only means that you have it under your control.

Controlled Substance defined: A specific term defined by both Federal and State statutes (H&S 11054-11058). In general, any substance that falls under one of these categories is a controlled substance: Opiates, Opium derivatives, hallucinogenic substances, depressants, cocaine and its derivatives, stimulants, codeine, and other narcotics – marijuana is a controlled substance.

This SHO struggled when addressing the specific act of "conspiracy to introduce/distribute controlled substance into the institution," through the mail. Through the evidence provided in the RVR #I-05-04-41, Incident Report CTF-CEN-02-05-0080 and the recorded phone records, there must be documentation establishing a direct and unequivocal connection between Inmates HEMPHILL and FULLER in this conspiracy. To identify this evidence, it is essential that one is familiar with the definition of a conspiracy, which reads as follows:

Conspiracy requires more than one person. There must be evidence of an agreement to commit a criminal offense. When an inmate is aware of and agrees to the plans, and actively promotes or assists these plans, the inmate is a member of the conspiracy. In order to establish an inmate's guilt in a conspiracy, the inmate or any other member of the conspiracy must make some type of an "overt act" in furtherance of the conspiracy. Agreement can be shown by circumstantial evidence. It can also be shown by the relationship of the conspirators or their common interests. Simple association is not enough.

Conspiracy requires evidence of an "overt act". An "overt act" occurs when the conspiracy moves from the planning stage to acting. If roles are assigned to each member of the conspiracy and they carry out these roles, this is an "overt act". They are no longer talking and have put the plan into action.

Penal Code, Section 184, defines "overt act" as follows:
"No agreement amounts to a conspiracy unless some act, besides such agreement, be done within this state to effect the object hereof, by one or more of the parties to such agreement, and the trial of cases of conspiracy may be had in any county in which any such act can be done."

A conspiracy to distribute controlled substances within the Institution usually consists of two or more individuals who form a criminal conspiracy to acquire and sell controlled substances to other inmates. This is where the goal of the conspirators includes acquiring a controlled substance for sale to other inmates (even if personal use is also intended). Additionally, if the quantity is greater than a reasonable amount for personal use, or the controlled substance is packaged for re-sale, it is reasonable to assume that this was a conspiracy to acquire and sale to others.

HEARING CONTINUED ON ATTACHED CDC 115-C)

| SIGNATURE OF WRITER | | DATE SIGNED |
|---|---|---|
| C.B. TUCKER,, Correctional Lieutenant | | |
| ☑ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |

CDC 115-C (5/95)



STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE 5 OF 16

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| C63328 | HEMPHILL, A. | I -05-04-41 | CTF-C | 7/28/04 |

☐ SUPPLEMENTAL  ☒ CONTINUATION OF:  ☐ 115 CIRCUMSTANCES  ☒ HEARING  ☐ IE REPORT  ☐ OTHER _____

HEARING - continued:

Although there is clear and convincing evidence which proves Inmate FULLER's guilt of the specific act of "Conspiracy to Introduce and Distribute a Controlled Substance into the Institution," through the mail, in violation of Title 15, CCR § 3016(c), a Division "A-2" offense, the evidence establishing FULLER's guilt does not show a nexus to Inmate HEMPHILL.

The issue in question is whether there is circumstantial and/or direct evidence which proves Inmate HEMPHILL's involvement in the planning, purchase and introduction of two (2) parcels of marijuana received by the Institution's warehouse and mailroom via the mail on 5-22-02. After review of numerous recorded phone records, which consisted of calls placed by Inmate HEMPHILL from the Institution initially seemed to reveal the possibility of Inmate HEMPHILL's involvement in this conspiracy. However, upon further and a more detailed review, specifically during the RVR hearing, it became apparent through questioning witnesses that the nexus initially established when reading the documents in evidence, such as the RVR, phone records, and Incident Report became questionable, and less reliable in establishing Inmate EHMPHILL'S direct involvement in this conspiracy.

Through the recorded phone records submitted by Correctional Officer D. Doglietto regarding conversations by Inmate HEMPHILL to his family members, there is much discussion regarding somewhat suspicious conversation. Additionally, the nickname Inmate HEMPHILL calls his brother "Moe" (nickname - not AKA), which is similar to an individual in Inmate FULLER's conversation by the same name, "Moe" (AKA).   When questioning Inmate FULLER regarding "Moe," during the RVR hearing of I/M HEMPHILL, he explained that his friend "Moe", was a close childhood friend. Then he revealed a tattoo on the back of his right bicep which read "Moe." This led me to believe that this could not be the same individual as the "Moe" Inmate HEMPHILL refers to (his brother's nickname), being that they were not raised in the same area, nor were they familiar with each other's families.

During the course of the RVR, Inmate FULLER denied Inmate HEMPHILL's involvement in this conspiracy. This was validated by the conspirators and confirmed in the phone conversation between Inmate FULLER and Trina, dated 05/14/02, in which Trina validates the fact that Inmate HEMPHILL's people did not contact Trina, even though she made two efforts to do so.

There is also discussion by Inmate HEMPHILL in the recorded phone conversation regarding $100.00, and his birthday approaching in the 5-5-02 and 5-12-02 phone records. Inmate HEMPHILL's intentions revealed during the RVR hearing was to obtain this amount of marijuana for a birthday present where payment was to be made by HEMPHILL's people, which did not occur, through Trina. This discussion occurred in the recorded phone records dated 5-12-02. Inmate HEMPHILL also revealed in the phone records dated 5-02-02, that he had no funds (money in his Inmate Trust Account). This is not consistent with an individual who would be involved in trafficking such large amounts of narcotics for sale.

Phone recorded records, dated 5-14-02, Inmate FULLER is talking with Trina and when asked if he was going to talk to Green, FULLER states, "probably, why?" Trina changes the conversation, as if this is an insignificant topic not worth discussion. Trina also is told by Inmate FULLER to give $100.00 to his "Moe." Where as in another conversation between Inmate HEMPHILL and his people, he tells them the figure $100.00 for his birthday purchase. Again, if this is the same "Moe," why would HEMPHILL want him (his brother "Moe") to pay $100.00 and FULLER would pay him right back? This does not make sense, or is it reasonable.

HEARING CONTINUED ON ATTACHED CDC 115-C)

| | SIGNATURE OF WRITER | | DATE SIGNED |
|---|---|---|---|
| | C.B. TUCKER., Correctional Lieutenant | | |
| ☒ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
| | C/O R. Shaw | 8/19/04 | 1345 |

DC 115-C (5/95)



STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE 16 OF 16

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| C63328 | HEMPHILL, A. | I -05-04-41 | CTF-C | 7/28/04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER _____ |

HEARING - continued:

Additionally, the phone records dated 4-30-02, a conversation between Inmate FULLER and Trina when FULLER references "two fifty." The conversation sounds more like the purchase of an item other than narcotics (canning machine possibly). The conversation between Inmate HEMPHILL and Billy Ray on 3-2-02 at 0837 hours, HEMPHILL comments on Page 17, Line 10, "I got one," this is referencing possession of a marijuana cigarette in his pocket at the time of the call, which was disclosed at the RVR hearing.

The recorded phone conversations by Inmate HEMPHILL to Corshia, Billy Ray and his nephew, as suspect as some of the content in discussion and conversations, it is not clear in this evidence, nor does it establish that Inmate HEMPHILL'S direct connection, or affiliation with Inmate FULLER'S conspiracy. To do so, I would have to speculate or make suppositions regarding these conversation. Inmate FULLER's recorded phone conversations validate the fact that Trina made negative contact with Inmate HEMPHILL's people. There is no clear assignment to conspirator roles isolating and recognizing direct involvement by Inmate HEMPHILL. The planning and preparation which is obviously communicated by Inmate FULLER to Trina during their recorded conversation is not present in Inmate HEMPHILL's conversations, to directly tie him to Inmate FULLER'S conspiracy.

The monitored phone records of Inmate FULLER regarding conversations he had with the non-CDC employee Trina, revealed the planning and delegating of the roles and duties of the conspirators implementing the conspiracy into action. It is also evident in the interview of Trina, contained in the Incident Report, where she is interviewed by Special Agent West on 10/16/03 regarding this conspiracy. There is clear implication of an ex-inmate, A.K.A. "Hoss." As well as the need to consider the inmate only identified by ISU, who provided the monetary support for this specific act of "Conspiracy to Introduce/Distribute Controlled Substance in the Institution," through the mail.

This evidence has definitely established the planning, headed by Inmate FULLER and with the assistance of the co-conspirators, as well as the execution of the act itself. The evidence identified Trina, the non-CDC employee as purchasing and making the copies of the medical literature which was contained in both parcels in order to conceal the marijuana. The printed mailing labels and the information contained on both labels were done in order to present legitimacy to the parcels as being sent from ETR Associates. The planning was so meticulous in the preparation of these parcels, it went as far as filling both parcels with known literature normally purchased and received through this particular vendor, for dissemination to the general inmate population at CTF.

The non-CDC employee Trina also identified an ex-inmate, who was later validated as having been incarcerated at CTF, A.K.A. "Hoss," as preparing the boxes for the packing of the marijuana, and the labels contained on both parcels. Trina also admitted to paying for and mailing out both parcels from Lynnwood, California, which was the postmark on both parcels.

**HEARING CONTINUED ON ATTACHED CDC 115-C)**

| | SIGNATURE OF WRITER | | DATE SIGNED |
|---|---|---|---|
| | C.B. TUCKER., Correctional Lieutenant | | |
| ☒ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
| | C/OR L. Wan | 8/19/04 | 1345 |

DC 115-C (5/95)

146

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE _7_ OF _16_

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| C63328 | HEMPHILL, A. | I -05-04-41 | CTF-C | 7/28/04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER _____ |
|---|---|---|---|---|---|

HEARING - continued:
We must not ignore the involvement of the unidentified inmate (known to ISU) who provided $3,500.00 to the non-CDC employee, Trina, which could only be utilized for the purchase of narcotics. This SHO truly believes that his role is just as guilty, if not more than the others involved in this conspiracy. The provision of monetary funds alone, withdrawn using a fabricated debt, then forwarded to an individual on the streets who is actively involved in a conspiracy for distribution and introduction of narcotics into an institution, is extremely suspect.

The phone records revealed numerous conversations between Inmate FULLER and his mother. Inmate FULLER's mother was also inclusive in this investigation. Inmate FULLER's mother did on several occasions pass information/messages to Trina for Inmate FULLER. However, it is not clear or likely that she was aware of her son's criminal activity in its entirety. These phone records proved to be valuable in the conversations between Inmate FULLER and Trina. Their numerous recorded contacts revealed the conversations regarding the cost of the photo copies, the somewhat coded conversations about the expected mailing of the parcels, the paperwork sent out by Inmate FULLER (medical literature), the inquiring about the marijuana and the amount of parcels being sent. The totality of evidence reveals planning, preparation and roles of the individuals directly involved in this conspiracy. There is substantial evidence of an overt act committed by Inmate FULLER, non-CDC employee Trina, ex-inmate A.K.A. "Hoss," and in this SHO's opinion the inmate providing the monetary funds known to ISU, totaling $3,500.00.

The RVR speaks to the involvement of Inmate HEMPHILL, C-63328, and Inmate MONETTE, E-48953. It is evident that this conspiracy has other players who have not been appropriately identified yet, however, I have great difficulty in directly establishing a nexus between Inmate FULLER with Inmate HEMPHILL and Inmate MONETTE. However, I do believe that HEMPHILL, MONETTE and WATERS, though not conspiring with inmate FULLER, possibly are involved in an activity which is adverse in nature combined with their present incarceration status, therefore, illegal and possibly criminal. I can only speculate to this. This theory is supposition, which cannot be deemed credible or reliable based on the lack of evidence required to validate it as truth. Even though Page 13 of 111 states that Inmate MONETTE and WATERS made additional calls to inmates asking relatives to send money ($100.00 to $150.00) to Inmate MONETTE'S grandmother, where is the evidence of such conversations taking place? Besides this statement alone, there is no suporting evidence of this. Even so, there is still no connection to Inmate FULLER.

The nexus between Inmate FULLER and Inmate HEMPHILL, when reviewing phone records seems apparent. That is until clarification could be provided during questioning of witnesses during the RVR hearing. I could not establish a clear and concrete nexus involving Inmate HEMPHILL and Inmate MONETTE in this particular conspiracy. Inmates HEMPHILL and MONETTE are guilty of specific acts not directly related to this case, which has not yet been fully disclosed besides the cell phone possession and possession of marijuana and MONETTE overfamiliarity. Inmate HEMPHILL's habitual drug usage immediately makes him suspect, as well as his frugal attempt to possibly obtain marijuana for his birthday, through family, giving money to Trina, that never happened nor was there a real effort made by HEMPHILL's people to do so, by not connecting with Trina, even though Trina made an effort to do so. (According to Inmate FULLER, Inmates HEMPHILL and MONETTE, and the medical record, staff member have no involvement with this conspiracy, which he verbalized numerous times during the RVR hearing.)
**HEARING CONTINUED ON ATTACHED CDC 115-C)**

| | SIGNATURE OF WRITER | DATE SIGNED |
|---|---|---|
| | C.B. TUCKER,, Correctional Lieutenant | |
| ☐ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
| | | 8/19/04 | 1345 |

DC 115-C (5/95)

147

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE 8 OF 16

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| C63328 | HEMPHILL, A. | I -05-04-41 | CTF-C | 7/28/04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER _____ |
|---|---|---|---|---|---|

HEARING - continued:

On Page 12 of 111 (original package issued)...the last paragraph contains a sentence that reads: "Additional calls were made to inmates WATERS, H-11664, FRAZIER, P-33880 and HEMPHILL, C-63328." This paragraph begins by stating that in May and July 2002, over three-hundred (300) calls had been placed from this number to the parents and wife of Inmate MONTTE, E-48953. These calls were made by cell phone. How was it determined that each individual, Inmates WATERS, FRAZIER and HEMPHILL, listed in the last statement, received an incoming call? How specifically was this determined? Who were they from?

On Page 14 of 111, Paragraph #2 reveals again that numerous calls were made to the parents and relatives of Inmate MONETTE and Inmate WATERS. At the RVR hearing I/M MONETTE admitted to having a cell phone a couple days a week and on the weekends sometimes. Inmate MONETTE also admitted to the cell phone being given to him by an employee, but refused to disclose or identify this employee.

In closing, it is truly disturbing to realize that there is additional staff involvement beyond what is realized as of this date. Currently, one staff member has been named for their alleged involvement with adverse ramifications, when it is all too clear that there are other medical staff involved in this conspiracy, whom at this point are not recognized or identified. One has to wonder how the knowledge was obtained and acquired to utilize the HIV medical literature, with the current distributor of these flyers, the correct return address and the mailing address, and to a specific employee who picks up parcels at the warehouse and their exact extension number.

It is disturbingly apparent that there was a lot of thought, planning and preparation put into the disguise of the marijuana shipment. The idea of its packaging and concealment by the HIV medical literature leads me to believe the involvement of staff's knowledge and familiarization regarding these types of bulk packaging and medical shipments sent to the institution, and by what vendor, as not to draw suspicion to the parcels. The reason for discovery was only due to the diligence of Warehouse staff in observing the contents as being suspect when the contents was revealed by the tear in the box. If not for the damage on the box, this discovery would not have been made. During the RVR hearing, Inmate FULLER denied the involvement of the employee who was adversely removed from their job site. . Inmate FULLER states he does not know who she is. When the SHO asked Inmate FULLER if the employees involved were still employed, he would not verbally confirm, but his smile implied an affirmative response as to the participants not being identified. Inamte FULLER expressed sympathy for the employee removed their position, for being identified as a party to his conspiracy, when he adamantly states that she is not. During the course of he RVR hearing, Inmate FULLER was asked several times to reveal the identity of the staff involved, but he declined to do so. Inmate FULLER also stated that both inmates MONETTE and HEMPHILL had nothing to do with what he had going on, and hat he did not even know the staff member named in his criminal complaint.

Although there is clear and convincing evidence which proves Inmate FULLER's guilt of the specific act of "Conspiracy to Introduce and Distribute a Controlled Substance into the Institution," through the mail, in violation of Title 15, CCR § 3016(c), a Division "A-2" offense, the evidence establishing FULLER's guilt does not show a nexus to Inmate HEMPHILL.

Inmate HEMPHILL's finding of guilt of a lesser included offense, the specific act of "Possession of a Controlled Substance," is based on the following evidence:

HEARING CONTINUED ON ATTACHED CDC 115-C)

| SIGNATURE OF WRITER | | DATE SIGNED |
|---|---|---|
| C.B. TUCKER, Correctional Lieutenant | | |

| | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
|---|---|---|---|
| ☒ COPY OF CDC 115-C GIVEN TO INMATE | C/O _____ | 8/19/04 | 1345 |

C 115-C (5/95)

148

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE _9_ OF _16_

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| C63328 | HEMPHILL, A. | I -05-04-41 | CTF-C | 7/28/04 |

☐ SUPPLEMENTAL  ☒ CONTINUATION OF:  ☐ 115 CIRCUMSTANCES  ☒ HEARING  ☐ IE REPORT  ☐ OTHER _____

HEARING - continued:

1- Incident Package CTF-Central 03-10-0263. In a report authored by ISU Officer J.C. Ramirez he states that on 9-23-03, at approximately 0930 hours, while assigned as ISU Officer, he was instructed, along with ISU Officer I. Oglesby, to conduct a search of cell GW-237, occupied by Inmate HEMPHILL, C-63328, and Inmate MONETTE, E-48953. During the search of the bed and locker area of Inmate MONETTE, GW-237L, I discovered three (3) bindles of green leafy material wrapped in plastic. These bindles were located in a skull cap hanging on a side rail near the head area of Inmate MONETTE's bunk in open view.

2- Inmate HEMPHILL's admission during the RVR hearing as to the marijuana in the skull cap belonging to him, not Inmate MONETTE.

3- The presumptive test resulted positive for marijuana, and weighed the approximate weight of 15 grams with plastic wrap. The large bindle 14 grams, the two little bindles 0.5 grams.

4- Incident Package CTF-Central 03-10-0263. In a report authored by ISU Officer I. Oglesby he states that on 9-23-03, at approximately 0930 hours when searching cell GW-237, occupied by Inmate HEMPHILL, C-63328, and Inmate MONETTE, E-48953 he discovered on the top bunk belonging to Inmate HEMPHILL, a rolled cigarette with green leafy material inside.

5- A presumptive test on the green leafy material found on Inmate HEMPHILL's bunk, tested positive for marijuana and weighed approximately 0.3 grams including cigarette paper.

6- On 9-23-03 at approximately 2000 hours, Inmate HEMPHILL was ordered by Officer C. Caster to submit to a urine sample, which was witnessed by Officer Chamberlin.

7- A report from the San Diego Reference Lab, Department of Corrections, Controlled Substances Urinalysis testing, received on 10-01-03 by ISU, revealed a positive urinalysis for Inmate HEMPHILL, C-63328, for THC (marijuana.)

8- A Department of Justice, Bureau of Forensic Services, report for controlled substances dated 10-2-03, and received by ISU on 10-6-03. This report validates the marijuana: 030 grams net. The item 1: "One rolled cigarette with green leafy matter."

9- A Department of Justice, Bureau of Forensic Services, report for controlled substances dated 10-2-03, and received by ISU on 10-6-03 validates item JR1- One large bindle containing green leafy matter as marijuana: 10.96 grams net. Items JR2 and JR3 were both analyzed. The subject of this report is listed as MONETTE, E-48953, owner of the marijuana in this report.

It should be noted that Inmate HEMPHILL was issued the RVR on 06/09/04. He was issued his copy of the recorded phone records on 07/09/04, after obtaining them from I.S.U.   On 07/11/04, Inmate HEMPHILL was issued pages 20, and 21 Incident Package #CTF-CEN-02-05-0080, after finally receiving these two (2) pages from I.S.U. .  These two pages were missing from the Incident Package; therefore, I.S.U. staff had to locate them, in order for them to be issued.

**HEARING CONTINUED ON ATTACHED CDC 115-C)**

| | SIGNATURE OF WRITER | DATE SIGNED |
|---|---|---|
| | C.B. TUCKER., Correctional Lieutenant | |
| ☒ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature)  C/O R. Shaw | DATE SIGNED  8/19/04 | TIME SIGNED  1345 |

DC 115-C (5/95)

149

STATE OF CALIFORNIA                                                                    DEPARTMENT OF CORRECTIONS
RULES VIOLATION REPORT - PART C                                                        PAGE 10 OF 16

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| C63328 | HEMPHILL, A. | I -05-0..-4| | CTF-C | 7/28/04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER _____ |

HEARING - continued:

On 06-27-04 this RVR hearing was postponed and resumed on 07/6/04 at approximately 1245 hours. Inmate FULLER was asked the following questions by the SHO (composed by Inmate HEMPHILL):

Q-1    SHO         Are Inmates MONETTE and HEMPHILL involved in your conspiracy to introduce/distribute
                   controlled substance into the institution?

A-1    I/M Fuller  No, they aren't. I saw the criminal complaint. I don't know who the staff member is or Inmate
                   MONETTE. I know HEMPHILL only.

Q-2    SHO         Who is Moe that you refer to during your telephone conversations. Is it Inmate HEMPHILL'S
                   brother? And what about James?

A-2    I/M Fuller  No, Moe is a close childhood friend. I have his name tattooed on the back of my left upper bicep.
                   I don't know HEMPHILL'S people. James is also one of my people, that is such a common
                   Name. My people and HEMPHILL 's people are not the same.


** At this time, the SHO look at Inmate FULLER'S left back. Upper bicep and observed the tattoo in large letters, "Moe".


Q-3    SHO         So during your phone conversation with Trina, your reference to Moe getting $100.00 is not
                   Inmate HEMPHILL'S brother.

A-3    I/M Fuller  No, it's my people!

Q-4    SHO         During the phone conversation with Trina regarding Green and if his brother James contacted
                   her, it is established that contact was not made. What was the purpose of the contact?

                   Why do you think I/M HEMPHILL was brought into the conspiracy if you say he is
                   not involved?

A-4    I/M Fuller  Trina never contacted his people.
                   I have no idea, because he is not.

HEARING CONTINUED ON ATTACHED CDC 115-C)

| | SIGNATURE OF WRITER | DATE SIGNED |
|---|---|---|
| | C.B. TUCKER,, Correctional Lieutenant | 8/10/04 |
| ☒ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
| | C/O R. Shaw | 8/19/04 | 1745 |

DC 115-C (5/95)

150

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE 11 OF 16

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| C63328 | HEMPHILL, A. | I -05-04-41 | CTF-C | 7/28/04 |

☐ SUPPLEMENTAL  ☒ CONTINUATION OF:  ☐ 115 CIRCUMSTANCES  ☒ HEARING  ☐ IE REPORT  ☐ OTHER _____

HEARING - continued:

Inmate Monette  was questioned (6-27-04) by SHO the following:  (for Inmate HEMPHILL)

Q-1  SHO            Did you work in the infirmary and how long?

A-1  I/M  Monette        Yes, since 4-4-02.

Q-2  SHO            What was your lock up for?

A-2  I/M Monette         Overfamiliarity and possession.

Q-3  SHO            Was the marijuana in the skull cap yours?

A-3  I/M Monette         No.

Q-4  SHO            Who's was it?

A-4  I/M Monette         I had a cellmate at that time, I had no knowledge of it.

Q-5  SHO            Who was your cellmate at that time?

A-5  I/M Monettte        Hemphill.

Q-6  SHO          The dope was discovered in your bed area.

A-6  I/M Monette      On the bed post, the cell phone charger was mine.

Q-7  SHO          Did you have a cell phone?

A-7  I/M Monette      Periodically, once or twice during the week, sometimes on the weekend.

Q-8  SHO          Why would you have the need for a cell phone?

A-8  I/M Monette      To help out the business.

**HEARING CONTINUED ON ATTACHED CDC 115-C)**

| | SIGNATURE OF WRITER | DATE SIGNED |
|---|---|---|
| | C.B. TUCKER., Correctional Lieutenant | |
| ☒ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
| | | 8/19/04 | 1345 |

IC 115-C (5/95)

151

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE 12 OF 16

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| C63328 | HEMPHILL, A. | I -05-04-41 | CTF-C | 7/28/04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER _____ |

HEARING - continued:

Questions – continued to Inmate MONETTTE (6-27-04): (for Inmate HEMPHILL)

Q-9  SHO            Did I/M Hemphill borrow the cell phone on occasion?

A-9  I/M Monette    A couple of times.

Q-10  SHO           Do you know who he called?

A-10  I/M Monette   Family members.

Q-11  SHO           What business are you referring to?

A-11  I/M Monette   My mom's.

Q-12  SHO           Why didn't you use the yard phone?

A-12  I/M Monette   I did at times, it became expensive.

Q-13  SHO           Why do you think you were charged with overfamiliarity?

A-13  I/M Monettee  I had an idea that it had to do with  9 staff at the hospital.

Q-14  SHO           Did Hemphill interact with any medical staff?

A-14  I/M Monette   No, the overfamiliarity and the cell phone had nothing to do with Hemphill.


On 6-27-04 at about 2015 hours, Inmate MONETTE was excused as a witness. Hearing stopped at 2040 hours due to late hour.
**HEARING CONTINUED ON ATTACHED CDC 115-C)**

| | SIGNATURE OF WRITER | | DATE SIGNED |
|---|---|---|---|
| | C.B. TUCKER., Correctional Lieutenant | | /11/04 |
| ☒  COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
| | | 8/19/04 | 1345 |

OC 115-C (5/95)

152



STATE OF CALIFORNIA                                                           DEPARTMENT OF CORRECTIONS
RULES VIOLATION REPORT - PART C                                              PAGE 13 OF 16

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| C63328 | HEMPHILL, A. | I -05-04-41 | CTF-C | 7/28/04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER _____ |

HEARING - continued:

Inmate Hemphill's questions I/M FULLER and I/M MONETTE at his RVR Hearing (6-27-04 at 1933 hours) through this SHO:


   ***WITNESS: SHO asked the following questions to I/M FULLER:

Q-1  SHO          Did Hemphill have anything to do with the introduction of the controlled substance
                  confiscated on 5/22/02?

A-1  I/M Fuller       No.

Q-2  SHO          Did Hemphill have any knowledge to the plot to introduce and distribute a controlled
                  substance into the institution with you?

Q-2  I/M Fuller       No.

Q-3  SHO          Was Hemphill working with you to introduce a controlled substance into the
                  institution?

A-3  I/M Fuller       No.


   ***WITNESS: SHO asked the following questions to I/M MONETTE:

Q-1  SHO          Did you conspire with Hemphill in March 2002 to introduce a controlled substance
                  into the institution?

A-1  I/M Monette      No. I have nothing to do with that.

Q-2  SHO          Has anybody inn your family or female friends ever meet or talk to anyone related to
                  or acquainted with Hemphill?

A-2  I/M Monette      No.

**HEARING CONTINUED ON ATTACHED CDC 115-C)**

| SIGNATURE OF WRITER | DATE SIGNED |
|---|---|
| C.B. TUCKER., Correctional Lieutenant | 3/10/04 |

| ☒ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
|---|---|---|---|
|  | C/O R. Cham | 8/19/04 | 1345 |

)C 115-C (5/95)

153

STATE OF CALIFORNIA                                          DEPARTMENT OF CORRECTIONS
RULES VIOLATION REPORT - PART C                              PAGE 14 OF 16

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|------------|---------------|------------|-------------|--------------|
| C63328 | HEMPHILL, A. | I -05-04-41 | CTF-C | 7/28/04 |

☐ SUPPLEMENTAL   ☒ CONTINUATION OF:   ☐ 115 CIRCUMSTANCES   ☒ HEARING   ☐ IE REPORT   ☐ OTHER _____

HEARING - continued:
Questions continued for FULLER 7-6-04.

Q-1 SHO          You asked Trina, "did Green's nephew call back again?" Trina replied to you, "Negative",
                 adding "he didn't call last time, I just went through there." You stated that he talked
                 to his nephew's wife and that he would call Trina. What do you mean by Green
                 pushing envelope?

A-1 I/M Fuller   His people never contacted Trina.

Q-2 SHO          Who is Keith and what area is he from?

A-2 I/M Fuller   Keith is from L.A.

Q-3 SHO          If Monette and Hemphill are not involved, why are they included in the criminal complaint?

A-3 I/M Fuller   I don't know, Doglietto puts this so-called theories together and he's wrong. He needs
                 to be accountable for his actions, getting uninvolved people caught up.!


          On 7/16/04, at approximately 2000 hours, the SHO asked Inmate HEMPHILL the following questions:

Q-1 SHO          How are you acquainted with Inmate FULLER?

A-1 I/M HEMPHILL    I play handball with him.

Q-2 SHO          Your phone call on 3-2-02 placed by you to Corshia and your brother Billy Ray in which
                 you discuss your cellie MONETTE, E-48933, and state your cellie's girl will contact you
                 Tuesday, what does this mean?

A-2 I/M HEMPHILL    No one ever contacted him.
**HEARING CONTINUED ON ATTACHED CDC 115-C)**

| | SIGNATURE OF WRITER | DATE SIGNED |
|---|---|---|
| | C.B. TUCKER,, Correctional Lieutenant | |
| ☑ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED 8/19/04 | TIME SIGNED 1345 |

CDC 115-C (5/95)

154

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE 15 OF 16

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| C63328 | HEMPHILL, A. | I -05-04-41 | CTF-C | 7/28/04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER _____ |

HEARING - continued:
(Questions to I/M HEMPHILL, dated 7/16/04, by the SHO)

Q-3    SHO    There is suspicious conversation as to the comments you relay during your phone conversations when talking to your brother Billy Ray. Comments such as, "Let's keep everything in order for that other things", and "Let me know what you're looking for and how you want it."

A-3    I/M HEMPHILL    The conversations are taken out of context. It's been two years (2) since these conversations. I got a conspiracy for distribution before from Doglietto. I would not talk about these types of things knowing I'm recorded.

Q-4    SHO    On 3-16-02, you talked to your brother, and asked if he sent the one (1) or one and half (1 1/2): What did you mean by that?

A-4    I/M HEMPHILL    I'm broke, I have no money on my books, I was supposed to get a money order.

Q-5    SHO    Let's discuss the cell phone belonging to the CTF employee, why does your brother's phone number show up on the CTF employee's cell phone?

A-5    I/M HEMPHILL    When MONETTE had the cell phone in our cell, I used it to call my brother, with MONETT'S permission.

Q-6    SHO    So, who received the cell phone?

A-6    I/M HEMPHILL    It was MONETE'S.

Q-7    SHO    Where did Inmate MONETTE get the phone from?

A-7    I/M HEMPHILL    I don't know.

**HEARING CONTINUED ON ATTACHED CDC 115-C**

| | |
|---|---|
| SIGNATURE OF WRITER | DATE SIGNED |
| C.B. TUCKER,, Correctional Lieutenant | |

| | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
|---|---|---|---|
| ☒ COPY OF CDC 115-C GIVEN TO INMATE | C/O. Shaw | 8/19/04 | 1345 |

C 115-C (5/95)

STATE OF CALIFORNIA

RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS

PAGE 16 OF 16

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| C63328 | HEMPHILL, A. | I -05-04-41 | CTF-C | 7/28/04 |

☐ SUPPLEMENTAL  ☒ CONTINUATION OF:  ☐ 115 CIRCUMSTANCES  ☒ HEARING  ☐ IE REPORT  ☐ OTHER _____

HEARING - continued:
(Questions to I/M HEMPHILL, dated 7/16/04, by the SHO)

Q-8  SHO    On 5-11-02 and 5-12-02, you referenced a phone number and a girl.  It's clear that this is Trina's phone number.

A-8  I/M HEMPHILL    But, I have nothing to do with FULLER, and what he got going on.

Q-9  SHO    In your conversations with your family, you bring up the female "TEEE" and the phone number of "TEEE", which is Trina's.  You also reference the amount of $100.00, what is this regarding? (5-12-02).

A-9  I/M HEMPHILL    My birthday present.  My birthday was coming up.

Q-10  SHO    Is this payment for marijuana for your birthday present?

A-10  I/M HEMPHILL   My birthday was coming up and I was going to try to get a birthday present.

Q-11  SHO    So the contact was to be made in order to acquire $100.00 worth of marijuana for your birthday, is this a correct statement?

A-11  I/M HEMPHILL    No comment, but I ain't got nothing to do with FULELR'S and what he's got going.
              (SHO took this as an affirmative response)

Reviewed by: _____    Date: 8-11-04
              R. A. POPE, Facility Captain

Chief Disciplinary Officer: _____    Date: 8,12.04
                            W. HILL, Associate Warden

| | SIGNATURE OF WRITER | | DATE SIGNED |
|---|---|---|---|
| | C.B. TUCKER., Correctional Lieutenant | | |
| ☑ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
| | | 8/19/04 | 1345 |

156

# Exhibit "F"

Exhibit "F"

**ABSTRACT OF JUDGMENT – PRISON COMMITMENT - DETERMINATE**
*[NOT VALID WITHOUT COMPLETED PAGE TWO OF CR-290 ATTACHED]*

CR-290

SUPERIOR COURT OF CALIFORNIA, COUNTY OF MONTEREY

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA vs.<br>DEFENDANT: Darren Fuller | DOB: 10-24-70 |

| | |
|---|---|
| | SS050647A -A |
| AKA: | -B |
| CII#: ☐ NOT PRESENT | -C |
| BOOKING #: | -D |
| ☐ COMMITMENT TO STATE PRISON<br>ABSTRACT OF JUDGMENT ☐ AMENDED<br>ABSTRACT | |

**FILED**
JUL 15 2005
LISA M. GALDOS
CLERK OF THE SUPERIOR COURT
_____ DEPUTY
J. NICHOLSON

| DATE OF HEARING | DEPT. NO. | JUDGE |
|---|---|---|
| 03-02-05 | Courtroom 4 | Robert F. Moody |

| CLERK | REPORTER | PROBATION NO. OR PROBATION OFFICER |
|---|---|---|
| Jamie Adcock | Yvette Gallardo-Garmon | Immediate Sentencing |

| COUNSEL FOR PEOPLE | COUNSEL FOR DEFENDANT | |
|---|---|---|
| Rick Storms | Stan Evans | ☒ APPTD. |

1. Defendant was convicted of the commission of the following felonies:
   ☐ Additional counts are listed on attachment
   ____ (number of pages attached)

| CNT. | CODE | SECTION NO. | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION (MO./DATE/YEAR) | CONVICTED BY JURY | CONVICTED BY COURT | CONVICTED BY PLEA | TERM (I, M, U) | CONCURRENT | CONSECUTIVE 1/3 VIOLENT | CONSECUTIVE 1/3 NON-VIOLENT | CONSECUTIVE FULL TERM | INCOMPLETE SENTENCE | 654 STAY | PRINCIPAL OR CONSECUTIVE TIME IMPOSED YRS. | MOS. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | PC | 182(a)(1) | Conspiracy-Commit Crime | 2002 | 3-2-05 | | | X | L | | | | | | | 2 | 0 |
| | | | | | · · | | | | | | | | | | | | |
| | | | | | · · | | | | | | | | | | | | |
| | | | | | · · | | | | | | | | | | | | |
| | | | | | · · | | | | | | | | | | | | |

2. ENHANCEMENTS charged and found to be true TIED TO SPECIFIC COUNTS (mainly in the PC 12022 series). List each count enhancement horizontally. Enter time imposed for each or "S" for stayed. DO NOT LIST ANY STRICKEN ENHANCEMENT(S).

| CNT. | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

3. ENHANCEMENTS charged and found to be true FOR PRIOR CONVICTIONS OR PRISON TERMS (mainly in the PC 667 series). List all enhancements horizontally. Enter time imposed for each or "S" for stayed. DO NOT LIST ANY STRICKEN ENHANCEMENT(S).

| ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | TOTAL |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

4. ☒ Defendant was sentenced pursuant to PC 667 (b)-(i) or PC 1170.12 (two-strikes).

5. INCOMPLETED SENTENCE(S) CONSECUTIVE

| COUNTY | CASE NUMBER |
|---|---|
| | |
| | |
| | |

6. TOTAL TIME ON ATTACHED PAGES: | 0 | 0 |

7. ☐ Additional indeterminate term (see CR-292).

8. TOTAL TIME EXCLUDING COUNTY JAIL TERM: | 4 | 0 |

This form is prescribed under PC 1213.5 to satisfy the requirements of PC 1213 for determinate sentences. Attachments may be used but must be referred to in this document.
Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CR-290 (Rev. January 1, 2003)

**ABSTRACT OF JUDGMENT – PRISON COMMITMENT – DETERMINATE**
*[NOT VALID WITHOUT COMPLETED PAGE TWO OF CR-290 ATTACHED]*

Penal Code,
§§ 1213, 1213.5

157



| PEOPLE OF THE STATE OF CALIFORNIA vs. DEFENDANT: Fuller, Darren | | | |
|---|---|---|---|
| SS050647A    -A | -B | -C | -D |

9. FINANCIAL OBLIGATIONS (including any applicable penalty assessments):

a. Restitution Fine(s):

Case A: $200.00    per PC 1202.4(b) forthwith per PC 2085.5;    $200.00    per PC 1202.45 suspended unless parole is revoked.
Case B: $_____    per PC 1202.4(b) forthwith per PC 2085.5;    $_____    per PC 1202.45 suspended unless parole is revoked.
Case C: $_____    per PC 1202.4(b) forthwith per PC 2085.5;    $_____    per PC 1202.45 suspended unless parole is revoked.
Case D: $_____    per PC 1202.4(b) forthwith per PC 2085.5;    $_____    per PC 1202.45 suspended unless parole is revoked.

b. Restitution per PC 1202.4(f):

Case A: $_____    ☐ Amount to be determined   to ☐ victim(s)*    ☐ Restitution Fund
Case B: $_____    ☐ Amount to be determined   to ☐ victim(s)*    ☐ Restitution Fund
Case C: $_____    ☐ Amount to be determined   to ☐ victim(s)*    ☐ Restitution Fund
Case D: $_____    ☐ Amount to be determined   to ☐ victim(s)*    ☐ Restitution Fund

(*List victim name(s) if known and amount breakdown in item 11, below.)

c. Fine(s):

Case A: $_____ per PC 1202.5 $_____ per VC 23550 or _____ days ☐ county jail ☐ prison in lieu of fine ☐ CC ☐ CS
Case B: $_____ per PC 1202.5 $_____ per VC 23550 or _____ days ☐ county jail ☐ prison in lieu of fine ☐ CC ☐ CS
Case C: $_____ per PC 1202.5 $_____ per VC 23550 or _____ days ☐ county jail ☐ prison in lieu of fine ☐ CC ☐ CS
Case D: $_____ per PC 1202.5 $_____ per VC 23550 or _____ days ☐ county jail ☐ prison in lieu of fine ☐ CC ☐ CS

d. Lab Fee and Drug Program Fee:

Case A: Lab Fee: $_____ per HS 11372.5(a) for counts _____ . ☐ Drug Program Fee of $150 per HS 11372.7(a).
Case B: Lab Fee: $_____ per HS 11372.5(a) for counts _____ . ☐ Drug Program Fee of $150 per HS 11372.7(a).
Case C: Lab Fee: $_____ per HS 11372.5(a) for counts _____ . ☐ Drug Program Fee of $150 per HS 11372.7(a).
Case D: Lab Fee: $_____ per HS 11372.5(a) for counts _____ . ☐ Drug Program Fee of $150 per HS 11372.7(a).

10. TESTING
a. ☐ AIDS pursuant to PC 1202.1   b. ☐ DNA pursuant to PC 296   c. ☐ other *(specify)*:

11. Other orders *(specify)*:

. EXECUTION OF SENTENCE IMPOSED
a. ☒ at initial sentencing hearing. 3-2-05
b. ☐ at resentencing per decision on appeal.
c. ☐ after revocation of probation.
d. ☐ at resentencing per recall of commitment. (PC 1170(d).)
e. ☐ other *(specify)*:

13. CREDIT FOR TIME SERVED

| CASE | TOTAL CREDITS | ACTUAL | LOCAL CONDUCT | |
|---|---|---|---|---|
| A | 0 | 0 | 0 | ☐ 4019   ☐ 2933.1 |
| B | | | | ☐ 4019   ☐ 2933.1 |
| C | | | | ☐ 4019   ☐ 2933.1 |
| D | | | | ☐ 4019   ☐ 2933.1 |

| Date Sentence Pronounced: | Time Served in State Institution: | | |
|---|---|---|---|
| 3-2-05 | DMH | CDC | CRC |

14. The defendant is remanded to the custody of the sheriff ☐ forthwith   ☐ after 48 hours excluding Saturdays, Sundays, and holidays.
To be delivered to ☐ the reception center designated by the director of the California Department of Corrections.
☒ other *(specify)*: North Kern State Prison, Delano, CA

## CLERK OF THE COURT

I hereby certify the foregoing to be a correct abstract of the judgment made in this action.

| DEPUTY'S SIGNATURE | DATE |
|---|---|
| Regina King   *Regina King* | 6-3-05 |

CR-290 (Rev. January 1, 2003)    ABSTRACT OF JUDGMENT – PRISON COMMITMENT – DETERMINATE    Page 2 of 2

158

15-9

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF MONTEREY | |
|---|---|
| The People of the State of California,<br><br>Plaintiff<br><br>vs.<br><br>Fuller, Darren,<br><br>Defendant | Hon. **Robert F. Moody**<br>Clerk:          **Jamie Adcock**<br>CSR:          Yvette Gallardo-Garmon<br>Recording No. |
| Minutes:    **Preliminary Calendar Call**<br><br>**March 2, 2005** | Case No.    **SS050647A**<br>**Courtroom 4** |

Charges:

**Count 1: Conspiracy: Commit Crime [PC182(a)(1)], Felony on 03-02-02. M/A: Y  Disp: Conviction: Guilty Plea on 03-02-05**

**Count 2: Prior felony conviction [PC1170.12(c)(1)], Felony on 06-15-92. M/A: Y  Disp: Admitted on 03-02-05**

**Count 3: Possession Of Drugs Where Prisoners Are Kept [PC4573.6], Felony on 10-16-03. M/A: Y**

Deputy District Attorney Rick Storms appeared.

Defendant appears and is in custody on this case.

Defendant appeared with Counsel Stan Evans.

Vacate Preliminary Hearing that was set on Friday, March 04, 2005 at 9:00am.

Defendant moves to withdraw plea of not guilty to enter conditional plea.

Motion to Withdraw Plea is granted.

Defendant advised of penalties as follows:

Defendant enters a plea of nolo contendere to count 1.

Allegation number 1 pursuant to PC1170.12(1) as alleged in count 1 is admitted.

Defendant advised that on entering a plea of guilty or Nolo Contendere that he would be giving up the following rights: His privilege against self-incrimination, the right to jury trial to confrontation and cross-examination of the witnesses against him. After questioning the Defendant the court finds that he understood the nature of the charge and the possible range of penalties and other consequences of his plea, including the effect of the admission of any prior convictions. The court finds that the Defendant understood and knowingly, voluntarily and intelligently waived each of the above rights, and that there was a factual basis for the plea.

Defendant orally states that he has read and understands the acknowledgement of waiver or rights form, and the maximum, and minimum penalties form, which he has signed and is incorporated herein.

Defendant waives time for sentencing..

Defendant waives probation referral and requests immediate sentence.

Defendant states there is no legal cause why judgment should not be pronounced.

Probation is denied.

As to count 1:  imposed the lower term of 2 year(s), 0 month(s), 0 day(s).

160

Sentence as to count 1 doubled pursuant to PC1170.12(1).

Defendant committed to department of corrections for the total fixed term of 4 year(s), 0 month(s), 0 day(s).

No Credits.

Pay a state restitution fine of $200 multiplied by the number of years of imprisonment, multiplied by the number of convicted Felony counts. (PC 1202.4(b)(2))

Pay additional restitution fine in same amount assessed pursuant to PC 1202.4(b). This restitution fine shall be suspended unless parole is revoked (PC 1202.45).

This sentence to be serve consecutively to defendant's present confinement.

All sentence elements for this proceeding entered.

All remaining charges, enhancements and/or special allegations are hereby ordered dismissed/stricken pursuant to PC 1385.

Sheriff to deliver Defendant into custody of the Director of California Institution for Men at North Kern State Prison, Delano, CA  .

Dated:    6 · 6 · 05                    _____
                                         Robert F. Moody, Superior Court Judge

SS050647A, March 2, 2005

161

162



# RULES VIOLATION REPORT

STATE OF CALIFORNIA                                                                 DEPARTMENT OF CORRECTIONS

| CDC NUMBER | INMATE'S NAME | | RELEASE/BOARD DATE | INST. | HOUSING NO | LOG NO |
|---|---|---|---|---|---|---|
| H45171 | Fuller, Darren | | | CTF-C | ZW-230U | H-GP-05-04-10 |
| VIOLATED RULE NO(S). | | SPECIFIC ACT | | LOCATION | DATE | TIME |
| 3016 (c) | | Consp. To Intro/Dist Controlled Substances | | Central Facility | 5/26/04 | 12:00 |

CIRCUMSTANCES

On May 26, 2004, at approximately 1200 hours, the Investigative Services Unit (ISU) concluded an investigation into a conspiracy to introduce and distribution of controlled substances into the institution by Inmate Fuller, H-45171, ZW-230U, Monette, E-48953, GW-237U, Inmate Hemphill, C-63328, GW-237L, a CTF-Soledad Medical Department staff member and several civilians, when it was notified that an investigation had been completed by the California Department of Corrections, Office of Internal Affairs.

Previously in the investigation, the Investigative Services Unit received a report from the California Department of Justice, Forensic Services Laboratory in Watsonville, California, indicating a combined positive test for 437.44 grams of marijuana. It should be noted that the Laboratory did not analyze or weigh two bindles that had a combined presumptive weight of 203 grams.

On May 22, 2002, at approximately 0845 hours, Materials and Stores Supervisor I (M&SS I) R. Angeles observed a partially opened white box addressed to CTF-Soledad Medical Department personnel. M&SS I Angeles

| REPORTING EMPLOYEE | | DATE | ASSIGNMENT | RDO'S |
|---|---|---|---|---|
| D. J. Doglietto, Correctional Officer | | 5/26/04 | Post # 1505 | S/S/H |
| REVIEWING SUPERVISOR'S SIGNATURE | | DATE | DATE | LOC: |
| D. Mansfield, Correctional Sergeant | | 5/26/04 | 10-16-03 | |

| CLASSIFIED | OFFENSE DIVISION | CLASSIFIED BY: (Typed Name and Signature) | HEARING REFERRED TO |
|---|---|---|---|
| [ ] | | Lt. D. King, Jr. | |
| [x] SERIOUS | | | [ ]  [x] SHO [ ] SC [ ] FC |

## COPIES GIVEN INMATE BEFORE HEARING

| | BY: (STAFF'S SIGNATURE) | DATE | TIME | TITLE OF SUPPLEMENT | | | |
|---|---|---|---|---|---|---|---|
| [ ] CDC 115 | | 6/2/04 | 1215 | Phone Record ... from I.S.U. | | | |
| [ ] INCIDENT REPORT LOG NUMBER | BY: (STAFF'S SIGNATURE) | DATE | TIME | BY: (STAFF'S SIGNATURE) | | DATE | TIME |
| N/A | | 6/8/04 | 300 | | | 7.04 | 14:0 |

HEARING

Documentation given to Inmate before Hearing:
1. Ref. To DA Office          2. Criminal Complaint          3. Photos of Evidence/Cash
4. Copy of Miranda Rights     5. Presumptive Drug Test       6. DOJ Laboratory Results
7. U.A. Results               8. Copy of investigation

BY: (Staff Signature) _____  Date: 6/4/04  Time: 300

Darren Fuller

Inmate FULLER appeared before this Senior Hearing Officer on 07/09/04 at approximately 1445 hours. FULLER is not a patient/participant the Mental Health Services Delivery System (MHSDS) and he did not exhibit any bizarre, unusual or uncharacteristic behavior at the time the infraction or the hearing. On 06/08/04, Inmate FULLER requested to postpone adjudication of this CDC-115 until the decision garding felony prosecution was settled. On 07/06/04, FULLER signed his intent not to postpone the hearing any long. (See CDC-115A.)

HEARING Continued on CDC-115-C)

PLEA: (See PLEA Continued on CDC-115-C)

FINDINGS: FULLER is found GUILTY of the specific charge of CONSPIRACY TO INTRODUCE/DISTRIBUTE A CONTROLLED SUBSTANCE INTO THE INSTITUTION.     (FINDINGS Continued on CDC-115-C)

DISPOSITION is located on Page 8 of CDC-115-C.

REFERRED TO [ ] CLASSIFICATION [ ] BPT/NAEA

| ACTION BY: (TYPED NAME) | SIGNATURE | DATE | TIME |
|---|---|---|---|
| C. B. Tucker, Correctional Lieutenant | | 07/09/04 | 1445 |
| REVIEWED BY: (SIGNATURE) | DATE | CHIEF DISCIPLINARY OFFICER'S SIGNATURE | DATE |
| J. Clancy, Unit-II Facility Captain | | W. Hill, Associate Warden | 7.21.0 |
| [ ] COPY OF CDC 115 GIVEN TO INMATE AFTER HEARING | | BY: (STAFF'S SIGNATURE) | DATE | TIME |

C 115 (7/88)

163



| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| H45171 | FULLER | II-GP-05-04-10 | CTF-CENTRAL | 07/09/04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER _____ |
|---|---|---|---|---|---|

**PLEA:** Inmate FULLER initially plead **"NOT GUILTY."** After this SHO reviewed the evidence with Inmate FULLER, FULLER announced that he wished to change his Plea to **"GUILTY."**

**HEARING (Continued)**

Inmate FULLER is not basic non-English speaking or illiterate and does have a T.A.B.E. reading score above 4.0. In addition, this SHO had FULLER read aloud from the RVR and explain his understanding of the Disciplinary Process in order to assure that FULLER understood this process. Therefore, pursuant to the Armstrong/Clark remedial plans criteria, and Inmate FULLER's waiver (see CDC-115A), a Staff Assistant **was not** assigned. Pursuant to CCR 3315(d)(1) and Inmate FULLER's waiver (see CDC-115A), an Investigative Employee **was not** assigned. FULLER **did not** request the presence of the reporting nor any staff witnesses. The purpose for the hearing was explained. FULLER acknowledged receiving copies of all relevant documents more than 24 hours prior to the hearing *except* the phone records. This SHO provided FULLER with a copy of the phone records at the time of the hearing and FULLER acknowledged his waiver of the right to 24 hour prior discovery with regard to the phone record documents. (See FULLER's written acknowledgement on CDC-115.) FULLER was advised he will receive a completed copy of the CDC-115 RVR upon final audit by the Chief Disciplinary Officer. FULLER was informed of credit forfeiture restoration criteria and of his right to and procedure for appealing this action. FULLER stated his health **is good**, he **is ready** to proceed, and he **is not** in the MHSDS. I have read the charges to FULLER.

**FINDINGS (Continued)**

The SHO posed the following questions to Inmate FULLER at the RVR hearing:

SHO: Was Inmate Hemphill (C63328) involved in this conspiracy to introduce/distribute controlled substances into the institution with you?

FULLER: No.

SHO: Was Inmate Monette (E-48953) involved in this conspiracy to introduce/distribute controlled substances into the institution with you?

FULLER: No.

SHO: The Medical Records employee named in the criminal complaint, what is her involvement with you?

FULLER: I don't know who she is. When I saw the criminal complaint, with all these people's names on it that weren't involved, I don't know where Doglietto got this information from. I don't know Inmate Monette. I know Hemphill.

SHO: If these individuals, the employee, Hemphill and Monette are not involved with you, then why are they named as co-conspirators?

FULLER: I have no idea where Doglietto got his theory from. He needs to be accountable for implicating people not involved.

SHO: From the complexity and planning of the shipments of marijuana, to me is overwhelming evidence of staff's involvement.

FULLER: Not that staff member.

SHO: So, are you saying that the actual staff member involved has not been identified?

FULLER: [Smiling. No response.]

(The SHO took the smile as an implied affirmative response to this question.)

| | SIGNATURE OF WRITER<br>C. B. Tucker, Correctional Lieutenant | | DATE SIGNED<br>07/09/04 |
|---|---|---|---|
| [..] COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature)<br>*(signature)* | DATE SIGNED<br>*7. .:..:* | TIME SIGNED<br>*/ _ ?e* |

J. Clancy, Facility Capt. _____ Date _____   W. Hill, Associate Warden _____ Date _____
C 115-C (5/95)

*164*



| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| H45171 | FULLER | II-GP-05-04-10 | CTF-CENTRAL | 07/09/04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER |
|---|---|---|---|---|---|

SHO: Who is the staff member involved if it is not the Medical Records staff member?

FULLER: I'm not going to say anything about that.

SHO: To be very clear on establishing involvement of Inmates Hemphill (C63328) and Monette (E48953), is it your statement that they had nothing to do with this specific conspiracy?

FULLER: They have nothing to do with me, and this whole incident. I don't know why they were implicated. They had no involvement.

SHO: Who is Moe?

FULLER: A childhood close friend.

SHO: Is he related to Hemphill?

FULLER: No, I don't know Hemphill's people on the streets. [Inmate FULLER then showed the SHO the tattoo on the back of his left bicep, which reads "MOE."]

FULLER: This Moe is my people, my good friend.

The SHO had no further questions for Inmate FULLER.

Conspiracy requires more than one person. There must also be evidence of an agreement to commit a criminal offense. When an inmate is aware of and agrees to the plans, and actively promotes or assists these plans, the inmate is a member of the conspiracy. In order to establish an inmate's guilt in a conspiracy, the inmate or any other member of the conspiracy must make some type of overt act in furtherance of the conspiracy. Again, becoming a member of the conspiracy requires agreeing to promote the conspiracy. Agreement can be shown by circumstantial evidence. Specifically, by taking some action to promote the goal of the conspiracy. Promoting the common design or purpose of the conspiracy can show agreement. It can also be shown by the relationship of the conspirators or their common interests. Simple association is not enough. Conspiracy requires evidence of an overt act. An overt act occurs when the conspiracy moves from the planning stage to acting. If roles are assigned to each member of the conspiracy and they carry out these roles, this is an overt act. They are no longer talking, and have put the plan into action. Penal Code § 184 defines Overt Act as follows:

No agreement amounts to a conspiracy unless some act, beside such agreement, be done within this state to effect the object thereof, by one or more of the parties to such agreement and the trial of cases of conspiracy may be had in any county in which any such act can be done.

A conspiracy to distribute controlled substances within the institutional usually consists of two or more individuals who form a criminal conspiracy to acquire and sell controlled substances to other inmates. This is where the goal of the conspirators includes acquiring a controlled substance for sale to other inmates (even if personal use is also intended). Additionally, if the quantity is greater than a reasonable amount for personal use, or the controlled substance is packaged for re-sale, it is reasonable to assume that this was a conspiracy to acquire and sale to others. There is clear and convincing evidence which proves Inmate FULLER's guilt of the specific act of "Conspiracy to Introduce and Distribute a Controlled Substance Into the Institution" through the mail in violation of Title 15, CCR, section 3016(c), a Division "A-2" offense. These findings are based on the following:

| | SIGNATURE OF WRITER<br>C. B. Tucker, Correctional Lieutenant | | DATE SIGNED<br>07/09/04 |
|---|---|---|---|
| [✗] COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED<br>7-22-4 | TIME SIGNED<br>/230 |

J. Clancy, Facility Capt. _____ Date _____ W. Hill, Associate Warden _____ Date 7-21-04

: 115-C (5/95)                                                                 95 30415

165



| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| H45171 | FULLER | II-GP-05-04-10 | CTF-CENTRAL | 07/09/04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER _____ |
|---|---|---|---|---|---|

1. On 5-22-02, at approximately 0845 hours, M & SS1 I. Randy Angeles discovered a white box addressed to the Medical Department, which was slightly opened and appeared to contain a green leafy substance.

2. On 5-22-02, at approximately 0840, I.S.U. Staff Member D. G. Doglietto responded to the CTF warehouse, opened the box and discovered three large bindles containing suspected marijuana. Presumptive test revealed the presence of the controlled substance marijuana. (It should be noted that the advisement of the discovery to Doglietto was at a time later than that reflected in his report. It should also be noted that the initial location reported to Doglietto, to which he responded, was the CTF Warehouse, not the Mailroom. The second package was discovered in the Mailroom.)

3. On 5/22/02, at approximately 1045 hours, I.S.U. Officer M. Williams discovered a package in the CTF Mailroom addressed to employee Javier Martinez (M & SS1). The package was then opened, which revealed two packages of a green leafy matter, secreted inside. A presumptive test revealed the presence of the controlled substance marijuana.

4. I.S.U. Officer D. G. Doglietto noted that the approximate 667 grams of marijuana seized had an estimated prison value of $26,000 (twenty-six thousand dollars). The seized marijuana was processed into evidence.

       Item DGD #1 — one evidence bag containing 115 grams suspected marijuana

       Item DGD #2 — one evidence bag containing 108 grams suspected marijuana

       Item DGD #3 — one evidence bag containing  95 grams suspected marijuana

       Item DGD #4 — one white box with paper contents and cellophane wrappers

5. On 5/24/02, I.S.U. Officer D. G. Doglietto submitted the suspected marijuana to the Department of Justice (DOJ) Bureau of Forensic Services for analysis: BFS Cases Number FM-02-001-801-0001, confirmed the suspected controlled substances as marijuana.

6. The labels on both boxes had the return address as "ETR Associates, P.O. Box 1830, Santa Cruz, CA 95902. The labels on both boxes were addressed to the "RECNG. WHSE, CORR. TRNG FAC., Highway 101 North, Soledad, CA 93960-0686, ATTN: Javier Martinez, M&SS1, Extension. 4103. The parcels bore a United States Postal Service metered postage label indicating that they were sent from Lynwood, California. This is inconsistent with the Santa Cruz address listed on the parcel.

7. Both boxes contained stacks of photo copied medical literature in the Spanish language regarding HIV infection. In the center of the stacks, was a cut out section which concealed the bindles of marijuana.

8. I.S.U. Officer Doglietto checked with the Receiving Warehouse Shipping & Purchase Manifest, which indicated that parcels containing HIV literature had last been received from ETR Associates on December 18, 2001. These parcels had been delivered by United Parcel Service. These handouts were given to inmates at CTF. Each package contained 750 single sheets for a total of 1,500 sheets.

9. I.S.U. Officer Doglietto noted in the incident package # CTF-CEN-02-05-080, that Javier Martinez is an employee at CTF in the Medical Department. One of his responsibilities is receiving and inventorying every package arriving at the institution for the Medical Department. (U.P.S. packages at the Warehouse.)

10. On 10/16/03, at approximately 0745 hours, I.S.U. Officer Doglietto, assisted by I.S.U. Officer R. Acevedo, conducted a cell search of cell ZW-230, which housed Inmate FULLER, H45171, and Inmate WEST, D80919. The search revealed a pair of size 7 Skechers brand hiking shoes with a bag containing a green leafy matter in the inner soles. A presumptive test was conducted on the green leafy matter using the Duquenoi's-Levine technique. This test produced a positive result for suspected marijuana. The green leafy substance produced a combined net weight of 46.5 grams, without packaging. This substance was then placed into evidence, along with the Size 7 Skechers brand shoes with the inner soles.

| | SIGNATURE OF WRITER<br>C. B. Tucker, Correctional Lieutenant | | DATE SIGNED<br>07/09/04 | |
|---|---|---|---|---|
| ☒ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature)<br>_signature_ | DATE SIGNED<br>_7-09-04_ | TIME SIGNED<br>_1330_ | |

_. Clancy, Facility Capt. _____ Date _____    W. Hill, Associate Warden _____ Date 7-21-__

115-C (5/95)

166



STATE OF CALIFORNIA            DEPARTMENT OF CORRECTIONS
Case 3:08-cv-02880-PJH   Document 1-4    Filed 06/09/2008    Page 176 of 200
RULES VIOLATION REPORT – PART C       PAGE 4 OF 8

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| H45171 | FULLER | II-GP-05-04-10 | CTF-CENTRAL | 07/09/04 |

☐ SUPPLEMENTAL   ☒ CONTINUATION OF:   ☐ 115 CIRCUMSTANCES   ☒ HEARING   ☐ IE REPORT   ☐ OTHER

11. On 10/16/03, Inmate FULLER was located on the yard and escorted to the Holding Cell #3. During a clothed body search conducted by Officer J. Cisneros, Inmate FULLER reached into his right front pocket and pulled out a small bindle containing a green leafy matter, then smashed it against the mesh, spilling the green leafy matter on the floor. This substance tested positive for 1.52 grams of marijuana.

12. On 4/26/02, Inmate FULLER, H-45171 (A.K.A. "Boo"), placed a telephone call to his mother, wherein he asked his mother if a phone number from Debbie was passed to Trina. Inmate FULLER's mother acknowledged having given it to Trina (co-conspirator).

13. On 4/26/02, Inmate FULLER told his mother to give Trina a message saying, "She should have got my mail by now," and "I had sent her some more paperwork. Tell her I said OK, go take that paperwork and she ain't got to wait for Moe.... Just tell her to go ahead and get the thing together for me and send me what she already got at the house. I ain't going to wait on Moe." Fuller added, "Yea, she was waiting for my partner to come through there and drop me some goods off for my package." Inmate FULLER's mother asked "Who do you want me to tell this to?" Fuller replied, "Trina" (referring to his co-conspirator), and he repeated the instruction to his mother and added, "We will wait for Moe later on in the game, because I don't know how long he going to take.... Just tell her to go ahead and shoot what she's got.... Wait for Moe's stuff later."

14. On 4/30/02, at 10:28:45 hours, Inmate FULLER placed a call to Trina, and asked if she talked to James and if his mother had called her. The female recipient of the call replied in the affirmative to both of Inmate FULLER's questions.

15. On 4/30/02, at 10:28:45, Inmate Fuller talked to Trina about stuff she already has and told her to "shoot that to me and we will get the shit when it gets there." The female recipient, Trina, informs Inmate FULLER of a price, saying "That thing is $250.00." Inmate FULLER indicates, "$250.00. That's too fucking much. I'm cool with that. We will shop around, you know what I'm saying." FULLER asked the female recipient (Trina) if she "Got that mail?" The female informed Inmate FULLER that the "machine was down, so I won't be able to...." FULLER interrupted by saying, "Alright. Hey, well, if not...." The female recipient (Trina) makes reference to it costing "seven cents." Inmate FULLER asked what the total would be. The female informs FULLER the total would be "105." FULLER then tells Trina to have his mother perform the task. Trina tells Inmate FULLER that his mother would have to pay the same. Inmate FULLER states, "I thought she had action at a free one, too?" FULLER than instructed the female recipient to wait until the machine she was going to use gets fixed. Trina informs Inmate FULLER that if she brings her own paper, "it's two cents cheaper." Then FULLER replies, "As a matter of fact, shit by then we can do both of them." Inmate FULLER then instructs Trina to give "Moe" $100.00 and if she gets done before Saturday, for her to let Mama know, so he can know when to be expecting "it."

It is noted that the two packages of marijuana seized on 5/22/02 contained 660 (six hundred, sixty) grams of marijuana in total. The marijuana was concealed in cut out sections of photo copied HIV medical literature, which are handouts given to inmates at CTF. Each package contained 750 single sheets for a total of 1500 sheets. (1500 @ .07 each = $105.00.)

16. On 5/28/02, at 10:42:45 hours, Inmate FULLER called his mother and asked her to contact Trina to ask her, "Just ask her if she got mail off?

17. On 5/14/02, at 10:33:44 hours, a telephone call was placed by Inmate FULLER to Trina, in which he asked "Is everything green?"" Trina responded, "Today." Inmate FULLER then inquired, "Alright, both of them?" to which Trina replied, "Yea, but it wouldn't all fit." Inmate FULLER replied, "Save it for next time." Further on in the conversation, Inmate FULLER asked "Did Green's nephew call back again?" Trina replied in the negative, adding "He <u>didn't</u> call the <u>last time</u>. I just went through there." Inmate FULLER adds, "Cause he talked to his nephew's wife (Corshia) and she said he was going to call you. That was Saturday or Sunday." FULLER makes a comment regarding Inmate GREEN pushing the envelope. Inmate FULLER then ends the conversations by asking Trina if it would take three days for the package to arrive, to which Trina replied in the affirmative.

| | SIGNATURE OF WRITER<br>C. B. Tucker, Correctional Lieutenant | | DATE SIGNED<br>07/09/04 |
|---|---|---|---|
| ☒ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature)<br>*[signature]* | DATE SIGNED<br>7-27-0 4 | TIME SIGNED<br>/3 5.0 |

J. Clancy, Facility Capt. _____ Date _____    W. Hill, Associate Warden _____ Date 7-2:-0 ·

: 115-C (5/95)                                                95 30415

167



| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| H45171 | FULLER | II-GP-05-04-10 | CTF-CENTRAL | 07/09/04 |

☐ SUPPLEMENTAL  ☒ CONTINUATION OF:  ☐ 115 CIRCUMSTANCES  ☒ HEARING  ☐ IE REPORT  ☐ OTHER _____

18. On 6/18/02, at 10:23:04, Inmate FULLER called Trina. Trina informed Inmate FULLER that she has received a call from an individual identified as "Chief" from an area code '831' telephone number. Trina told Inmate FULLER that she would make arrangements with "Chief" to provide him with an unidentified item. This person was later identified as "Keith," not "Chief." (It should be noted that the person later identified as Keith is from the L.A. County area, where Trina got the money order from.)

19. On 6/25/02, at 18:06:51, Inmate FULLER called Trina. Trina informed Inmate FULLER that "Keith's" girlfriend came to the door, but not Keith. Trina was angry because the girlfriend gave her a money order instead of cash.

20. A copy of ETR Associates address labels was provided to Agent West for comparison to the labels on the two seized parcels. The labels were not the same type of label. The boxes at ETR Associates were also compared to the parcel boxes which were confiscated. None of the boxes at ETR Associates matched the confiscated parcels. Agent West also compared the photographs of the literature which concealed the marijuana with literature ordered by CTF from ETR Associates. The literature received at CTF on 5/22/02 was not the same as the literature shipped by ETR Associates on December 14, 2001. According to the Business Director and the Distribution Supervisor of ETR Associates, the photocopied literature received by CTF on May 22, 2002, didn't come from ETR Associates.

21. On 10/16/03, Trina was interviewed at her placed of employment by Special Agent Gary West and Special Agent Robert Bryan regarding allegations of narcotics trafficking and undue-familiarization against staff at CTF-Soledad. Trina is a non CDC employee and is an associate of Inmate FULLER, H-45171. Trina reported that her residence from October 1998 to May 7, 2003, is in Lynwood, California. She acknowledged her telephone number as the number Inmate FULLER repeatedly called. Trina reviewed photographs of the package and its contents seized on 5/22/02 and gave the following account of her involvement with these packages. Trina stated that she received the packages from a person who goes by the name "Hoss." She said "Hoss" let her take it to the post office. Trina stated that during one visit with Inmate FULLER, he told her that she would be mailed a yellow manila envelope containing medical pictures. When the envelope arrived, it instructed her to make copies of the "medical pictures." This letter also instructed her to mail a second letter, which she found in the envelope to Hoss.

22. On 10/23/03, Special Agent Gary West contacted an unidentified inmate regarding money he sent to Trina out of his trust account on 5/22/02 ($2,500.00) and May 30, 2002 ($1,000.00). The unidentified inmate admitted sending money to Trina out of his trust account which was intended for protection. The unidentified inmate denied that this was drug money.

23. RVR #II-GP-05-04-10, where Reporting Employee I.S.U. Officer D. G. Doglietto establishes the conspiracy between Inmate FULLER, Trina and "Hoss" by stating from Trina's interview statement on 10/10/03 that an associate of Inmate FULLER assembled the parcels and secreted the marijuana inside. "Hoss" then returned the parcels to Trina, which she mailed at the Lynnwood Post Office. Trina also admitted receiving money orders in the mail, and that Inmate FULLER had told her that the money was from people who owed him money. Trina also provided Agent West with a letter that was smuggled out of CTF, authored by Inmate FULLER on May 30, 2002, exactly eight days after the two parcels containing marijuana were seized. In the letter, Inmate FULLER wrote, "But on the other hand, that mail you send, I got half of it. The other half got gaffled. So when that happened, we just chalked it up as a lost. That's why the mail that's going to grandma's house is running a little slow. But don't worry. I'm going to get you some chips there. By the time you get this, it should be $2,500.00 at grandma's." FULLER added, "Remember the keyboard thing and we have something else. I'll explain it to you when I see you, but try to find a place that sales can sealing machines."

| | SIGNATURE OF WRITER | DATE SIGNED |
|---|---|---|
| | C. B. Tucker, Correctional Lieutenant | 07/09/04 |

| | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
|---|---|---|---|
| ☒ COPY OF CDC 115-C GIVEN TO INMATE | | | /3 3 |

J. Clancy, Facility Capt. _____ Date _____  W. Hill, Associate Warden _____ Date 7·2?··4



| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| H45171 | FULLER | II-GP-05-04-10 | CTF-CENTRAL | 07/09/04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER |
|---|---|---|---|---|---|

24. During the interview of Trina on 10/16/03, by Special Agents West and Bryan, regarding allegations of narcotics trafficking, Trina was asked if she received $3,500.00 from a specific inmate, not named as a participant in the conspiracy (identified by I.S.U. staff). Trina replied "Yes," saying her brother (referring to Inmate FULLER, Godbrother) told her to cash the check and give it to him later on. She claimed to have given Inmate FULLER the money. Inmate FULLER told her he had a partner whom he didn't identify, saying his "partner" had a staff contact by the name of "Alice." Alice was only identified as being an "ugly nurse." It should be noted that CTF Soledad Correspondent Data Sheet dated 10/23/03 notes that the unidentified inmate authorized a $2,500.00 house note on 5/22/02 and a $1,000.00 house note on 5/30/02. Both house notes were sent to Trina.

25. On 10/24/03, Special Agent West received two letters from Trina. One letter contained the envelope bearing "Keith" and a cellular phone number of a CTF Staff Member. The envelope had no postmark and no address, just the name of the intended female recipient. From "Boo Mason (Inmate FULLER, H45171, A.K.A. "Boo") and a return address. The second letter talked about a "keyboard thing," and asked her to "find a place that sells can-sealing machines." In addition to the statement by Inmate FULLER which says "But on the other hand, the mail you sent, I got half of it. The other half got gaffled."

26. The search of Inmate FULLER's cell (Z-230) resulted in the seizure of an address book. The address book contained the name and address of a "Deon Hoss Billingslea."

27. A parolee records check revealed a Deon Billingslea, CDC #J94186, and the confirmation that he has been incarcerated at CTF.

28. On 11/25/03, an interview of Deon Billingslea, A.K.A. "Hoss," was conducted in the Los Angeles County Jail by Special Agent West and Special Agent Bryan. During the interview, Billingslea (A.K.A. "Hoss") admits that over a year ago he had acknowledged a similar plan to smuggle marijuana into CTF and discussed the plan with Darren FULLER. (At the time of the interview, Billingslea was incarcerated for an unrelated parole violation.)

It is clear through the numerous forms of direct evidence contained not only in the RVR (#GP-05-04-10) and Incident Report (CTF-CEN-02-05-0080), which establish the preponderance of evidence essential in the finding of guilt. The monitored phone records of Inmate FULLER regarding conversations he had with the non-CDC employee Trina, which revealed the planning and delegating of the roles and duties of the conspirators implementing this plan into action. It is also evident in the interview of Trina, contained in the Incident Report, where she is interviewed by Special Agent West on 10/16/03 regarding this conspiracy. There is clear implication of an ex-inmate, A.K.A. "Hoss," as well as the need to consider the inmate only identified by I.S.U., who provided the monetary support for this specific act of "Conspiracy to Introduce/Distribute Controlled Substance in the Institution," through the mail.

The evidence far exceeds the Department's requirement of preponderance of evidence in a guilty finding. Inmate FULLER is guilty beyond a reasonable doubt.

This evidence has definitely established the planning, headed by Inmate FULLER and with the assistance of the co-conspirators, as well as the execution of the act itself. The evidence identified Trina, the non-CDC employee as purchasing and making the copies of the medical literature which was contained in both parcels in order to conceal the marijuana. The printed mailing labels and the information contained on both labels were done in an order to present legitimacy to the parcels as being sent from ETR Associates. The planning was so meticulous in the preparation of these parcels, it went as far as filling both parcels with known literature normally purchased and received through this particular vendor, for dissemination to the general inmate population at CTF.

| | SIGNATURE OF WRITER<br>C. B. Tucker, Correctional Lieutenant | | DATE SIGNED<br>07/09/04 | |
|---|---|---|---|---|
| ☐ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED | |

J. Clancy, Facility Capt. _____ Date _____    W. Hill, Associate Warden _____ Date _____

C 115-C (5/95)                                   95 30415

169



| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| H45171 | FULLER | II-GP-05-04-10 | CTF-CENTRAL | 07/09/04 |

| ☐ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER _____ |
|---|---|---|---|---|---|

The non-CDC employee Trina also identified an ex-inmate, who was later validated as having been incarcerated at CTF, A.K.A. "Hoss," as preparing the boxes for the packing of the marijuana, as well as the purchase of the marijuana, and the labels contained on both parcels. Trina also admitted to paying for and mailing out both parcels from Lynnwood, California, which was the postmark on both parcels.

We must not ignore the involvement of the unidentified inmate (known to I.S.U.) who provided $3,500.00 to the non-CDC-employee, Trina, which could only be utilized for the purchase of narcotics. This SHO truly believes that his role is just as guilty as the others involved in this conspiracy. The provision of monetary funds alone, withdrawn using a fabricated debt, then forwarded to an individual on the streets who is actively involved in a conspiracy for distribution and introduction of narcotics into an institution, is extremely suspect.

The phone records revealed numerous conversations between Inmate FULLER and his mother. Inmate FULLER's mother was also inclusive in this investigation. Inmate FULLER's mother did on several occasions pass information/messages to Trina for Inmate Fuller. However, it is not clear or likely that she was aware of her son's criminal activity in its entirety. These phone records proved to be valuable in the conversations between Inmate FULLER and Trina. Their numerous recorded contacts revealed the conversations regarding the cost of the photo copies, the somewhat coded conversation about the expected mailing of the parcels, the paperwork sent out by Inmate FULLER (medical literature), the inquiring about the marijuana and the amount of parcels being sent. The totality of evidence reveals the planning, preparation and roles of the individuals directly involved in this conspiracy. There is substantial evidence of an overt act committed by Inmate FULLER, non-CDC employee Trina, ex-inmate A.K.A. "Hoss," and in this SHO's opinion the inmate providing the monetary funds known to I.S.U., totaling $3,500.00.

The RVR speaks to the involvement of Inmate Hemphill (C63328) and Inmate Monette (E48953). It is evident that this conspiracy has other players who have not been appropriately identified yet, however, I have great difficulty in directly establishing a nexus between Inmate FULLER with Inmate Hemphill and Inmate Monette.

The nexus between Inmate FULLER and Inmate Hemphill, on it's face, when reviewing phone records seems apparent. That is until clarification could be provided regarding the individual mentioned as "Moe" in monitored phone conversations made by Inmate FULLER and the monitored phone conversations by Inmate Hemphill. Although Inmate Hemphill calls his brother "Moe," this is not the same individual as mentioned in Inmate FULLER's monitored conversations. During the RVR hearing, Inmate FULLER stated he did not personally know Inmate Hemphill's people. Then, when asked about the individual "Moe" in the monitored phone conversations, Inmate FULLER stated Moe is a close childhood friend, then revealed a tattoo on the back of his upper left bicep which read, "MOE." During these monitored conversations by Inmate FULLER, Inmate Hemphill's name and the reference to whether contact was made to James. Confirmation by co-conspirator Trina replied "negative.". In addition, the reference to $250.00 seems more likely for the purchase of a canning machine, an item other than narcotics. I could not establish a clear and concrete nexus involving Inmate Hemphill and Inmate Monette in this particular conspiracy. Inmate Hemphill and Monette are guilty of specific acts not directly related to this case, which has not yet been full disclosed besides the cell phone possession. Inmate Hemphill's habitual drug usage immediately makes him suspect, as well as his frugal attempt to possibly obtain marijuana for his birthday, through family, giving money to Trina, that never happened nor was there a real effort made by Hemphill's people to do so, by not connecting with Trina, even though Trina made an effort to do so. (According to Inmate FULLER, Trina has no involvement with this conspiracy, which he verbalized numerous times during the RVR hearing.)

| | SIGNATURE OF WRITER | | DATE SIGNED |
|---|---|---|---|
| | C. B. Tucker, Correctional Lieutenant | | 07/09/04 |
| ☒ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |

J. Clancy, Facility Capt. _____ Date _____   W. Hill, Associate Warden _____ Date _____

: 115-C (5/95)

95 30415



STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS
RULES VIOLATION REPORT - PART C
PAGE 8 OF 8

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| H45171 | FULLER | II-GP-05-04-10 | CTF-CENTRAL | 07/09/04 |

☐ SUPPLEMENTAL  ☒ CONTINUATION OF:  ☐ 115 CIRCUMSTANCES  ☒ HEARING  ☐ IE REPORT  ☐ OTHER

In closing, it is truly disturbing to realize that there is additional staff involvement beyond what is realized as of this date. Currently, one staff member has been named for their alleged involvement with adverse ramifications, when it is all too clear that there are other medical staff involved in this conspiracy, whom at this point are not recognized or identified. One has to wonder how the knowledge was obtained and acquired to utilize the HIV medical literature, with the current distributor of these flyers, the correct return address and the mailing address, and to a specific employee who picks up parcels at the warehouse and their exact extension number.

It is disturbingly apparent that there was a lot of thought, planning and preparation put into the disguise of the marijuana shipment. The idea of its packaging and concealment by the HIV medical literature concludes me to believe the involvement of staff's knowledge and familiarization regarding these types of bulk packaging and medical shipments sent to the institution, and by what vendor, as not to draw suspicion to the parcels. The reason for discovery was only due to the diligence of Warehouse staff in observing the contents as being suspect when the contents were revealed by the tear in the box. If not for the damage on the box, this discovery would not have been made. During the RVR hearing, Inmate FULLER denied the involvement of the employee who was adversely removed. Inmate FULLER states he does not know who she is. When the SHO asked Inmate FULLER if the employees involved were still employed, he would not verbally confirm, but his smile implied an affirmative response as to the other participant or participants not being identified. Inmate FULLER expressed sympathy for this employee for being identified as a party to his conspiracy, when he adamantly states that they are not. During the course of the RVR hearing, Inmate FULLER was asked several times to reveal the identity of the staff involved, but he declined to do so. Inmate FULLER also stated that both Inmates Monette and Hemphill had nothing to do with what he had going on.

**DISPOSITION (Continued)**

FULLER is assessed 180 days credit forfeiture; which is consistent with a Division A-2 Offense, pursuant to CCR Title 15 § 3323(c)(8). One (1) year no visits, effective 7/9/04 through 7/8/05; Two (2) years non-contact visits, effective 7/9/05 through 10/15/06; One (1) year random drug testing, once a month, 7/9/04 through 7/8/05. (Inmate FULLER is credited 267 days non-contact visiting for time spent in administrative segregation on non-contact visiting status (10/16/03 to 07/09/04) Counseled, warned and reprimanded regarding possession of controlled substances. Refer to Narcotics Anonymous.

**REFER to ICC** for two (2) years placement on Close B Custody pursuant to CCR§ 3377.2(c)(6)(C).

**REFER to BPT** for evaluation of in-custody misconduct..

| | SIGNATURE OF WRITER C. B. Tucker, Correctional Lieutenant | DATE SIGNED 07/09/04 |
|---|---|---|
| ☒ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED / TIME SIGNED |

J. Clancy, Facility Capt. _____ Date _____   W. Hill, Associate Warden _____ Date 7-21-04

115-C (5/95)

95 30415

171



# Exhibit "G"



SPOT Home

Ask SPOT

Search SPOT

About SPOT

SHS Home

Search         Go

RSS: XML▶

Alcohol & Other Drugs » Drug Testing and Metabolism »

# Testing and Second Hand Marijuana Smoke

The following information will help you determine your potential exposure to THC, the active and detectable ingredient in marijuana, if you do not smoke but were in close proximity to second hand smoke. Unless the answer to a specific question differs substantively from the information provided below, your question will be linked directly to this page. Spot will only answer your question specifically if there is an element of it that cannot be answered by the information provided on this page.

Irrespective of body size, the degree of second hand exposure is influenced by one or more of the following: size of the room or space you occupy, air circulation and quantity of smoke in the air, duration of time you are exposed and potency of the marijuana.

Exposure to second hand smoke can cause a drug test to be positive. A "contact high" indicates that THC has entered the blood stream where it is then detectable by drug analysis. If you do not feel "high" after exposure this does not mean that you are necessarily THC free.

If the exposure is inconsistent, the guidelines for minimal use apply and you can expect to be "clean" in approximately 10 days, possible fewer. If you have prolonged exposure (e.g. living with a frequent user), THC may be detectable for as long as a month.

Beyond the information above, determining whether you will or won't pass a THC test based on second-hand exposure is literally a guess by anyone weighing in on the subject, including Spot. Unfortunately, your guess is as good as Spot's. This page contains all the information possible for making a determination. Due to volume of questions, all questions about second hand marijuana smoke will all be linked to this page rather than answered specifically. Thanks for your understanding. -- Spot

— October 28, 2004

Contact | Disclaimer | © 2004 SHS

172

# Exhibit "H"

## DECLARATION OF STEVEN C. SANDERS

I, Steven C. Sanders, hereby declare under penalty of perjury as follows:

1.      I am an attorney licensed to practice law in the State of California and a member in good standing with the California State Bar.

2.      If called to testify, I would testify competently to those matters set forth herein.

3.      I am the attorney for petitioner Alex Monette.

4.      I am on the list of Panel Attorneys which provide low cost legal aid at state expense to indigent inmates for the California Board of Parole Hearings (BPH).

5.      I also represent private clients who pay my full fee to represent them before the BPH.

6.      All told, I have been attorney of record at about 500 parole hearings.

7.      That in my experience the BPH will punish any inmate who ends up with an in-prison felony conviction by lengthy (and most of the time repeated) denials of parole.

8.      That the BPH views things in terms of the length of time between a blemish on an inmate's record and the current bid for parole, meaning they will view gains such as staying out of trouble as a slow progression, and a year or two of good behavior after a bad incident rarely, if ever, will be enough to address the board's concerns about that inmate.

9.      That I have reviewed the "board packet" of Alex Monette prepared for his 2006 Parole Hearing.

10.     Board packets are the term used to denote a compilation of the most

1

*177*

relevant information from an inmate's prison central file, and the board packet is the primary document used by the parole board in determining parole suitability.

11.    That having reviewed Mr. Monette's board packet, and aside from the new drug conviction, I am at a loss as to why parole was denied in 2006. The crime was a single stab wound murder (meaning it was at or near the minimum behavior necessary to commit the crime). Mr. Monette has no prior criminal record. The psychological reports have been consistent in their positive view of Mr. Monette, and his in-prison behavior and participation in programming have been exceptional prior to the drug charge. Mr. Monette also has solid parole plans, including many job offers. Mr. Monette, in my opinion and absent the drug charge, should have already been granted parole. He certainly presents in a favorable light next to some clients of mine who have been granted parole.

12.    I understand the approach trial counsel took in the Monterey County drug case in that pleading guilty to the minimum term on the drug charge was the best Mr. Monette could have done with that charge. I also understand that Mr. Monette might have been convicted of the drug charge if he went to trial; and could have been subject to a two strike sentence.

13.    Yet I cannot understand how an attorney would allow a client to plead guilty who claims he is innocent, or doing so without reviewing with him, in detail, exactly how much time he would have to serve as a result of the plea agreement.

14.    The analysis discussed at paragraph 13 would necessarily include a full discussion of how the new prison term would impact the existing prison term being served.

174 

15.    Any attorney with experience in parole board matters could have advised Mr. Monette's trial counsel that pleading guilty to any charge is viewed very harshly by the parole board.

16.    I would anticipate that Mr. Monette will be denied parole in 2010 (four years from 2006), and only at the hearing after the 2010 hearing will he be fairly considered for parole by the board.

17.    I believe my analysis of the situation would be supported by any attorney who regularly represents inmates before the BPH.

18.    Given my beliefs as to the drastic adverse impact of the drug conviction on Mr. Monette, I cannot fathom why an attorney who was well versed in the entire situation his client faced, rather than narrowly focused only on the Monterey County case, would allow the client to plead guilty.

19.    As it is my belief Mr. Monette would not be fairly considered for parole for many years once the conviction was placed upon him, any benefit gained in an ensuing plea bargain was an illusion, for any time saved via the plea agreement is simply lost to the parole board via their long term denials of parole in such cases.

20.    Based on the foregoing I do not believe allowing Mr. Monette to plead guilty was a decision made with all the relevant information. For based on my view of the situation, Mr. Monette was going to spend many extra years in prison pursuant to any conviction in Monterey County due to parole board policy, practice and procedure. Thus any benefit to be obtained via reduced punishment in a plea agreement was illusory and did not warrant waiving the treasured right to contest the charge for a client claiming he was innocent.



175

21.    As to the possession charge, Mr. Monette steadfastly maintains his innocence; his cell mate (inmate Hemphill) admits to smoking marijuana often in the small cell with Mr. Monette present; and admits the drugs found in the cell Monette shared with him were in fact his (Hemphill's).  As such, there was a viable defense to the possession charge.

22.    Based on the views expressed in paragraph 21 and the case of *People v Spann,  187 Cal.App.3d. 400 (1986)*, I see no reason to have entered a no contest plea in this case.  Simply put, any punishment sought to be avoided via entry of the plea was an illusion, and a viable defense did exist to the charge of possession for this client who claimed he was innocent, and had absolutely nothing to gain by admitting his guilt given parole board policies..

I declare the foregoing under penalty of perjury.  This document executed on the 31st day of July, 2006, at West Sacramento, Yolo County, California, by:


/s/ *[signature]*

Steven C. Sanders

176

4

# Exhibit "I"

Exhibit "I"

## DECLARATION OF ALEX MONETTE

I, Alex Monette, hereby declare under penalty of perjury as follows:

1.     I am the petitioner in the cause now before the court.

2.     If called to testify, I would testify competently to those matters set forth herein.

3.     Prior to the Monterey County conviction, I was serving a 15 year to life sentence for second degree murder (*Penal Code 187*) and a one year weapon use enhancement [*Penal Code 12022(d)*], via a conviction from the Los Angeles County Superior Court.

4.     On September 23, 2003, I was placed in administrative segregation at the Correctional Training Facility (CTF) at Soledad.  Other inmates were apparently involved in a marijuana trafficking scheme, where the drugs were allegedly brought in through the prison medical department, as revealed in an in-house prison investigation.

5.     I was forced by prison rules to share a cell with inmate Hemphill, one of the inmates targeted in the drug smuggling investigation.

6.     Search of our jointly occupied cell revealed some marijuana which Hemphill admitted was his own and had nothing to do with me.

7.     As a result of finding marijuana in our cell, correctional officers ordered me to submit to a urine test, which revealed I was positive for marijuana.

8.     I did not smoke any marijuana with inmate Hemphill or anyone else, and I do not smoke, drink or use any drugs.

9.     I was not, in any way, involved in the drug smuggling conspiracy.

10.    I was not, at any time, in possession of marijuana.

1

127 

11.     Prison inmates who go to correctional officers and inform on their cell mates are subject to serious repercussions by other inmates.  I was thereby in a catch-22 situation.  I either continued to live with inmate Hemphill and kept my mouth shut, or I went to the officers, told them what I knew (that Hemphill smoked marijuana in our cell) and risked physical assault or even death.  Clearly, I made the wrong choice and I am responsible for that choice.

12.     I was ultimately absolved of any wrongdoing related to the smuggling of drugs into the prison by the prison disciplinary officer, as even under the low preponderance of the evidence standard, the evidence was insufficient.

13.     I told my trial attorney, repeatedly, that I was not involved in drug smuggling; I never had possession of any marijuana; and that I had not smoked any marijuana with anyone.

14.     My trial attorney told me he was not overly concerned with the conspiracy charge (which was dismissed), but that he thought I may well be convicted of possession.  Trial counsel informed me I faced 8-10 years if convicted and sentenced to the maximum term.  Counsel told me that I should plead guilty whether I was innocent or not.  The only reason offered by him for me to plead guilty was to avoid additional time in prison if I was convicted.

15.     I ultimately pled guilty to possession of drugs in a correctional institution, but entered the plea pursuant to *People v West.*

16.     Trial counsel explained to me that a *People v West* plea meant that I was proclaiming my innocence, but entering a plea because it was in my best interests.  I received a two year prison term for the drug charge, running consecutive to my existing

2



15 year to life prison term.

    17.    I repeatedly asked trial counsel how the plea in the drug case would impact my 15 year to life term, but never received any coherent reply. Indeed, I do not believe my trial attorney had any idea how the plea in the drug case would impact my other prison term.

    18.    Had I ever been informed of how the drug charge would doom any chance for parole into the foreseeable future, I would have never entered into the plea agreement. Indeed, I would have had no reason to. If I would have known I was going to be denied parole for a long period of time because of the conviction, I would have fought the charges to the fullest extent possible as I am not guilty of the crime to which I pled no contest..

    19.    When I appeared before the parole board on March 8, 2006, for my first parole hearing after my drug conviction I was shocked that the board was more concerned about the drug case than the murder, and was in disbelief when I received a four year denial of parole.

    I declare the foregoing under penalty of perjury. This document executed on the 10 ᵗʰ day of August, 2006, at West Sacramento, Yolo County, California, by:

/s/ _____

Alex Monette

3

179

# Exhibit "J"

**Exhibit "J"**

1             SUPERIOR COURT OF CALIFORNIA

2                 COUNTY OF MONTEREY

FILED

OCT 23 2006

LISA M. GALDOS
CLERK OF THE SUPERIOR COURT
R. Hanson    DEPUTY

3

4   In re                   )   Case No.: HC 5459

5        Alex Monette (E-48953)   )   ORDER

6            On Habeas Corpus. )

7

8        Petitioner raises three grounds for relief in the instant petition for writ of habeas corpus:

9   (1) he was improperly convicted for being in possession of narcotics while incarcerated; (2) his

10  attorney rendered ineffective assistance of counsel; and (3) his plea bargain is unenforceable for

11  violations of contract law.

12       On May 26, 2004, prison officials concluded their investigation into an alleged

13  conspiracy involving Petitioner and other inmates to introduce and distribute controlled

14  substances into CTF-Soledad. Petitioner's cell was searched as part of the investigation, and was

15  found to contain 3 bindles of marijuana in a skull cap hanging on a rail near the head area of

16  Petitioner's bunk in open view. The bindles were submitted to the Department of Justice,

17  Bureau of Forensic Services, for analysis and were found to contain in excess of 10.96 grams of

18  marijuana. Petitioner was required to submit a urinalysis, which revealed tested positive for

19  THC (marijuana). He was charged with and found guilty of a CDC-115 serious rule violation,

20  and later entered a plea of nolo contendere in Monterey County Superior Court to one count of

21  being in possession of a controlled substance in prison (Pen. Code sec. 4573.6).

22       Petitioner was afforded a full and complete hearing on the charge of conspiracy to

23  introduce and distribute a controlled substance within the institution. He was ultimately found

24  guilty of the lesser included offense of being in possession of a controlled substance. 15 CCR

25  sec. 3016(a). In so finding, the Senior Hearing Officer (SHO) relied on information provided in

180

1   the rules violation report (RVR), incident reports, phone records, the testimony of Petitioner's

2   witnesses, and Petitioner's statements. The SHO explained in her *35-page* report her belief that

3   it was "necessary to be extremely meticulous with this RVR and the evidence because there are

4   liberty issues which the outcome will affect." 8/17/04 RVR, pg. 5. She then meticulously

5   reviewed statements made during telephone calls, the testimony of each witness, the lab results

6   from the urinalysis and forensics analysis, and all other evidence submitted.

7          To the extent that Petitioner is attempting to challenge the conviction/guilty finding made

8   by the SHO, it does not appear that Petitioner exhausted available administrative remedies

9   through the Director's Level of Review with respect to the findings made by the SHO, and the

10  determination of guilt. While certain exceptions apply to the requirement of exhaustion of

11  administrative remedies (see, e.g., *Green v. City of Oceanside* (1987) 194 Cal.App.3d 212, 222)

12  Petitioner has failed to allege that any exception applies in his case, and indeed, it does not

13  appear that any do apply. Accordingly, his failure to timely file his appeal through the third level

14  of review bars judicial review of this claim for relief. *In re Muszalski* (1975) 52 Cal.App.3d 500,

15  503; *In re Strick* (1983) 148 Cal.App.3d 906, 911; *In re Dexter* (1979) 25 Cal.3d 921, 925.

16         If, on the other hand, Petitioner is attempting to overturn the conviction made at the trial

17  level, Petitioner has failed to demonstrate that claimed errors made by trial counsel require such

18  a result. To establish ineffective assistance of counsel, a petitioner must demonstrate that no

19  reasonably competent attorney would have acted in the same manner as defense counsel, and that

20  he was prejudiced by such conduct. *People v. Haskett* (1990) 52 Cal.3d 210, 248; *People v. Frye*

21  (1988) 18 Cal.4th 894, 979. To establish prejudice, a petitioner must show that it is reasonably

22  probable that a more favorable determination would have resulted in the absence of counsel's

23  failings. *People v. Lucas* (1995) 12 Cal.4th 415, 436; *Strickland v. Washington* (1984) 466 U.S.

24  668.

25

2

181

1        Here, there was overwhelming evidence in the form of investigative reports, positive

2    urinalysis, and the forensic results on the 3 bindles of marijuana that Petitioner was, in fact,

3    guilty of being in possession of marijuana while institutionalized at CTF-Soledad. With the

4    assistance of counsel, Petitioner was able to benefit from receiving the lower term of 2 years on

5    the charge of possession, obtain a dismissal from the prosecutor on the charge of conspiracy

6    (Pen. Code sec. 182(a)(1)), and avoid the charged strike from his sentence (Pen. Code sec.

7    1170.12(c)(1)). The fact that a conviction may ultimately be considered by the Board of Prison

8    Terms upon its consideration of whether Petitioner was suitable for release on parole does not, in

9    and of itself, create the presumption that counsel's representation was constitutionally deficient

10   for permitting his client to enter a plea. Under the facts and evidence presented, Petitioner has

11   failed to demonstrate that his attorney's representation was either incompetent or resulted in

12   prejudice.

13       As a final matter, Petitioner raises various and unique arguments concerning the

14   enforceability of his plea bargain. This was a matter which should have been, but apparently was

15   not, raised on direct appeal. Habeas corpus neither serves as a second appeal nor as a

16   substitution for appeal. Contentions that should have been, but were not, raised on appeal cannot

17   be renewed in a petition for habeas corpus unless the petitioner clearly establishes that he falls

18   within a recognized exception to the rule. *In re Dixon* (1953) 41 Cal.2d 756; *In re Harris* (1993)

19   5 Cal.4th 813; *In re Clark* (1993) 5 Cal.4th 750. Petitioner has failed to make such a showing.

20       For each of the foregoing reasons, the petition is DENIED.

21       IT IS SO ORDERED.
         OCT 2 3 2006

22   Dated:

23

24       Hon. Marla O. Anderson
         Judge of the Superior Court

25

3

182

1

## CERTIFICATE OF MAILING

2

### C.C.P. SEC. 1013a

3    I do hereby certify that I am not a party to the within stated cause and that on

4    ___OCT 2 3 2006___ I deposited true and correct copies of the following document:

5    ORDER in sealed envelopes with postage thereon fully prepaid, in the mail at Salinas,

6    California, directed to each of the following named persons at their respective addresses as

7    hereinafter set forth:

8    Steven C. Sanders
9    Sanders & Associates
     3960 Industrial Blvd., Ste. 100
10   W. Sacramento, CA  95691

11   Office of the Attorney General
     455 Golden Gate Ave., Suite 11000
12   San Francisco, CA  94102
     Attn:  Correctional Law Section
13

14   Pam Ham, DDA
     Office of the District Attorney
15   240 Church St., Rm. 101
     Salinas, CA  93901

16
     Dated:  OCT 2 3 2006                    LISA M. GALDOS,
17                                           Clerk of the Court

18

19                                           By: _____
                                                Deputy    K. Hanson
20

21

22

23

24

25

4

# Exhibit "K"

**Exhibit "K"**



IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

FILED

Court of Appeal - Sixth App. Dist.

JAN 4 - 2007

MICHAEL J. YERLY, Clerk

By_____

DEPUTY

In re ALEX MONETTE,

on Habeas Corpus.

H030949
(Monterey County
Super. Ct. No. HC5459)

BY THE COURT:

The petition for writ of habeas corpus is denied.

(Premo, Acting P.J., Elia, J., and Duffy, J., participated in this decision.)

Dated ___JAN 4  2007___     ___PREMO, J.___ Acting P.J.

184

# Exhibit "L"



# CALIFORNIA APPELLATE COURTS
Case Information

| | |
|---|---|
| Supreme Court | **Supreme Court**     Change court |
| Welcome | |
| Search | Court data last updated: 08/22/2007 07:53 AM |
| E-mail | Case Summary **Docket** Briefs |
| Calendar | Disposition Parties and Attorneys Lower Court |
| Help | **Docket (Register of Actions)** |
| Opinions | **MONETTE (ALEX) ON H.C.** |

**MONETTE (ALEX) ON H.C.**
**Case Number S149707**

| Date | Description | Notes |
|---|---|---|
| 01/23/2007 | Petition for writ of habeas corpus filed | Alex Monette, Petitioner by Steven C. Sanders, Counsel |
| 01/25/2007 | Exhibit(s) lodged | 1 volume |
| 06/27/2007 | Petition for writ of habeas corpus denied | |

**Click here** to request automatic e-mail notifications about this case.

/ 85

## UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐)<br>Alex Monette E-48953 | DEFENDANTS<br>Nick Dawson |
|---|---|
| (b) County of Residence of First Listed Plaintiff (Except in U.S. Plaintiff Cases):<br>Kings | County of Residence of First Listed Defendant (In U.S. Plaintiff Cases Only):<br>Kings |
| (c) Attorneys (Firm Name, Address and Telephone Number. If you are representing<br>yourself, provide same.)<br>Steven C. Sanders SBN 171369<br>3960 Industrial Blvd., #100<br>West Sacramento, CA 95691<br><br>Phone: 916-376-8738 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only)

☐ 1 U.S. Government Plaintiff   ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☐ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes   ☐ No           ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 USC 2254 state prisoner habeas corpus action

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☒ 530 General | ☐ 730 Labor/Mgmt. Reporting & |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | Disclosure Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities /Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 891 Agricultural Act | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | **SOCIAL SECURITY** |
| ☐ 892 Economic Stabilization Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 893 Environmental Matters | ☐ 196 Franchise | | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 894 Energy Allocation Act | **REAL PROPERTY** | | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 210 Land Condemnation | | | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 220 Foreclosure | | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| | ☐ 230 Rent Lease & Ejectment | | | | **FEDERAL TAX SUITS** |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 890 Other Statutory Actions | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**VIII(a). IDENTICAL CASES:** Has this action been previously filed and dismissed, remanded or closed? ☐ No   ☐ Yes

If yes, list case number(s):

10/8/07

**FOR OFFICE USE ONLY:**   Case Number: _____

EDCA-JS44 (01/05)                    **CIVIL COVER SHEET**                    Page 1 of 2

**UNITED STATES DISTRICT COURT**
EASTERN DISTRICT OF CALIFORNIA
Office of the Clerk

**Victoria C. Minor**                                      501 "I" Street                           Divisional Office
Clerk of Court                                      Sacramento, CA 95814                 2500 Tulare Street
                                                                                     Fresno, CA 93721

**October 9, 2007**

Case Number:      **2:07–CV–02119–WBS–KJM**

Case Title:      **ALEX MONETTE,**                          vs.  **NICK DAWSON,**

Dear Litigant,

   You are hereby notified that the above case number has been assigned to your action. You are to include the complete case number on all documents sent to the court for filing in this case. Failure to do so results in delayed processing of your documents.

   All matters in this action shall be sent to the following address until further notice:

<div align="center">

Office of the Clerk
United States District Court
Eastern District of California
501 "I" Street , Suite 4–200
Sacramento, CA 95814

</div>

   For timely processing of your pleadings or correspondence, please comply with our Local Rules of Court, in particular:

   **Local Rule 5–133**  The court requires an original plus one copy of each document sent for filing. If you desire to receive a conformed copy for your records, you must send an original and two copies of your document and a pre–addressed postage–paid envelope for us to return your copy to you.

   **Local Rule 5–135**  Once the defendant(s) have served a responsive pleading, you are under an ongoing duty to serve them with copies of all documents you submit to the court. A proof of service shall be attached to the original of any document lodged or filed with the court, showing the date, manner and place of service. A sample proof of service is attached.

   **Local Rule 7–130**  Documents submitted to the court must be legible, on 8–½ " x 11" paper, with writing on one (1) side of the page only. Each separate document must be stapled at the top left corner and pre–punched with two (2) holes centered 2–¾" apart, ½" from the top edge of the page. Each page should be numbered consecutively at the bottom.

   **Local Rule 7–132**  Every document submitted to the court must include your name, address and prisoner identification number in the upper left hand corner of the first page. The caption on the first page must include the title of this court, the title of the action, the case number assigned to this action (including all initials and letters that follow the number), and the title of your document. If you are pursuing more than one action in this court, you must submit a separate original document and the appropriate number of copies for each action in which you want the document filed.

**Local Rule 6–142**  A request for extension of time must state the reason an extension is needed. A request for extension of time should be filed before the deadline in question.

**Local Rules 30–250, 33–250, 34–250 and 36–250**  Discovery requests or responses should not be submitted to the court unless they are relevant and necessary to support or oppose a motion at issue before the court.

**Local Rule 83–182**  Each party appearing in propria persona is under a continuing duty to notify the Clerk and all other parties of any change of address.

**Other Provisions:**

**Request for Case Status**  The court will notify you as soon as any action is taken in your case. Due to the large number of civil actions pending before the court, THE CLERK IS UNABLE TO RESPOND IN WRITING TO INDIVIDUAL INQUIRES REGARDING THE STATUS OF YOUR CASE. As long as you keep the court apprised of your current address, you will receive all court decisions which might affect the status of your case.

**Copy Work**  The Clerk's Office does not provide copies of documents to parties. Copies of documents may be obtained from Attorney's Diversified Service (ADS) by writing to them at: 1424 21st Street, Sacramento, CA 95814, or by phoning 916–441–4396 or 916–441–4466. The court will provide copies of docket sheets at $0.50 per page. **Note: In Forma Pauperis** status does not include the cost of copies.

> Victoria C. Minor
> Clerk of Court
> United States District Court
>
> by: /s/ M. Marciel
> Deputy Clerk

The following is a sample Proof of Service.   Pursuant to Rule 5 of the F.R.Cv.P. and Local Rule 5–135, each document filed after the court orders service in your case shall be served on opposing counsel and a proof of service attached to your document filed with the court.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

(Case Title)
_____
Plaintiff or Petitioner

V.

Case Number: 2:99–CV–99999 ABC DFG
(example case no.)

_____
Defendant or Respondent

**SAMPLE PROOF OF SERVICE**

_____  /

I hereby certify that on    (Date)_____, I served a copy

of the attached    (Title of Document Served and Filed)_____,

by placing a copy in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said

enevelope in the United States Mail at      (Location of Mailing)_____:

**(List Name and Address of Each Defendant or Attorney Served)**

I declare under penalty of perjury that the foregoing is true and correct.

_____
(Name of Person Completing Service)

**NOTICE OF AVAILABILITY OF A MAGISTRATE JUDGE**

**TO EXERCISE JURISDICTION AND APPEAL INSTRUCTIONS**

You are hereby notified in accordance with 28 U.S.C §636(c), F.R.Civ.P.73 and Local Rule 73–305, the United States Magistrate Judges sitting in Sacramento and Fresno are available to exercise the court's case dispositive jurisdiction and to conduct any or all case despositive proceedings in this action, including motions to dismiss, motions for summary judgment, a jury or nonjury trial, and entry of a final judgment.  Exercise of this jurisdiction by a Magistrate Judge is however, permitted only if all parties voluntarily consent.  You may, without adverse substantive consequences, withhold your consent, but this will prevent the court's case dispositive jurisdiction from being exercised by a Magistrate Judge.

Any appeal from a judgment entered by a Magistrate Judge is taken directly to the United States Court of Appeals for the Ninth Circuit or, where appropriate, for the Federal Circuit in the same manner as an appeal from any other judgment of a District Court.

Whether or not the parties consent to pursuant to 28 U.S.C. § 636(c) the assigned Magistrate Judge will hear all motions except those case dispositive motions set forth in 28 U.S.C. § 636(b)(1)(A).

A copy of the Form for "Consent to / Decline of Jurisdiction of United States Magistrate Judge" is attached hereto for pro per use and attorney information.  This form is available in fillable .pdf format on the court's web site at www.caed.uscourts.gov for all attorney ECF filers. This form may be filed through CM/ECF or by pro se litigants at the appropriate Clerk's Office location.

Office of the Clerk

501 I Street, Room 4–200

Sacramento, CA 95814

Office of the Clerk

2500 Tulare Street , Suite 1501

Fresno, CA 93721

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

**ALEX MONETTE,**
   Plaintiff(s)/Petitioner(s),

vs.

CASE NO.  **2:07–CV–02119–WBS–KJM**

**NICK DAWSON,**
   Defendant(s)/Respondents(s).

---

**IMPORTANT**
  **IF YOU CHOOSE TO CONSENT OR DECLINE TO CONSENT TO JURISDICTION OF A UNITED STATES MAGISTRATE JUDGE, CHECK AND SIGN THE APPROPRIATE SECTION OF THIS FORM AND RETURN IT TO THE CLERK'S OFFICE.**

---

☐    **CONSENT TO JURISDICTION OF**
**UNITED STATES MAGISTRATE JUDGE**

   In accordance with the provisions of Title 28, U.S.C Sec. 636(c)(1), the undersigned hereby voluntarily consents to have a United States Magistrate Judge conduct all further proceedings in this case, including trial and entry of final judgment, with direct review by the Ninth Circuit Court of Appeals, in the event an appeal is filed.

   Date: _____      Signature: _____

                                             Print Name: _____
                                               ( ) Plaintiff/Petitioner ( ) Defendant/Respondent
                                             ( ) Counsel for *_____

---

☐    **DECLINE OF JURISDICTION OF**
**UNITED STATES MAGISTRATE JUDGE**

   Pursuant to Title 28, U.S.C. Sec 636(c)(2), the undersigned acknowledges the availability of a United States Magistrate Judge but hereby declines to consent.

   Date: _____      Signature: _____

                                             Print Name: _____
                                               ( ) Plaintiff/Petitioner ( ) Defendant/Respondent
                                             ( ) Counsel for *_____

---

*If representing more than one party, counsel must indicate name of each party responding.*

**UNITED STATES DISTRICT COURT**
**FOR THE**
**EASTERN DISTRICT OF CALIFORNIA**

**OFFICE OF THE CLERK**
**501 "I" Street**
**Sacramento, CA 95814**

Northern District
450 Golden Gate Avenue
16th Floor, #1111
San Francisco, CA 94102

**RE:**        **ALEX MONETTE vs.  NICK DAWSON**
**USDC No.:**    **2:07–CV–02119–WBS–KJM**

Dear Clerk,

Pursuant to the order transferring the above captioned case to your court, dated
October 22, 2007 , transmitted herewith are the following documents.

**Electronic Documents: 1 to 3.**

Documents maintained electronically by the district court are accessible through
PACER for the Eastern District of California at **https://ecf.caed.uscourts.gov**.

Please <u>acknowledge</u> receipt on the extra copy of this letter and return to the Clerk's Office.

Very truly yours,

**October 22, 2007**        /s/  **M. Dillon**
_____

Deputy Clerk

RECEIVED BY:    _____

Please Print Name

DATE RECEIVED:    _____

NEW CASE
NUMBER:    _____